















MNA   8/13/03   11:03

3:03-CV-01614   MINEBEA CO LTD V. CHICONY ELECTRONICS

*1*

*TRANCS.*

**FILED**

AUG 1 2 2003

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JUN 20 2003

MINEBEA CO., LTD.,

        Plaintiff,

   v.

CHICONY ELECTRONICS CO.,
LTD. and CHICONY AMERICA,
INC.,

        Defendants.

NO. C03-0295R

ORDER GRANTING DEFENDANTS'
MOTION TO TRANSFER



CV 03-00295 #00000029

THIS MATTER comes before the court on defendants Chicony
America, Inc. and Chicony Electronics Corp.'s ("Chicony") motion
to transfer this patent infringement action to the United States
District Court for the Southern District of California, where a
related case is now proceeding (referred to herein as the "Cali-
fornia litigation"). In this motion, Chicony argues that this
case should be adjudicated together with the California action,
thereby furthering judicial efficiency and convenience of the
parties and witnesses. Plaintiff Minebea Co. Ltd., ("Minebea")
opposes the transfer, arguing that the California litigation is
not closely related to this action and that no interests would be
served by a transfer. Having reviewed the documents filed in
support and in opposition to this motion, the court finds and
rules as follows:

ORDER
Page - 1 -

I hereby certify that the
annexed instrument is a true
and correct copy of the original
on file in my office.
ATTEST: BRUCE RIFKIN
Clerk, U. S. District Court
Western District of Washington

By _____
           Deputy Clerk

## I. BACKGROUND

Minebea, a Japanese corporation, initiated this patent infringement action against Chicony, a Taiwanese corporation, on February 11, 2003. Rather than filing an Answer, Chicony, on April 4, 2003, moved to transfer this case to the Southern District of California.[1]

The patent at issue, United States Patent No. 4,443,225 ("the '225 patent"), entitled "Keytop Levelling [sic] Mechanism," is directed to a "durable and economical keytop leveling mechanism for assisting the keys of an electronic keyboard to move evenly through their travel when they are depressed and then return to their original position." Chicony is a keyboard manufacturer, whose products, Minebea alleges, infringe the '225 patent.

In May 2001, Minebea initiated litigation against Think Outside, Inc. and Peripheral Technology, Inc. in the Southern District of California. Like the litigation filed in this court, the California litigation asserts only the '225 patent. In

_____

[1]In its original motion, Chicony argued both that this action should be transferred to the Southern District of California pursuant to 28 U.S.C. § 1404(a) and, alternatively, that the case should be dismissed for lack of personal jurisdiction. On May 16, 2003, the court held a telephone conference with the parties, during which counsel for Minebea stated that additional time was needed to conduct discovery regarding the jurisdictional issue. The parties, accordingly, agreed that the court should first consider whether this action should be transferred to the Southern District of California, and, in the meantime, discovery could proceed on the jurisdictional issue. The motion to dismiss was placed on the court's calendar for July 11, 2003.

October 2002, the California court issued claim construction on the patent. At least one of the allegedly infringing devices, the Stowaway XT Keyboard, is the subject of both the California litigation and the instant litigation.

## II. DISCUSSION

### A. Standard for Motions to Transfer Venue

The court has the discretion to transfer this litigation to another district:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court or division where it might have been brought.

28 U.S.C. § 1404(a). When determining whether to grant a motion to transfer venue, courts engage in an individualized, case-specific analysis. Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988). In addition to considering the interests expressed in § 1404(a), the district court weighs several other factors.[2] See, e.g., Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000) (citing the non-exhaustive list of factors in Stewart, 487 U.S. at 29). Those considered below include (1) the existence of a related, earlier-filed case in another district; (2)

_____

[2]Although a plaintiff's choice of forum is generally given substantial weight in deciding whether to transfer a case, see Jones, 211 F.3d at 498, when the forum selected is not the residence of the plaintiff, this factor is accorded less weight. See, e.g., Gemini Capital Group, Inc. v. Yap Fishing Corp., 150 F.3d 1088, 1091 (9th Cir. 1998). Here, inasmuch as Minebea is not a resident of this district, its choice of forum is afforded minimal weight.

ORDER
Page - 3 -

the interest of convenience of parties and witnesses; and (3)
other public factors, including administrative difficulties from
court congestion, logistical considerations for the transferee
court, and this district's interest in the litigation.

B.   Venue

     As a threshold matter, section 1404(a) requires that venue
must be proper in the district to which the case would be trans-
ferred.  Minebea does not, of course, dispute that venue would be
proper in the Southern District of California.

C.   Transfer Interests

     1.   Related Litigation

     Avoiding duplicative litigation is a primary purpose of 28
U.S.C. § 1404(a).  Minebea does not contest that the single
patent at issue in this case is also at issue in the California
litigation.  Instead, Minebea argues only that there are key-
boards at issue here that are not at issue in the California
action.  This point is of little moment.  Even if there are
additional accused devices in this litigation, it can hardly be
said that efficiency interests are not better served by transfer-
ring this action.  Indeed, the reasons that duplicative litiga-
tion is, when possible, to be avoided are amply on display in
this case:  the parties and the California court have already
expended an enormous effort construing the '225 patent, a process
that, according to Chicony, alone consumed a year of litigation.
As such, proceeding with this litigation would be wasteful for
all of the parties.  See Ferens v. John Deere Co., 494 U.S. 516,

ORDER
Page - 4 -

531, (1990) (stating that "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy, and money that § 1404(a) was designed to prevent.") (internal quotations omitted). That there are additional claim issues involved in this action is not, in the court's view, sufficient reason to maintain parallel cases involving closely related issues.

2. Convenience

a. *Witnesses*

Witness convenience is "[p]robably the most important factor" in deciding a § 1404(a) motion. 15 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure, § 3851 at 415 (2d ed. 1986). If this case is not transferred, each of the nine individuals designated as witnesses in both the Seattle and San Diego cases will have to testify at two different trials, at different locations and on different occasions. Inasmuch as witness convenience is a central factor in a § 1404(a) analysis, that convenience is better served by requiring the individuals designated as witnesses in both the Seattle and San Diego cases to testify only once, especially those who must travel from Asia. See Cali v. E. Coast Aviation Servs. Ltd., 178 F. Supp. 2d 276, 294 (E.D.N.Y. 2001)("This fact tips the balance in favor of transfer, because it is certainly more convenient for a witness to give testimony once . . . .").

Minebea's Complaint indicates that the sole basis for

ORDER
Page - 5 -

1 jurisdiction in this district is the residence here of the '225

2 patent's inventor, Dean Cowles, who lives in Snohomish, Washing-

3 ton. Compl. ¶ 9. Minebea maintains that Cowles' testimony is

4 "critical" to this case, that Minebea has no control over Cowles,

5 and that Cowles is beyond the subpoena power of the California

6 court.[3] None of these arguments carries the day. First, Cowles'

7 testimony may not even figure prominently in this litigation.

8 Cowles was recently deposed in connection with the California

9 litigation, and it appears that his memory of events has faded

10 substantially in the twenty years since the patent was issued.

11 See Friedman Decl., Ex. L. In any event, even if Cowles has

12 something to contribute at trial, there is no indication that he

13 is unwilling to appear at trial. At his deposition, Cowles

14 stated only that he "[didn't] know about a trial."[4] Id. at

15 132:11.

16     b.   *Parties*

17     Chicony argues, and Minebea does not contest, that San Diego

18 is more convenient for all the parties. Minebea's domestic

19 keyboard subsidiary, NMB Technologies, is located in Chatsworth,

20 California, and, indeed, Minebea concedes that "some documents

21 _____

22     [3]Minebea's assertion that it has no control over Cowles is,
as Chicony points out, suspect. Among other reasons, Minebea's
23 lawyers represented Cowles at his deposition and filed objections
to a deposition subpoena on his behalf, identifying themselves as
24 Cowles' counsel. Friedman Reply Decl., Ex. 8 at 11.

25     [4]To the extent that Cowles is unwilling to attend a trial in
San Diego, his testimony can be presented by deposition. See
26 Fed. R. Civ. P. 32(a)(3)(B).

ORDER
Page - 6 -

and keyboards are located in the Central District of California."
Opp'n at 10. Similarly, Chicony America's principal place of
business is in Irvine, California, some 79 miles from the federal
courthouse in San Diego. This factor, even if it is of lesser
importance, weighs in favor of transfer.

   3.  Public Factor Arguments

   In opposing Chicony's motion, Minebea makes three other
arguments that merit only brief mention. First, Minebea asserts
that a judicial emergency has been declared in the Southern
District of California; second, that it would be impractical to
join this action with the California action; and third, that
Washington has an interest in this litigation.

   As to whether this litigation will proceed expeditiously in
San Diego, the court is of the opinion that this factor is of
little relevance here. Docket congestion can defeat transfer
"only if such circumstances are established by clear and convinc-
ing evidence." In re Horseshoe Entm't, 305 F.3d 354, 358 (5th
Cir. 2002). As shown in defendants' reply brief, the disposition
times in 2002 were only minimally longer in San Diego than they
were in Seattle. See Reply Br. at 4. These differences are
insufficient to establish clear and convincing evidence of a
probable delay. Moreover, as noted supra, transfer will obviate
the need for certain time-consuming tasks such as claim construc-
tion, a lengthy process that has already concluded in the Cali-
fornia litigation.

   Next, Minebea argues that the court should not transfer this

ORDER
Page - 7 -

litigation because the deadlines to add parties and complete
discovery in San Diego have passed.  The California litigation is
not so far along that this litigation would be unduly disrup-
tive.[5]  Certain measures can and no doubt will be taken to struc-
ture that litigation so that all matters are heard expediently
and efficiently.

Finally, Minebea argues that Washington has an interest in
this litigation because the accused device is sold by third
parties here.  Minebea, therefore, contends that "Washington has
an interest in preventing the importation of infringing goods
into its territory."  Opp'n at 11.  Insofar as Chicony's products
are sold in all 50 states, it is unclear how Washington's inter-
ests would be any greater than other states'.  See Invivo Re-
search Inc. v. Magnetic Resonance Equip. Corp., 119 F. Supp. 2d
433, 439-40 (S.D.N.Y. 2000) ("Where a party's products are sold
in many states, sales alone are insufficient to establish a
material connection to the forum and to override other factors
favoring transfer."); cf. Asahi Metal Indus. Co. v. Super. Ct.,
480 U.S. 102, 114 (1987) ("Because plaintiff is not a [Washing-
ton] resident, [Washington]'s legitimate interests in the dispute
have considerably diminished.").

III.  CONCLUSION

For the foregoing reasons, pursuant to 28 U.S.C. § 1404(a),

_____

[5]According to Minebea, Judge Moskowitz, who is presiding
over the California litigation, has indicated that trial will
likely begin in the fall of 2003.

ORDER
Page - 8 -

1  defendant's motion to transfer to this action to the United

2  States District Court for the Southern District of California

3  [doc. no. 14-1] is GRANTED.

4      DATED at Seattle, Washington this 19th day of June, 2003.

5

6

                    BARBARA JACOBS ROTHSTEIN

7                      UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
Page - 9 -

CLOSED, JURYDEMAND

# U.S. District Court
## Western District of Washington (Seattle)
## CIVIL DOCKET FOR CASE #: 2:03-cv-00295-BJR
### Internal Use Only

Minebea Co Ltd v. Chicony Elec Co Ltd, et al
Assigned to: Hon. Barbara J. Rothstein
Referred to:
Demand: $0
Lead Docket: None
Related Cases: None
Case in other court: None
Cause: 35:145 Patent Infringement

Date Filed: 02/11/03
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**
------------------------

**Minebea Co Ltd**

represented by **Benjamin Levi**
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022
212-756-2000
Fax : FAX 1-212-593-5955
Email: benjamin.levi@srz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Kagan**
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022
212-756-2000
Fax : FAX 1-212-593-5955
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel E Lutzker**
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022
212-756-2000
Fax : FAX 1-212-593-5955
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

I hereby certify that the
annexed instrument is a true
and correct copy of the original
on file in my office.
ATTEST: BRUCE RIFKIN
Clerk, U. S. District Court
Western District of Washington

By
Deputy Clerk

**Lisa Knight**
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022
212-756-2000
Fax : FAX 1-212-593-5955
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Scott Ehrlichman**
DORSEY & WHITNEY LLP
1420 5TH AVE
STE 3400
SEATTLE, WA 98101
206-903-8800
Fax : FAX 903-8820
Email: ehrlichman.peter@dorsey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ramsey Ramerman**
FOSTER PEPPER & SHEFELMAN
1111 3RD AVE
STE 3400
SEATTLE, WA 98101-3299
206-447-4400
Fax : FAX 447-9700
Email: ramer@foster.com
*TERMINATED: 03/14/2003*
*LEAD ATTORNEY*

**Todd Sicklinger**
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022
212-756-2000
Fax : FAX 1-212-593-5955
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**
----------------------

**Chicony Electronics Co Ltd**          represented by  **Angelo J Calfo**
YARMUTH WILSDON CALFO PLLC

1201 THIRD AVE

STE 3080
SEATTLE, WA 98101-3000
206-516-3800
Fax : FAX 516-3888
Email: acalfo@yarmuth.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Yang**
17220 NEWHOPE ST
STE 101 & 102
FOUNTAIN VALLEY, CA 92708
714-641-4022
Fax : FAX 1-714-641-2082
Email: cyang@sjclawpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A Jacobs**
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA 94105-2482
415-268-7455
Fax : FAX 1-415-276-7455
Email: mjacobs@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul A Friedman**
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA 94105-2482
415-268-6902
Fax : FAX 1-415-276-7377
Email: pafriedman@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott T Wilsdon**
YARMUTH WILSDON CALFO PLLC

1201 THIRD AVE
STE 3080
SEATTLE, WA 98101-3000
206-516-3800
Fax : FAX 516-3888
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chicony America Inc**          represented by **Angelo J Calfo**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Christine Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul A Friedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott T Wilsdon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Filing Date | # | Docket Text |
|---|---|---|
| 02/11/2003 | 1 | COMPLAINT and JURY DEMAND (Summons(es) issued) Receipt # 309657 (PM) (Entered: 02/19/2003) |
| 02/27/2003 | 2 | RETURN OF SERVICE of summons and complaint executed upon defendant Chicony America Inc on 2/13/03 (RS) (Entered: 03/03/2003) |
| 03/04/2003 | | LODGED ORDER: stip and order extending time (RS) (Entered: 03/05/2003) |
| 03/10/2003 | | Add Attorney (Utility Event) Angelo Calfo (RS) (Entered: 03/11/2003) |
| 03/10/2003 | 3 | STIPULATION and ORDER by Judge Barbara J. Rothstein : allowing dfts until 4/4/03 to answer (cc: counsel, Judge) (RS) (Entered: 03/11/2003) |
| 03/14/2003 | 4 | SUBSTITUTION OF COUNSEL on behalf of Minebea Co Ltd withdrawing law firm of Foster Pepper and substituting law firm Dorsey & Whitney re atty Peter Ehrlichman (RS) (Entered: 03/17/2003) |
| 03/18/2003 | 5 | ORDER RE: INITIAL DISCLOSURES, JOINT STATUS REPORT AND EARLY SETTLEMENT. Joint Status Report due 4/21/03 (cc: |

| | | |
|---|---|---|
| | | counsel, Judge) (RS) (Entered: 03/20/2003) |
| 03/25/2003 | 6 | APPLICATION by defendant Chicony Elec Co Ltd, defendant Chicony America Inc AND ORDER admitting Paul A Friedman pro hac vice. Receipt # 406932 (cc: counsel, Judge) (RS) (Entered: 03/25/2003) |
| 03/25/2003 | 7 | APPLICATION by defendant Chicony Elec Co Ltd, defendant Chicony America Inc AND ORDER admitting Michael A Jacobs pro hac vice. Receipt # 406931 (cc: counsel, Judge) (RS) (Entered: 03/25/2003) |
| 03/27/2003 | 8 | APPLICATION by plaintiff Minebea Co Ltd AND ORDER admitting Benjamin Levi pro hac vice. Receipt # 406938 (cc: counsel, Judge) (RS) (Entered: 03/28/2003) |
| 03/27/2003 | 9 | APPLICATION by plaintiff Minebea Co Ltd AND ORDER admitting Joel E Lutzker pro hac vice. Receipt # 406938 (cc: counsel, Judge) (RS) (Entered: 03/28/2003) |
| 03/27/2003 | 10 | APPLICATION by plaintiff Minebea Co Ltd AND ORDER admitting Lisa Knight pro hac vice. Receipt # 406938 (cc: counsel, Judge) (RS) (Entered: 03/28/2003) |
| 03/27/2003 | 11 | APPLICATION by plaintiff Minebea Co Ltd AND ORDER admitting Todd Sicklinger pro hac vice. Receipt # 406938 (cc: counsel, Judge) (RS) (Entered: 03/28/2003) |
| 03/27/2003 | 12 | APPLICATION by plaintiff Minebea Co Ltd AND ORDER admitting David Kagan pro hac vice. Receipt # 406938 (cc: counsel, Judge) (RS) (Entered: 03/28/2003) |
| 04/01/2003 | 13 | APPLICATION by defendant Chicony Elec Co Ltd, defendant Chicony America Inc AND ORDER admitting Christine Yang pro hac vice. Receipt # 603435 (cc: counsel, Judge) (RS) (Entered: 04/02/2003) |
| 04/04/2003 | 14 | Joint MOTION by defendants to transfer or dismiss NOTED FOR 5/2/03 (VK) (Entered: 04/07/2003) |
| 04/04/2003 | 15 | DECLARATION of Paul A. Friedman by defendants re motion to transfer or dismiss [14-1] (CL) (Entered: 04/07/2003) |
| 04/04/2003 | 16 | DECLARATION of Bruce Chang by defendants re motion to transfer or dismiss [14-1] (CL) (Entered: 04/07/2003) |
| 04/04/2003 | | LODGED ORDER: re: motion to transfer or dismiss [14-1] (CL) |

|  |  | (Entered: 04/07/2003) |
|---|---|---|
| 04/04/2003 | 17 | AFFIDAVIT OF SERVICE by defendants of motion to transfer or dismiss [14-1], etc. (CL) (Entered: 04/07/2003) |
| 04/18/2003 |  | LODGED ORDER: stip and order (RS) (Entered: 04/18/2003) |
| 04/22/2003 | 18 | STIPULATION and ORDER by Judge Barbara J. Rothstein : continuing noting date to 5/23/03 for dfts' motion to transfer or dismiss [14-1] (cc: counsel, Judge) (RS) (Entered: 04/23/2003) |
| 05/05/2003 | 19 | JOINT STATUS REPORT filed by all parties. Est. Trial Days: 7 (VK) (Entered: 05/06/2003) |
| 05/16/2003 | 20 | MINUTES RE TELEPHONE CONF: BJR; dfts' motion to transfer [14-1] renoted for 6/6/03; opposition due 6/2/03; dfts' motion to dismiss noted for 7/11/03 (RS) (Entered: 05/19/2003) |
| 05/19/2003 | 21 | SPECIALLY APPEARING DFTS' CERTIFICATE of interested parties (RS) (Entered: 05/21/2003) |
| 05/29/2003 |  | LODGED ORDER: stipulated protective order (MD) (Entered: 05/30/2003) |
| 06/02/2003 | 22 | RESPONSE by plaintiff Minebea Co Ltd to motion to transfer or dismiss [14-1] OA REQ'D (RS) (Entered: 06/04/2003) |
| 06/02/2003 | 23 | DECLARATION of Todd Sicklinger by plaintiff re: motion response [22-1] (RS) (Entered: 06/04/2003) |
| 06/02/2003 | 24 | AFFIDAVIT OF SERVICE by plaintiff motion response [22-1] (RS) (Entered: 06/04/2003) |
| 06/05/2003 | 25 | REPLY by defendants TO RESPONSE to motion to transfer or dismiss [14-1] (RS) (Entered: 06/06/2003) |
| 06/05/2003 | 26 | REPLY DECLARATION of Paul Friedman by defendant re: motion reply [25-1] (RS) (Entered: 06/06/2003) |
| 06/05/2003 | 27 | AFFIDAVIT OF SERVICE by defendant motion reply [25-1] (RS) (Entered: 06/06/2003) |
| 06/10/2003 | 28 | STIPULATED PROTECTIVE ORDER by Judge Barbara J. Rothstein : (cc: counsel, Judge) (RS) (Entered: 06/11/2003) |
| 06/20/2003 | 29 | ORDER by Judge Barbara J. Rothstein GRANTING dfts' motion to |

| | | transfer case to S Dist of CA [14-1] (cc: counsel, Judge) (RS) (Entered: 06/20/2003) |
|---|---|---|
| 07/14/2003 | ❸30 | ANSWER to Complaint by Defendants Chicony America Inc, Chicony Electronics Co Ltd.(Friedman, Paul) (Entered: 07/14/2003) |
| 08/06/2003 | ❸ | Clerk transferred original case file documents, certified copy of docket sheet and certified copy of transf order to S Dist CA by UPS on 8/6/03 (RS, ) (Entered: 08/06/2003) |

BRUCE RIFKIN
CLERK

215 U.S. COURTHOUSE
SEATTLE, WASHINGTON 98104

August 6, 2003

U.S. District Court, Clerk's Office
4290 Federal Building
880 Front Street
San Diego, CA 92101

    RE:    Minebea Co Ltd v. Chicony Electronics Co, et al, C03-295R

Dear Clerk:

    Pursuant to the order transferring the above captioned case to your Court, enclosed are:

        1. Certified copy of docket entries;

        2. Certified copy of transfer order; and

        3. Original case file documents.

    Please acknowledge receipt of the above documents by returning the copy of this letter.

        Very truly yours,

        BRUCE RIFKIN, CLERK

    By: _____
        Rhonda Stiles, Deputy Clerk

Enclosures

cc:    counsel of record
       file

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD., | No.    CV 03 0295 R |
| Plaintiff, | |
| v. | **DEFENDANTS CHICONY ELECTRONICS CO., LTD. AND CHICONY AMERICA, INC.'s ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT** |
| CHICONY ELECTRONICS CO., LTD., and CHICONY AMERICA, INC., | |
| Defendants. | |

Defendants CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC. ("Chicony"), by its undersigned attorneys, answer the complaint filed by plaintiff MINEBEA CO., LTD. ("Minebea") as follows:

## PRELIMINARY STATEMENT

By order dated June 19, 2003, this Court transferred this action to the United States District Court for the Southern District of California. By the filing of this answer, Chicony does not intend to suggest that it anticipates any further litigation in this Court or to submit to the personal jurisdiction of this Court. It is, instead, filing this answer to expedite the processing of this case upon transfer to the Southern District of California.

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

## JURISDICTION AND VENUE

1. Chicony admits that the United States District Court for the Southern District of California has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, but denies each and every other allegation of paragraph 1.

2. Chicony admits that venue lies in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1391(c) & 1400(b), but denies each and every other allegation of paragraph 2.

3. Chicony denies each and every allegation of paragraph 3.

## PARTIES

4. Chicony is without sufficient information to admit or deny the allegations of paragraph 4 and on that basis denies each and every allegation of paragraph 4.

5. Chicony admits that Chicony Electronics is a corporation organized under the laws of Taiwan with its principal place of business at No. 25, Wu-Gong 6th Road, Wu-Ku Industrial Park, Taipei Hsein 248, Taiwan. Chicony admits that Chicony Electronics is a manufacturer, seller, and exporter of computer equipment and computer keyboards. Chicony admits that Chicony Electronics manufactures and sells computer equipment and computer keyboards. Chicony denies each and every other allegation of paragraph 5.

6. Chicony admits that Chicony America, Inc. is a corporation organized under the laws of California with its principal place of business at 53 Parker, Irvine, California 92618. Chicony admits that Chicony Electronics, Inc. is the ultimate corporate parent of Chicony America, Inc. Chicony admits that Chicony America sells computer equipment and computer keyboards. Chicony denies each and every other allegation of paragraph 6.

## FIRST CLAIM FOR RELIEF

7. In response to paragraph 7, Chicony hereby incorporates its answers to paragraphs 1 through 6, inclusive.

8. Chicony admits that United States Patent No. 4,433,225 ("the '225 patent") was issued on February 21, 1984, and that it is entitled "Keytop Levelling Mechanism." Except as

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

1  admitted, Chicony is without sufficient knowledge or information to admit or deny the remaining

2  allegations of paragraph 8 and on that basis denies those allegations.

3       9.    Chicony is without sufficient information to admit or deny the allegation of

4  paragraph 9 and on that basis denies the allegation of paragraph 9.

5       10.    Chicony is without sufficient information to admit or deny the allegation of

6  paragraph 10 and on that basis denies the allegation of paragraph 10.

7       11.    Chicony admits that it is presently aware of the '225 patent, and that it was aware of

8  the patent as of a date prior to filing this answer.  Except as admitted, Chicony denies each and

9  every other allegation of paragraph 11.

10      12.    Chicony denies each and every allegation of paragraph 12.

11      13.    Chicony denies each and every allegation of paragraph 13.

12      14.    Chicony denies each and every allegation of paragraph 14.

13      15.    Chicony denies each and every allegation of paragraph 15.

14      16.    Chicony denies each and every allegation of paragraph 16.

15      17.    Chicony denies each and every allegation of paragraph 17.

16      18.    Chicony denies each and every allegation of paragraph 18.

17                        **AFFIRMATIVE DEFENSES**

18      Without admitting or acknowledging that it bears the burden of proof as to any of them,

19  Chicony asserts the following affirmative defenses:

20                     **FIRST AFFIRMATIVE DEFENSE**

21      19.    On information and belief, the '225 patent is invalid and void because it fails to

22  meet the conditions for patentability set forth in 35 U.S.C. § 102.

23                    **SECOND AFFIRMATIVE DEFENSE**

24      20.    On information and belief, the '225 patent is invalid and void because it fails to

25  meet the conditions for patentability set forth in 35 U.S.C. § 103.

26                     **THIRD AFFIRMATIVE DEFENSE**

27      21.    On information and belief, the '225 patent is invalid and void because it fails to

28  meet the conditions for patentability set forth in 35 U.S.C. § 112.

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415)  268-7000
Fax: (415)  268-7522

## FOURTH AFFIRMATIVE DEFENSE

22. The prior art known before the alleged invention covered by the '225 Patent so limits and restricts the scope of the '225 patent that Chicony cannot be considered to infringe this patent.

## FIFTH AFFIRMATIVE DEFENSE

23. Chicony has not infringed any valid claim of the '225 patent.

## SIXTH AFFIRMATIVE DEFENSE

24. In the event liability is shown, Minebea's damages are limited for failure to comply with 35 U.S.C. § 287.

## SEVENTH AFFIRMATIVE DEFENSE

25. On the basis of proceedings in the Patent and Trademark Office during prosecution of the applications that matured into the '225 patent and of statements made by or on behalf of the named inventor, Minebea is estopped from construing the '225 patent to cover the products of Chicony and others.

## EIGHTH AFFIRMATIVE DEFENSE

26. Each of Minebea's claims for relief is barred by the doctrine of laches.

## NINTH AFFIRMATIVE DEFENSE

27. Each of Minebea's claims for relief is barred by the doctrine of equitable estoppel.

## TENTH AFFIRMATIVE DEFENSE

28. Each of Minebea's claims for relief is barred by the doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

29. The United States District Court for the Western District lacks personal jurisdiction over the Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

30. Chicony reserves the right to assert any other defenses that discovery may reveal, including the defense of unenforceability due to inequitable conduct.

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

## PRAYER FOR RELIEF

WHEREFORE, Chicony respectfully requests that the Court grant the following relief:

A. that Minebea take nothing by its claims;

B. that the Complaint be dismissed with prejudice;

C. that Chicony be awarded its costs and reasonable attorneys' fees incurred in this action; and

D. that Chicony be awarded such other and further relief as the Court may deem just and proper.

Dated: July 14, 2003

MICHAEL A. JACOBS
PAUL A. FRIEDMAN
MORRISON & FOERSTER LLP


By: ___/s/ Michael A. Jacobs_____
      Michael A. Jacobs

Attorneys for Defendants
CHICONY ELECTRONICS CO., LTD. and
CHICONY AMERICA, INC.

Additional Counsel of Record:

| | |
|---|---|
| Scott Wilsdon (WSBA No. 20608)<br>YARMUTH WILSDON CALFO PLLC<br>1201 Third Avenue<br>Seattle, Washington 98101<br>Telephone: (206) 516-3800<br>Facsimile: (206) 516-3888 | S. J. Christine Yang (Pro Hac Vice)<br>LAW OFFICES OF S. J. CHRISTINE YANG<br>Plaza Del Lago<br>17220 Newhope Street<br>Suites 101 & 102<br>Fountain Valley, California 92708<br>Telephone: (714) 641-4022<br>Facsimile: (714) 641-2082 |

### Attestation

I, Paul A. Friedman, am the ECF User whose ID and password are being used to file Defendants Chicony Electronics Co., Ltd. and Chicony America, Inc.'s Answer to Complaint for Patent Infringement. I hereby attest that Michael A. Jacobs has concurred in this filing.

___/s/ Paul A. Friedman_____
Paul A. Friedman

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

# PROOF OF SERVICE

I declare that I am employed with the law firm of Morrison & Foerster ᴌᴌᴘ, whose address is 425 Market Street, San Francisco, California 94105-2482. I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on the July 14, 2003 hereof, I served a copy of:

**DEFENDANTS CHICONY ELECTRONICS CO., LTD. AND CHICONY AMERICA, INC.'s ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT**

☒ **[BY FACSIMILE, CCP § 1013(e), FRCP § 5(b)]** by sending a true copy from Morrison & Foerster ᴌᴌᴘ's facsimile transmission telephone number (415) 268-7522 to the fax number(s) set forth below, or as stated on the attached service list. The transmission was reported as complete and without error. The transmission report was properly issued by the transmitting facsimile machine.

I am readily familiar with Morrison & Foerster ᴌᴌᴘ's practice for sending facsimile transmissions, and know that in the ordinary course of Morrison & Foerster ᴌᴌᴘ's business practice the document(s) described above will be transmitted by facsimile on the same date that it (they) is (are) placed at Morrison & Foerster ᴌᴌᴘ for transmission.

☒ **[BY U.S. MAIL, CCP § 1013(a)(3); FRCP § 5(b)]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, addressed as follows, for collection and mailing at Morrison & Foerster ᴌᴌᴘ, 425 Market Street, San Francisco, California 94105-2482 in accordance with Morrison & Foerster ᴌᴌᴘ's ordinary business practices.

I am readily familiar with Morrison & Foerster ᴌᴌᴘ's practice for collection and processing of correspondence for mailing with the United States Postal Service, and know that in the ordinary course of Morrison & Foerster ᴌᴌᴘ's business practice the document(s) described above will be deposited with the United States Postal Service on the same date that it (they) is (are) placed at Morrison & Foerster ᴌᴌᴘ with postage thereon fully prepaid for collection and mailing.

**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

1    ☐  **BY OVERNIGHT DELIVERY, CCP § 1013(d); FRCP§ 5(b)]** by placing a true
2       copy thereof enclosed in a sealed envelope with delivery fees provided for,
        addressed as follows, for collection by United Parcel Service, at 425 Market Street,
3       San Francisco, California 94105-2482 in accordance with Morrison & Foerster
        LLP's ordinary business practices.
4
5       I am readily familiar with Morrison & Foerster LLP's practice for collection and
        processing of correspondence for overnight delivery and know that in the ordinary
6       course of Morrison & Foerster LLP's business practice the document(s) described
        above will be deposited in a box or other facility regularly maintained by United
7       Parcel Service or delivered to an authorized courier or driver authorized by United
        Parcel Service to receive documents on the same date that it (they) is are placed at
8       Morrison & Foerster LLP for collection.

9    ☐  **[BY PERSONAL SERVICE, § CCP 1011(a); FRCP § 5(b)]** by placing a true
        copy thereof enclosed in a sealed envelope addressed as follows for collection and
10      delivery at the mailroom of Morrison & Foerster LLP, causing personal delivery of
        the document(s) listed above to the person(s) at the address(es) set forth below.
11
12      I am readily familiar with Morrison & Foerster LLP's practice for the collection and
        processing of documents for hand delivery and know that in the ordinary course of
13      Morrison & Foerster LLP's business practice the document(s) described above will be
        taken from Morrison & Foerster LLP's mailroom and hand delivered to the
14      document's addressee (or left with an employee or person in charge of the
        addressee's office) on the same date that it is placed at Morrison & Foerster LLP's
15      mailroom.

16      Peter Ehrlichman                    Joel Lutzker
17      Dorsey & Whitney LLP                Schulte Roth & Zabel LLP
        1420 Fifth Avenue Suite 3400        919 Third Avenue
18      Seattle, WA 98101                   New York, NY 10021
        Fax: 206/903-8820                   Fax: 212/593-5955
19
            I declare under penalty of perjury under the laws of the State of California and the United
20   States of America that the foregoing is true and correct. Executed at San Francisco, California,
     this 14th day of July, 2003.
21
                                        /s/ Clementine
22                                      Clementine

23                                      **Attestation**
24          I, Paul A. Friedman, am the ECF User whose ID and password are being used to file
25   this Proof of Service. I hereby attest that Clementine has concurred in this filing.
26
                                        /s/ Paul A. Friedman
27                                      Paul A. Friedman
28

**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

```
MIME-Version:1.0
From:ECF@wawd.uscourts.gov
To:ECF@wawd.uscourts.gov
Bcc:RothsteinDocs@wawd.uscourts.gov,acalfo@yarmuth.com,benjamin.levi@srz.com,cyang@s
Message-Id:<369653@wawd.uscourts.gov>
Subject:Activity in Case 2:03-cv-00295-BJR Minebea Co Ltd v. Chicony Elec Co Ltd, et
```

Content-Type: text/html

***NOTE TO PUBLIC ACCESS USERS***You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

## U.S. District Court

## Western District of Washington

Notice of Electronic Filing

The following transaction was received from Friedman, Paul A entered on 7/14/2003 at 11:04 AM PDT and filed on 7/14/2003

| | |
|---|---|
| **Case Name:** | Minebea Co Ltd v. Chicony Elec Co Ltd, et al |
| **Case Number:** | 2:03-cv-295 |
| **Filer:** | Chicony Electronics Co Ltd |
| | Chicony America Inc |

**WARNING: CASE CLOSED on 06/20/2003**
**Document Number:** 30

**Docket Text:**
ANSWER to Complaint by Defendants Chicony America Inc, Chicony Electronics Co Ltd.(Friedman, Paul)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1035929271 [Date=7/14/2003] [FileNumber=369651-0]
[762c2d8238a24e2d67e697408e50aa454e0d3d3493a0919116b2dcb986cfddc3793a
6e516e6acb3b3104929fbda7ea401ee58d98ccd18225509f8cb076c26eba]]

**2:03-cv-295 Notice will be electronically mailed to:**

Angelo J Calfo    acalfo@yarmuth.com, ndawber@yarmuth.com

Peter Scott Ehrlichman    ehrlichman.peter@dorsey.com

Paul A Friedman    pafriedman@mofo.com,

Michael A Jacobs    mjacobs@mofo.com,

Benjamin Levi    benjamin.levi@srz.com,

Christine Yang    cyang@sjclawpc.com,

**2:03-cv-295 Notice will not be electronically mailed to:**

David Kagan
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022

Lisa Knight
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022

Joel E Lutzker
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022

Todd Sicklinger
SCHULTE ROTH & ZABEL
919 3RD AVE
STE 1929
NEW YORK, NY 10022

Scott T Wilsdon
YARMUTH WILSDON CALFO PLLC
1201 THIRD AVE
STE 3080
SEATTLE, WA 98101-3000



The Honorable Barbara Jacobs Rothstein

FILED ___ ENTERED
___ LODGED ___ RECEIVED

**JUN 1 0 2003**

AT SEA....
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY ___ DEPUTY

FILED
LODGED ___ ENTERED
___ RECEIVED

**MAY 2 9 2003 MR**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY ___ DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

------------------------------------------------X

Minebea Co. Ltd.     :

       Plaintiffs,     :

     - against -     :

Chicony Electronics Co.. Ltd. and Chicony
America, Inc.     :

       Defendants.     :

------------------------------------------------X

No. CV 03 0295R

STIPULATED PROTECTIVE ORDER

CV 03-00295 #00000028

## STIPULATED PROTECTIVE ORDER

PRELIMINARY STATEMENT: Defendants have filed a motion to dismiss this action for lack of personal jurisdiction. By submitting to the provisions of this Stipulated Protective Order, Defendants do not waive or prejudice their pending motion to dismiss for want of personal jurisdiction, nor prejudice their right to assert any defense that they could have otherwise raised had they not submitted to the terms of this stipulated order.

WHEREAS, documents, things and information may be furnished or disclosed in the above captioned Proceeding (hereinafter, "the Proceeding"), which documents, things and information may contain or constitute confidential or proprietary technical, scientific and/or business information.

It is hereby ORDERED as follows:

1. Scope

This Order shall be applicable to and govern all documents, things and information produced or furnished during the course of the Proceeding, including depositions, documents

9430898.1

1



produced in response to requests for production of documents, answers to interrogatories, responses to requests for admissions and all other discovery taken pursuant to the Federal Rules of Civil Procedure, as well as pleadings, briefs, memoranda, testimony adduced at trial, materials introduced into evidence, and all other information produced or furnished by or on behalf of any party or third party.

2. Definitions

    a.    "Furnishing Party" shall mean a party to the Proceeding or any third party on behalf of which documents, things or information are furnished or produced during the course of the Proceeding, either voluntarily or in response to requests for production of documents, interrogatories, requests for admissions, depositions, or any other request for discovery pursuant to the Federal Rules of Civil Procedure, or in the form of pleadings, briefs, memoranda, testimony adduced at trial, materials introduced into evidence, or other form of information produced or furnished by or on behalf of such a party or third party. When used in connection with particular documents, things, or information, "Furnishing Party" shall mean the party on behalf of which those documents, things, or information are furnished or produced.

    b.    "Receiving Party" shall mean a party to the Proceeding to which documents, things or information are furnished or produced, whether voluntarily or in response to a request for discovery or court order.

    c.    "Confidential Information" shall mean confidential or proprietary technical, scientific or business information which the Furnishing Party would not normally reveal to third parties or would cause third parties to maintain in confidence, that is designated as such by the Furnishing Party pursuant to Section 4 hereof.

d.    "Outside Counsel" shall mean attorneys who are employed by, partners or associates of, or counsel of, outside law firms selected by each party as trial counsel of record, or "of counsel" to trial counsel of record or local counsel of record, as well as all secretarial, clerical and paralegal personnel assisting such counsel.

e.    "Expert(s)" shall mean any person who has been employed or retained by a party to the Proceeding solely to advise and assist in the preparation and presentation of the party's case and who has been approved by a Furnishing Party to receive its Confidential Information pursuant to Section 3 hereof, provided, however, that such person, during the year prior to his retention or employment as an Expert in the Proceeding, was not employed or retained by the party except as an Expert.

3. Undertakings and Approvals

a.    A proposed Expert may receive Confidential Information of a Furnishing Party only after the following conditions have been satisfied: (i) the proposed Expert has executed the undertaking attached hereto as Appendix A; (ii) the executed undertaking has been served on Outside Counsel for all parties to the Proceeding; and (iii) the Furnishing Party has approved of the proposed Expert pursuant to paragraph (c) of this Section.

b.    Court reporters and their personnel shall execute the agreement attached hereto as Appendix B before recording testimony that may contain Confidential Information, and the executed agreement shall be served on the Furnishing Party.

c.    A Furnishing Party shall have twenty (20) days from the date of service of an undertaking served pursuant to paragraph (a) of this Section to object to a proposed Expert. Such objection must be for good cause, stating with

particularity the reasons for the objection, and must be in writing served on all parties to the Proceeding. Failure to object within twenty (20) days from the service of the referenced undertaking shall constitute approval. If the parties are unable to resolve objections, application may be made to the Court to resolve the matter.

4. Designation of Information

    a.   Documents and things produced or furnished during the course of this litigation, including, without limitation, documents produced in response to requests for production of documents, answers to interrogatories, responses to requests for admissions, pleadings, briefs and memoranda, may be designated as containing Confidential Information, prior to producing or furnishing the documents or things, by placing on each page and each thing to which the designation applies a legend substantially as follows:

<div align="center">

[Furnishing Party's Name]
CONFIDENTIAL INFORMATION

</div>

    b.   Deposition testimony shall be treated as Confidential for a period of thirty (30) days after receipt of the deposition transcript by the Furnishing Party to permit the Furnishing Party to review the transcript and designate information disclosed therein as Confidential Information. A Furnishing Party may designate information disclosed at a deposition as Confidential Information: (i) during the deposition, by requesting that the reporter place the appropriate legend as set forth in paragraph (a) hereof on the pages of the transcript containing Confidential Information, or (ii) within ten (10) days after receipt of the transcript, by sending a written list of the particular pages of the transcript that contain such information

to Outside Counsel for the Receiving Party and requesting that the list be affixed to the face of the transcript and each copy thereof.

c.    A Furnishing Party may designate information disclosed at a hearing or trial as Confidential Information by requesting the Court, at the time the information is proffered or adduced, to receive the information in camera and to designate the transcript appropriately.

d.    Furnishing Parties shall avoid designating as Confidential Information any document, thing or information that is not entitled to such designation or which is generally available to the public.

e.    Documents, things and information designated by the Furnishing Party as Confidential Information shall be treated as such unless and until the designation is removed or changed by the Furnishing Party or by the Court.

5.  Disclosure, Use and Handling of Confidential Information

a.    Confidential Information shall not be disclosed to anyone except as provided in this Protective Order.

b.    Confidential Information of a Furnishing Party may be disclosed only to:

(1)    Experts of the Receiving Party subject to compliance with the undertakings and approvals set forth in Section 3;

(2)    The Court and members of the staff of the Court whose functions necessitate access to Confidential Information;

(3)    Qualified court reporters taking testimony in the Proceeding, and necessary stenographic and clerical personnel thereof, who have executed the agreement attached hereto as Appendix B;

(4)    Outside Counsel for any Receiving Party in the Proceeding;

(5)     Anyone who was an author, addressee or recipient of a document prior to the filing of the complaint between the Furnishing Party and the Receiving Party. However, showing a document that has been designated as containing Confidential Information to anyone who was an author, addressee or recipient of the document prior to the filing of the Complaint between the Furnishing Party and the Receiving Party shall not be deemed a waiver of the confidentiality of the document;

(6)     A witness who is a present or former officer, agent, employee, servant, attorney or Fed. R. Civ. P. 30(b)(6) designee of the Furnishing Party or was an officer, agent, employee, servant or attorney of the Furnishing Party on or after the date the document or thing was created to reexamine or cross-examine the witness during a deposition or trial, but the witness shall not be permitted to retain any such document or things or any copies thereof, unless the witness is otherwise authorized under this Section to receive such information, provided, however, that if the witness is a present employee or officer of a party to the Proceeding other than the Furnishing Party, the witness shall execute an undertaking in the form attached hereto as Appendix D prior to being shown any document or thing containing Confidential Information;

(7)     Reputable copy services, replication outfits, and litigation support firms for purposes reasonably and substantially related to the litigation.


c.      Confidential Information may be disclosed to persons not included in paragraph (b) of this Section pursuant to a Court order or a stipulation by the Furnishing

Party in writing or on the record in a deposition, hearing or trial in the Proceeding, provided, however, that such disclosure shall be subject to the conditions and obligations of this Protective Order, and such persons shall be considered subject to the conditions and obligations of this Protective Order.

d.    All pages designated as containing Confidential Information shall be removed from any document or copy of a document that is made available to any person not authorized to receive such information, and the front page of all other copies of the document shall be marked to reflect that it is redacted to exclude Confidential Information.

e.    When a party (the "Filing Party") submits material to the Court that contain confidential information, the Filing Party shall file the confidential portions under seal and in accordance with Western District of Washington Local Civil Rule 5(g). Pursuant to Local Civil Rule 5(g)(4), documents shall remain under seal except on court order unsealing the materials, on stipulation of the parties, or on the Court's own motion. Motions to unseal documents, and oppositions thereto, shall be assessed according to the standards expressed in Local Civil Rule 5(g)(4) and other pertinent authority.

f.    Portions of discovery materials, deposition transcripts, trial exhibits, demonstrative exhibits, trial testimony, briefs, memoranda, and all other documents and things filed with the Court or presented at trial which contain Confidential Information of any party or any third party shall become part of the in camera record and shall not be made part of the public record unless the Court determines otherwise after providing an opportunity for the Furnishing Party to argue in favor of maintaining its confidentiality.

g.  In the event that any Confidential Information is used in any hearing or trial in this litigation, it shall not lose its confidential status through such use, and the parties and the Court shall take all reasonable steps to protect its confidentiality during such use.

h.  Notwithstanding any provision in this Order to the contrary, the disclosure of Confidential Information due to operation of law is not a violation hereunder.

i.  Confidential information shall not be disclosed by any Receiving Party to its in-house counsel.

6.  Safeguards

a.  Outside Counsel and Experts of the Receiving Party: (i) shall maintain all documents and things containing Confidential Information of another party in a secure place that is reasonably inaccessible to anyone other than those persons authorized under this Protective Order to receive such information; (ii) shall take reasonable steps to ensure that such information is not disclosed to such other persons; and (iii) shall exercise the same standard of due care with respect to the storage, custody, use and/or dissemination of such information as is exercised with the Receiving Party's own confidential and proprietary information of a like nature.

7.  Inadvertent Failure to Designate

a.  In the event that a Furnishing Party inadvertently fails to designate any document, thing or information pursuant to Section 4 hereof, it may later designate such document, thing or information by notifying Outside Counsel for the Receiving Party in writing, identifying the particular documents, things or information it wishes to designate and the appropriate designation. Outside Counsel for the

Receiving Party shall thereafter: (i) use reasonable efforts to retrieve all such particular documents, things or information and all copies thereof; (ii) mark the particular documents, things or information, and all copies thereof, with the appropriate legend as set forth in Section 4(a); (iii) treat the document, thing or information, and all copies thereof, in accordance with the designation.

b. It shall be understood, however, that no person or party shall incur liability hereunder with respect to any disclosure that occurred prior to receipt of written notice of a belated designation.

c. In the event that a Furnishing Party inadvertently fails to designate any document, thing or information as privileged, it may within a reasonable time designate such document, thing or other information as privileged by notifying Outside Counsel for the Receiving Party in writing, identifying the particular documents, things or information it wishes to designate as privileged. Outside Counsel for the Receiving Party shall immediately thereafter and without further order of the Court use reasonable efforts to retrieve all such particular documents, things or information and all copies thereof and return them to the Furnishing Party. Such acts by the Receiving Party shall not be deemed a waiver of the right to challenge the designation of such documents, things or other information as privileged after they have been returned.

8. Challenge to Designations

a. A Receiving Party may challenge a Furnishing Party's designation of Confidential Information. Failure of any party to challenge a claim of confidentiality of any document, thing or information shall not constitute a waiver of the right to assert

at any subsequent time that the same is not in fact confidential or not an appropriate designation for any reason.

b. A Receiving Party disagreeing with the designation of any information received from a Furnishing Party as Confidential Information or simply wanting the designation changed in order to be able to disclose the information to an unauthorized person may request the Furnishing Party in writing to change the designation. Upon receipt of such a request, the parties shall make a good faith attempt to resolve the matter informally.

c. If the matter is not informally resolved within ten (10) days of receipt of the Receiving Party's written request, either party may move the Court for a ruling with respect to the confidentiality designation. In any dispute over the designation of Confidential Information, the Furnishing party bears the burden of showing that the designated information is Confidential Information within the meaning of Section 2(c) hereof. Except as set forth in the preceding sentence, this Protective Order does not alter the burden imposed by law on any party seeking to uphold any limitation on the production or dissemination of materials.

9. Inadvertent Disclosure

In the event of an inadvertent disclosure of the Confidential Information of another party or a third party, the party making the inadvertent disclosure shall upon learning of the disclosure:

a. immediately notify the party to whom the disclosure was made that it contains Confidential Information and is subject to this Protective Order;

b. immediately make all reasonable efforts to (i) preclude further dissemination of the confidential material, (ii) remove disclosed material from the public record,

and (iii) prevent further use of the document by the person to whom disclosure was inadvertently made; and

c.      within ten (10) business days, notify the Furnishing Party of the identity of the person to whom disclosure was inadvertently made, the circumstances surrounding disclosure, and the steps taken to insure against the dissemination or use of the information.

10.     Enforcement

Each individual who receives any Confidential Information pursuant to this Protective Order shall be subject to the jurisdiction of the Court in any proceeding relating to the performance under, compliance with, or violation of this Protective Order.

11.     Modification

a.      Nothing herein shall restrict the power of the Court to modify this Protective Order or any term hereof for good cause shown.

b.      Nothing herein shall preclude any party from moving the Court to modify the terms of this Protective Order or the status of any particular information, document or thing.

12.     Limitation

This Protective Order shall be without prejudice to any party's right to assert at any time that any particular information, document or thing is or is not subject to discovery, production or admissibility on any grounds other than confidentiality. Any party may assert that particular documents and information are not subject to discovery or production because a party is contractually bound to prevent dissemination of such documents, absent a court order.

13.     Conclusion of Litigation

a.      Except as provided in paragraph (b) of this Section, at the conclusion of this litigation, each party or other person subject to the terms of this Protective Order

by reason of receipt of confidential information from the party shall either destroy, or return to the Furnishing Party, all documents and things designated as containing Confidential Information and shall certify such destruction or return in writing to the Furnishing Party. Such return or destruction shall not relieve said parties or persons from the obligations imposed upon them by this Protective Order.

b. At the conclusion of this litigation, Outside Counsel for each party may retain a record including the following, irrespective of whether or not Confidential Information of another party or of a third party is included: its correspondence file of this case, its pleadings file (including all briefs, memoranda, affidavits, and all papers served by/on the party represented), and any briefs and appendix on appeal and all legal research memoranda.

c. At the conclusion of this litigation, including all appeals, the Court may either destroy or return to the furnishing party all documents and things designated as Confidential.

SCHULTE ROTH & ZABEL LLP

Joel E. Lutzker
David H. Kagan
Benjamin Levi
Todd Sicklinger
919 Third Avenue
New York, New York 10022
(212) 756-2000

DORSEY & WHITNEY LLP
Peter S. Ehrlichman
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

Attorneys for Plaintiff Minebea Co. Ltd.

MORRISON & FOERSTER LLP


_(signature)_

Michael A. Jacobs
Paul A. Friedman
425 Market Street
San Francisco, California 94105
(415) 268 7000

YARMUTH WILSDON CALFO PLLC
Scott Wilsdon, Esq.
3080 Washington Mutual Tower
1201 Third Ave
Seattle Washington 98101
206 516 3800


LAW OFFICES OF S. J. CHRISTINE YANG
S. J. Christine Yang
Plaza DelLago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, California 92708
(714) 641-4022


Attorneys for Specially Appearing Defendants
Chicony Electronics Corporation and Chicony
America, Inc.

IT IS ORDERED that the Stipulated Protective Order agreed to between the parties is

entered by the court.

Dated: June 10, 2003

_(signature)_

HON. Barbara Jacobs Rothstein
United States District Judge

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

```
-----------------------------------------------x
Minebea Co. Ltd.                               :
                                               :
                          Plaintiffs,          :     No. CV 03 0295R
                                               :
                      - against -              :     EXPERT
                                               :
Chicony Electronics Co., Ltd. and Chicony      :
America, Inc.                                  :
                                               :
                          Defendants.          :
-----------------------------------------------X
```

### UNDERTAKING OF _____

I, _____, being duly sworn, state that:

1.    My address is _____

_____

_____

2.    My present employer is _____

_____, and

the address of my present employment is _____

_____.

3.    My present occupation or job description is ___ _____

_____.

4.    I have attached hereto a full and accurate description of my educational and
employment history or a current curriculum vitae containing the same.

5.    I hereby acknowledge that I may receive information designated as Confidential Information from the parties in this litigation or from third parties producing documents in this litigation and certify my understanding that such information is provided to me pursuant to the terms and restrictions of the PROTECTIVE ORDER issued in this case, that I have been given a copy of and have read the said PROTECTIVE ORDER, that I am familiar with the terms thereof, that I agree to comply with and to be bound by the terms thereof, that I agree not to reveal any Confidential Information any notes or results of any tests or analyses containing Confidential Information to anyone not authorized to receive such information pursuant to the terms of said PROTECTIVE ORDER, that I agree not to use, directly or indirectly, or allow the use of any Confidential Information for any purpose other than directly associated with my duties in this litigation.

6.    I understand that I am to retain all copies of the materials that I receive which have been designated as Confidential Information, in a container, cabinet, drawer, room or other safe place in a manner consistent with this PROTECTIVE ORDER, and that all copies of any such materials are to remain in my custody until I have completed my assigned duties or turned over to a successor who also has agreed in writing to be bound by the terms of the PROTECTIVE ORDER, whereupon the copies are to be destroyed or returned to the disclosing party. Such return or destruction shall not relieve me from the obligations imposed upon me by said PROTECTIVE ORDER.

7.    I hereby agree to subject myself to the jurisdiction of the United States District Court for the Southern District of California in any proceeding relating to the performance under, compliance with, or violation of said PROTECTIVE ORDER.

Signed_____ _____  ._____ _____

Dated_____ ._____ ._____

# APPENDIX B

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

```
------------------------------------------------x
Minebea Co. Ltd.                                :
                          Plaintiffs,           :      No. CV 03 0295R
                                                :
             - against -                        :
                                                :
Chicony Electronics Co., Ltd. and Chicony       :
America, Inc.                                    :
                                                :
                          Defendants.           :
------------------------------------------------X
```

## NONDISCLOSURE AGREEMENT
## FOR REPORTER/STENOGRAPHER/OUTSIDE CONTRACTOR

I, _____, do solemnly swear that I will not divulge any information communicated to me in any confidential portion of the Proceeding, except as permitted in the PROTECTIVE ORDER issued in this case. I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with any official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the parties in the action.

I hereby agree to subject myself to the jurisdiction of the United States District Court for the Southern District of California in any proceeding relating to the performance under, compliance with, or violation of said PROTECTIVE ORDER.

Signed_____  ___

Dated_____

Firm or Affiliation_____

_____

_____

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

```
------------------------------------------x
Minebea Co. Ltd.                          :
                        Plaintiffs,       :     No. CV 03 0295R
                                          :
              - against -                 :     WITNESS
                                          :
Chicony Electronics Co., Ltd. and Chicony :
America, Inc.                             :
                                          :
                        Defendants.       :
------------------------------------------X
```

## UNDERTAKING OF _____

I, _____ _____, being duly sworn, state that:

1.    My    address    is    _____

_____  _____

_____  _____.

2.    My    present    employer    is    _____

_____, and

the address of my present employment is _____

_____  _____  _____.

3.    My present occupation or job description is _____

__ _____ _____ _____ _____.

4.    I hereby acknowledge that I may receive information designated as Confidential

Information from the parties in this litigation or from third parties producing documents in this

litigation and certify my understanding that such information is provided to me pursuant to the

terms and restrictions of the PROTECTIVE ORDER issued in this case, that I have been given a

copy of and have read the said **PROTECTIVE ORDER**, that I am familiar with the terms thereof, that I agree to comply with and to be bound by the terms thereof, that I agree not to reveal any Confidential Information, any notes or results of any tests or analyses containing Confidential Information to anyone not authorized to receive such information pursuant to the terms of said **PROTECTIVE ORDER**, that I agree not to use, directly or indirectly, or allow the use of any Confidential Information for any purpose other than directly associated with my duties in this litigation.

5.  I understand that I am to retain all copies of the materials that I receive which have been designated as Confidential Information in a container, cabinet, drawer, room or other safe place in a manner consistent with this **PROTECTIVE ORDER**, and that all copies of any such materials are to remain in my custody until I have completed my assigned duties or turned over to a successor who also has agreed in writing to be bound by the terms of the **PROTECTIVE ORDER**, whereupon the copies are to be destroyed or returned to the disclosing party. Such return or destruction shall not relieve me from the obligations imposed upon me by said **PROTECTIVE ORDER**.

6.  I hereby agree to subject myself to the jurisdiction of the United States District Court for the Southern District of California in any proceeding relating to the performance under, compliance with, or violation of said **PROTECTIVE ORDER**.

Signed_____

Dated_____

United States District Court
for the
Western District of Washington
June 11, 2003


\* \* MAILING CERTIFICATE OF CLERK \* \*


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:

Peter Scott Ehrlichman, Esq.
DORSEY & WHITNEY LLP
STE 3400
1420 5TH AVE
SEATTLE, WA  98101
FAX 903-8820

Benjamin Levi, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Joel E Lutzker, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Lisa Knight, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Todd Sicklinger, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

David Kagan, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022

FAX 1-212-593-595...

Angelo J Calfo, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Scott T Wilsdon, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

Christine Yang, Esq.
STE 101 & 102
17220 NEWHOPE ST
FOUNTAIN VALLEY, CA  92708
FAX 1-714-641-2082

Honorable Barbara J. Rothstein

CC TO JUDGE DJ

_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

JUN  5 2003

WESTERN DISTRICT OF ...
DEPUTY

_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

**JUN 0 5 2003**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                        DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

MINEBEA CO., LTD.,

    Plaintiff,

v.

CHICONY ELECTRONICS CO., LTD. and
CHICONY AMERICA, INC.,

    Defendants.

No. CV 03 0295 R

CERTIFICATE OF SERVICE

I certify that on this date, I caused true and correct copies of

1.    Defendants' Reply Memorandum of Law in Support of Motion to Transfer;

2.    Rply Declaration of Paul A. Friedman in Support of Defendants' Motion to Transfer

to be served as follows:

//

//

//

//

//

CV 03-00295  #00000027

ORIGINAL

CERTIFICATE OF SERVICE
NO. CV 03 0295 R – Page 1

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

**COUNSEL FOR CHICONY**

S. J. Christine Yang
Attorneys at Law
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, CA 92708
Phone: (714) 641-4022
Fax:    (714) 641-2082
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

Peter Ehrlichman
Dorsey & Whitney
1420 Fifth Avenue, #3400
Seattle, WA  98101
Phone: (206) 903-8800
Fax:    (206) 903-8820
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☒ Via Hand Delivery
☐ Via U.S. Mail

Joel Lutzker
Schulte Roth Zabel LLP
919 Third Ave.
New York, New York 10022
Phone: 212-756-2520
Fax:    (212) 593-5955
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated this 5th day of June, 2003 at Seattle, Washington.

*Shelley Meyer*

Shelley Meyer
Legal Assistant

CERTIFICATE OF SERVICE
NO. CV 03 0295 R – Page 2

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

263.01 df054802 6/5/03

HONORABLE BARBARA J. ROTHSTEIN

CC TO JUDGE DJ

FILED _____ ENTERED
LODGED _____ RECEIVED

JUN - 5 2003 DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

CV 03-00295 #00000026

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

### SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD., | No.  CV 03 0295 R |
| Plaintiff, | **REPLY DECLARATION OF PAUL A. FRIEDMAN IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER** |
| v. | |
| CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC., | NOTE ON MOTION CALENDAR: June 6, 2003 |
| Defendants. | [28 U.S.C. § 1404(a)] |

ORIGINAL

REPLY DECL. OF PAUL A. FRIEDMAN I/S/O
DEFENDANTS' MOTION TO TRANSFER
(CV 03 0295 R)
sf-1512982

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

I, Paul A. Friedman, declare as follows:

1. I am a member of the bar of the State of California and am admitted pro hac vice before this Court. I am an attorney with the law firm of Morrison & Foerster LLP, counsel of record for the Defendants in the above-captioned action. Unless otherwise noted, I have personal knowledge of the facts set forth herein and, if called as a witness, I could competently testify thereto.

2. Attached as Exhibit 1 is a true and correct copy of Minebea Co. Ltd.'s Memorandum in Opposition to Peripheral Technology, Inc.'s Motion to Dismiss, dated November 26, 2001, in *Minebea Co., Ltd. v. Think Outside, Inc., et al.*

3. Attached as Exhibit 2 is a true and correct copy of Plaintiff Minebea's Rule 26(a)(1) Initial Disclosures, dated May 19, 2003.

4. Attached as Exhibit 3 is a true and correct copy of Defendants' Initial Disclosures, dated May 15, 2003.

5. Attached as Exhibit 4 is a true and correct copy of a letter from David H. Kagan of Schulte Roth & Zabel LLP to Michael Jacobs of Morrison & Foerster, dated August 23, 2001.

6. Attached as Exhibit 5 is a true and correct copy of a letter from Lisa M. Knight of Schulte Roth & Zabel LLP to me, dated October 28, 2002.

7. Attached as Exhibit 6 is a true and correct copy of a letter from Lisa M. Knight of Schulte Roth & Zabel LLP to me, dated November 2, 2002.

8. Attached as Exhibit 7 is a true and correct copy of a letter from Lisa M. Knight of Schulte Roth & Zabel LLP to me, dated November 6, 2002.

9. Attached as Exhibit 8 is a true and correct copy of Objections and Responses to Defendant Think Outside, Inc.'s Subpoena Directed to Dean S. Cowles, dated November 27, 2002, in *Minebea Co., Ltd. v. Think Outside, Inc.*

REPLY DECL. OF PAUL A. FRIEDMAN I/S/O
DEFENDANTS' MOTION TO TRANSFER
(CV 03 0295 R) – PAGE 1

sf-1512982

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

10.   Attached as Exhibit 9 is a true and correct copy of excerpts of the transcript of the Telephonic Status Conference with Judge Barry Ted Moskowitz on May 14, 2003 in *Minebea Co., Ltd. v. Think Outside, Inc., et al.*

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 4, 2003, in San Francisco, California.

_____
Paul A. Friedman

REPLY DECL. OF PAUL A. FRIEDMAN I/S/O
DEFENDANTS' MOTION TO TRANSFER
(CV 03 0295 R) – PAGE 2

sf-1512982

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

Exhibit 1

1   ARNOLD & PORTER
    RONALD L. JOHNSTON (State Bar No. 57418)
2   JAMES S. BLACKBURN (State Bar No. 169134)
    1900 Avenue of the Stars, 17th Floor
3   Los Angeles, California 90067-4408
    Telephone: (310) 552-2500
4   Facsimile: (310) 552-1191

5

6   SCHULTE ROTH & ZABEL LLP
    JOEL LUTZKER
7   DAVID KAGAN
    TODD SICKLINGER
    LISA M. KNIGHT
8   919 Third Avenue
    New York, New York 10022
9   Telephone: (212) 756-2000
    Facsimile: (212) 593-5955

10

11  Attorneys for Plaintiff Minebea Co., Ltd.

12

13

14              UNITED STATES DISTRICT COURT

15              SOUTHERN DISTRICT OF CALIFORNIA

16

17  MINEBEA CO., LTD., a Japanese          )   Case No. 01 CV 0771BTM (POR)
    corporation,                           )
18                                         )   MINEBEA CO. LTD.'S MEMORANDUM
            Plaintiff,                     )   IN OPPOSITION TO PERIPHERAL
19                                         )   TECHNOLOGY, INC.'S MOTION TO
        v.                                 )   DISMISS
20                                         )
    THINK OUTSIDE, INC., a California      )   Hearing Date: December 10, 2001
21  corporation; and PERIPHERAL           )   Time:          9:00 a.m.
    TECHNOLOGY, INC., a Taiwan             )
22  corporation.                           )
                                           )
23          Defendants.                    )
                                           )
24                                         )

25

26

27

28

RECEIVED
NOV 29 2001
M.A.J.

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
160 F.3d 1373 (Fed. Cir. 1998) ........................................................................ 8

*Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*,
480 U.S. 102 (1987) ........................................................................ 8

*Beverly Hills Fan Company v. Royal Sovereign Corp.*,
21 F.3d 1558 (Fed. Cir. 1994) ........................................................................ 15-17

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ........................................................ 8-11, 13, 15, 16

*Duple Motor Bodies, Ltd. v. Hollingsworth*,
417 F.2d 231 (9th Cir. 1969) ........................................................................ 11, 12

*Goldberg v. Cordis Corp.*,
203 U.S.P.Q. 717 (N.D. Ill. 1976) ........................................................................ 18

*Inamed Corp. v. Kuzmak*,
249 F.3d 1356 (Fed. Cir. 2001) ........................................................................ 8-9

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ........................................................................ 8

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) ........................................................................ 13, 16, 17

*Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*,
24 F.3d 1368 (Fed. Cir. 1994) ........................................................................ 18

*N. Am. Philips Corp. v. Am. Vending Sales, Inc.*,
35 F.3d 1576 (Fed. Cir. 1994) ........................................................................ 14

*Nelson v. Park Indus., Inc.*,
717 F.2d 1120 (7th Cir. 1983) ........................................................ 11, 13-14, 17

*Stein Assoc.,Iinc. v. Heat & Control, Inc.*,
748 F.2d 653 (Fed. Cir. 1984) ........................................................................ 18

*Taylor v. Phelan*,
912 F.2d 429 (10th Cir. 1990) ........................................................................ 9

*Wilden Pump & Eng'g Co. v. Versa-Matic Tool Inc.*,
20 U.S.P.Q.2d 1788 (C.D. Cal. 1991) ........................................................................ 12, 14

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ........................................................................ 10, 12, 16

*Worldtronics Int'l, Inc. v. Ever Splendor Enter. Co.*,
969 F. Supp. 1136 (N.D. Ill. 1997) ........................................................ 11, 14, 17

i

# STATUTES

Page

35 U.S.C. § 271 ................................................................................................ 18

Fed. R. Civ. P. 4(k)(2) ................................................................................ 3, 15

Fed. R. Civ. P. 12(b)(2) ................................................................................. 1

# TABLE OF CONTENTS

Page

I.   INTRODUCTION.................................................................................................1

II.  THE PARTIES AND THE UNDERLYING ACTION ...........................................3

III. PERTECH HAS AN OVERWHELMING NUMBER OF CONTACTS WITH
     CALIFORNIA THAT ALLOW THIS COURT TO EXERCISE PERSONAL
     JURISDICTION OVER IT CONSONANT WITH DUE PROCESS ......................8

     A.   PerTech Purposefully Directed Its Activities At California
          Residents .............................................................................................9

     B.   This Court's Assertion Of Personal Jurisdiction Over PerTech Is
          Clearly Reasonable And Fair .............................................................15

     1.   Fairness Requires PerTech To Submit To The Burdens Of
          Litigating This Action In California ...................................................16

     2.   California Has A Significant Interest In This Action.........................17

     3.   Minebea Has A Significant Interest In Obtaining Relief In
          California.............................................................................................18

IV.  CONCLUSION ..................................................................................................19

1    Plaintiff Minebea Co., Ltd. (hereinafter "Minebea") submits this memorandum in opposition

2    to Defendant Peripheral Technology, Inc.'s (hereinafter "PerTech") Motion To Dismiss for lack of

3    personal jurisdiction under Fed. R. Civ. P. 12(b)(2).

4    **I.    INTRODUCTION**

5    The underlying Action was commenced by Minebea against PerTech and Think Outside,

6    Inc. (hereinafter "Think Outside") for infringement of U.S. Patent No. 4,433,225 (hereinafter "the

7    '225 Patent"), which pertains to a highly innovative mechanism for ensuring that the keys of a

8    computer keyboard remain level when they are depressed and then return to their original position.

9    The product accused of infringment is a fold-up keyboard manufactured by PerTech and sold by

10   Think Outside.

11   PerTech has filed this Motion to Dismiss on the grounds that this Court lacks personal

12   jurisdiction over it because: 1) PerTech allegedly lacks sufficient minimum contacts with

13   California, and 2) even if PerTech has the requisite minimum contacts with California, it would

14   allegedly be constitutionally unreasonable to require PerTech to defend this Action before this

15   Court. These arguments are meritless. PerTech has submitted a declaration provided by its

16   Chairman and General Manager, Mr. George Kao, (hereinafter "the Kao Declaration") in an effort

17   to demonstrate a lack of minimum contacts. This declaration is filled with factually incorrect

18   statements. In particular, Mr. Kao incorrectly states in paragraphs 8 and 9 of his declaration, that

19   "PerTech has no … knowledge of what Think Outside does with the keyboards once they leave

20   PerTech's manufacturing facility in Taiwan" and that "PerTech employees have never visited Think

21   Outside in California or elsewhere in the United States." PerTech's Memorandum in support of its

22   Motion improperly relies upon these false statements. The deposition testimony of Mr. Jeffrey

23   Seligman, vice president of business development for Think Outside and Mr. Kao's own deposition

24   testimony clearly establishes that these statements are incorrect.

25   PerTech's Motion must fail given PerTech's purposeful, substantial and continuous activities

26   directed at United States residents, and California residents in particular. The following is just a

27   partial list of PerTech's contacts with California:

28

MINEBEA CO. LTD.'S MEMORANDUM IN OPPOSITION TO
PERIPHERAL TECHNOLOGY, INC.'S MOTION TO DISMISS
CASE NO. 01 CV 0771BTM (POR)

1

- PerTech purposefully directed communications including telephone calls, facsimile transmissions and overnight mail at California to successfully negotiate a contract to supply the infringing keyboards to California based Think Outside ;

- PerTech purposefully entered into a continuous and systematic contract to supply California based Think Outside with infringing keyboards. The contract is governed by California law and has a California forum selection clause. In the past, PerTech and Think Outside have also entered into other contracts governed by California law;

- PerTech is the party responsible for providing patent protection against infringement of any United States patents directed to the Key Lift portion of its keyboards, the portion at issue in this Action, under its Manufacturing Agreement with Think Outside;

- PerTech has sent a representative to California to meet with Think Outside in connection with their continuing relationship. Furthermore, Think Outside employees visit PerTech in Taiwan on nearly a monthly basis;

- PerTech maintains a U.S. bank account in another name thorugh which it receives U.S. dollars;

- PerTech prepares invoices that indicate the "port of destination" of PerTech's infringing products is California;

- PerTech directly ships infringing keyboards into California from Taiwan;

- PerTech is responsible for applying the logos of Think Outside's customers to its infringing keyboards prior to relinquishing control of them. Think Outside's customers include Palm, Inc. (hereinafter "Palm"), another California company;

- PerTech's infringing keyboards meet FCC standards, which are relevant only to products destined for the United States. PerTech applies the FCC labels to the bottom of its infringing keyboards prior to relinquishing control of them;

- PerTech employees frequently correspond with Think Outside employees via e-mail from Taiwan to California with respect to their continuing business relationship. Moreover, PerTech and Think Outside communicate via telephone on a daily basis; and

1      •  Approximately one million units of PerTech's infringing keyboards have been sold in the

2          United States since February of 2000.

3      PerTech's contacts with California far exceed the level of contacts sufficient for this Court to

4  exercise personal jurisdiction over it. Furthermore, even if PerTech lacked sufficient minimum

5  contacts with California, which it clearly does not, this Court should still exercise personal

6  jurisdiction over PerTech under Fed. R. Civ. P. 4(k)(2), which allows this Court to aggregate

7  PerTech's contacts with the United States to satisfy the constitutional criteria.

8      This Court's assertion of personal jurisdiction over PerTech is certainly reasonable and fair.

9  PerTech should have reasonably anticipated being haled into court in California. PerTech

10  continually supplies infringing keyboards to Think Outside and generates a large volume of

11  business in California, in the course of which it receives the benefits and protections of California's

12  laws. The burden on PerTech of litigating this matter in California is minimal in comparison to

13  California's significant interest in discouraging infringements of United States patents that occur

14  within the state. In addition, Minebea has a significant interest in having PerTech's infringement of

15  Minebea's United States patent adjudicated before this Court.

16  **II.    THE PARTIES AND THE UNDERLYING ACTION**

17      Plaintiff Minebea owns numerous United States patents including all right, title and interest

18  in the '225 Patent, entitled Keytop Leveling mechanism. The '225 Patent is directed to a highly

19  innovative and elegant mechanism for supporting and stabilizing the keys of a keyboard.

20      Defendant PerTech is a Taiwanese corporation that manufactures computer keyboards,

21  including the keyboard that Minebea accuses of infringement in this lawsuit. Although PerTech's

22  principal place of business is Taiwan, it owns five United States patents, specifically U.S. Patent

23  Nos. 6,183,150 B1, 5,850,194, 6,144,551, 6,017,222, and U.S. Des. Patent No. 332,946. Two of

24  these patents, in particular U.S. Patent Nos. 6,183,150 B1 and 5,850,194, are directed to computer

25  key technology, the very technology at issue in this Action. In the process of applying for these

26  patents, PerTech employed the services of various United States law firms located throughout the

27  country including Baker & Botts L.L.P., Fish & Richardson P.C., Ladas & Parry, Harness, Dickey

28

1 & Pierce, P.L.C. and Woodard, Emhardt, Naughton, Moriarty & McNett. Two of these law firms,

2 specifically Fish & Richardson P.C. and Ladas & Parry, have offices in California.

3      PerTech's main customer is Quanta, one of the largest computer manufacturers in Taiwan.

4 PerTech's keyboards are ubiquitous throughout the United States since Quanta sells portable

5 computers incorporating PerTech keyboards to Hewlett-Packard and Gateway Inc., both California

6 companies, IBM, Dell Computer Corp., Siemens AG and Sharp Corp. Seligman Tr. at 79-81, Exh.

7 H. All of Quanta's above-identified customers are large multinational companies that conduct

8 business throughout the United States, including the state of California.

9      Defendant Think Outside is a California corporation that has its principal place of business

10 in California. It is engaged in the business of selling a line of fold-up keyboards known as the

11 Stowaway Portable Keyboard that is intended for use with cellular telephones and Personal Digital

12 Assistants (hereinafter "PDAs"), which are electronic organizers such as the Palm Pilot. The

13 Stowaway Portable Keyboard was specifically manufactured and developed by PerTech for Think

14 Outside. *See* Seligman Tr. at 46, Exh. H. Think Outside sells Stowaway Portable Keyboards to

15 various corporations including Palm, another California corporation, Motorola, Inc. (hereinafter

16 "Motorola") and Targus Inc. (hereinafter "Targus"). *See* Seligman Tr. at 39-40, Exh. H.

17      Think Outside has no manufacturing capabilities of its own, and contracts with PerTech for

18 the manufacture of the Stowaway Portable Keyboard. Since January 29, 1999, PerTech and Think

19 Outside have been bound by a continuing contract, whereby PerTech manufactures the Stowaway

20 Portable Keyboards for Think Outside. *See* Manufacturing Agreement at 1, Exh. F. The contract

21 between PerTech and Think Outside is "governed by and construed in accordance with the laws of

22 the United States and the State of California as applied to agreements entered into and to be

23 performed entirely within California between California residents." *See* Manufacturing Agreement

24 at 14.6, Exh. F. Furthermore, as provided in paragraph 14.7 of the contract between PerTech and

25 Think Outside:

26      Jurisdiction and Venue. The parties hereby submit to the jurisdiction of, and waive any

27 venue objections against, the United States District Court for the Central District of California, the

28 Superior Court of the State of California for the County of Los Angeles, the Los Angeles Municipal

1   Court, and any mutually agreed to alternative dispute resolution proceeding taking place in Los

2   Angeles County, California, in any litigation arising out of the Agreement. *See* Manufacturing

3   Agreement at 14.7, Exh. F.

4        Under the contract between PerTech and Think Outside, PerTech is responsible for the Key

5   Lift portion of the Stowaway Portable Keyboard, the portion at issue in this Action. *See* Seligman

6   Tr. at 49, Exh. H. Furthermore, under the contract, PerTech provides patent protection against

7   infringement of any United States patents directed to the Key Lift portion of the Stowaway

8   Portable Keyboard. *See* Seligman Tr. at 49-52, Exh. H. In addition, the contract renews

9   automatically every twelve months unless one of the parties informs the other ninety days prior to

10  the contract's expiration date that they do not want to renew the contract. *See* Manufacturing

11  Agreement at 1, Exh. F. This contract was negotiated by telephone, facsimile transmissions and

12  overnight mail to California. *See* PerTech Motion to Dismiss Memo, at 3.

13        Prior to entering into the Manufacturing Agreement of January 29, 1999, PerTech and Think

14  Outside had also entered into two other written agreements, specifically a Letter of Understanding

15  dated July 8, 1998 and an Agreement dated August 12, 1998. *See* Exhs. D & E. Under both of

16  these agreements as well, PerTech provided patent protection against infringement of any patents

17  directed to the Key Lift portion of its keyboards. *See* Letter of Understanding at 9, Exh. D;

18  August 12, 1998 Agreement at 5c, Exh. E. In addition, the "formation, construction and

19  performance" of the Agreement dated August 12, 1998 was also "construed in accordance with the

20  laws of California." *See* August 12, 1998 Agreement at 12, Exh. E.

21        PerTech undoubtedly knows that many of the Stowaway Portable Keyboards it

22  manufactures and sells to Think Outside are destined for California. *See* Seligman Tr. at 17-19,

23  Exh. H. First, it fills in the "port of destination" on all the invoices it provides to Think Outside,

24  including those for shipments that are bound for California. *See* Seligman Tr. at 17-19, Exh. H.

25  Second, it frequently ships its Stowaway Portable Keyboards directly into California from Taiwan.

26  *See* Seligman Tr. at 37-38, Exh. H; PerTech Motion to Dismiss Memo, at 3. In the past, PerTech

27  has shipped Stowaway Portable Keyboards directly from Taiwan into Anaheim, California and

28  Redwood City, California. *See* Seligman Tr. at 37-38, Exh. H.

MINEBEA CO. LTD.'S MEMORANDUM IN OPPOSITION TO
PERIPHERAL TECHNOLOGY, INC.'S MOTION TO DISMISS
CASE NO. 01 CV 0771BTM (POR)

5

1  Third, PerTech knows the identity of Think Outside's customers, which include California

2  based Palm. PerTech has the logos of Palm, Targus, Compaq and Motorola applied to its Stowaway

3  Portable Keyboards prior to relinquishing control of them to Think Outside or Think Outside's

4  customers. *See* Seligman Tr. at 39-40, Exh. H. Furthermore, Think Outside's customers have

5  visited PerTech's manufacturing facility in Taiwan on multiple occasions to ensure that PerTech's

6  Stowaway Portable Keyboards meet their standards. *See* Seligman Tr. at 67-70, Exh. H. Both Palm

7  and Targus have visited PerTech in Taiwan and met with Mr. George Kao, Chairman and General

8  Manager of PerTech. *See* Seligman Tr. at 70, Exh. H. In addition, PerTech has directly shipped

9  Stowaway Portable Keyboards to both Palm's and Targus' distributors in California. *See* Seligman

10  Tr. at 37-38, Exh. H. PerTech also manufactures user-specific versions of its Stowaway Portable

11  Keyboards which have different connectors to the products of Think Outside's customers. *See*

12  Seligman Tr. at 32-34, 88-89, Exh. H.

13  Fourth, PerTech manufactures localized versions of its Stowaway Portable Keyboard, for

14  marketing in different countries or regions including the United States. *See* Seligman Tr. at 23-24,

15  33-38, Exh. H. All of PerTech's Stowaway Portable Keyboards that are sold in the United States

16  meet FCC standards, which are relevant only to products destined for the United States. *See*

17  Seligman Tr. at 40-41, Exh. H. Furthermore, PerTech applies the FCC labels to the bottom of its

18  Stowaway Portable Keyboards prior to relinquishing control of them to Think Outside or Think

19  Outside's customers. *See* Seligman Tr. at 40-41, Exh. H. In fact, under their Manufacturing

20  Agreement, PerTech was obligated to "assist and cooperate" with Think Outside to obtain FCC

21  approval for the Stowaway Portable Keyboard. *See* Manufacturing Agreement at 11, Exh. F;

22  Seligman Tr. at 70, Exh. H.

23  PerTech's present Motion is therefore based upon the incorrect recitation of facts provided in

24  its moving papers. In particular, the statements that "PerTech has no ... knowledge of what Think

25  Outside does with the keyboards once they leave PerTech's manufacturing facility in Taiwan" (Kao

26  Decl. at 8, Exh. G) and that "PerTech has no knowledge of Think Outside's customer base" and that

27  "PerTech has no ...knowledge of what Think Outside does with the keyboards once they leave

28

1    PerTech's manufacturing facility in Taiwan" (PerTech Motion To Dismiss Memo, at 1, 4) are

2    wrong.

3        Mr. Kao and PerTech are also wrong when they emphasize that "PerTech employees have

4    never visited Think Outside in California or elsewhere in the United States." Kao Decl. at 9, Exh.

5    G; PerTech Motion To Dismiss Memo, at 4. PerTech has sent a representative to California to visit

6    Think Outside in connection with their continuing relationship. *See* Seligman Tr. at 75-76, Exh. H.

7    Furthermore, Think Outside employees visit PerTech in Taiwan on nearly a monthly basis. *See*

8    PerTech Motion To Dismiss Memo, at 4. The two corporations frequently correspond with each

9    other via e-mail from Taiwan to California and vice versa with respect to their continuing business

10    relationship. *See* Exh. B (e-mail). PerTech and Think Outside also communicate via telephone on a

11    daily basis. *See* Seligman Tr. at 91, Exh. H. In addition, PerTech has done business with several

12    other U.S. entities, including Design Concept and Manufacturing Services of Sacramento CA.;

13    Mr. Gary Livingston of Phoenix, AZ; and an unidentified company in Marietta, CA.. *See* Kao

14    Transcript pages 42-50, Exh. I.

15        The Stowaway Portable Keyboards manufactured by PerTech and distributed by Think

16    Outside are extremely popular in the United States. Since February of 2000, approximately one

17    million units have been sold in the United States. *See* Seligman Tr. at 42-43, Exh. H. Furthermore,

18    PerTech's Stowaway Portable Keyboards have frequently appeared in various national publications

19    in the United States including, *inter alia*, Forbes magazine, the Wall Street Journal, Stuff magazine,

20    Business Week, Popular Science, the New York Times, PC Magazine, and PC World magazine.

21    See News Articles on Think Outside's Website, available at

22    http://www.thinkoutside.com/news/articles.html (last visited Oct. 31, 2001) , Exh. A. PerTech's

23    Stowaway Portable Keyboards have also won various awards in the United States including, *inter*

24    *alia*, "Best Accessory of the Year" for 2001 from Mobile Computing, "Mobility Award Winner" for

25    2000 and 2001 from Mobile Insights, "General Accessory of the Year" for 2000 from

26    VisorCentral.com, "EDN Innovation Award Winner" for 2000 from EDN Magazine, "Technical

27    Excellence Award" for 2000 from PC Magazine, and "World Class Award Winner" for 2000 from

28    PC World magazine. *See* News Awards on Think Outside's Website, available at

1    http://www.thinkoutside.com/news/awards.html (last visited Oct. 31, 2001) , Exh. A. Finally,

2    PerTech's Stowaway Portable Keyboards are advertised and sold on Think Outside's Website,

3    Targus' Website, Motorola's Website and Palm's Website.

4        When Minebea discovered that the PerTech's popular Stowaway Portable Keyboards

5    implement one or more inventions claimed in '225 patent, Minebea commenced this infringement

6    Action against Think Outside and PerTech.

7    **III.     PERTECH HAS AN OVERWHELMING NUMBER OF CONTACTS WITH**

8         **CALIFORNIA THAT ALLOW THIS COURT TO EXERCISE PERSONAL**

9         **JURISDICTION OVER IT CONSONANT WITH DUE PROCESS**

10        To determine whether a non-resident defendant such as PerTech is subject to personal

11    jurisdiction in California, the requirements of both California's long-arm statute and federal due

12    process must be satisfied. Since it is undisputed that California's long-arm statute is coextensive

13    with the limits of federal due process, the two inquiries collapse into one. *See Inamed Corp. v.*

14    *Kuzmak,* 249 F.3d 1356, 1360 (Fed. Cir. 2001). Thus, the inquiry is whether PerTech has minimum

15    contacts with California such that maintenance of this suit will not offend traditional notions of fair

16    play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

17        Minimum contacts purposefully established by defendants in the forum state are the

18    "constitutional touchstone" for determining whether the exercise of personal jurisdiction comports

19    with due process. *See Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*, 480

20    U.S. 102, 108-09 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Minimum

21    contacts exist if the defendant "purposefully avails itself of the privilege of conducting activities

22    within the forum State, thus invoking the benefits and protections of its laws." *Asahi*, 480 U.S. at

23    109 (quoting *Burger King*, 471 U.S. at 474). Where the defendant creates "continuing obligations"

24    between him or herself and residents of the forum, minimum contacts will be found to exist. *Burger*

25    *King*, 471 U.S. at 476 (internal citations omitted). Furthermore, direct contact with the forum state

26    is not essential to the exercise of personal jurisdiction. *Id.* at 476.

27        Federal Circuit law applies when analyzing personal jurisdiction for purposes of compliance

28    with federal due process in a patent infringement suit. *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160

1    F.3d 1373, 1377 (Fed. Cir. 1998). The Federal Circuit has established the following three-prong

2    minimum contacts test for determining whether asserting jurisdiction over a non-resident defendant

3    comports with due process: 1) whether the defendant purposefully directed its activities at residents

4    of the forum; 2) whether the claim arises out of or relates to the defendant's activities with the forum

5    ; and 3) whether assertion of personal jurisdiction is reasonable and fair. *Id.* at 1378.

6    **A.    PerTech Purposefully Directed Its Activities At California Residents**

7         PerTech has an overwhelming number of contacts with California that make this Court's

8    exercise of personal jurisdiction over it consonant with due process. First, PerTech purposefully

9    directed communications including telephone calls, facsimile transmissions and overnight mail at

10   California to successfully negotiate the Manufacturing Agreement to supply Stowaway Portable

11   Keyboards to Think Outside. These negotiation efforts accomplished through telephone and mail

12   alone provide a sufficient basis for this Court to exercise personal jurisdiction over PerTech. *See*

13   *Inamed*, 249 F.3d at 1360-62 (holding that combination of infringement letter and negotiation

14   efforts by telephone and mail which culminated in four license agreements sufficient to establish

15   that defendant purposefully directed activities at residents of the forum); *see also Taylor v. Phelan*,

16   912 F.2d 429, 433 n.4 (10th Cir. 1990) ("So long as it creates a substantial connection, even a single

17   telephone call into the forum state can support jurisdiction.").

18        In addition, by entering into the Manufacturing Agreement to sell Stowaway Portable

19   Keyboards to Think Outside, PerTech purposefully created a substantial and continuing relationship

20   with California. PerTech has sent a representative to California to meet with Think Outside in

21   connection with their continuing business relationship. Furthermore, Think Outside employees visit

22   PerTech in Taiwan on nearly a monthly basis. The two corporations frequently correspond with

23   each other via e-mail from Taiwan to California and vice versa, and they communicate via

24   telephone on a daily basis. The Manufacturing Agreement renews automatically every twelve

25   months and generates a large volume of continuous and systematic business for PerTech, in the

26   course of which PerTech receives the benefits and protections of California's laws. Under these

27   circumstances, this Court's assertion of personal jurisdiction over PerTech is certainly proper. *See*

28   *Burger King*, 471 U.S. at 475-76 (Where the defendant "'deliberately' has … created 'continuing

1 obligations' between himself and residents of the forum, …he manifestly has availed himself of the

2 privilege of conducting business there, and because his activities are shielded by 'the benefits and

3 protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the

4 burdens of litigation in that forum as well."); *See LG Elecs., Inc. v. Asustek Computers*, 126 F.

5 Supp. 2d 414, 419-20 (E.D. Va. 2000) (finding personal jurisdiction over a Taiwanese company that

6 made ongoing and continuous shipments of computers containing allegedly infringing

7 motherboards to a company located in another state with knowledge that the computers would

8 arrive in the forum).

9      The Manufacturing Agreement as well as previous agreements between PerTech and Think

10 Outside are governed by California law, further reinforcing PerTech's "deliberate affiliation with the

11 forum State and the reasonable foreseeability of possible litigation there." *See Burger King*, 471

12 U.S. at 482 (concluding that choice-of-law provisions should be considered in determining whether

13 personal jurisdiction over a non-resident defendant is proper). The contract also has a California

14 forum selection clause, which indicates PerTech's willingness to submit to the jurisdiction and

15 venue of this Court. Under the Manufacturing Agreement, PerTech also provides patent protection

16 against infringement of any United States patents directed to the Key Lift portion of the Stowaway

17 Portable Keyboard, the portion at issue in this Action. Thus, PerTech was clearly aware that it

18 might someday be haled into Court in California to defend a patent infringement suit based upon the

19 Key Lift portion of its Stowaway Portable Keyboard. *See World-Wide Volkswagen Corp. v.

20 Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis …

21 is that the defendant's conduct and connection with the forum State are such that he should

22 reasonably anticipate being haled into court there.").

23      PerTech deliberately serves the California market. PerTech specifically manufactured and

24 developed the Stowaway Portable Keyboard for Think Outside, indicating its purposeful intent of

25 serving the California market. Furthermore, PerTech knows the identity of Think Outside's

26 customers, which include California based Palm. Palm and other Think Outside customers have

27 visited PerTech in Taiwan to ensure that PerTech's Stowaway Portable Keyboards meet their

28 standards. PerTech manufactures user-specific versions of its Stowaway Portable Keyboards which

1 have different connectors to the products of Think Outside's customers including Palm. In fact,

2 PerTech intentionally has the logos of Palm and Think Outside's other customers applied to its

3 Stowaway Portable Keyboards prior to relinquishing control of them. Under these circumstances,

4 this Court can clearly assert personal jurisdiction over PerTech. *See Nelson v. Park Indus., Inc.*,

5 717 F.2d 1120, 1123 (7th Cir. 1983) (finding personal jurisdiction over Hong Kong manufacturer of

6 apparel that placed American retailer's labels on shirts); *Duple Motor Bodies, Ltd. v. Hollingsworth*,

7 417 F.2d 231, 234 (9th Cir. 1969) (finding personal jurisdiction over foreign defendant that

8 designed and manufactured its product "with special modifications to adapt them for use" in the

9 forum).

10 PerTech knows that its Stowaway Portable Keyboards are bound for California. It prepares

11 invoices that indicate the "port of destination" of PerTech's Stowaway Portable Keyboards is

12 California. PerTech directly ships Stowaway Portable Keyboards into California from Taiwan.

13 Furthermore, PerTech is clearly aware that its Stowaway Portable Keyboards are destined for the

14 United States since its keyboards meet FCC standards, which are only relevant to products destined

15 for the United States. PerTech applies the FCC labels to the bottom of its Stowaway Portable

16 Keyboards prior to relinquishing control of them. *See Worldtronics Int'l, Inc. v. Ever Splendor*

17 *Enter. Co.*, 969 F. Supp. 1136, 1139-42 (N.D. Ill. 1997) (finding personal jurisdiction over

18 Taiwanese manufacturer of allegedly infringing coffee makers that met FDA standards because it

19 knowingly shipped infringing products into the forum via intermediaries).

20 In addition, PerTech has done business with several other U.S. entities, including Design

21 Concept and Manufacturing Services of Sacramento CA.; Mr. Gary Livingston of Phoenix, AZ; and

22 an unidentified company in Marietta, CA. *See* Kao Transcript pages 42-50, Exh I.

23 Accordingly, since PerTech purposefully sells Stowaway Portable Keyboards to a California

24 company knowing that the infringing keyboards will subsequently be sold to Palm, California

25 consumers, as well as consumers throughout the United States, this Court's assertion of personal

26 jurisdiction over PerTech is clearly proper. *See Burger King*, 471 U.S. at 473 ("[t]he forum State

27 does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a

28 corporation that delivers its products into the stream of commerce with the expectation that they

1    will be purchased by consumers in the forum State"); *World-Wide Volkswagen Corp. v. Woodson*,

2    444 U.S. 286, 297 (1980) ("[I]f the sale of a product of a manufacturer or distributor ... is not

3    simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve,

4    directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to

5    suit in one of those States if its allegedly defective merchandise has there been the source of injury

6    to its owners or to others."); *Duple Motor Bodies, Ltd. v. Hollingsworth*, 417 F.2d 231, 235 (9th Cir.

7    1969) ("[T]he presence of Duple's coach bodies in Hawaii, brought about by Duple's sale to

8    Vauxhall with knowledge that the product was destined for Hawaii, was sufficient contact with

9    Hawaii to meet the requirements of due process."); *Wilden Pump & Eng'g Co. v. Versa-Matic Tool*

10    *Inc.*, 20 U.S.P.Q.2d 1788, 1790 (C.D. Cal. 1991) (finding personal jurisdiction over non-resident

11    defendant where it "deliberately sold and shipped its [allegedly infringing] pumps to California

12    distributors").

13         PerTech also intentionally derives substantial benefit from its contacts with the United

14    States and California. Approximately one million units of PerTech's Stowaway Portable Keyboards

15    have been sold in the United States since February of 2000. A member of its board of directors –

16    George Kao's wife – maintains a bank account in her name in the United States with Merrill Lynch

17    and Pertech receives payments through this account for services it renders to Think Outside. Kao

18    Rough Transcript pages 55-58, Exh H. PerTech's Stowaway Portable Keyboards have frequently

19    appeared in various national publications including, inter alia, Forbes magazine, the Wall Street

20    Journal, Stuff magazine, Business Week, Popular Science, the New York Times, PC Magazine, and

21    PC World magazine. The infringing keyboards have also won various awards in the United States

22    including, inter alia, "Best Accessory of the Year" for 2001 from Mobile Computing, "Mobility

23    Award Winner" for 2000 and 2001 from Mobile Insights, "General Accessory of the Year" for 2000

24    from VisorCentral.com, "EDN Innovation Award Winner" for 2000 from EDN Magazine,

25    "Technical Excellence Award" for 2000 from PC Magazine, and "World Class Award Winner" for

26    2000 from PC World magazine. Moreover, PerTech's Stowaway Portable Keyboards are advertised

27    and sold on Think Outside's Website, Targus' Website, Motorola's Website and Palm's Website.

28    *See LG Elecs.*, 126 F. Supp. 2d at 420 (finding personal jurisdiction over a Taiwanese company in

1   part because it maintained a website where consumers of the forum could locate retailers of the its

2   allegedly infringing products).

3       PerTech's other products are popular in the United States as well. PerTech's other keyboards

4   are ubiquitous throughout the United States since Quanta sells portable computers incorporating

5   PerTech keyboards to Hewlett-Packard and Gateway Inc., both California companies, IBM, Dell

6   Computer Corp., Siemens AG and Sharp Corp. Since PerTech clearly generates a large volume of

7   continuous and systematic business in California, in the course of which it receives the benefits and

8   protections of California's laws, PerTech clearly has sufficient contacts with California for this

9   Court to properly assert personal jurisdiction over it. *See Burger King*, 471 U.S. at 473-74

10  ("[W]here individuals 'purposefully derive benefit' from their interstate activities, ...it may well be

11  unfair to allow them to escape having to account in other States for consequences that arise

12  proximately from such activities."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)

13  ("[R]egular monthly sales of thousands of magazines cannot by any stretch of the imagination be

14  characterized as random, isolated, or fortuitous. It is, therefore, unquestionable that New

15  Hampshire jurisdiction over a complaint based on those contacts would ordinarily satisfy the

16  requirement of the Due Process Clause that a State's assertion of personal jurisdiction over a

17  nonresident defendant be predicated on 'minimum contacts' between the defendant and the State.");

18  *Nelson*, 717 F.2d at 1127 (finding personal jurisdiction over Hong Kong manufacturer of apparel

19  that "derived economic benefit from selling the flannel shirts they placed into and moved along the

20  stream of commerce).

21       Finally, PerTech purposefully sought protection for its intellectual property under the patent

22  laws of the United States. It owns five United States patents, two of which are directed to the very

23  technology at issue in this Action. These patents restrict the ability of California residents to

24  conduct business with respect to the technology involved in PerTech's patents. Furthermore, in the

25  process of applying for these patents, PerTech employed the services of various United States law

26  firms located throughout the country. Two of these law firms have offices in California. Thus, this

27  Court's assertion of personal jurisdiction over PerTech is clearly proper since PerTech purposefully

28  sought and has received the benefits and protections of the patent laws of the United States. *See*

1  *Mates v. N. Am. Vaccine, Inc.*, 53 F. Supp. 2d 814, 820 (D. Md. 199) (finding personal jurisdiction

2  over Canadian corporation in part because it owned 13 U.S. Patents establishing that it

3  "purposefully availed [itself] of the privilege of conducting activities in the United States"); *Rodin*

4  *Props.-Shore Mall, N.V. v. Cushman & Wakefield, Inc.*, 49 F. Supp. 2d 709, 718 (D.N.J. 1999)

5  (finding personal jurisdiction over non-resident defendant that hired two law firms located in the

6  forum).

7         Consequently, PerTech's contacts with California far exceed the level of contacts sufficient

8  for this Court to exercise personal jurisdiction over it. Yet, PerTech emphasizes that it delivers its

9  Stowaway Portable Keyboards "FOB Taiwan" and that it "has no control over what Think Outside

10  does with the keyboards once they leave PerTech's manufacturing facility in Taiwan," in an attempt

11  to mitigate its contacts with California. The Federal Circuit as well as other courts have rejected

12  this argument when presented by non-resident defendants under even more attenuated

13  circumstances. *See N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576 (Fed. Cir. 1994)

14  (finding personal jurisdiction over nonresident defendants that delivered allegedly infringing

15  product into forum f.o.b. from other states because they "voluntarily placed a substantial quantity of

16  infringing articles into the stream of commerce conscious that they were destined for Illinois.

17  Regardless where the transactions are deemed to be situated under the tort or the 'transacting

18  business' provisions, these defendants were nonetheless parties to the importation into the forum

19  state. Surely the reasonable market participant in the modern commercial world has to expect to be

20  haled into the courts of that state, however distant, to answer for any liability based at least in part

21  on that importation."); *Nelson*, 717 F.2d at 1126 (finding personal jurisdiction over a Hong Kong

22  manufacturer of apparel that sold shirts f.o.b. Hong Kong to a Hong Kong intermediary that it had

23  "no control over," who in turn sold it to the retailer); *Worldtronics*, 969 F. Supp. at 1138-42 (finding

24  personal jurisdiction over Taiwanese corporation that sold allegedly infringing products f.o.b.

25  Taiwan or Hong Kong to intermediaries "in Taiwan or Hong Kong, where it relinquishes control of

26  the products to the purchaser, who can ship those products anywhere in the world as its discretion");

27  *Wilden Pump & Eng'g Co. v. Versa-Matic Tool Inc.*, 20 U.S.P.Q.2d 1788 (C.D. Cal. 1991) (finding

28  personal jurisdiction over non-resident defendant where sales of allegedly infringing articles to

1  distributors in the forum could not be said to fall entirely without the forum for purposes of a

2  jurisdictional analysis simply because they were delivered f.o.b. outside the forum).

3  Even if PerTech lacked sufficient minimum contacts with California, which it clearly does

4  not, this Court can still exercise personal jurisdiction over PerTech under Fed. R. Civ. P. 4(k)(2).

5  Rule 4(k)(2) allows this Court to aggregate PerTech's contacts with the United States to assert

6  jurisdiction over PerTech. *See, e.g., Minebea Co. v. Papst*, 13 F. Supp. 2d 35, 42 n.6 (D.D.C. 1998)

7  (noting personal jurisdiction over foreign defendant via aggregation of contacts under Rule 4(k)(2)

8  for patent declaratory judgment claims). PerTech's contacts with the entire United States certainly

9  exceed the level of contacts sufficient for this court to exercise personal jurisdiction over PerTech

10  under Rule 4(k)(2).

11  In summary, PerTech's contacts with California far exceed the minimum contacts required

12  for this Court to exercise personal jurisdiction over it consonant with due process.

13  **B.     This Court's Assertion Of Personal Jurisdiction Over PerTech Is Clearly**

14  **Reasonable And Fair**

15  PerTech's assertion that it would be unreasonable and unfair for this Court to exercise

16  personal jurisdiction over it should also be rejected. Since PerTech has purposefully directed its

17  activities at California residents, PerTech bears the burden of demonstrating a "compelling case"

18  why this Court's assertion of personal jurisdiction over it would be unreasonable. *Burger King*, 471

19  U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents

20  seeks to defeat jurisdiction, he must present a compelling case that the presence of some other

21  considerations would render jurisdiction unreasonable.") (emphasis added); *see also Beverly Hills*

22  *Fan Company v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994) ("In general, these

23  cases are limited to the rare situation in which the plaintiff's interest and the state's interest in

24  adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the

25  burden of subjecting the defendant to litigation within the forum."). Among the factors this Court

26  may consider in making this determination are: (1) the burden on PerTech; (2) California's interest

27  in adjudicating the dispute; (3) Minebea's interest in obtaining convenient and effective relief; (4)

28  the interstate judicial system's interest in obtaining the most efficient resolution of controversies; (5)

the shared interest of the several states in furthering their social policies. *See Burger King*, 471 U.S. at 477.

## 1. Fairness Requires PerTech To Submit To The Burdens Of Litigating This Action In California

PerTech's complaints regarding the burden of litigating this Action in California are unjustifiable since this Action is based upon its sales of infringing keyboards to a California company. Through its continuous and systematic business relationship with Think Outside, it receives the benefits and protections of California's laws. Under these circumstances, PerTech should have reasonably anticipated being haled into Court in California. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."); *Burger King*, 471 U.S. at 473-74 ("[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities"); *see also Hustler Magazine*, 465 U.S. at 781 (holding that since defendant "has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine.").

In addition, Modern transportation and communications have mitigated the burden on PerTech of litigating this Action in California. *See Burger King*, 471 U.S. at 473-74 ("[B]ecause 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigation in another forum for disputes relating to such activity."); *Beverly Hills*, 21 F.3d at 1569 ("[I]t is recognized that 'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.'").

In fact, many Courts have found proper the exercise of personal jurisdiction over foreign defendants under circumstances where the defendants contacts with the forum were even more attenuated than PerTech's. *See Beverly Hills*, 21 F.3d at 1563-69 (finding personal jurisdiction over

1 Chinese manufacturer where its contact with the forum resulted from indirect shipments of

2 allegedly infringing products, through intermediaries, into forum and not through direct sales of its

3 product to a resident of the forum); *Nelson*, 717 F.2d at 1126 (finding personal jurisdiction over a

4 Hong Kong manufacturer of apparel that sold shirts f.o.b. Hong Kong to a Hong Kong intermediary

5 that it had "no control over," who in turn sold it to the retailer); *LG Elecs.*, 126 F. Supp. 2d at 416-

6 21 (finding personal jurisdiction over Taiwanese manufacturer that sold its allegedly infringing

7 product, through an intermediary located in another state, to retailers in the forum); *Worldtronics*

8 *Int'l*, 969 F. Supp. at 1141 (finding personal jurisdiction over Taiwanese manufacturer of allegedly

9 infringing products who shipped "the accused product f.o.b. outside of Illinois to a customer who

10 ships the product to Illinois (albeit sometimes through yet another customer)").

11         2.     **California Has A Significant Interest In This Action**

12        California has a significant interest in having this matter adjudicated here. First, California

13 has a significant interest in discouraging PerTech's infringement of Minebea's U.S. patent within its

14 borders. *See Beverly Hills*, 21 F.3d at 1568 ("Virginia's interests in the dispute are significant.

15 Virginia has an interest in discouraging injuries that occur within the state. ...That interest extends

16 to design patent infringement actions such as the one here."); *LG Elecs*, 126 F. Supp. 2d at 1420

17 (holding that the forum had an interest in discouraging patent infringement within the state).

18 California also has a substantial interest in cooperating with other states to provide a forum for

19 efficiently litigating Minebea's patent infringement claim against PerTech. *See Beverly Hills*,

20 21 F.3d at 1568 ("Virginia also has a substantial interest in cooperating with other states to provide

21 a forum for efficiently litigating plaintiff's cause of action. ... These other states will thus be spared

22 the burden of providing a forum for Beverly to seek redress for these sales. And defendants will be

23 protected from harassment resulting from multiple suits.").

24        Furthermore, PerTech's emphasis on Minebea's status as a non-resident to demonstrate that

25 California has a negligible interest in this Action lacks merit. *See Keeton v. Hustler Magazine, Inc.*,

26 465 U.S. at 780 ("[P]laintiff's residence in the forum State is not a separate requirement, and lack of

27 residence will not defeat jurisdiction established on the basis of defendant's contacts."); *Beverly*

28 *Hills*, 21 F.3d at 1560 (finding personal jurisdiction over Chinese manufacturer in Virginia where

1 plaintiff/patent owner was a not a resident of the forum); *LG Elecs.*, 126 F. Supp. 2d at 416-17

2 (finding personal jurisdiction over a Taiwanese defendant in a patent infringement suit where

3 plaintiff/patent owner was a Korean corporation).

4     PerTech's emphasis on the location of witnesses and documentary evidence also favors

5 California as the proper forum for this Action since all of Think Outside's documents and witnesses

6 are located in California.

7     **3.    Minebea Has A Significant Interest In Obtaining Relief In California**

8     Minebea has a significant interest in adjudicating this Action in California. First, this Action

9 involves PerTech's sales of infringing keyboards to a California company. Second, PerTech

10 apparently has more contacts with California than any other state, thereby increasing the likelihood

11 that PerTech will be amenable to personal jurisdiction in California. Third, rather than institute a

12 separate Action against PerTech in another state, Minebea has commenced suit against both Think

13 Outside and PerTech in California in an attempt to preserve judicial resources. Common sense

14 dictates that the issues to be resolved involving both defendants will be the same including that

15 patent infringed, the infringing products, the witnesses, etc. Accordingly, adjudicating this Action

16 against both defendants in California is clearly preferable to piecemeal litigation in different states.

17     Furthermore, this case involves PerTech's infringement of Minebea's United States patent. It

18 is clearly disingenuous for PerTech to argue that the interests of Japan and Taiwan in having the

19 infringement of a United States Patent adjudicated in one of their countries outweighs California's

20 interests in having this matter litigated here, since United States patents do not have extraterritorial

21 effect. *See* 35 U.S.C. § 271. Moreover, it contravenes the social policy of the United States for a

22 Taiwanese or Japanese court to adjudicate the infringement of a United States patent. *Cf. Mars Inc.*

23 *v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1376 (Fed. Cir. 1994) ("[G]eneral concerns

24 respecting international comity counsel against exercising jurisdiction over a matter involving a

25 Japanese patent, Japanese law, and acts of a Japanese defendant in Japan."); *Stein Assoc.,Iinc. v.*

26 *Heat & Control, Inc.,* 748 F.2d 653, 658 (Fed. Cir. 1984) ("Only a British court, applying British

27 law, can determine the validity and infringement of British patents."); *Goldberg v. Cordis Corp.,*

28 203 U.S.P.Q. 717, 718 (N.D. Ill. 1976) ("In an infringement action where claims of infringement of

foreign patents are made, the validity of the patents would necessarily be in issue. To determine the validity of patents granted by foreign governments would invite conflicts with the administrative and judicial officers of those governments. The power to adjudicate conflicts of this type should be exercised with great reluctance.").

## IV.    CONCLUSION

For all the foregoing reasons, PerTech's Motion To Dismiss for lack of personal jurisdiction should be denied.

Dated:  November 26, 2001

ARNOLD & PORTER
RONALD L. JOHNSTON
JAMES S. BLACKBURN

SCHULTE ROTH & ZABEL LLP
JOEL LUTZKER
DAVID KAGAN
TODD SICKLINGER
LISA M. KNIGHT

By:      _James Black_
James S. Blackburn
Attorneys for Plaintiff Minebea Co., Ltd.

241147_1

# PROOF OF SERVICE

STATE OF CALIFORNIA      )
                              )   ss
COUNTY OF LOS ANGELES  )

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1900 Avenue of the Stars, 17th Floor, Los Angeles, California 90067-4408.

    On November 26, 2001, I served the foregoing document described as: **MINEBEA CO. LTD.'S MEMORANDUM IN OPPOSITION TO THINK OUTSIDE INC.'S MOTION TO DISMISS**

☒ by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

☒ **BY MAIL** I placed such envelope with postage thereon prepaid in the United States Mail at 1900 Avenue of the Stars, 17th Floor, Los Angeles, California 90067-4408. Executed on November 26, 2001 at Los Angeles, California.

☐ **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to the office of the addressee. Executed on      at Los Angeles, California.

☒ **BY FACSIMILE** The above-referenced document (together with all exhibits and attachments thereto) was transmitted via facsimile transmission to the addressee(s) as indicated on the attached mailing list on the date thereof. The transmission was reported as completed and without error. Executed on November 26, 2001 at Los Angeles, California.

☐ **BY FEDERAL EXPRESS** I am readily familiar with Arnold and Porter's business practices of collecting and processing items for pickup and next business day delivery by Federal Express. Under said practices, items to be delivered the next business day are either picked up by Federal Express or deposited in a box or other facility regularly maintained by Federal Express in the ordinary course of business on that same day with the cost thereof billed to Arnold and Porter's account. I placed such sealed envelope for delivery by Federal Express to the offices of the addressee(s) as indicated on the attached mailing list on the date hereof following ordinary business practices. Executed on      at Los Angeles, California.

☒ **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

 

_____

Valerie Spencer

Signature

235126.1

*Minebea Co., Ltd., v. Think Outside, Inc., et al.*
Case No. 01 CV 0771BTM ( POR)

Michael A. Jacobs, Esq.
Paul A. Friedman, Esq.
Morrison & Foerster, LLP
425 Market Street
San Francisco, CA  94105-2482

Joel Lutzker, Esq.
David Kagan, Esq.
Todd Sicklinger, Esq.
Schulte Roth & Zabel
919 Third Avenue
New York, NY  10022

Thomas D. Bunton, Esq.
Pamela J. Wang, Esq.
Baker & McKenzie
101 West Broadway
12th Floor
San Diego, CA  92101

Exhibit 2

The Honorable Barbara Jacobs Rothstein

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

------------------------------------------------x

Minebea Co. Ltd.

                Plaintiff,

          - against -

Chicony Electronics Co., Ltd. and Chicony
America, Inc.

               Defendants.

------------------------------------------------X

No. CV 03 0295R

PLAINTIFF MINEBEA'S
RULE 26(a)(1)
INITIAL DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff Minebea

Company, Ltd. ("Minebea") hereby makes its initial disclosures to Defendants Chicony

Electronics Co., Ltd and Chicony America, Inc..

**A.**    **The name and, if known, the address and telephone number of each individual
likely to have discoverable information that the disclosing party may use to support
its claims or defenses, unless solely for impeachment, identifying the subjects of the
information.**

The individuals listed below are likely to have discoverable information that Plaintiff

Minebea may use to support its claims or defenses.  Except as otherwise indicated, all listed

individuals may be reached by contacting Joel Lutzker at the following address:

            Joel Lutzker, Esq.
            Schulte Roth & Zabel LLP
            919 Third Avenue
            New York, New York  10022
            Phone:  (212) 756-2000
            Fax:    (212) 593-5955

| Subject Matter | Name | Address & Telephone No. |
|---|---|---|
| The Patent-In-Suit | Dean Cowles | Dean Cowles<br>c/o Joel E. Lutzker |
| | Barry R. Lipsitz, Esq. | Barry R. Lipsitz, Esq.<br>c/o Joel E. Lutzker |
| | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| Defendants' Infringement of the Patent-In-Suit | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| The Willfulness of Defendants' Infringement | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| Minebea's Damages | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| | Yokio Okuyama | Minebea<br>c/o Joel E. Lutzker |

B.    A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

Any production of documents by Plaintiff Minebea in the course of making these Initial Disclosures shall not be construed as a waiver of attorney-client privilege, work product exception, and/or any other privilege or exception afforded to Plaintiff Minebea under the law.

The following are the categories of documents in the possession, custody, or control of Plaintiff Minebea that Plaintiff Minebea reasonably anticipates that they may use to support their claims or defenses, unless solely for impeachment. These documents are located at the offices of Plaintiff Minebea, at the offices of NMB Technologies Corporation or at the offices of Minebea's

9436595 1

2



counsel of record. These documents fall within the following categories and/or relate to the
following subject matters:

1. United States Patent No. 4,433,225 and its prosecution history;

2. Extrinsic evidence relevant to claim construction;

3. Defendants' infringement of United States Patent No. 4,433,225;

4. The willfulness of Defendants' infringement;

5. Minebea's damages;

6. Commercial success;

7. Long felt need;

8. Failure of others; and

9. Notice of infringement.

C. **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

Minebea is entitled to damages adequate to compensate Minebea for Defendants'
infringement. Minebea's damages include lost profits on the keyboards it would have sold but
for the Defendants' infringement. The Patent Statute requires that these damages be no less than
a reasonable royalty for the use made of the invention by the Defendants together with interest
and costs. In order to accurately calculate its damages, Minebea requires information that is in
the possession of the Defendants. Accordingly, Minebea does not currently have sufficient
information to calculate the amounts of its lost profits or a reasonable royalty rate.

**D.** For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

To the best of Defendant Minebea's knowledge, no applicable insurance agreement exists.

DATED this 19th day of May, 2003.

SCHULTE ROTH & ZABEL LLP

Joel E. Lutzker
David H. Kagan
Benjamin Levi
Todd Sicklinger
919 Third Avenue
New York, New York 10022
(212) 756-2000

DORSEY & WHITNEY LLP
Peter S. Ehrlichman
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800
Attorneys for Plaintiff Minebea Co. Ltd.

Exhibit 3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD., | No.      CV 03 0295 R |
|            Plaintiff, | **DEFENDANTS' INITIAL DISCLOSURES** |
|    v. | [Fed. R. Civ. P. 26(a)(1)] |
| CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC., | |
|            Defendants. | |

Pursuant to Rule 26.1(a)(1) of the Federal Rules of Civil Procedure, Specially Appearing Defendants CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC. (collectively, "Chicony") make these initial disclosures and objections.

### GENERAL OBJECTIONS

1.      The following disclosures are based solely on the information available to Chicony at the present time and made without prejudice to Chicony's right to present additional evidence in any filing or proceeding, including, but not limited to, at trial.

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800   F 206 516 3888

2. Chicony objects to disclosure to the extent that the production of confidential information without the protection of a confidentiality order may be called for, and reserves its right to supplement its disclosures once an appropriate protective order is entered by the Court.

3. Chicony objects to disclosure to the extent that the production of information protected by the attorney-client privilege and/or work product doctrine may be called for, and therefore will not produce information protected by attorney-client privilege and/or work product doctrine.

4. Chicony objects to the disclosure to the extent that there is now pending a motion to dismiss for lack of personal jurisdiction. In submitting this disclosure, Chicony does not waive its pending motion to dismiss for want of personal jurisdiction, nor prejudice its right to assert any defense that it could have raised in the absence of this filing.

## DISCLOSURES

### I. IDENTITY OF PERSONS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT THE DISCLOSING PARTY MAY USE TO SUPPORT CLAIMS OR DEFENSES

Chicony identifies the following individuals pursuant to Rule 26(a)(1)(A). Chicony does not consent to plaintiff's communications with its employees and does not consent to or authorize any communications otherwise prohibited by any applicable rule of professional conduct. Plaintiff's contact with Chicony's employees should take place solely through Chicony's counsel of record. Chicony furthermore does not concede that the individuals listed herein necessarily have discoverable information relevant to disputed facts, but has identified such individuals reading broadly its disclosure obligations:

| Identity | Contact | Knowledge |
|----------|---------|-----------|
| Bruce Chang | Via Chicony's Counsel of Record | Structure of the keylift mechanisms used in accused keyboards; negotiations and agreements with customers; supply chain of accused devices. |
| Elain Maio | Via Chicony's Counsel of Record | Unit and dollar amount of sales of certain infringing products. |

DEFENDANTS' INTIAL DISCLOSURES (CV 03 0295 R) – Page 2

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

| Identity | Contact | Knowledge |
|---|---|---|
| Hank Fu | Via Chicony's Counsel of Record | Technical knowledge regarding accused keyboards marketed and sold by Chicony; sales by Chicony Electronics of accused devices; sales data; unit and dollar amount of sales of other infringing products. |
| Susie Ho | Via Chicony's Counsel of Record | Accounting systems used to collect pertinent data; financial status of Chicony Electronics; sales figures. |
| Jenson Tsai | Via Chicony's Counsel of Record | Technical knowledge regarding accused keyboards marketed and sold by Chicony. |

## II. DESCRIPTION BY CATEGORY AND LOCATION OF DOCUMENTS, DATA COMPILATIONS, AND TANGIBLE THINGS IN THE POSSESSION, CUSTODY OR CONTROL OF CHICONY WHICH MAY BE USED TO SUPPORT CLAIMS OR DEFENSES

Chicony provides the following descriptions of documents in its possession, custody, or control pursuant to Rule 26(a)(1)(B):

1. Sales and revenue data relating to the accused devices;

2. Shipping information relating to the accused devices;

3. Engineering and design documents relating to the accused devices;

4. Prior art limiting the patent-at-suit; and

5. Certain customer information, including agreements.

These files are located at the offices of Chicony in Irvine, California and Taipei, Taiwan. Chicony reserves its right to object to the production of any documents described herein on any basis permitted by the Federal Rules of Civil Procedure.

## III. COMPUTATION OF DAMAGES CLAIMED BY THE DISCLOSING PARTY

Chicony may seek attorneys' fees and costs in defending this action, but is unable at this time to estimate the amount.

DEFENDANTS' INTIAL DISCLOSURES (CV 03 0295 R) – Page 3

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

**IV. ANY INSURANCE AGREEMENT UNDER WHICH ANY PERSON CARRYING ON AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY PART OR ALL OF A JUDGMENT OR TO INDEMNIFY OR REIMBURSE FOR PAYMENTS MADE TO SATISFY THE JUDGMENT**

Chicony has no insurance policies responsive to Rule 26(a)(1)(D).

## CERTIFICATION

To the best of my knowledge, information and belief, formed after an inquiry that is reasonable under the circumstances, this disclosure is complete and correct, except as noted, as of the date set forth below.

Dated: May 15, 2003

MICHAEL A. JACOBS
PAUL A. FRIEDMAN
MORRISON & FOERSTER LLP

By: _Paul a. Fr_____

Paul A. Friedman

Attorneys for Specially Appearing
Defendants CHICONY ELECTRONICS
CO., LTD. and CHICONY AMERICA, INC.

Additional Counsel of Record:

Scott Wilsdon (WSBA #20608)
YARMUTH WILSDON CALFO PLLC
1201 Third Avenue, Suite 3080
Seattle Washington 98101
Telephone: (206) 516-3800
Facsimile: (206) 516-3888

S. J. Christine Yang (Pro Hac Vice)
LAW OFFICES OF S. J. CHRISTINE YANG
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, California 92708
Telephone: (714) 641-4022
Facsimile: (714) 641-2082

DEFENDANTS' INTIAL DISCLOSURES (CV 03 0295 R) – Page 4

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

Exhibit 4

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number
(212) 756-2591

Writer's E-mail Address
david.kagan@srz.com

August 23, 2001

**VIA FACSIMILE**
Michael Jacobs, Esq.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482

Re: Minebea Co., Ltd. v. Think Outside, Inc., et al. (S.D. Cal.)
Our File: 861975/0037

Dear Michael:

Please be advised that Schulte, Roth & Zabel LLP represents Dean S. Cowles and Barry Lipsitz, Esq. in connection with all matters regarding the lawsuit brought by Minebea Co., Ltd., against Think Outside, Inc. and Peripheral Technology, Inc. All contacts and communications directed to Dean S. Cowles or Barry Lipsitz, Esq. are to be directed to their counsel at Schulte, Roth & Zabel LLP, attention Joel E. Lutzker, Esq.

Very truly yours,

David H. Kagan

cc:   Ron Johnston, Esq.
      Charles H. Dick, Jr., Esq.

9095263.1

Exhibit 5

 
# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number
(212) 756-2306

Writer's E-mail Address
lisa.knight@srz.com

October 28, 2002

<u>**VIA FACSIMILE**</u>

Paul A. Friedman, Esq.
Morrison & Foerster
425 Market Street
San Francisco, California 94105-2482

> Re:  Minebea Co. Ltd. v. Think Outside Inc.
>      And Peripheral Technology, Inc.
>      <u>No. 01CV0771 – BTM (POR)</u>

Dear Paul:

We are writing to inform you that we will not be able to make our client Mr. Cowles available for deposition on the date noticed, November 27, 2002. We, however, would like to propose December 5, 2002 as an alternate date. Please let me know as soon as possible if this date is acceptable to you.

Also, with respect to our Rule 30(b)(6) deposition of Think Outside scheduled for December 3, 2002, we are prepared to change the location of the deposition from Los Angeles to San Diego at the Westin Hotel if that would be more convenient for you.

We look forward to hearing from you regarding these issues.

Thank you,

Lisa M. Knight

cc:   Ronald L. Johnston, Esq. (by fax)
      James Blackburn, Esq.
      Arnold & Porter

9321990.1



Paul A. Friedman, Esq.
October 28, 2002
Page 2


Charles H. Dick, Jr., Esq. (by fax)
Pamela J. Wong, Esq.
Baker & McKenzie

Exhibit 6

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number

(212) 756-2306

Writer's E-mail Address

lisa.knight@srz.com

November 2, 2002

**VIA FACSIMILE**

Paul A. Friedman, Esq.
Morrison & Foerster
425 Market Street
San Francisco, California 94105-2482

NOV - 2002

Re:  Minebea Co. Ltd. v. Think Outside Inc.
And Peripheral Technology, Inc.
No. 01CV0771 – BTM (POR)

Dear Paul:

We are writing in response to your letter dated November 1, 2002. In your letter you proposed that the parties agree it is presently unnecessary to list any communication between a party and its litigation counsel on its privilege log where any such communication is directly related to this litigation. You further proposed that if any such communication became pertinent in the future any party would be able to terminate this agreement on 45 days notice. Lastly, after a notice of termination and a 45-day period all parties will be obligated to produce supplemental privilege logs that include a list of the previously unlisted privileged communications. We accept this proposal.

Subject to approval from our client Mr. Cowles, which we believe will be forthcoming; we also tentatively accept your proposed date of December 12, 2002 for the Cowles deposition.

Thank you for your cooperation,

Lisa M. Knight

9325888.1

Paul A. Friedman, Esq.
November 2, 2002
Page 2

cc:   Ronald L. Johnston, Esq. (by fax)
      James Blackburn, Esq.
      Arnold & Porter

      Charles H. Dick, Jr., Esq. (by fax)
      Pamela J. Wong, Esq.
      Baker & McKenzie

Exhibit 7

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number

(212) 756-2306

Writer's E-mail Address

lisa.knight@srz.com

November 6, 2002

**VIA FACSIMILE**

Paul A. Friedman, Esq.
Morrison & Foerster
425 Market Street
San Francisco, California 94105-2482

'VED

l.0V – : 2002

ᵖ𝔄F

     Re:   Minebea Co. Ltd. v. Think Outside Inc.
          And Peripheral Technology, Inc.
          <u>No. 01CV0771 – BTM (POR)</u>

Dear Paul:

         We are writing in response to your letter dated November 1, 2002. We accept the proposal set forth in your letter regarding the issue of outstanding interrogatories. Minebea is prepared to fully respond to Think Outside's First and Second Set of Interrogatories on November 8, 2002. Please confirm that Think Outside is likewise prepared and willing to respond fully Minebea's First and Second Set of Interrogatories. We would appreciate your confirmation as soon as possible.

         Lastly, we would like to confirm that our client Mr. Cowles is available for deposition on December 12, 2002.

                         Thank you for your cooperation,

                         Lisa M. Knight

cc:    Ronald L. Johnston, Esq. (by fax)
       James Blackburn, Esq.

Paul A. Friedman, Esq.
November 6, 2002
Page 2

Arnold & Porter

Charles H. Dick, Jr., Esq. (by fax)
Pamela J. Wong, Esq.
Baker & McKenzie

Exhibit 8

1　ARNOLD & PORTER
　　RONALD L. JOHNSTON (State Bar No. 57418)
2　JAMES S. BLACKBURN (State Bar No. 169134)
　　1900 Avenue of the Stars, 17th Floor
3　Los Angeles, California 90067-4408
　　Telephone: (310) 552-2500
4　Facsimile: (310) 552-1191

5　SCHULTE ROTH & ZABEL LLP
　　JOEL E. LUTZKER
6　DAVID H. KAGAN
　　919 Third Avenue
7　New York, New York 10022
　　Telephone: (212) 756-2000
8　Facsimile: (212) 593-5955

9　Attorneys for Plaintiff Minebea Co., Ltd.

10　　　　　　　　UNITED STATES DISTRICT COURT

11　　　　　　　　SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13　MINEBEA CO., LTD., a Japanese corporation, | ) Case No. 01 CV 0771BTM (POR) |
| 14 | ) OBJECTIONS AND RESPONSES TO |
| 15　　　　　　Plaintiff, | ) DEFENDANT THINK OUTSIDE, INC.'S<br>) SUBPOENA DIRECTED TO DEAN S. |
| 16　　　v. | ) COWLES |
| 17　THINK OUTSIDE, INC., a California<br>corporation; and PERIPHERAL | ) |
| 18　TECHNOLOGY, INC., a Taiwan<br>corporation. | ) |
| 19　　　　　　Defendants. | ) |
| 20 | ) |
| 21 | ) |

22

23　　　　　Dean S. Cowles ("Respondent") hereby makes the following objections and

24　responses to Defendant Think Outside, Inc.'s Subpoena Duces Tecum directed to Respondent ("the

25　Subpoena").

26

27　<sub>9326577.2</sub>

28

## GENERAL OBJECTIONS

1. Respondent objects to the Subpoena and Exhibit A in that they are unduly broad and place undue hardship on Respondent. For instance, many of the items in Exhibit A are not limited in time and/or concern information not in Respondent's possession, custody or control.

2. Respondent objects to the Subpoena to the extent that it goes beyond what is required by the Federal Rules of Civil Procedure and the Local Rules.

3. Respondent objects to the scope of the categories of Exhibit A of the Subpoena to the extent that it requires Respondent to produce documents which are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

4. Respondent objects to the Subpoena to the extent that it calls for Respondent to produce documents on subject matter that is not currently in his possession, custody or control or to identify or describe persons, entities, facts or events not known to him on the grounds that such topics seek to require more that any obligation imposed by law and would subject Respondent to unnecessary and undue annoyance, burden, and expense, and seek to impose Respondent an obligation to investigate or discover information or materials from third parties beyond his control.

5. Respondent objects to the Subpoena with respect to Instruction B as being beyond what is required by the Federal Rules of Civil Procedure.

## DOCUMENT REQUEST NO. 1:

All documents constituting, reflecting, or relating to an opinion, review, or analysis of the patentability of the alleged inventions disclosed or claimed in the '225 patent.

## OBJECTIONS AND RESPONSE TO REQUEST NO. 1:

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

93265772

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

2

1    **DOCUMENT REQUEST NO. 2:**

2    All documents constituting, reflecting, or relating to the conception or first written

3    description of any alleged invention claimed in the '225 patent.

4    **OBJECTIONS AND RESPONSE TO REQUEST NO. 2:**

5    Respondent incorporates the General Objections herein. Respondent objects to this

6    request to the extent it seeks documents subject to the attorney client privilege or work product

7    exemption. Respondent has made a diligent search for documents falling within the scope of this

8    requested, but no responsive documents have been located in Respondent's possession, custody or

9    control.

10    **DOCUMENT REQUEST NO. 3:**

11    All documents constituting, reflecting, or relating to the diligence toward reduction

12    to practice and reduction to practice of any alleged invention claimed in the '225 patent.

13    **OBJECTIONS AND RESPONSE TO REQUEST NO. 3:**

14    Respondent incorporates the General Objections herein. Respondent objects to this

15    request to the extent it seeks documents subject to the attorney client privilege or work product

16    exemption. Respondent has made a diligent search for documents falling within the scope of this

17    requested, but no responsive documents have been located in Respondent's possession, custody or

18    control.

19    **DOCUMENT REQUEST NO. 4:**

20    All documents and communications relating to the first sale, offer for sale, test

21    marketing, or public use of the subject matter of the '225 patent.

22    **OBJECTIONS AND RESPONSE TO REQUEST NO.4:**

23    Respondent objects to this request to the extent it seeks documents subject to the

24    attorney client privilege or work product exemption. Respondent incorporates the General

25    Objections herein. Respondent has made a diligent search for documents falling within the scope of

26

27    9326577.2

28

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

3

1  this requested, but no responsive documents have been located in Respondent's possession, custody

2  or control.

3  **DOCUMENT REQUEST NO. 5:**

4        All documents concerning any use (including testing) prior to February 22, 1983, in

5  the United States by any person or entity of the alleged inventions claimed in the '225 patent,

6  including, but not limited to, all documents regarding the date of use, people observing the use, any

7  confidentiality agreements pertaining to the use, and the degree of supervision of the use by the

8  named inventor.

9  **OBJECTIONS AND RESPONSE TO REQUEST NO. 5:**

10        Respondent incorporates the General Objections herein. Respondent objects to this

11  request to the extent it seeks documents subject to the attorney client privilege or work product

12  exemption. Respondent has made a diligent search for documents falling within the scope of this

13  requested, but no responsive documents have been located in Respondent's possession, custody or

14  control.

15  **DOCUMENT REQUEST NO. 6:**

16        All documents that refer or relate to any disclosure of or publication regarding the

17  alleged inventions claimed in the '225 patent prior to February 22, 1983.

18  **OBJECTIONS AND RESPONSE TO REQUEST NO. 6:**

19        Respondent incorporates the General Objections herein. Respondent objects to this

20  request to the extent it seeks documents subject to the attorney client privilege or work product

21  exemption. Respondent has made a diligent search for documents falling within the scope of this

22  requested, but no responsive documents have been located in Respondent's possession, custody or

23  control.

24

25

26

27

28

9326577.2

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

4

**DOCUMENT REQUEST NO. 7:**

All documents and communications relating to the preparation or prosecution of the United States patent application that resulted in the issuance of the '225 patent, including any drafts thereof.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 7:**

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

**DOCUMENT REQUEST NO. 8:**

All documents and communications relating to the preparation or prosecution of any foreign patent application related to the subject matter of the '225 patent, including any drafts thereof.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 8:**

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

9326577.2

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

5

1    **DOCUMENT REQUEST NO. 9:**

2          All documents that constitute, refer or relate to any prior art, patents, publications, or

3    other material or information that you, General Instrument Corporation, or you or their agents,

4    attorneys or other representatives considered in the course of conceiving and analyzing the subject

5    matter of the '225 patent, or prosecution of the '225 patent, including any prior art search.

6    **OBJECTIONS AND RESPONSE TO REQUEST NO. 9:**

7          Respondent incorporates the General Objections herein. Respondent objects to this

8    request to the extent it seeks documents subject to the attorney client privilege or work product

9    exemption. Respondent further objects to this request to the extent that some of the information is

10    publicly available and Defendant Think Outside, Inc. can obtain these documents through other less

11    burdensome means. Respondent has made a diligent search for documents falling within the scope

12    of this requested, but no responsive documents have been located in Respondent's possession,

13    custody or control.

14    **DOCUMENT REQUEST NO. 10:**

15          All documents and communications that refer or relate to the disclosure or

16    nondisclosure of information to the PTO during the prosecution of the '225 patent.

17    **OBJECTIONS AND RESPONSE TO REQUEST NO. 10:**

18          Respondent incorporates the General Objections herein. Respondent objects to this

19    request to the extent it seeks documents subject to the attorney client privilege or work product

20    exemption. Respondent further objects to this request to the extent that some of the information is

21    publicly available and Defendant Think Outside, Inc. can obtain these documents through other less

22    burdensome means. Respondent has made a diligent search for documents falling within the scope

23    of this requested, but no responsive documents have been located in Respondent's possession,

24    custody or control.

25

26

27    9326577.2

28

PLAINTIFF MINEBEA COMPANY. LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

6

**DOCUMENT REQUEST NO. 11:**

         All documents and communications relating to the validity, invalidity, enforceability, or unenforceability of the '225 patent or any of its claims, including any prior art pertinent thereto.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 11:**

         Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

**DOCUMENT REQUEST NO. 12:**

         All documents relating to the interpretation or construction of any of the claims in the '225 patent.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 12:**

         Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

**DOCUMENT REQUEST NO. 13:**

         All documents constituting, evidencing or referring to any inventor's records relating to any invention claimed in the '225 patent, including but not limited to laboratory notebooks, diaries, and calendars.

9326577.2

PLAINTIFF MINEBEA COMPANY. LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

7

**OBJECTIONS AND RESPONSE TO REQUEST NO. 13:**

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

**DOCUMENT REQUEST NO. 14:**

All documents that relate to whether you are the sole inventor of all of the subject matter claimed in the '225 patent.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 14:**

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

**DOCUMENT REQUEST NO. 15:**

All documents that refer or relate to the identities and activities of any persons or entities who in any way assisted you in conceiving, developing, reducing to practice, evaluating, or testing any of the alleged inventions claimed or disclosed in the '225 patent.

**OBJECTIONS AND RESPONSE TO REQUEST NO. 15:**

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product

9326577.2

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

6

1   exemption. Respondent has made a diligent search for documents falling within the scope of this

2   requested, but no responsive documents have been located in Respondent's possession, custody or

3   control.

4   **DOCUMENT REQUEST NO. 16:**

5         All communications with Kramer and Brufsky or the Law Offices of Barry R.

6   Lipsitz regarding the alleged inventions disclosed or claimed in the '225 patent, including any

7   documents or prior art provided to Kramer and Brufsky or the Law Offices of Barry R. Lipsitz.

8   **OBJECTIONS AND RESPONSE TO REQUEST NO. 16:**

9         Respondent incorporates the General Objections herein. Respondent objects to this

10   request to the extent it seeks documents subject to the attorney client privilege or work product

11   exemption. Respondent has made a diligent search for documents falling within the scope of this

12   requested, but no responsive documents have been located in Respondent's possession, custody or

13   control.

14   **DOCUMENT REQUEST NO. 17:**

15         All documents that refer or relate to the ownership, assignment, or licensing of the

16   '225 patent.

17   **OBJECTIONS AND RESPONSE TO REQUEST NO. 17:**

18         Respondent incorporates the General Objections herein. Respondent objects to this

19   request to the extent it seeks documents subject to the attorney client privilege or work product

20   exemption. Respondent has made a diligent search for documents falling within the scope of this

21   requested, but no responsive documents have been located in Respondent's possession, custody or

22   control.

23   **DOCUMENT REQUEST NO. 18:**

24         All documents that refer or relate to any litigation or potential litigation involving the

25   '225 patent.

26

27   9326577.2

28

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

9

## OBJECTIONS AND RESPONSE TO REQUEST NO.18:

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent further objects to this request to the extent that some of the information is publicly available and Defendant Think Outside, Inc. can obtain these documents through other less burdensome means. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

## DOCUMENT REQUEST NO. 19:

All documents concerning whether any party does or does not infringe any of the claims of the '225 patent.

## OBJECTIONS AND RESPONSE TO REQUEST NO.19:

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent has made a diligent search for documents falling within the scope of this requested, but no responsive documents have been located in Respondent's possession, custody or control.

## DOCUMENT REQUEST NO. 20:

All documents and things that relate to the level of skill in the art that existed at the time the invention allegedly disclosed and claimed in the '225 patent was filed with the United States Patent and Trademark Office.

## OBJECTIONS AND RESPONSE TO REQUEST NO. 20:

Respondent incorporates the General Objections herein. Respondent objects to this request to the extent it seeks documents subject to the attorney client privilege or work product exemption. Respondent has made a diligent search for documents falling within the scope of this

9326577.2

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

10

1     requested, but no responsive documents have been located in Respondent's possession, custody or

2     control.

3     **DOCUMENT REQUEST NO. 21:**

4            All documents that otherwise refer or relate to the '225 patent.

5     **OBJECTIONS AND RESPONSE TO REQUEST NO.21:**

6            Respondent incorporates the General Objections herein. Respondent also

7     specifically objects to this request because it is unduly broad, burdensome and oppressive, and place

8     undue hardship on Respondent. Respondent objects to this request to the extent it seeks documents

9     subject to the attorney client privilege or work product exemption. Respondent further objects to

10    this request to the extent that some of the information is publicly available and Defendant Think

11    Outside, Inc. can obtain these documents through other less burdensome means. Respondent has

12    made a diligent search for documents falling within the scope of this requested, but no responsive

13    documents have been located in Respondent's possession, custody or control.

14

15                         \*   \*   \*

16            Subject to each of the forgoing objections to each of the Requests, Respondent will

17    produce reasonably available responsive documents for inspection and copying at the office of his

18    counsel, Schulte Roth & Zabel, LLP on a mutually convenient date and time.

19

20    Dated: November 27, 2002

21

22

23                 JOEL E. LUTZKER

24                 DAVID H. KAGAN
                  FRANK LAUDADIO

                  **SCHULTE ROTH & ZABEL LLP**

25                 919 Third Avenue
                  New York, NY 10022

26                 Telephone: (212) 756-2000

27                 Attorneys for DEAN S. COWLES

     9326577.2

28

PLAINTIFF MINEBEA COMPANY, LTD.'S
OBJECTIONS AND RESPONSES TO DEFENDANT THINK
OUTSIDE, INC.'S SUBPOENA DIRECTED TO DEAN S. COWLES

11

Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE BARRY TED MOSKOWITZ, JUDGE PRESIDING

| | | |
|---|---|---|
| MINEBEA COMPANY LTD., | ) | CASE NO. 01CV0771-BTM |
| PLAINTIFF, | ) | SAN DIEGO, CALIFORNIA |
| VS. | ) | WEDNESDAY, MAY 14, 2003 |
| | ) | 11:00 O'CLOCK A.M. |
| THINK OUTSIDE, INC., ET AL., | ) | |
| DEFENDANTS. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

<u>TELEPHONIC STATUS CONFERENCE</u>

COUNSEL APPEARING:

  FOR PLAINTIFF:     DAVID KAGAN, ESQ. (TELEPHONICALLY)
                        TODD SICKLINGER, ESQ.(TELEPHONICALLY)
                        SCHULTE ROTH AN DZABEL
                        919 THIRD AVENUE
                        NEW YORK, NEW YORK 10022

    FOR DEFENDANT:    MICHAEL A. JACOBS, ESQ.(TELEPHONICALLY)
                        PAUL A. FRIEDMAN, ESQ.(TELEPHONICALLY)
                        MORRISON & FOERSTER
                        425 MARKET STREET
                        SAN FRANCISCO, CALIFORNIA 94105

                        PAMELA WONG, ESQ.
                        BAKER & MCKENZIE
                        101 WEST BROADWAY, TWELFTH FLOOR
                        SAN DIEGO, CALIFORNIA 92101

      REPORTED BY:       LEE ANN PENCE,
                        OFFICIAL COURT REPORTER
                        UNITED STATES COURTHOUSE
                        940 FRONT STREET, ROOM 5160
                        SAN DIEGO, CALIFORNIA 92101
                        TELEPHONE: (619) 238-5576

1    DETERMINATION, NUMBER ONE, WHETHER THERE IS A MATERIAL DISPUTE

2    OF FACT; NUMBER TWO, IF THERE IS NOT, WHETHER THEY ARE

3    ENTITLED TO JUDGMENT ESSENTIALLY AS A MATTER OF LAW ON THIS.

4         MR. JACOBS:  JUDGE, YOU BROUGHT UP SOMETHING.  I

5    REALIZE WE ARE TAKING A LOT OF YOUR TIME, THE CURRENT SCHEDULE

6    FOR TRIAL -- FALL, WITH A PRETRIAL HEARING ON OCTOBER 26TH, I

7    THINK.  I WAS WONDERING IF YOU WERE OF A MIND TO PERHAPS RESET

8    THAT DATE SO THAT WE AREN'T SCRAMBLING DURING THIS PERIOD TO

9    GET READY FOR TRIAL.  I AM OPTIMISTIC WE CAN RESOLVE THE

10   FACTUAL ISSUE.

11        THE COURT:  45 DAYS IS GOING TO BE THE END OF JUNE.

12   IF YOU SUBMIT IT TO US JUNE 30TH -- I REQUIRE JOINT

13   SUBMISSIONS ON THIS ISSUE, JUNE 30TH.  AND THE BRIEFS SHOULD

14   BE NO LONGER -- I DON'T THINK THE BRIEFS SHOULD BE ANY LONGER

15   THAN TEN PAGES.  LIMIT IT TO TEN PAGES, SUPPLEMENTING THE

16   BRIEFS WITH ANY DECLARATIONS, COPIES OF DEPOSITIONS THAT YOU

17   ARE REFERRING TO, AND SIMULTANEOUSLY SUBMITTED JUNE 30TH.  I

18   HOPE THAT I WILL HAVE AN ANSWER FOR YOU BEFORE THE 21ST OF

19   JULY.

20        MR. KAGAN:  CAN I RAISE ONE LAST ISSUE VERY QUICKLY?

21        THE PARTIES HAD STIPULATED TO EXTENDING DISCOVERY

22   WHICH IS ABOUT TO CLOSE AT, I BELIEVE, THE END OF JUNE, THEN

23   END OF MAY, AND WE HAD AGREED TO STIPULATIONS OF ONE-MONTH

24   EXTENSIONS FOR FACT DISCOVERY AND EXPERT DISCOVERY.  WE

25   SUBMITTED THAT TO MAGISTRATE JUDGE PORTER.  SHE DENIED IT

1 BECAUSE SHE FELT IT WAS, I BELIEVE, IT WAS YOUR PREROGATIVE TO

2 EXTEND THE DATES.

3       THE COURT: YOU BOTH WANT TO STIPULATE TO THAT?

4       MR. KAGAN: WE ALREADY HAVE. I THINK WE NEED TO --

5       THE COURT: IT WOULDN'T AFFECT ME AT ALL.

6       MR. KAGAN: ARE THE DEFENDANTS STILL PREPARED TO

7 SUBMIT THAT IN STIPULATION TO JUDGE MOSKOWITZ?

8       MR. JACOBS: YES.

9       MS. WONG: I THINK THE DIFFICULTY WAS, I THINK WE

10 NEEDED -- YOU HAD A MOTION CUTOFF DATE OF SEPTEMBER 2ND WHICH

11 MEANS THAT MOTIONS HAD TO BE NOTICED SOMETIME IN AUGUST. WE

12 PUSHED SOME OF THE FACT DISCOVERY DATES BACK, WOULD HAVE

13 CROSSED ON THE EXPERT DISCOVERY DATES. SUPPLEMENTARY EXPERT

14 REPORTS WOULD HAVE COME IN AFTER THE DAY WE NEEDED TO NOTICE

15 MOTION FOR YOUR MOTION CUTOFF DATE.

16       THE COURT: HERE IS THE THING. RIGHT NOW I HAVE TWO

17 SIX- TO EIGHT-WEEK CRIMINAL TRIALS SCHEDULED TO START IN MID

18 SEPTEMBER. AND IF THEY DON'T GO THEN, AND THEY GET PUT OFF A

19 BUNCH OF MONTHS, THERE IS THE WINDOW TO TRY YOUR CASE. IF

20 THEY DO GO I COULDN'T TRY YOUR CASE, PROBABLY, UNTIL FEBRUARY.

21 I AM TRYING TO LOOK AT THAT WINDOW. I TRY TO THINK AHEAD,

22 FIGURE OUT WHICH CASES I COULD TRY WHEN. I AM CONSTANTLY

23 TRYING CASES. YOU WOULD BE THE BACKUP TO THOSE TWO BIG

24 CRIMINAL CASES, IF THEY DON'T GO. AND I DON'T KNOW THAT THEY

25 WILL. ONE IS SET, I THINK, FOR SEPTEMBER 15TH, OR

1    THEREABOUTS. SO IF THAT ONE DOESN'T GO OR THE OTHER ONE THAT

2    IS SET FOR THE BEGINNING OF OCTOBER DOESN'T GO, THEN

3    SEPTEMBER, OCTOBER WOULD BE TIME FOR YOU TO TRY YOUR CASE

4    HERE.

5         MR. KAGAN:  THAT WOULD WORK FOR US, AS LONG AS WE DO

6    GET THIS DISCOVERY, AND WE GOT DEPOSITIONS FROM THEIR EXPERT.

7         THE COURT:  I DON'T MIND CHANGING DATES AS LONG AS WE

8    DON'T MESS UP THAT OPPORTUNITY.

9         MR. KAGAN:  I THINK IT SHOULD WORK.  WE WILL WORK ON

10   IT TOGETHER, THE COUNSEL, AND SUBMIT SOMETHING TO YOUR HONOR.

11        THE COURT:  OKAY.  THEN AFTER HOPEFULLY THERE WILL BE

12   A RESOLUTION, OTHER THAN THERE IS A MATERIAL DISPUTE OF FACT.

13   IF THERE IS A MATERIAL DISPUTE OF FACT, SO BE IT.  THAT

14   DOESN'T REALLY HELP VERY MUCH, ALTHOUGH I TRY TO GIVE YOU

15   GUIDANCE AS TO HOW THE DISPUTE OF FACT IS MATERIAL UNDER MY

16   LOOKING AT THIS.  BUT, OBVIOUSLY, IF I RULED FOR OR AGAINST --

17   NO MATERIAL DISPUTE OF FACT AND I RULED FOR OR AGAINST THE

18   DEFENDANT THAT WOULD CERTAINLY --

19        THE SPK IS NOT THE ONLY DEVICE, RIGHT?

20        MR. KAGAN:  RIGHT.  THERE IS ANOTHER ACCUSED PRODUCT

21   AS WELL.

22        THE COURT:  IT WOULD GIVE YOU A WAY OF SEEING HOW I

23   LOOK AT IT.

24        MR. KAGAN:  THANK YOU.

25        THE COURT:  I DID ALL THIS WORK, I KIND OF WANT TO

1  GET CLOSURE ON THIS.

2          MR. JACOBS:  SAME WITH US, YOUR HONOR.

3          MS. WONG:  THANK YOU, YOUR HONOR.

4          THE COURT:  SEE YOU ALL AGAIN SOON.

5          MS. WONG:  HOPEFULLY NOT TOO SOON.

6

7                    *  *  *

8          I CERTIFY THAT THE FOREGOING IS A
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
9          IN THE ABOVE-ENTITLED MATTER.

10         _____  5-28-03
                 COURT REPORTER              DATE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HONORABLE BARBARA J. ROTHSTEIN

CC TO JUDGE FTD.I _____ ENTERED
_____ LODGED _____ RECEIVED

JUN 5 2003 DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD.,<br><br>               Plaintiff,<br><br>    v.<br><br>CHICONY ELECTRONICS CO., LTD. and<br>CHICONY AMERICA, INC.,<br><br>               Defendants. | No.     CV 03 0295 R<br><br>**DEFENDANTS' REPLY**<br>**MEMORANDUM OF LAW IN**<br>**SUPPORT OF MOTION TO**<br>**TRANSFER**<br><br>NOTE ON MOTION CALENDAR:<br>June 6, 2003<br><br>[28 U.S.C. § 1404(a)] |

CV 03-00295 #00000025

ORIGINAL

DEFENDANTS' REPLY BRIEF ISO MOTION TO
TRANSFER (CV 03 0295 R)

sf-1504860

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

# INTRODUCTION

Despite exceeding the page limit imposed by this District's Local Rules, Minebea never manages to explain in its opposition why it considers this District to be an appropriate forum for this dispute. The best Minebea can muster is the unremarkable assertion that unaffiliated third parties – *not* Chicony – sell the accused product in this District, an argument that ignores completely that the same third parties sell the accused product in every State and territory in this nation. Meanwhile, Minebea shows no regard for the undisputed fact that its effort to proceed here will require this Court to duplicate the efforts of the court in San Diego, where claim construction alone consumed a year of litigation.

Minebea also does little to contest the basic facts underlying Chicony's motion. It remains undisputed that (1) none of the parties have employees or offices in this District, (2) Chicony has never manufactured, designed, sold, or marketed the accused device in this District, (3) this is not Minebea's home district and its choice to proceed here is entitled to minimal weight, (4) the sole witness located in this District has little recollection of the pertinent events, (5) transfer would result in cost savings for the judiciary and all parties, and (6) this action could have been filed in the Southern District of California. The Court needs to look no further than these uncontested facts to justify transferring this case to the Southern District of California.

# ARGUMENT

## I.    THE WEIGHT OF EQUITIES FAVORS TRANSFER

### A.    Transfer Will Avoid Duplicative Litigation

Avoidance of duplicative litigation is a primary purpose of 28 U.S.C. § 1404(a). (Opening Br. at 8-10.) Minebea does not dispute this and, indeed, has extolled the virtues of resolving all issues in a single forum. In successfully opposing a motion to dismiss filed by a defendant in the San Diego case, Minebea stated that:

> Common sense dictates that the issues to be resolved involving both defendants will be the same including that [sic] patent infringed, the infringing products, the witnesses, etc. Accordingly, adjudicating this Action against both defendants in California is clearly preferable to piecemeal litigation in different states.

(Reply Decl. of Paul A. Friedman in Supp. of Mot. to Transfer ("Friedman Reply Decl.") Ex. 1

DEFENDANTS' REPLY BRIEF I.S.O. MOTION TO
TRANSFER (CV 03 0295 R) – PAGE 1

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

at 18.) Minebea's assessment is especially accurate given the unique burdens that patent litigation places on parties and courts alike. *Optical Recording Corp. v. Capitol-EMI Music, Inc.*, 803 F. Supp. 971, 973-74 (D. Del. 1992) ("Patent cases are generally recognized by litigants, attorneys and courts as complicated . . . . The Court's familiarity with the subject matter of the litigation will reduce the expenditure of judicial resources in the handling of this matter.").

Minebea never contests that the single patent in this case is also at issue in the Southern District of California. Minebea also does not contest that if this Court retains jurisdiction it will have to replicate the Southern District's labors construing this patent. Minebea seeks to avoid this point by arguing that there are keyboards at issue in Seattle that are not at issue in San Diego. (Opp'n Br. at 12-13.) Minebea offers absolutely nothing in the way of competent evidence to substantiate its assertion that there is any difference in the keyswitch mechanisms used in Chicony's different keyboards. Minebea also offers the conclusory allegation there might be some terms this Court has to construe that the Southern District did not construe, but offers nothing to support this, not even identifying the additional terms requiring construction.

## B.    Transfer Would Serve Witness Convenience

Minebea concedes that witness convenience is a central factor in a § 1404(a) analysis. (Opp'n Br. at 7.) If this case is not transferred, each of the nine individuals designated as witnesses in both the Seattle and San Diego cases will have to testify at two different trials, in two different locations, on two separate occasions.[1] Transfer will permit these witnesses to testify just once, which is manifestly more convenient for the witnesses, particularly those who must travel from Asia. "This fact tips the balance in favor of transfer, because it is certainly more convenient for a witness to give testimony once. . . ." *Cali v. E. Coast Aviation Servs. Ltd.*, 178 F. Supp. 2d 276, 294 (E.D.N.Y. 2001).

---

[1] Minebea has recently identified four witnesses with relevant knowledge of this dispute which it also identified as witnesses in the San Diego case: Dean Cowles, Barry Lipsitz, Nobuyuki Takahashi, and Yokio Okuyama. (*Compare* Friedman Reply Decl. Ex. 2 at 2 *with* Friedman Reply Decl. Ex. K at 2-3.) Chicony identified five witnesses in the Seattle case, each of whom may also need to testify in San Diego. (Friedman Reply Decl. Ex. 3 at 2-3.)

DEFENDANTS' REPLY BRIEF I.S.O. MOTION TO
TRANSFER (CV 03 0295 R) – PAGE 2

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

sf-1504860

1    Minebea's claim that Seattle is more convenient because its airport has direct flights from

2    Asia plays no proper role in the transfer analysis. *See Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp.

3    473, 484 n.24 (D.N.J. 1993) (commenting of a similar argument: "This argument barely deserves

4    a response.") Even if this were pertinent, denying transfer will require foreign party witnesses to

5    travel to San Diego *and* to Seattle for two trials. Thus, if this case remains here, these witnesses

6    will still have to make the connecting flight that Minebea considers so onerous.

7        The residence here of the patent's inventor, Dean Cowles, is of minimal importance

8    given his documented inability to recollect information on matters as to which inventor

9    testimony is appropriate. (Opening Br. at 6-7 & App. A.) Minebea does not contest the

10   complete failings in Mr. Cowles' recollection of pertinent events, instead offering only the

11   conclusory allegation that his testimony will be "critical." (Opp'n Br. at 4.)

12       Even if Mr. Cowles did have something to contribute, his residence is a factor only if he

13   is unwilling to appear at a trial. *See Becnel v. Smile Cmty. Action Agency, Inc.,* 207 F. Supp. 2d

14   520, 522 (M.D. La. 2001) (rejecting argument based on unavailability of witness where it was

15   not shown that witness would not voluntarily attend a trial). There is nothing in the record

16   suggesting his unwillingness to do so. Minebea's citation to Chicony's brief to support this point

17   is insufficient, as Chicony made no such statement in its brief. (Opp'n Br. at 9 n.10.) What Mr.

18   Cowles stated during his deposition, and what Chicony repeated in its brief, is that he is *unaware*

19   of a trial. He never stated that he was unwilling to appear for a trial.

20       To the extent that Mr. Cowles is unwilling to attend a trial in San Diego, his testimony

21   can be presented by deposition. *See Broadnax v. ABF Freight Sys.,* 169 F.R.D. 628, 630 (N.D.

22   Ill. 1996) ("If such is ultimately the case, deposition testimony can be substituted for an

23   appearance by a reticent witness."); Fed. R. Civ. P. 32(a)(3)(B) (trial testimony of witness

24   outside court's subpoena power can be presented by deposition). Moreover, if Minebea is

25   concerned that the jury have the opportunity to observe Mr. Cowles' demeanor, it can present his

26   testimony via videotaped deposition. *See Longo v. Wal-Mart Stores, Inc.,* 79 F. Supp. 2d 169,

27   172 (E.D.N.Y. 1999) (granting motion to transfer, noting that plaintiff could "effectively place

28   the testimony of her New York physicians before an Arizona jury by . . . a video deposition").

DEFENDANTS' REPLY BRIEF I.S.O. MOTION TO
TRANSFER (CV 03 0295 R) – PAGE 3

YARMUTH WILSON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800 F 206 516 3888

sf-1504860

1    Minebea's assertion that it has no sway over Mr. Cowles is suspect. (Opp'n Br. at 7.)

2    Minebea's lawyers represent Mr. Cowles and have demanded that all contacts with Mr. Cowles

3    be made through them. (Friedman Reply Decl. Ex. 4.) Minebea's lawyers have repeatedly

4    referred to Mr. Cowles as their client. (Friedman Reply Decl. Exs. 5-7.) Minebea's lawyers

5    represented him at his deposition, and filed objections to a deposition subpoena on his behalf

6    identifying themselves as Mr. Cowles' counsel. (Friedman Reply Decl. Ex. 8 at 11.) If Minebea

7    truly needs his testimony, there is reason to believe its lawyers can persuade him to attend a trial.

8    **C.    This Litigation Will Proceed More Expediently In San Diego**

9        Docket congestion can defeat transfer "only if such circumstances are established by

10   clear and convincing evidence." *In re Horseshoe Entm't*, 305 F.3d 354, 358 (5th Cir. 2002).

11   Even if aggregate docket conditions were the right comparison, Minebea is simply wrong that

12   this Court is appreciably less congested than the Southern District.

13       In determining which district is more congested, the courts look to two statistics: (1)

14   median number of months between filing and disposition, and (2) median number of months

15   between filing and trial. *E.g., LG Elecs., Inc. v. First Int'l Computer, Inc.*, 138 F. Supp. 2d 574,

16   593 n.15 (D.N.J. 2001); *Law Bulletin Publ'g Co. v. LRP Publ'ns, Inc.*, 992 F. Supp. 1014, 1020

17   (N.D. Ill. 1998) (these are "the two most relevant" statistics). These statistics show that

18   disposition times in 2002 were only minimally longer in San Diego than they were in Seattle:

19
20

| Judicial District | Median Time from Filing to Disposition (Civil Cases) | Median Time from Filing to Trial (Civil Cases) |
|---|---|---|
| Western District of Washington | 5.8 months | 18.0 months |
| Southern District of California | 6.4 months | 21.0 months |
| **Difference** | **0.6 months ( ≈18 days)** | **3.0 months** |

24

25   (Sicklinger Decl. Ex. A). Such nominal differences are insufficient to establish clear and

26   convincing evidence of a probable delay. In *L.G. Electronics,* the court transferred a case to a

27   district with a median time from filing to disposition that was two months greater, and a median

28   time from filing to trial that was three months shorter, than those of the transferor district. 138 F.

DEFENDANTS' REPLY BRIEF I.S.O. MOTION TO
TRANSFER (CV 03 0295 R) – PAGE 4

sf-1504860

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1    Supp. 2d at 593 n.15. The court concluded that these differences were insignificant. *Id.*

2    Minebea also wrongly compares aggregate docket conditions, rather than focusing on the

3    likely outcome in this case. *See Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1337 (9th Cir.

4    1984) (finding comparison of aggregate statistics, rather than analysis of likely outcomes in the

5    specific case an abuse of discretion).  The aggregate statistics do not support Minebea's claim of

6    a disparity in relative congestion, but even if they did, three facts demonstrate that this particular

7    matter will reach resolution faster if transferred.

8    First, transfer will obviate the need for certain time-consuming tasks, such as claim

9    construction.  The claim construction process in San Diego was lengthy, consuming a year of

10   litigation and requiring the Court to consider thirteen briefs.  Second, contrary to Minebea's

11   assertion, the judicial emergency declared thirty-two months ago by the Southern District has

12   subsided.  Five new judgeships have been allotted to the Southern District of California and

13   President Bush's nominees are expected to be confirmed quickly.  21st Century Department of

14   Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 312(a)(1)(A) (2002), 116 Stat.

15   1758, 1786 (2002); Marisa Taylor, *Bush Picks 5 as S.D. Federal District Judge Nominees*, San

16   Diego Union-Tribune, May 2, 2003, at B5.   Third, it is possible that resolution times in this

17   District will increase when one of its judges moves to a leadership post with the Federal Judicial

18   Center.  Paul Shukovsky, *Judge Moving to New Job in D.C.*, Seattle Post-Intelligencer, Feb. 15,

19   2003, at B2 (citing Seattle federal judges' concerns that "they could face burdensome caseloads

20   and disruptions of court calendars unless a new judge is quickly appointed").

21   **D.      This District Has No More Interest In This Litigation Than the Other
22            Ninety-Three District Courts**

23   Minebea's explanation that Washington has an interest in this litigation because the

24   accused device is sold by third parties here does nothing to distinguish this Court from any of the

25   other remaining district courts in the federal system.  Minebea concedes as much when it states

26   that third parties sell Defendants' products in "each of the 50 states and in the territories of the

27   United States." (Opp'n Br. at 11.)  "Where a party's products are sold in many states, sales alone

28   are insufficient to establish a material connection to the forum and to override other factors

DEFENDANTS' REPLY BRIEF I.S.O. MOTION TO
TRANSFER (CV 03 0295 R) – PAGE 5

sf-1504860

1 favoring transfer." *Invivo Research, Inc. v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d

2 433, 439-40 (S.D.N.Y. 2000) (citation and internal quotations omitted). Minebea does not dispute

3 that most of the activities related to the accused products were focused in Southern California, or

4 that courts seek to place patent actions in the forum "which is the center of the accused activity."

5 *S.C. Johnson & Sons, Inc. v. Gillette Co.*, 571 F. Supp. 1185, 1187-88 (N.D. Ill. 1983).

6 **II.     THE SAN DIEGO DEADLINES BEAR NO RELEVANCE TO THIS
7             COURT'S § 1404(A) ANALYSIS**

8          Minebea claims the Court should not transfer this litigation because the deadlines to add

9 parties and complete fact discovery in San Diego have passed. (Opp'n Br. at 12.) This Court is

10 deciding only a transfer motion – not a joinder, scheduling, or consolidation motion, which must

11 be addressed to the Southern District. Minebea's assumption that transfer will disrupt the San

12 Diego litigation underestimates Judge Moskowitz, who is undeniably competent to structure the

13 litigation so that all matters are heard expediently and efficiently.

14          Finally, there is additional reason to doubt that the San Diego deadlines pose any real

15 impediment to transfer. With respect to the December 9, 2002, deadline to add parties, it applies

16 only to parties' efforts to amend their pleadings. This deadline does not preclude this Court from

17 transferring a case. As concerns the fact discovery deadline, Minebea fails to inform this Court

18 that it has recently approached Judge Moskowitz about extending fact discovery. (Friedman

19 Reply Decl. Ex. 9.) Even if this extension is not granted, this deadline need not concern this

20 Court because Chicony is willing to agree that, upon transfer, it will not object to reasonable

21 discovery requests on the basis that the fact discovery deadline has passed.

**CONCLUSION**

23          For the foregoing reasons, Defendants' motion to transfer this action should be granted.

24     Dated: June 5, 2003                    YARMUTH WILSDON CALFO PLLC   (*36986*)

25
                                             By: _____
26                                               Scott Wilsdon (WSBA #20608)
                                                 Attorneys for Specially Appearing
27                                               Defendants CHICONY ELECTRONICS
                                                 CORP. and CHICONY AMERICA, INC.
28

DEFENDANTS' REPLY BRIEF I.S.O. MOTION TO                **YARMUTH WILSDON CALFO PLLC**
TRANSFER (CV 03 0295 R) – PAGE 6                         3080 WASHINGTON MUTUAL TOWER
                                                         1201 THIRD AVENUE
                                                         SEATTLE WASHINGTON 98101-3000
                                                         T 206 516 3800  F 206 516 3888

sf-1504860

HONORABLE BARBARA J. ROTHSTEIN

_____FILED _____ENTERED
_____LODGED_____RECEIVED

JUN 02 2003 PM

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

CV 03-00295 #00000024

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MINEBEA CO., LTD.<br><br>Plaintiff,<br><br>vs.<br><br>CHICONY ELECTRONICS CO., LTD. and<br>CHICONY AMERICA, INC.<br><br>Defendants. | CIVIL ACTION NO. CV 03 0295R<br><br>**CERTIFICATE OF SERVICE** |

I certify that on June 2, 2003, I caused to be served a true copy of the following documents as indicated to the individuals identified below:

1.  Minebea's Memorandum of Law in Opposition to Defendants' Joint Motion to Transfer;

2.  Declaration of Todd Sicklinger in Support of Minebea's Opposition to Defendants' Joint Motion to Transfer; and this

3.  Certificate of Service.

ORIGINAL

**DORSEY & WHITNEY** LLP
A Limited Liability Partnership
U.S. Bank Bldg. Centre
1420 Fifth Ave., Suite 3400
Seattle, Washington 98101
(206) 903-8800

CERTIFICATE OF SERVICE - 1

**VIA HAND DELIVERY:**

Angelo J. Calfo
Yarmuth Wilsdon Calfo PLLC
Attorneys for Chicony Electronics CO., Ltd.
and Chicony America, Inc.
3080 Washington Mutual Tower
1201 Third Avenue
Seattle, WA  98101-3000

**VIA FACSIMILE & OVERNIGHT DELIVERY:**

S.J. Christine Yang
Law Offices of S.J. Christine Yang
Attorneys for Chicony Electronics CO., Ltd.
and Chicony America, Inc.
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, CA  92708
Fax: 714-641-4022

**VIA FACSIMILE & OVERNIGHT DELIVERY:**

Paul A. Friedman
Michael A. Jacobs
Morrison & Foerster LLP
Attorneys for Chicony Electronics CO.,
Ltd. and Chicony America, Inc.
425 Market Street
San Francisco, CA  94105-7455
Fax:  415-268-7522

DATED this 2 day of June, 2003.

Lynne Overlie

**DORSEY & WHITNEY LLP**
A Limited Liability Partnership
U.S. Bank Bldg. Centre
1420 Fifth Ave., Suite 3400
Seattle, Washington 98101
(206) 903-8800

CC: TO JUDGE ___PM___

The Honorable Barbara Jacobs Rothstein

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JUN 02 2003 PM

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

CV 03-00295 #00000023

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

```
--------------------------------------------X
Minebea Co. Ltd.                            :
                     Plaintiffs,            :      No. CV 03 0295R
       - against -                          :
                                            :      DECLARATION OF TODD
                                            :      SICKLINGER IN SUPPORT OF
Chicony Electronics Co., Ltd. and Chicony   :      MINEBEA'S OPPOSITION TO
America, Inc.                               :      DEFENDANTS' JOINT MOTION TO
                     Defendants.            :      TRANSFER
                                            :
--------------------------------------------X
```

Todd Sicklinger declares as follows:

1. I am an attorney at the law firm of Schulte Roth & Zabel LLP, attorneys for Plaintiff Minebea Co. Ltd. I have personal knowledge of the matters set forth herein, and am competent to testify to them. I make this declaration in support of Minebea's Memorandum of Law In Opposition to Defendants' Joint Motion to Transfer.

2. Attached as Exhibit A is a true and correct copy of the U.S. District Court – Judicial Caseload Profile as downloaded from the web cite from the United states District Court for the Southern District of California.

3. Attached as Exhibit B is a true and correct copy of Southern District of California General Order 486 as downloaded from the web cite from the United states District Court for the Southern District of California.

4. Attached as Exhibit C is a true and correct copy of the Scheduling Order Regulating Trial and Other Pretrial Proceedings, which was issued by Magistrate Judge Porter in the case of Minebea v. Think Outside in the Southern District of California on October 10, 2002.

DECLARATION OF TODD SICKLINGER IN SUPPORT
OF MINEBEA'S OPPOSITION TO DEFENDANTS' JOINT
MOTION TO TRANSFER

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, #3400
SEATTLE, WASHINGTON 98101
206-903-8800

**ORIGINAL**

1    5. Attached as Exhibit D are true and correct copies of pages printed from Chicony's web cite

2    (portions of Chicony's web cite that provide details on Chicony's mobile keyboards are currently

3    unavailable to the public).

4    6. Attached as Exhibit E are true and correct copies of patents assigned to Chicony.

5    7. Attached as Exhibit F is a true and correct copy of excerpts from the Deposition of Dean Stuart

6    Cowles taken in the case of Minebea v. Think Outside.

7    8. Attached as Exhibit G is a true and correct copy of excerpts from the transcript of the September

8    5, 2001 Status Conference before Judge Moskowitz in the case of Minebea v. Think Outside.

9    9. Attached as Exhibit H are true and correct copies of pages printed from the web cite Yahoo

10   Travel showing that only connecting service is available from either Taipei or Tokyo to San

11   Diego while non-stop service is available from either Taipei or Tokyo to Seattle.

12

13   I declare under penalty of perjury that the foregoing is true and correct.

14   Executed this 2nd day of June 2003, in New York, New York.

15

16   _____

17   Todd Sicklinger

18

19

20

21

22

23

24

25

26

DECLARATION OF TODD SICKLINGER IN SUPPORT
OF MINEBEA'S OPPOSITION TO DEFENDANTS' JOINT
MOTION TO TRANSFER

**DORSEY & WHITNEY LLP**
1420 FIFTH AVENUE, #3400
SEATTLE, WASHINGTON 98101
206-903-8800

# EXHIBIT A

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

**12-MONTH PERIOD ENDING SEPTEMBER 30**

## CALIFORNIA SOUTHERN

| | | | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | Numerical Standing U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|
| OVERALL CASELOAD STATISTICS | Filings* | | 8,360 | 6,442 | 6,686 | 6,762 | 6,326 | 5,688 | | |
| | Terminations | | 8,191 | 6,393 | 6,579 | 6,513 | 6,755 | 5,728 | | |
| | Pending | | 3,522 | 3,462 | 4,087 | 3,489 | 3,391 | 3,708 | | |
| | % Change in Total Filings | Over Last Year | 29.8 | | 25.0 | 23.6 | 32.2 | 47.0 | 13 | 2 |
| | | Over Earlier Years | | | 23.6 | 25.0 | 32.2 | 47.0 | 2 | 3 |
| | Number of Judgeships | | 8 | 8 | 8 | 8 | 8 | 8 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .8 | 13.1 | 12.0 | 20.1 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 1,045 | 805 | 836 | 845 | 791 | 711 | 2 | 1 |
| | | Civil | 357 | 327 | 348 | 377 | 324 | 319 | 49 | 6 |
| | | Criminal Felony | 437 | 478 | 488 | 468 | 467 | 392 | 1 | 1 |
| | | Supervised Release Hearings** | 251 | - | - | - | - | - | 1 | 1 |
| | Pending Cases | | 440 | 433 | 511 | 436 | 424 | 464 | 29 | 7 |
| | Weighted Filings** | | 1,021 | 1,007 | 978 | 1,029 | 1,006 | 814 | 2 | 1 |
| | Terminations | | 1,024 | 799 | 822 | 814 | 844 | 716 | 1 | 1 |
| | Trials Completed | | 40 | 44 | 55 | 47 | 49 | 33 | 1 | 1 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 3.8 | 4.0 | 3.7 | 3.8 | 3.6 | 2.9 | 2 | 1 |
| | | Civil** | 6.4 | 6.4 | 7.5 | 7.8 | 13.5 | 7.9 | 8 | 2 |
| | From Filing to Trial** (Civil Only) | | 21.0 | 24.0 | 26.0 | 28.0 | 20.0 | 20.7 | 41 | 4 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 92 | 68 | 38 | 27 | 48 | 48 | 56 | 4 |
| | | Percentage | 4.3 | 3.5 | 2.0 | 1.3 | 2.6 | 1.7 | | |
| | Average Number of Felony Defendants Filed Per Case | | 1.1 | 1.1 | 1.1 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 58.29 | 58.31 | 35.52 | 54.40 | 43.75 | 39.48 | | |
| | | Percent Not Selected or Challenged | 44.3 | 45.9 | 45.7 | 45.7 | 33.2 | 29.1 | | |

## 2002 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 2858 | 164 | 8 | 818 | 87 | 28 | 88 | 269 | 244 | 177 | 663 | 9 | 303 |

| Criminal* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3486 | 1621 | 4 | 22 | 26 | 12 | 1290 | ** | 9 | 411 | 15 | 21 | 55 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

**WASHINGTON WESTERN**

12-MONTH PERIOD ENDING SEPTEMBER 30

| | | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|
| OVERALL CASELOAD STATISTICS | Filings* | 4,103 | 3,257 | 3,479 | 3,354 | 3,239 | 3,196 | | |
| | Terminations | 4,041 | 3,396 | 3,435 | 3,194 | 3,081 | | | |
| | Pending | 2,373 | 2,325 | 2,486 | 2,482 | 2,631 | 2,352 | | |
| | % Change in Total Filings Over Last Year | 26.0 | | | | | | 14 | 3 |
| | Over Earlier Years | | 17.9 | 22.3 | 33.2 | 26.7 | | 18 | 4 |
| | Number of Judgeships | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months** | 12.0 | 11.0 | .1 | 12.0 | 8.0 | .0 | | |
| FILINGS | Total | 586 | 465 | 497 | 479 | 440 | 463 | 17 | 4 |
| | Civil | 498 | 416 | 433 | 408 | 376 | 417 | 13 | 3 |
| | Criminal Felony | 56 | 49 | 64 | 71 | 64 | 46 | 54 | 12 |
| | Supervised Release Hearings** | 32 | - | - | - | - | - | | |
| ACTIONS PER JUDGESHIP | Pending Cases | 339 | 332 | 355 | 355 | 376 | 336 | 10 | 3 |
| | Weighted Filings** | 682 | 505 | 548 | 525 | 490 | 508 | 9 | 4 |
| | Terminations | 577 | 485 | 491 | 456 | 398 | 457 | 15 | 5 |
| | Trials Completed | 12 | 17 | 17 | 20 | 20 | 25 | 78 | 9 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 5.8 | 6.3 | 5.3 | 5.2 | 4.7 | 5.5 | 16 | 3 |
| | Civil** | 5.8 | 8.1 | 8.5 | 9.9 | 9.1 | 8.7 | 7 | 1 |
| | From Filing to Trial** (Civil Only) | 18.0 | 15.0 | 17.4 | 18.8 | 15.2 | 15.6 | 24 | 2 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 36 | 32 | 28 | 15 | 34 | 19 | 17 | 1 |
| | Percentage | 1.8 | 1.6 | 1.3 | .7 | 1.3 | .9 | | |
| | Average Number of Felony Defendants Filed Per Case | 1.6 | 1.6 | 1.5 | 1.4 | 1.3 | 1.3 | | |
| | Jurors — Avg. Present for Jury Selection | 32.8 | 29.9 | 31.2 | 35.5 | 31.4 | 24.2 | | |
| | Percent Not Selected or Challenged | 36.51 | 36.96 | 36.62 | 39.96 | 33.33 | 30.65 | | |

**2002 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE**

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 3487 | 234 | 7 | 545 | 48 | 24 | 298 | 307 | 1141 | 143 | 467 | 6 | 267 |

| Criminal* | 389 | 22 | 15 | 44 | 6 | 19 | 115 | ** | 12 | 92 | 10 | 22 | 32 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.

\*\* See "Explanation of Selected Terms."

# EXHIBIT B



thern District of California

# eneral Order

| | |
|---|---|
| eral Order No: | Description:1 |
| | **In the Matter of Declaration of Judicial Emergency** |
| e Posted | Date Filed |
| 1/2000 | 10/30/2000 |

e Court for the Southern District of California declares a judicial emergency in the District. Due to the vy criminal felony caseload and lack of new judgeships, the district continues to rank as one of the iest courts in the nation. According to the Judicial Caseload Profile Report prepared by the ministrative Office of the United States Courts, the District Court has the highest weighted caseload judge nationwide. In recognition of the heavy caseload, the Judicial Conference of the United States ommended the addition of eight judgeships -- five permanent and three temporary -- to improve the ministration of justice in the district. This was the highest number of new judgeships recommended for court in the nation. Despite the Judiciary's recommendation, no new judgeships have been created for district in pending judgeship legislation. Consequently, the needs of the litigants in our district for v judgeships have not been met. Without new judgeships, the District will operate under judicial ergency procedures as required by the needs of justice.

TED: October 30, 2000

ED: October 30, 2000

**PPORTING CHARTS:**

iminal cases filed FY '94 - '99



del.PDF

eighted cases per judgeship for 12 month period ending December 31, 1998



ght38.PDF

eighted cases per judgeship for 12 month period ending September 30, 2000



ght00.PDF

**LATED READINGS:**

ministrative Office of the U.S. Courts; *Fact Sheet: Crisis in the Border Courts*



morandum; **U.S. District Court, Southern District of California**

; **Angeles Times, November 1, 2000;** *U.S. judges in San Diego declare judicial emergency*

ι **Diego Union-Tribune, November 1, 2000;** *Beyond Petty*

ι **Diego Union-Tribune, October 31, 2000;** *S.D., needing 8, gets zero new federal judgeships*

ι **Diego Union-Tribune, September 28, 2000;** *Judicial distress: Congress should increase*
*geships here*

ι **Diego Union-Tribune, June 22, 2000;** *Break the logjam: Need is urgent for more federal judges*
*'e*

ınscript of KPBS interview, **June 7, 2000, regarding judicial overload, featuring Chief Judge**
.rilyn L. **Huff et al.**

lifornia Lawyer, **January 2000;** *The Busiest Court Around: There's no relief in sight for the*
*ieged Southern District* (**eighth article on page**)

ι **Diego Union-Tribune, October 17, 1999;** *Judicial overload: Busiest court in nation needs judges*

---

**: for Download:**
Type: WordPerfect 6.1

Size: 27; 5; 14 KBytes

---



U.S. District Court
Southern District of California

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|
| Cr. Cases (FY) | 1,128 | 1,704 | 2,176 | 3,136 | 3,736 | 3,744 |
| Cr. Def. (FY) | 1,466 | 2,215 | 2,829 | 3,763 | 4,483 | 4,493 |



Weighted Cases per Judgeship for the 12 Month Period Ending December 31, 1998



# Weighted Cases per Judgeship for the 12 Month Period Ending September 30, 2000

**Number of Cases**

1000
800
600
400
200
0

Alaska 248
Arizona 589
Central Cal 504
Eastern Cal 677
Northern Cal 501
Southern California 976
Hawaii 470
Idaho 447
Montana 436
Nevada 410
Oregon 535
E. Wash 288
Western Wash 548

**Ninth Circuit Districts**

* Includes new authorized judgeships for Arizona and Nevada

# CRISIS IN THE BORDER COURTS

Impact of Massive Illegal Immigration, Related Drug and Other Criminal Prosecutions Along the U.S. Southwest Border Upon the Federal Courts

## FACT SHEET

• **The Southwest Border Initiative has dramatically increased federal prosecutions along the U.S./Mexico Border.**

Beginning in 1995, the Southwest Border Initiative ("SBI"), a national strategy designed to crack down on illegal immigration and drug smuggling in Southern California, Arizona, New Mexico and Texas, has produced record numbers of federal prosecutions in those states. Operating under a congressional mandate and increased funding, the Department of Justice has significantly expanded its presence along the U.S./Mexico border, stationing thousands of additional Border Patrol, INS and DEA agents there since 1994, with plans to significantly increase the number of such agents over the next two years.

• **The SBI has had an enormous impact upon the workload of the federal courts on the southwest border.**

The five federal district courts of the Southern District of California, the District of Arizona, the District of New Mexico, the Western District of Texas, and the Southern District of Texas (the "Border Courts") *now handle 27 percent of all federal court criminal filings in the United States*. The other 73 percent of federal criminal filings are divided among 89 other district courts.

• **Since 1994, criminal cases filed in the Border Courts have increased by 161 percent.**



Criminal Cases Filed in District Court - SDCA, AZ, NM, WDTX, SDTX

■ 1994 - 6,460
■ 2000 - 16,868

• **Drug prosecutions in the Border Courts more than doubled between 1994 and 2000, from 2,864 to 6,116, and immigration prosecutions increased more than seven-fold, from 1,056 to 7,613.**



• **In contrast to the skyrocketing caseload and massive expansion of prosecutorial resources, judicial resources in the Border Courts have fallen far behind.**

Between 1994 and 1998,[1] DEA personnel in the Border Courts surged 155 percent, Border Patrol personnel 99 percent, INS personnel 93 percent, and FBI personnel 37 percent. By contrast, the federal judicial officer resources in these five districts increased only four percent, with probation and pretrial resources increasing 19 percent.



• **The Average Criminal Caseload per district judge[2] in the Border Courts is more than quadruple the average for the rest of the nation.**

## Criminal Cases Per District Judge
## - SDCA, AZ, NM, WDTX, SDTX



In 2000, the average criminal caseload per district judge in the five Border Courts was 324. By contrast, the average criminal caseload in the other 89 federal district courts was 75. Specifically, the criminal caseload per district judge in 2000 for each of the Border Courts was:

| | |
|---|---|
| Southern District of California: | 492 |
| District of Arizona: | 282 |
| District of New Mexico: | 343 |
| Western District of Texas: | 442 |
| Southern District of Texas: | 205 |

---

1998 is the latest year for which comparative data is available from the Department of Justice. Between 1994 and 00, probation and pretrial personnel increased 52.2 percent. During that same period, judicial officer resources reased by only twelve percent.

This data is based upon the total number of authorized district judgships.



# SOUTHERN DISTRICT OF CALIFORNIA

The Southern District of California continues to rank as one of the busiest courts in the nation. A recent judicial survey ranks the Southern District of California as the busiest court in the nation in terms of felony cases filed per judgeship and total weighted caseload. As of September 30, 1999, the Southern District had a weighted caseload of 1,029 cases filed per judge, far above the national average of 430 weighted filings per judge. This is an increase over the court's already heavy filings in 1998 of 1,006 cases per judge for fiscal year 1998. These statistics also do not take into account the recent deaths of Judge Leland C. Nielsen and Judge Edward J. Schwartz.

In July 2000, the United States Judicial Conference authorized new district court judgeship positions for the Southern District of California. The Judicial Conference authorized five permanent judgeships and three temporary judgeships. The Southern District received the highest number of new authorized judgeships based on our status as the busiest court in the nation in terms of felony cases filed per judgeship and total weighted caseload. It is imperative that Congress pass a

judgeship bill to enable the court to continue to preside over its heavy criminal

caseload.

The Southern District is comprised of San Diego and Imperial Counties and borders Mexico to the south. The Southern District includes a very active portion of the United States-Mexico border, and considerable law enforcement activity in the district focuses on the border area. The district contains three major points of entry between the United States and Mexico, and shares an approximate 200-mile border with Mexico, along which 6 million people live, comprising 60% of the total population along the entire border.

Further, with almost 2.8 million residents, San Diego County is the second largest county in the state. San Diego is projected to continue to grow rapidly in the future and is projected to be the fourth fastest growing Metropolitan Statistical Area in the nation, behind only Houston, Washington, D.C., and Atlanta. Unique to the Southern District, however, is the presence of an adjacent major foreign city, Tijuana.

According to the U.S. Customs Service, as much as 33% of the United States' illegal drugs and 50% of its cocaine are smuggled in through the Southern District of California. Law enforcement officials now refer to Imperial County as the nation's new "cocaine corridor." The drug related cases include defendants from major drug cartels, including the Arellano-Felix organization. The drug cases include drug trafficking in marijuana, cocaine, methamphetamine, and heroin. The incidence of

drug-related cases is expected to continue to rise substantially in the region. Additionally, the court faces a substantial number of immigration cases, with many defendants having prior convictions for aggravated felonies.

The court desperately needs additional judgeships in order to continue to preside over its heavy criminal caseload. Our senior judges are of advanced age, with one judge at 86 years old and cannot continue to preside over their heavy calendars. We need new judges to ensure that defendants are brought to trial in accord with the limitations imposed by their rights to a speedy trial.

# EXHIBIT C



FILED

02 OCT 11 AM 8:45

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINEBEA CO., LTD., a Japanese corporation,<br><br>Plaintiff,<br><br>v.<br><br>THINK OUTSIDE, INC., a California corporation; and PERIPHERAL TECHNOLOGY, INC., a Taiwan corporation,<br><br>Defendant. | Civil No.   01cv0771-BTM(POR)<br><br>**SCHEDULING ORDER REGULATING DISCOVERY AND OTHER PRETRIAL PROCEEDINGS** |

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, a Case Management Conference was held on <u>October 9, 2002</u>. Appearing were James Blackburn, Esq., Joel Lutzker, Esq., David Kagan, Esq., and Lisa Knight, Esq., of Plaintiff Minebea; Pamela Wong, Esq., on behalf of Defendant Peripheral Technology, Inc.; and Michael Jacobs, Esq., and Paul Friedman, Esq., on behalf of Defendant Think Outside, Inc.

After consulting with the attorneys of record for the parties and being advised of the status of the case, and good cause appearing,

IT IS HEREBY ORDERED:

1.     All parties shall repropound any requested discovery sought from the other parties on of before <u>October 11, 2002</u>.

2.     All parties shall respond to discovery propounded by October 11, 2002, on or before <u>November 8, 2002</u>.

///

190

1    3.    Any motion to join other parties, to amend the pleadings, or to file additional
2 pleadings shall be filed on or before **December 9, 2002**.

3    4.    On or before **February 24, 2003**, all parties shall exchange with all other parties a list
4 of all expert witnesses expected to be called at trial. The list shall include the name, address, and
5 phone number of the expert and a brief statement identifying the subject areas as to which the expert
6 is expected to testify. The list shall also include the normal rates the expert charges for deposition
7 and trial testimony. On or before **March 10, 2003**, any party may supplement its designation in
8 response to any other party's designation so long as that party has not previously retained an expert
9 to testify on that subject.

10    5.    Each expert witness designated by a party shall prepare a written report to be
11 provided to all other parties no later than **June 27, 2003**, containing the information required by Fed.
12 R. Civ. P. 26(a)(2)(A) and (B).

13    *Except as provided in paragraph 6, below, any party that fails to make these disclosures*
14 *shall not, absent substantial justification, be permitted to use evidence or testimony not disclosed at*
15 *any hearing or at the time of trial. In addition, the Court may impose sanctions as permitted by Fed.*
16 *R. Civ. P. 37(c).*

17    6.    Any party, through any expert designated, shall in accordance with Fed. R. Civ. P.
18 26(a)(2)(C) and Fed. R. Civ. P. 26(e), supplement any of its expert reports regarding evidence
19 intended solely to contradict or rebut evidence on the same subject matter identified in an expert
20 report submitted by another party. Any such supplemental reports are due on or before **July 11,**
21 **2003**.

22    7.    All fact discovery, excluding expert discovery, shall be completed on or before **May**
23 **30, 2003**. All expert discovery shall be completed on or before **August 1, 2003**.

24    *"Completed"* means that all discovery under Rules 30-36 of the Federal Rules of Civil
25 Procedure must be initiated a sufficient period of time in advance of the cut-off date, so *that it may*
26 *be completed* by the cut-off date, taking into account the times for services, notice, and response as
27 set forth in the Federal Rules of Civil Procedure. All disputes concerning discovery shall be brought
28 to the attention of the Magistrate Judge no later than thirty (30) days following the date upon which

1    the event giving rise to the discovery dispute occurred. Counsel shall meet and confer pursuant to

2    the requirements of Fed. R. Civ. P. 26 and Local Rule 26.1(a).

3         8.    A Mandatory Settlement Conference shall be conducted on **November 20, 2002**, at

4    **2:00 p.m.**, and **November 21, 2002**, at **9:00 a.m.**, in the chambers of Magistrate Judge Louisa S.

5    Porter. Counsel shall submit *confidential* settlement statements *directly to chambers* no later than

6    **November 13, 2002**. The settlement statements should include a neutral factual statement of the

7    case, identify controlling legal issues, and concisely set out issues of liability and damages, including

8    any settlement demands and offers to date and addressing special and general damages where

9    applicable. *The settlement conference statements shall not be filed with the Clerk of the Court nor*

10   *shall they be served on opposing counsel.*

11        All parties and claims adjusters for insured defendants and representatives with complete

12   authority to enter into a binding settlement, as well as the principal attorney(s) responsible for the

13   litigation, *must be present* and legally and factually prepared to discuss and resolve the case at the

14   mandatory settlement conference. Corporate counsel and/or retained outside corporate counsel *shall*

15   *not* appear on behalf of a corporation as the party who has the authority to negotiate and enter into a

16   settlement. All conference discussions will be informal, off the record, privileged and confidential.

17        Mandatory settlement conferences shall not be rescheduled without a showing of good cause

18   and adequate notice to the Court. If counsel wish to reschedule this conference, they shall contact

19   the Court at least ten (10) days prior to the conference. Absent exceptional circumstances, the Court

20   will not reschedule this conference with less than ten (10) days notice. *Only in extreme*

21   *circumstances will the Court reschedule a mandatory settlement conference with less than twenty-*

22   *four (24) hour notice.*

23        9.    All motions, other than motions to amend or join parties, or motions in limine, shall

24   be filed SO AS TO BE HEARD on or before **September 8, 2003**.

25        Motions will not be heard or calendared unless counsel for the moving party has obtained a

26   motion hearing date from the law clerk of the judge who will hear the motion. *Be advised that the*

27   *parties must file their moving papers within three (3) days of receiving the motion hearing date from*

28   *the Court. Be further advised that the period of time between the date you request a motion date and*

- 3 -

1 *the hearing date may be up to two months. Please plan accordingly.* For example, you may need to

2 contact the judge's law clerk at least two months in advance of the motion cut-off to calendar the

3 motion. Failure of counsel to timely request a motion date may result in the motion not being heard.

4 *Motions will not be heard on the above date unless you have obtained that date in advance from the*

5 *judge's law clerk.*

6     Briefs or memoranda in support of or in opposition to any pending motion shall not exceed

7 twenty-five (25) pages in length without permission of the judge or magistrate judge who will hear

8 the motion. No reply memorandum shall exceed ten (10) pages without leave of the judge or

9 magistrate judge who will hear the motion.

10     10.   In a bench trial, counsel shall serve on each other and file with the Clerk of the Court

11 their Memoranda of Contentions of Fact and Law in compliance with Local Rule 16.1(f)(2), (3) and

12 (4) on or before September 29, 2003.

13     11.   All parties or their counsel shall also fully comply with the Pretrial Disclosure

14 requirements of Fed. R. Civ. P. 26(a)(3) on or before September 29, 2003. *Failure to comply with*

15 *these disclosures requirements could result in evidence preclusion or other sanctions under Fed. R.*

16 *Civ. P. 37.*

17     12.   Counsel shall meet and confer on the preparation of the Pretrial Order required by the

18 Honorable Barry Ted Moskowitz, and take the action required by Local Rule 16.1(f)(4), on or before

19 October 6, 2003. The parties shall discuss and prepare a proposed Pretrial Order containing the

20 following:

21     a.   A statement to be read to the jury, not in excess of one page, setting forth the nature

22     of the case, claims and defenses;

23     b.   A list of the causes of action to be tried, referenced to the Complaint and

24     Counterclaim. For each cause of action, the order shall succinctly list the elements of

25     the claim, damages and any defenses. A cause of action in the Complaint or

26     Counterclaim which is not listed shall be dismissed with prejudice.

27     c(i).   A list of each witness that counsel actually expects to call at trial with a brief

28     statement, not exceeding four sentences, of the substance of the witnesses' testimony.

- 4 -

(ii). A list of additional witnesses including experts that counsel do not expect to call at this time but reserve the right to call at trial along with a brief statement, not exceeding four sentences, of the substance of the expert witness' testimony.

d(i). A list of all exhibits that counsel actually expect to offer at trial with a single-sentence description.

(ii). A list of additional exhibits that counsel do not expect to offer at this time but reserve the right to offer if necessary at trial along with a single-sentence description

e. A statement of all facts to which the parties stipulate. This statement shall be on a separate page and will be read to and provided to the jury. The parties are encouraged to meet with the assigned magistrate judge to work out as many stipulations of fact as possible.

f. A list of all deposition transcripts by page and line, or video tape depositions by section, that will be offered at trial. The proponent of the deposition shall prepare a copy of all portions to be read or played to the jury.

g. The parties shall prepare proposed jury instructions (if trial by jury) on the substantive claims, damages and defenses. One set of proposed instructions shall be given to the court. If the parties disagree on an instruction, the alternative instructions shall be submitted.

h. The parties shall prepare a proposed jury verdict form.

The parties are encouraged to consult with the assigned magistrate judge to work out any problems in preparation of the proposed pretrial order. The Court will entertain any questions concerning the conduct of the trial at the pretrial conference.

13. The proposed final pretrial conference order, including objections any party has to any other parties' Fed. R. Civ. P. 26(a)(3) Pretrial Disclosures shall be prepared, served and lodged with the Clerk of the Court on or before October 14, 2003, and shall be in the form prescribed in and in compliance with Local Rule 16.1 (f)(7). Counsel shall also bring a court copy of the pretrial order to the pretrial conference.

///

01cv0771

1    14.    The final pretrial conference shall be held before the **Honorable Barry T.**
2 **Moskowitz**, United States District Court Judge, on **October 21, 2003**, at **2:30 p.m.**
3    15.    The dates and times set forth herein will not be further modified except for good
4 cause shown.
5    16.  Counsel for Plaintiff shall serve a copy of this order on all parties that enter this case
6 hereafter.

7
8 DATED: _10/10/02_

9                                                     Hon. LOUISA S. PORTER
                                                      United States Magistrate Judge
10

11 cc:    District Judge
          All parties
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

01cv0771

# EXHIBIT D






GROUPS INFORMATION □ SEARCH □ MY FAVORITE
NEW PRODUCTS □ OEM □ SITE MAP



select Langu



Company Information

Global Logistics

Products

Download

News Room

Employment



Input Devices



HoT    DeskTop KeyBoard    Mobile KeyBoard    P C Camera    Di

THIS SITE REQUIRES FLASH 5 PLUG-IN ( DOWNLOAD FLASH 5 )

© 1983 - 2003 Chicony Electronics CO - Terms of Usage

# Chicony

## Global Logistics Support



Greenock, Scotland

Czech

Beijing

Ame

Glasgow
Limerick

Omaha
Nashville

San Jose
Irvine
Los Angeles
San Diego

IndianaPolis
Austin
Raleigh
Huntsvil

Hamburg
Beijing
Xiamen
Taipei
Dongguan
Bangkok
S'pore
Penang

Sydney

SuZhou
( Mainland China III )

**Warehouse**

**Sales**

**Technical Support**

**Laser Printing**

**Tampo Printing**

**Silkscreen Printing**

Taiwan
• R&D Center and Headquarter

Thailand & China
• Mass Production Bases

Hamburg

Thailand

Dongguan
( Mainland China II )

1983 - 2003 Chicony Electronics CO - Terms of Usage



Chicony

COMPANY INFORMATION    SEARCH    INVESTORS    select Langu

NEWSROOM    SITE MAP    CONTACT US

Company Information

Global Logistics

Products

Download

News Room

Employment



concerns and changing demand

*Un*compromising in quality enforcement

*In*novation-driven in valuing value of customers!!

**Input Devices**






HoT    DeskTop KeyBoard    Mobile KeyBoard    P C Camera    Di

THIS SITE REQURIES FLASH 5 PLUG-IN    ( DOWNLOAD FLASH 5 )

© 1983 - 2003 Chicony Electronics CO - Terms of Usage



GROUP INFORMATION ● SEARCH ☐ PRODUCTS
NEW PRODUCTS ☐ IDEA ☐ SITEMAP ☐

select Item o

| Home | Company Information | Global Logistics | Products | Investor Relations | Download | News Room |



Corporate Philosophy
Corporate Mission
Milestones
Corporate Profile
Core Competencies
Contact Chicony



# Corporate Philosophy

Business goes far beyond money things only, but a partnership way to pursue for win-win. A l our basic theme to enforce customers competitive edge to achieve success. We believe customer success. Chicony develops strong, long-lasting alliances with our customers and makes the full a resources available to help them meet their short- and long-term strategic objectives.

We honor our employees since neither modern equipment nor products make the difference bu believe our people will make you distinguished from your competitors in total competitive posit respect, appreciate and investment in people creating a culture that thrives on innovation and pa: clients on important challenges set us apart in the marketplace. Meet our Board of Directors, mar team members and learn more about how they work in Chicony, you may discover what takes C

# Corporate Mission ： *QUICK*

**Q**uick and effective response to customers concerns and changing demand
**U**ncompromising in quality enforcement
**I**nnovation-driven in valuing value of customers
**C**ost consciousness in developing total solution for customers
**K**eep continuous efforts on delivering speed and flexible services to meet time-to-market competition

# Milestones

**2002**
  Set-up Philippine BTO hub

  Merge Hipro Electronics as a 100% owned subsidiary
**2001**
  Set-up Czech BTO full-functioned hub in Brno

  Established Japan Office in Tokyo

  Built up China 3rd. Plant in Wu-Jian

  XGA and VGA PC Camera in production

  Increased in holding Hipro Electronics shares from 32.29 % to 75%

  Rated 27th in Economic Performance Top 200 ( Oct. 2001. Accounting Research Monthly,Taiwan )
**2000**
  CIF and VGA PC Camera in production


1999
Set-up Digital Image Division

Listed in TSEC
1998
Built up China 2nd. Plant in Dongguan, with a monthly keyboard capacity up to 2.5 million sets
1997
Awarded ' Best Product of Year 1997 ' in Chip Magazine ( German Edition )
1996
Both monthly keyboard manufacturing and sales volume breakthrough one million threshold
1995
Set-up UK BTO hub with full-functioned facility in Greenock, Scotland
1994
Built up China 1st. Plant in Dongguan, with a monthly keyboard capacity up to 600k sets
1993
Headquarter with manufacturing facility built up in Wu-Ku, Taipei Hsien, Taiwan
1992
Awarded ' National Awards of Excellence ' for keyboard and notebook products
1991
Monthly keyboard manufacturing and sales volume hit 160k sets
1990
Holding company, Chicony Overseas Inc., set-up. Chicony America Inc. and Chicony Electronics Gmbh were also established to enforce Chicony¦¦s overseas marketings network
1989
Built up first overseas plant in Bangpakong, Thailand
1988
Listed as one of top five keyboard manufacturers in PC Clones Magazine

Set-up Hamburg branch office
1987
Monthly keyboard sales volume reached 80k sets
1986
Set-up California branch office
1983
Chicony Electronics Co. Founded

# Corporate Profile

Chicony Electronics was founded in 1983 and known as a world leading manufacturer and marketer in ir keyboards and power supplies, has been also devoted in digital image products such as PCCs and DSCs si innovative-driven engineering team, world-class experts skilled in a variety of technologies and market ar hubs spread over worldwide, Chicony always offers quality , flexible and speed services exceed customer

Chicony is committed to provide leading-edge input devises and digital image products with top quality customers. We value value of customers' through teamwork both its diverse resources and efforts and cust expectation. Our business units often team together, cross-pollinating ideas and technical expertise to prov innovative solutions tailored to the market and business proposition at hand. Chicony specializes in blendi technology know-how and application development expertise needed for breakthrough results with strateg the creation of clear competitive advantage for our clients.


# Core Competencies : Why Choose Chi

### Unparalleled R & D Team

Chicony differentiates itself by maintaining a proactive, innovative-driven, and sophisticated-disciplinec more than 500 accumulated man-years of design experience which assures our capability in offering comp new product ramp up from conceptualize, physical design, prototype, to test and certify and successfully p more...Constantly efforts on seeking new ideas and better solutions in bridging and exploiting the versatile market trend, technology development, and customer value and needs. Chicony R&D is equipped with EN professional design verification lab and also owns firmware, software, optical and ID design team to honoi distinguishing competitive standing in response to the demand of dynamic market essence , low cost, shori outstanding product efficiency.

### Never Compromised In Quality Assurance

We believe " long-term partnership " is created from the confidence in quality of quality assurance syste enforcement is far beyond a thing of " no quality, no sales " but a tradition in pursuing challenge for succe Preventive quality engineering plays a key roll in every progress of product cycle from design, manufactui and is solid instilled in qualifying functionality, manufacturability, testability, traceability, useability and s employs the latest auto test equipment and software to assure reliability. Proprietary equipment and softwi customized testing services. Continuous improvement is a way of life at Chicony and we make sure our cl process from day one.

### A Team-up Resources -- Effective Teamwork To Speed Up Product Marketing

Undoubtedly quality teamwork support defines the successfulness of products marketing. Chicony total who can move products from concept to commercialization at breakneck speed are capable of enforcing al competition mix for customers in ID, performance, quality, cost, time-to-market, flexible supply , worldwi services. We believe these critical characteristics that Chicony's diligent team members possess not only e: experience and distinguished track record of implementing challenge provide insight into all aspects of tec concerns will spell success for our customers.

### Single Contact Window For Your Unique Demand - Project Management

Project management services are provided for OEM customers in managing all related progress of on-goin leveraging our superior engineering power and task management skills to coordinate multiple internal and designated project manager is capable of offering a broad range of customized support services, convertin; concrete outputs and ensuring timely, cost effective project implemented. So your management team can f issues.

### Global Logistics Networks With More Than 20 BTO Hubs

Chicony establishes more than 20 BTO hubs spread over all strategic time-to-market regions in Canada, U Taiwan. China, Philippine, Thailand, Singapore, Australia, German, Czech, Ireland, UK, etc.. Especially, located at Taiwan, China, and Thailand. BTO hubs in German, UK, Czech, and Philippine are also equipp printing capacity and engineering capability. These full-functioned BTO hubs privilege our customers ove efficiency, supply flexibility, time-to-market, and also cost concerns.

# Contact Chicony




| | |
|---|---|
| *Taiwan*<br>Chicony Electronics Co., Ltd.<br>No.25, Wu-Gong 6th. Rd., Wu-Ku Industrial Park, Taipei Hsien 248, Taiwan<br>Tel.: 886-2-22988120<br>Fax : 886-2-22988442 |  |
| *America* (I)<br>Chicony America Inc.<br>53 Parker , Irvine, CA 92618, USA<br>Tel.: 1-949-3800928<br>Fax : 1-949-3808201 |  |
| *America* (II)<br>Chicony Electronics RTP.<br>1000 PARK FORTY PLAZA ,<br><br>CAUSA Suite #300,DURHAM NC 27713<br>Tel.: 1-949-3800928<br>Fax : 1-949-3808201 |  |
| *Chicony Electronics ( Mainland China II ) Co., Ltd.*<br>San Zhong Gong Ye Qu, Qingxi,<br>Dongguan, China<br>Tel.: 86-769-7311688<br>Fax : 86-769-7312680<br><br>function : Services, Manufactory center, Marking, Sales, technical support, After Service, BTO Hub/Warehouse | |
| *Chicony Electronics ( SU Zou, Mainland China III ) Co., Ltd.*<br>No. 25, 205 Province Ave., Wu-Jiang Development Zone<br>Song Ling Town, Wu-Jiang City, SuZhou,<br>Jiang Su Province, China<br>Tel.: 86-512-3487888<br>Fax : 86-512- 3487911<br><br>function : Services, Manufactory center, Marking, Sales, technical support, After Service, BTO Hub/Warehouse | |
| *Chicony Sales Office.*<br>Room 7, Floor 10, Suite C, Chengrning Mansion, No, 2 Nan-Da Street, Xichen District, Beijing, P.R.C |  |



Tel.: 010-66116285/66518196/66153885
Fax : 010-66116271

function : Manufactory center, Marking, Sales, technical support, After Service, BTO Hub/Warehouse

*Thailand*
Chicony Electronics ( Thailand ) Co., Ltd.
82 Mu 4 Takham
Bangpakong, Chachoengsao 24130
Thailand

function : Manufactory center, technical support, After Service

*Europe*
Chicony Electronics GmbH
Oehleckerring 6B, 22419 Hamburg, Germany
Tel.: 49-40-514400-0
Fax : 49-40-512932

function : Manufactory center, Marking, Sales, technical support, After Service, BTO Hub/Warehouse, Laser Printing

*Chicony Electronics ( UK ) Ltd.*
Larkfield Industrial Estate,
Earnhill Rd.,
Greenock, Scotland
Tel.: 44-1475-657300
Fax : 44-1475-657320

function : Manufactory center, Marking, Sales, technical support, After Service, BTO Hub/Warehouse, Laser Printing, Tampro prooting silkscreen printing

*Chicony CZ ( Czech Republic )*
Turanka 115, Brno 62732
Czech Republic
Tel.: 420-5-48181355
Fax : 420-5-48183150

function : Manufactory center, Marking, Sales, technical support, After Service, BTO Hub/Warehouse, Laser Printing, Tampro prooting





1983 - 2003 Chicony Electronics CO - Terms of Usage



GROUP INFORMATIONS    SEARCH    MYPRODUCTS
NEW PRODUCTS          DATA      SITEMAPS

select Item

| Home | Company Information | Global Logistics | Products | Investor Relations | Download | News Room |

## Desktop Keyboard

## Mobile Keyboard





- Desktop Keyboard
- Mobile Keyboard
- Digital Camera
- PC Camera

## Digital Camera

## PC Camera





1983 - 2003 Chicony Electronics CO - Terms of Usage





Standard Keyboard

USB Keyboard

Cordless Keyboard

Special Keyboard

Multimedia Keyboard

Numeric Keypad

Ergonomic Keyboard

Gaming Keyboard

Home > Products >Digital Images

## Features

- Storage card reader
- Compatible with USB specification V.1.0
- Support 3.3V Smartmedia card
- Support Type I, Type II Compact Flash card
- Access (read/ write) LED indication
- Low noise, low profile key switches for quiet and easy typing
- Removable palm rest (option)
- With 18 full compatible with Windows Me above hot-keys



KUS010

**Take a Prod**

## Specifications

| Test item | KUS0108 | KUS0103 | 990 |
|---|---|---|---|
| Product Picture | | | |
| Bump height | --- | yes | |
| Shear strength | yes | --- | |
| Void detection | 18 | 9 | |
| Compatible w/Windows 2000/Me/XP OS | yes | yes | |
| Agency: FCC, CE (TUV,UL option) | yes | yes | |
| Interface | USB | USB | |
| Dimension (mm) | 490 x 213 x 47490 x 254 x 47 | 460 x 250 x 45 | 470 > |
| <w/ palm-rest> Packing (piece/ carton) | 10 | 10 | |
| Gross Weight (kgs/ carton) | 14 | 13 | |





# Chicony

| Home | Company Information | Global Logistics | Products | Download | News Room | Employmen |

PRODUCTINFORMATIONS ☐     SEARCH ☐     ☐ MY FAVORITE
NEWPRODUCTS ☐     DEAD ☐     ☐ SITEMAP

Company Info



**Standard Keyboard**

**USB Keyboard**

**Cordless Keyboard**

**Special Keyboard**

**Multimedia Keyboard**

**Numeric Keypad**

**Ergonomic Keyboard**

**Gaming Keyboard**

Home > Products >



**KB-8923/KB-8926**
KB-8923:104 keys with metal plate
KB-8926:105 keys with metal plate



**KB-3923/KB-3926**
KB-3923:104 keys
KB-3926:105 keys



**KBP-0173**
KB-0173: Without palm rest
KBP0173: With palm rest
Fashion ID with colorful bezel & Palmrest
With One sleep hot key



**KB-2961**
KB-2961:104 keys
KB 2966:105 keys






**KB-9810**

Standard Keyboard,with 3 ACPI Keys (po
wake-up)



**KBP2971**
KB-2971: Without palm rest
KBP2971: With palm rest



**KBP9850**
KB-9850: without palm rest
KBP9850: with palm rest
Keyboard,with 3 ACPI Keys(power, suspe

1983 - 2003 Chicony Electronics CO - Terms of Usage





GROUP INFORMATION ☐ SEARCH ☐ MY FAVORITE ☐
NEW PRODUCTS ☐ Q.&A ☐ SITE MAP ☐

Company Info

Home | Company Information | Global Logistics | Products | Download | News Room | Employment



Standard Keyboard

USB Keyboard

Cordless Keyboard

Special Keyboard

Multimedia Keyboard

Numeric Keypad

Ergonomic Keyboard

Gaming Keyboard

Home > Products >



**KU-9900**
KU-9900: Without palm rest
KUP9900: With palm rest
Middle-end multimedia keyboard II
Full compatible with Windows Me later v
Removable comfortable palmrest(option)



**KUB-925**
Silver spray printing



**KU-0108**
KU-0108
KUP0108
Removable palm rest (option)
With 18 full compatible with Windows M



**KUM-9973**
KU-9973
KUM9973
KUM9973: USB interface with PS/2 mous
Compact size design for space saving, me
Match-up LCD system
Full compatible with Windows Me later v



**KU-9943**
Compact size design with non-traditional ]
7 hotkeys: Internet, E-mail, Search, Vol+,
2 programmable keys
USB interface with HUB (2 USB ports)



**KUH9943**
KU-9943 with Hub
Compact size design with non-traditional ]
7 hotkeys: Internet, E-mail, Search, Vol+,
2 programmable keys
USB interface

with 2 down stream ports

**KU-9865**
KU-9865 with Hub

Fully compliant with Universal Serial Bus
device Class definition for human interfac
version 1.0 Integrated HUB supporting tw
downstream ports Full support hot Plug &
connector easy to connect any USB device
devices can be added with additional USB
the attachment of 127 devices per USB Th
supports two device speeds: 1.5Mb/s and ]
Peripheral can be powered directly from th
power is available form the cable. The cur.
vary from 100ma-500ma depending on the
more IRQ, 1/0, or memory needed Power
supported USB transactions include error
mechanisms that are used to ensure that d
without error. In the event of errors, transa
retried.



**KUP9908**
KU-9908 with palm rest
KUP9908 without palm rest

Multimedia/Internet Feature of Volume U
Internet, Email and Search Windows 98/N
compatible Multi-language CD driver with
Installation Detachable Palm Rest as Optic





KU-8933

with a built-in standard PS/2 mouse port w



KU-2971
USB End Device



KU-9973

with 2 down stream ports



1983 - 2003 Chicony Electronics CO - Terms of Usage

 





Home | Company Information | Global Logistics | Products | Download | News Room | Employment





- Standard Keyboard
- USB Keyboard
- Cordless Keyboard
- Special Keyboard
- Multimedia Keyboard
- Numeric Keypad
- Ergonomic Keyboard
- Gaming Keyboard

Home > Products >



**KUS0108**
Storage card reader
Compatible with USB specification V.1.0
Support 3.3V Smartmedia card
Support Type I, Type II Compact Flash ca
Access (read/ write) LED indication
Low noise, low profile key switches for qt
typing



**KUS0103**
Smart Card interface compatible with ISO
Compatible with USB specification V.1.0
3V/ 5V smart card compatible
Fully compatible with Microsoft PC/SC ar
Easy and quick touch to Smart Card featur



**KU-9903**
Finger Print with Smart Card Reader Keyt
KUF 9903 fighter prnt only
KUS 9903 Smart Card reader only

1983 - 2003 Chicony Electronics CO - Terms of Usage









Standard Keyboard

USB Keyboard

Cordless Keyboard

Special Keyboard

Multimedia Keyboard

Numeric Keypad

Ergonomic Keyboard

Gaming Keyboard

Home > Products >



**KB-0108/KBP0108**
KB-0108:Without Palm rest
KBP0108:With Palm rest



**KB-0175/KBP0175**
KB-0175: Without palm rest
KBP0175: With palm rest



**KBP-0173A**
KB-0173A
KBP0173A
Fashion ID with colorful bezel & Palmrest
With optional 5 hot keys combation
High level image with attractive price



**KB-9943**
KB-9943:Without mouse port
KBM9943:With mouse port

9 Hot-keys: Internet, E-mail, Searchh, Vol
Down, Mute, Sleep, Bookmarks 1 Progran
Windows 98/NT/2000 compatible Multi-li
driver with Auto Installation



### KB-9973

Compact size design for space saving, met
Match-up LCD system
Full compatible with Windows Me back v
KBM9973: PS/2 interface with PS/2 mous

9 Hot-keys: Internet, Previous track, Play/
track, Suspend 2 Programmable keys Win
compatible Multi-language CD driver with
Installation



### KBP9885

KB-9885: without palm rest
KBP9885: with palm rest

3 Power Management Keys 7 Multi-media
Volume Up/Down, Mute, Pre track, Next
4 Internet Keys for WWW, Pre Page, Nex
Programmable Keys Windows 98/NT/200
Multi-language CD driver with Auto Insta
Detachable Palm Rest as Option



### KBP9908

KB-9908: without palm rest
KBP9908: with palm rest

Multimedia/Internet Feature of Volume U
Internet, Email and SearchDetachable Palm
Windows 2000 or earlier version compatib
language CD driver with Auto Installation
Rest as Option



### KBP9805

KBP9805: with palm rest
KB-9805: without palm rest
Win98 Keyboard,with 3 Power Manageme
14 built in external hot keys allow one tou
popular multimedia functions, including: F
Stop, Play/Pause >, Next track >>, Vol+,
detect CD audio and VCD Multi-track VC
programmable hot keys Microsoft DirectX
using all function keys in your games) Use
interface

1983 - 2003 Chicony Electronics CO - Terms of Usage





GROUP INFORMATION ☐ SEARCH ☐ MY FAVORITE
NEW PRODUCTS ☐ Q & A ☐ SITE MAP

Company Info

Home | Company Information | Global Logistics | Products | Download | News Room | Employment

Standard Keyboard

USB Keyboard

Cordless Keyboard

Special Keyboard

Multimedia Keyboard

Numeric Keypad

Ergonomic Keyboard

Gaming Keyboard

Home > Products >



**KB-5660**
Rubber membrane tactile touch feeling
17 key keypad
Pal rest for 9880 series



**KU-9933**
KUF9933(F/P only)
KUS9933(S/C only)
Finger Print with Smart Card Reader Key



**KB-9880**
KB-9880: PS/2 interface
KU-9880: USB interface



**KB-9925**
KB-9925: PS/2 interface
KU-9925: USB interface



**KB-5640/KU-9835**
KB-5640: PS/2 interface
KU-9835: USB interface

1983 - 2003 Chicony Electronics CO - Terms of Usage





# Chicony

Home | Company Information | Global Logistics | Products | Download | News Room | Employment

Home > Products >

Standard Keyboard

USB Keyboard

Cordless Keyboard

Special Keyboard

Multimedia Keyboard

Numeric Keypad

Ergonomic Keyboard

Gaming Keyboard



### KB-9938

Split-key 3D ergonomic design to support
comfortable typing Palm rest offering a co
for wrist & forearms. 7 hot keys for Intern
Volume Up/Down, Mute, Sleep



### KTP7903
KTP7903:104 keys; KTP7906:105 keys
KB-7903:Without touch pad, 104 keys; Kl

Windows 95 compatible. Removable palm
saving environments. Split-key design alle
stress. 100% compatible with Microsoft m
drivers required. Unique synaptics DOS ai
drivers offer additional features. Supportin
port and PS/2 mouse port. (Adaptor includ

1983 - 2003 Chicony Electronics CO - Terms of Usage





Home > Products >Keyboard Products

- Standard Keyboard
- USB Keyboard
- Cordless Keyboard
- Special Keyboard
- Multimedia Keyboard
- Numeric Keypad
- Ergonomic Keyboard
- Gaming Keyboard



1983 - 2003 Chicony Electronics CO - Terms of Usage

# EXHIBIT E



# United States Patent [19]

## Tsai et al.

[11] Patent Number: 5,763,842

[45] Date of Patent: Jun. 9, 1998

[54] **KEY SWITCH ARRANGEMENT FOR NOTEBOOK COMPUTERS**

[75] Inventors: **Ching-Cheng Tsai**, Keelung; **Wen-To Chuo**; **Fu-Jen Hsu**, both of Taipei Hsien, all of Taiwan

[73] Assignee: **Chicony Electronics Co., Ltd.**, Taipei Hsien, Taiwan

[21] Appl. No.: **753,045**

[22] Filed: **Nov. 19, 1996**

[51] Int. Cl.⁶ ............................................... H01H 13/70
[52] U.S. Cl. ................................. 200/5 A; 200/344
[58] Field of Search ................. 200/5 A, 512–517, 200/341–345; 361/680

[56] **References Cited**

### U.S. PATENT DOCUMENTS

5,278,371  1/1994  Watanabe et al. ...................... 200/344
5,512,719  4/1996  Okada et al. ........................... 200/344
5,555,971  9/1996  Takada et al. .......................... 200/345
5,590,020  12/1996  Sellers ................................ 361/680
5,630,501  5/1997  Tsay ................................ 200/341 X

*Primary Examiner—J. R. Scott*
*Attorney, Agent, or Firm—Morton J. Rosenberg; David I. Klein; Jun Y. Lee*

[57] **ABSTRACT**

A key switch for notebook computers, including a bottom frame having two pairs of upright lugs spaced near two opposite sides, a membrane circuit mounted on the bottom frame, a key cap, a rubber cone supported on the membrane circuit and compressed by the key cap to trigger the membrane circuit in producing an electrical signal, a first link having one end pivoted to the key cap and an opposite end coupled to one pair of upright lugs of the bottom frame by a slip joint, and a second link pivotably coupled to the first link in its middle and having one end pivoted to the key cap and an opposite end pivoted to the other pair of upright lugs of the bottom frame.

**7 Claims, 9 Drawing Sheets**





FIG.1
(PRIOR ART)



FIG.2



FIG.2B



FIG.2C



FIG.2A



FIG.3



FIG.3A



FIG.4



FIG.5



FIG.5B



FIG.5A



FIG.6

FIG.7

1

# KEY SWITCH ARRANGEMENT FOR NOTEBOOK COMPUTERS

## BACKGROUND OF THE INVENTION

The present invention relates to a key switch for notebook computers, and more particularly to such a key switch which is easy to assemble, and can be smoothly and positively operated.

FIG. 1 shows a key switch for notebook computers according to the prior art. This structure of prior art key switch 10a is comprised of a key cap 11a, a rubber cone 12a, a first link 13a, a second link 14a, a membrane circuit 15a, and a bottom frame 16a. The first link 13a and the second link 14a are pivotably connected into a crossed linkage coupled between the key cap 11a and the bottom frame 16a. When the key cap 11a, is depressed, the rubber cone 12a, is compressed to trigger the membrane circuit 15a, causing it to produce an electrical signal. On the contrary, when the key cap 11a is released from the hand, the rubber cone 12a, immediately returns to its former shape, and therefore the membrane circuit 15a, is switched off. This structure of key switch is complicated to assemble because a big number of screws shall be used to fix the rubber cone 12a, the membrane circuit 15a, and the bottom frame 16a together. When the key switch is operated, the links 13a, 14a tend to be forced to vibrate by the sharp edges of the link mounting holes 17a, 18a of the bottom frame 16a. Another drawback of this structure of key switch is that the key cap 11a tends to oscillate when it is moved vertically, because the link mounting holes 18a to which the first link 13a is slidably coupled are oblong holes respectively sloping in one direction. Still another drawback of this structure of key switch is that the key cap 11a tends to be damaged when it is forced into engagement with respective pivot pins 19a, 20a of the links 13a, 14a. Because the links 13a, 14a are rigid and not deformable, the pivot pins 19a, 20a of the links 13a, 14a cannot be respectively squeezed inwards for coupling to the respective coupling portions of the key cap 11a conveniently. Still another drawback of this structure of key switch is that the rubber cone tends to deviate from course when it is compressed, thereby causing a malfunction. Furthermore, when the key switch is operated, heat cannot be quickly carried away.

## SUMMARY OF THE INVENTION

The present invention has been accomplished to provide a key switch for notebook computers which eliminates the aforesaid drawbacks. According to one aspect of the present invention, the key switch is comprised of a bottom frame, a key cap, a membrane circuit supported on the bottom frame, a rubber cone supported on the membrane circuit, a first link and a second link pivotably connected together and coupled between the key cap and the bottom frame to guide the movement of the key cap vertically, wherein the first link and the second link have respective smoothly curved raised portions movably disposed in contact with the flat base of the rubber cone. According to another aspect of the present invention, the first link has a pair of pivot pins pivotably coupled to pivot holes in respective upright lugs of the bottom frame, the second link has a pair of pivot pins slidably coupled to horizontal oblong holes in respective upright lugs of the bottom frame. According to still another aspect of the present invention, the pivot holes and oblong holes of the respective upright lugs of the bottom frame have a respective smoothly curved end edge so that the pivot pins of the first link and second link can be smoothly turned in the

2

respective pivot holes or moved in the respective oblong holes. According to still another aspect of the present invention, the first link is comprised of two parallel frame rods, and an arched springy connecting rod connected between the parallel frame rods that can be deformed, for permitting the respective pivot pins of first link to be respectively coupled to respective downward hooks of the key cap. According to still another aspect of the present invention, the second link is comprised of two parallel frame rods, and a transverse connecting rod connected between the parallel frame rods, wherein the transverse connecting rod has an arched springy section in the middle, that can be deformed, for permitting the respective pivot pins of the second link to be coupled to respective axle housings of the key cap. According to still another aspect of the present invention, the rubber cone has bottom ventilation grooves and through holes, the bottom frame has through holes, and the membrane circuit has punch holes respectively provided for dissipation of heat quickly.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side plain view of a key switch for notebook computers according to the prior art;

FIG. 2 is an exploded view of a key switch for notebook computers according to the present invention;

FIG. 2A is an enlarged view of part A of FIG. 2;

FIG. 2B is an enlarged view of part B of FIG. 2;

FIG. 2C is an enlarged view of part C of FIG. 2;

FIG. 3 is a side plain view of the key switch according to the present invention;

FIG. 3A is an enlarged view of part A of FIG. 3;

FIG. 4 is a top plain view in an enlarged scale of the key switch according to the present invention;

FIG. 5 is an elevational view in an enlarged scale of the bottom frame of the key switch shown in FIG. 2;

FIG. 5A is an enlarged view of part A of FIG. 5;

FIG. 5B is an enlarged view of part B of FIG. 5;

FIG. 6 is a sectional side view of the key switch according to the present invention; and,

FIG. 7 is similar to FIG. 6 but showing the key cap depressed.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to Figures from 2 to 5, a key switch in accordance with the present invention is generally comprised of a key cap 10, a first link 20, a second link 30, a rubber cone 40, a membrane circuit 50, and a bottom frame 60.

The key cap 10 has a substantially rectangular shape, a downward plunger 11 perpendicularly downwardly raised from the center at the bottom, a plurality of radial ventilation grooves 12 disposed at the bottom and spaced around the plunger 11, two symmetrical pairs of downward hooks 13 bilaterally raised from the bottom and disposed adjacent to one side, two symmetrical axle housings 14 bilaterally raised from the bottom and disposed adjacent to one side remote from the downward hooks 13 and having a respective tive bevel bottom edge 15, two first guide grooves 16 disposed at the bottom adjacent to one side and spaced between the axle housings 14, and two second guide grooves 17 symmetrically disposed at the bottom near two opposite sides and spaced between the downward hooks 13 and the axle housings 14.

The first link 20 is coupled to the key cap 10 at the bottom, comprising two parallel frame rods 21 and an arched springy

3

connecting rod 23 connected between the parallel frame rods 21 in the middle. Each of the parallel frame rods 21 comprises a first pivot pin 24 perpendicularly inwardly raised from one end, a second pivot pin 25 perpendicularly inwardly raised from an opposite end, a third pivot pin 22 perpendicularly outwardly raised from the middle, and a smoothly curved raised portion 26 at the bottom adjacent to the second pivot pin 25.

The second link 30 is coupled to the key cap 10 at the bottom, comprising two parallel frame rods 31, and a transverse connecting rod 33 connected between the parallel frame rods 31 at one end. The transverse connecting rod 33 has an arched springy section 34 in the middle, and two pivot pins 35 longitudinally extended from two opposite ends. Each of the frame rods 31 has a pivot hole 32 in the middle, a pivot pin 37 raised from one end at an outer side remote from the transverse connecting rod 33, and a smoothly curved raised portion 36 disposed at the bottom near the pivot pins 37.

The rubber cone 40 is disposed below the first link 20 and the second link 30 at the bottom, having a recessed top hole 45 adapted for receiving the plunger 11 of the key cap 10, a downward triggering rod 44 suspended from the bottom below the recessed top hole 45 and spaced above the center hole 47 (Shown in FIGS. 6 and 7) at the center the flat base 41 of the rubber cone 40, a plurality of through holes 42, 43 through the flat base 41 for ventilation, and a plurality of ventilation grooves 46 at the bottom of the flat base 41.

The membrane circuit 50 is a multi-layer membrane circuit supported between the bottom frame 60 and the rubber cone 40, having a plurality of punch holes 51, 52 peripherally sealed with a bonding resin 53.

The bottom frame 60 supports the membrane circuit 50, comprising two first upright lugs 61' which define a respective axle hole 61 adapted for coupling the second link 30, two second upright lugs 62' which define a respective horizontal oblong hole 62 adapted for coupling the first link 20, and a plurality of vertical through holes 63 for ventilation. Each of the upright lugs 61', 62' has a smoothly curved edge 64 at one end (see FIGS. 5A and 5B) of the respective hole 61, 62.

The assembly process of the key switch is outlined hereinafter with reference to Figures from 2 to 5 again. The membrane circuit 50 and the rubber cone 40 are mounted on the bottom frame 60 at the top in proper order, permitting the upright lugs 61', 62' to be inserted through the punch holes 51, 52 of the membrane circuit 5 and the through holes 42, 43 of the flat base 41 of the rubber cone 40, then the pivot pins 37 of the frame rods 31 of the second link 20 are respectively inserted into the axle holes 61 of the first upright lugs 61' of the bottom frame 6 and the second pivot pins 25 of the first link 20 are respectively inserted into the oblong holes 62 of the second upright lugs 62', and then the third pivot pins 22 of the first link 20 are respectively inserted into the pivot holes 32 of the second link 30 for permitting the links 20, 30 to be turned relative to each other, and then the key cap 10 is coupled to the links 20, 30 by coupling the downward hooks 13 and axle housings 14 of the key cap 10 to the first pivot pins 24 of the first link 20 and the pivot pins 35 of the transverse connecting rod 33 of the second link 30.

Referring to FIGS. 6 and 7, when the key cap 10 is depressed, the links 20, 30 are turned relative to each other to guide the downward movement of the key cap 10 smoothly, and at the same time the downward triggering rod 44 of the rubber cone 40 is forced by the plunger 11 of the

4

key cap 10 to trigger the membrane circuit 50, and therefore the key switch is switched on (see FIG. 7). When the key cap 10 is released from the hand, the rubber cone 40 immediately returns to its former shape, thereby causing the links 20, 30 to be turned relative each other reversely, and therefore the key cap 10 is returned to its former position. When the rubber cone 40 returns to its former shape, the triggering rod 44 of the rubber cone 40 is disconnected from the membrane circuit 50, and therefore the key switch is switched off (see FIG. 6). When the first link 20 and the second link 30 are respectively turned downward or upward, the smoothly curved raised portions 26, 36 are moved over the top side of the flat base 41 of the rubber cone 40, therefore the first link 20 and the second link 30 can be smoothly moved relative to the flat base 41 of the rubber cone 40.

Referring to Figures from 2 to 7 again, because the upright lugs 61', 62' have a respective smoothly curved edge 64 at one end of the respective hole 61, 62, the links 20, 30 can be smoothly turned relative to the upright lugs 61', 62'. Because pivot pins 37 of the frame rods 31 of the second link 30 are respectively turned in the pivot holes 61 of the first upright lugs 61' of the bottom frame 60 and the second pivot pins 25 of the first link 20 are slidably mounted in the oblong holes 62 of the second upright lugs 62', the key cap 10 can be guided by the links 20, 30 up and down smoothly. The aforesaid guide grooves 16, 17 of the key cap 10 are adapted for guiding the key cap 10 into coupling with the links 20, 30. Because the frame rods 21 of the first link 20 are connected in parallel by the arched springy connecting rod 23, the link 20 can be deformed, for permitting the first pivot pins 24 to be respectively coupled to the downward hooks 13 of the key cap 10. When the key cap 10 is operated, the arched springy connecting rod 23 absorb shock waves. The arched springy section 34 of the transverse connecting rod 33 of the second link 30 enables the transverse connecting rod 33 to be deformed, so that the pivot pins 35 can be conveniently coupled to the axle housings 14 of the key cap 10. The arched springy section 34 can also absorb shocks when the key cap 10 is operated. Furthermore, because the plunger 11 of the key cap 10 is inserted into the recessed top hole 45 of the rubber cone 40, the downward pressure of the key cap 10 can be positively transmitted to the downward triggering rod 44 of the rubber cone 40, causing it to trigger the membrane circuit 50. The design of the ventilation grooves 12 of the key cap 10 prevents the key cap 10 from being adhered to the rubber cone 40. The design of the holes 42, 43 in the flat base 41 of the rubber cone 40 and the holes 63 in the bottom frame 60 enables heat to be quickly carried away from the key switch.

It is to be understood that the drawings are designed for purposes of illustration only, and are not intended as a definition of the limits and scope of the invention disclosed.

What the invention claimed is:

1. A key switch for a notebook computer, comprising:
   a key cap, said key cap comprising a bottom side, a downward plunger perpendicularly and downwardly raised from the bottom side at a central position, a plurality of radial ventilation grooves disposed at the bottom side and spaced around said plunger, two symmetrical pairs of downwardly directed hooks and two symmetrical axle housings bilaterally raised from the bottom side;
   a bottom frame, said bottom frame comprising two first upright lugs which define a respective axle hole, two second upright lugs which define a respective horizontal oblong hole, and a plurality of vertical through holes

5

respectively disposed around said first upright lugs and said second upright lugs;

a membrane circuit supported on said bottom frame, said membrane circuit having a plurality of punch holes through which the first upright lugs and second upright lugs of said bottom frame pass;

a rubber cone mounted on said membrane circuit for pressing by the plunger of said key cap to trigger said membrane circuit in producing an electrical signal, said rubber cone comprising a flat base having a center hole, and a plurality of through holes through which the first upright lugs and second upright lugs of said bottom frame pass, a cone body raised from the periphery of the center hole of said flat base and having a downwardly directed trigger rod suspended from an inside surface spaced above the center hole of said flat base;

a first link coupled between said key cap and said bottom frame, said first link comprising two parallel frame rods and an arched springy connecting rod connected between the parallel frame rods of said first link, each of the parallel frame rods of said first link comprising a first pivot pin at one end pivoted to one pair of said downwardly directed hooks of said key cap, a second pivot pin at an opposite end sliding in the oblong hole of one second upright lug of said bottom frame, a third pivot pin spaced between said first pivot pin and said second pivot pin, and a smoothly curved raised portion disposed adjacent to said second pivot pin and in contact with the flat base of said rubber cone; and,

a second link pivoted to said first link and coupled between said key cap and said bottom frame, said second link comprising two parallel frame rods, and a transverse connecting rod connected between the parallel frame rods of said second link at one end, the

6

transverse connecting rod of said second link having an arched springy section in a middle portion thereof, and two pivot pins longitudinally aligned at two opposite ends and respectively pivoted to the axle housings of said key cap, each of the frame rods of said second link having (a) a pivot hole in a middle portion thereof for receiving the second pivot pin of one frame rod of said first link therein, (b) a pivot pin raised from one end and revolvably inserted into the axle hole of one upright lug of said bottom frame, and (c) a smoothly curved raised portion disposed at a bottom side of said frame rod and in contact with the flat base of said rubber cone.

2. The key switch of claim 1 wherein the axle housings of said key cap have a respective bevel bottom edge.

3. The key switch of claim 1 wherein the cone body of said rubber cone has a recessed top hole which receives the downward plunger of said key cap.

4. The key switch of claim 1 wherein the flat base of said rubber cone has a plurality of ventilation grooves at a bottom side respectively extended from the center hole of said flat base and facing said membrane circuit.

5. The key switch of claim 1 wherein the punch holes of said membrane circuit are respectively peripherally sealed with a bonding resin.

6. The key switch of claim 1 wherein the axle holes and oblong holes of the first upright lugs and second upright lugs of said bottom frame have a respective smoothly curved end edge.

7. The key switch of claim 1 wherein said key cap has a plurality of guide grooves at the bottom side for guiding said key cap into coupling engagement with said first link and said second link.

* * * * *



# United States Patent [19]

## Tsai

[11] **Patent Number:** 5,769,210

[45] **Date of Patent:** Jun. 23, 1998

[54] **SCISSORS-TYPE KEY SWITCH**

[75] Inventor: **Ching-Cheng Tsai,** Chi Lung, Taiwan

[73] Assignee: **Chicony Electronics Co., Ltd.,** Taipei Hsien, Taiwan

[21] Appl. No.: **798,630**

[22] Filed: **Feb. 11, 1997**

[51] **Int. Cl.[6]** .................................................... **H01H 3/12**

[52] **U.S. Cl.** ............................................ **200/344; 200/345**

[58] **Field of Search** .................................... 200/340, 341, 200/344, 345, 512, 515, 517, 520, 5 A

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,433,225 | 2/1984 | Cowles | 200/340 |
| 5,278,371 | 1/1994 | Watanabe et al. | 200/344 |
| 5,278,372 | 1/1994 | Takagi et al. | 200/344 |
| 5,329,084 | 7/1994 | Watanabe et al. | 200/344 |
| 5,512,719 | 4/1996 | Okada et al. | 200/344 |
| 5,562,203 | 10/1996 | Mochizuki | 200/345 |

*Primary Examiner*—Khanh Dang
*Attorney, Agent, or Firm*—Morton J. Rosenberg; David I. Klein; Jun Y. Lee

[57] **ABSTRACT**

A scissors-type key switch comprising a key top, a scissors-type supporting bracket, a base member, an elastic actuator, a membrane switch, and a bottom plate is provided. The membrane switch, the elastic actuator, and the base are disposed above the bottom plate. The scissors-type supporting brackets are pivotally supported and received on the base by the pivotally engagement between the pin shaft of the supporting brackets and the connecting holes of the base. The key top is also pivotally connected to the scissors-type supporting brackets by the connecting slots of the key top and the pin shafts of the supporting bracket. This scissors-type key switch features a simplified structure resulted from reduced number of components and durable operation wherein the key top can readily move down and up without rolling thereof. The manufacturing cost is advantageously reduced while the throughput is considerably increased.

**5 Claims, 4 Drawing Sheets**





FIG. 1
(PRIOR ART)



FIG. 2



FIG. 4



FIG. 3



FIG.6



FIG.5

1

# SCISSORS-TYPE KEY SWITCH

## FIELD OF THE INVENTION

The present invention relates to a key switch, more particularly, to a scissors-type key switch for notebook computer. This scissors-type key switch features a simplified structure resulted from reduced number of components and durable operation wherein the key top can readily move down and up without rolling thereof.

## DESCRIPTION OF PRIOR ART

As shown in FIG. 1, a conventional keyboard assembly used on notebook computer is shown. The conventional key switch 10a generally comprises a key top 11a, an elastic actuator 12a, a first supporting bracket 13a, a second supporting bracket 14a, a membrane switch 15a, and a basic plate 16a. The key top 11a is disposed atop of the first and second supporting brackets 13a and 14a which are disposed with cross to each other. The key top 11a can be moved downward as guided by the combination of the first and second supporting brackets 13a, 14a. When the key top 11a is depressed, the elastic actuator 12a disposed thereunder will actuate the membrane switch 15a such that a closed signal is sent when the switch 15a is closed, i.e. On. When the external force is removed, the key top 11a is bounced back and the switch 15a is resumed to open, Off position.

Nevertheless, since the first and second supporting bracket 13a and 14a are not symmetrically to each other and can not be replaced with each other. Consequently, the manufacturing cost is quite high since each of the brackets is made from an associated mold. On the other hand, if the operator is not quite concentrated, the first and second supporting bracket can be misused from each other. On the other hand, the configuration of the base plate is quite complex which is not good for production. Even those components are assembled to form a key switch for the notebook computer, the key top 11a is found to have a stable movement, easy to roll, and incomplete actuation.

In light of this, there is a need to improve the conventional key switch.

## SUMMARY OF THE INVENTION

It is the object of this invention to provide a scissors-type key switch for notebook computer. This scissors-type key switch features a simplified structure resulted from reduced number of components and durable operation wherein the key top can readily move down and up without rolling thereof.

In order to achieve the object set forth, a scissors-type key switch comprising a key top, a scissors-type supporting bracket, a base member, an elastic actuator, a membrane switch, and a bottom plate is provided. The membrane switch, the elastic actuator, and the base are disposed above the bottom plate. The downward and upward movements of the key top is vertically guided by a pair of scissors-type supporting brackets. The supporting bracket has identically configuration which can be readily replaced with each other. Consequently, the manufacturing cost can be considerably reduced since only one mold is required. On the other hand, the throughput of the key switch can also be increased since the operator will not misuse the incorrect components. Furthermore, the bottom plate has a simple configuration which in turn benefits mass production.

According to another aspect of the present invention, the key top is further provided with a guiding ribs which serve

2

as a guiding means to stable the key top during the downward movement. The key top further includes auxiliary ribs which may contact with the scissors-type supporting bracket when the key top is depressed. Consequently, the key top will not roll-off. In light of this, the key switch made according to the present invention provides a substantial actuation.

## BRIEF DESCRIPTION OF THE DRAWINGS

In order that the present invention may more readily be understood the following description is given, merely by way of example with reference to the accompanying drawings, in which:

FIG. 1 is a cross sectional view of a conventional key switch;

FIG. 2 is an exploded perspective view of the scissors key switch made according to the present invention;

FIG. 3 is a cross sectional view of the key switch shown in FIG. 2;

FIG. 4 is a top plan view of the key switch shown in FIG. 2;

FIG. 5 is a schematic illustration of the key switch shown in FIG. 2 wherein the key top is positioned at the normal position; and

FIG. 6 is still a schematic illustration of the key switch shown in FIG. 2 wherein the key top is positioned at the actuated position.

| Brief Description of Numerals | | | |
|---|---|---|---|
| 10 | key top | | |
| 11 | positioning post | 12 | ventilating slot |
| 13 | auxiliary rib | 14 | guiding rib |
| 15 | connecting slot | | |
| 20 | scissors bracket | | |
| 21 | supporting arm | 22 | pin shaft |
| 23 | pin shaft | 24 | base plate |
| 25 | cutout | 26 | external teeth portion |
| 27 | internal teeth portion | | |
| 30 | base member | | |
| 31 | through hole | 32 | connecting socket |
| 33 | connecting hose | | |
| 40 | elastic actuator | | |
| 41 | basic portion | 42 | pressing portion |
| 43 | central hole | 44 | ventilating slot |
| 50 | membrane switch | | |
| 60 | bottom plate | | |
| 10a | key switch | 11a | keytop |
| 12a | elastic actuator | 13a | first supporting bracket |
| 14a | second supporting bracket | 15a | membrane switch |
| 16a | bottom plate | | |

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENT

Referring to FIGS. 2, 3, and 4, respectively showing the exploded perspective view, cross sectional view and top plan view of the scissors key switch of the present invention. The scissors-type key switch made according to the present invention generally comprises a key top 10, a scissors-type supporting bracket 20, a base member 30, an elastic actuator 40, a membrane switch 50, and a bottom plate 60.

The key top 10 has a square shape having an elastic positioning post 11. The outer peripheral of the positioning post 11 is provided with a ventilating slot 12. The ceiling of the key top 10 further includes four auxiliary ribs 13 and four guiding ribs 14. The key top 10 further includes four connecting slots 15 for connecting with the scissors-type supporting brackets 40.

3

The key top 10 can be well supported by a pair of scissors-type supporting brackets 20. Each of the supporting brackets 20 includes a pairs of supporting arms 21 disposed opposite to each other. Each of the supporting arm 21 further includes a pair of pin shafts 22, 23 at upper and lower end portions respectively. The supporting arms 21 are connected to each other by a base plate 24. The lower portion of the base plate 24 is provided with a circular cutout 25. One of the supporting arms 21 of the supporting bracket 20 is provided with an external teeth portion 26 at the lower portion and the other supporting arm 21 is provided with an internal teeth portion 27 corresponding to the external teeth portion 26. When those external and internal teeth portion 26, 27 are meshed together, the scissors-type supporting brackets 20 can be moved in an interactive manner.

The supporting brackets 20 can be well supported and installed on the base. The base 30 is provided with a through hole 31 for passing through thereof the elastic actuator 40 in the position corresponding to the key top 10 and the supporting bracket 20. Both sides of the through hole 31 are provided with a connecting socket 32 respectively. Each of the connecting sockets 32 is provided with a connecting hole 33 for pivotally receiving the pin shaft 23 of the supporting arm 21 of the supporting bracket 20.

The elastic actuator 40 is disposed within the through hole 31 of the base 30. Each of the key top 10 is provided with an elastic actuator 40 having a shape of dome. The basic portion 41 of elastic actuator 40 is disposed right under the base 30. The elastic actuator 40 can be disposed individually or can be formed in an array. The elastic actuator 40 is provided with a pressing portion 42 internally, as shown in FIG. 5. The elastic actuator 40 is provided with a central hole 43 in the top and a ventilating slot 44 at the bottom.

The membrane switch 50 is disposed under the elastic actuator 40 and is supported by a bottom plate 60. By this arrangement, all these components can be well supported by the bottom plate 60.

In assembling, the membrane switch 50, the basic portion 41 of he elastic actuator 40, and the base 30 are disposed and assembled onto the bottom plate 60 in order such that the elastic actuator 40 is projected over the base 30 through hole 31 of the base 30. Afterward, the pin shafts 23 of the supporting arm 21 of the scissors-type supporting bracket 20 are pivotally received and retained within the corresponding connecting holes 33 of the connecting socket 32 of the base 30. In light of this, the scissors-type supporting brackets 20 are pivotally attached to the base 30. On the other hand, the lower portion of the supporting brackets 20 are interactively connected by the external and external teeth portion 26 and 27. Finally, the key top 10 is disposed on the supporting brackets 20 such that the pin shafts 22 of the supporting arms 21 of the scissors-type supporting brackets 20 are pivotally received and retained within the connecting slots 15 of the key top 10. By this arrangement, the key top 10 can be well supported by the scissors-type supporting bracket 20 for vertical downward and upward movement. On the other hand, the elastic positioning post 11 of the key top 10 is positioned within the central hole 43 of the elastic actuator 40. By this arrangement, when the key top 10 is depressed, the pressing portion 42 of the elastic actuator 40 will accurately press against the membrane switch 50 to ensure a signal generation.

Referring to FIGS. 5 and 6, two schematic illustrations are respectively shown. When the key top 10 is depressed by the finger of a user, the key top 10 may readily and vertically move downward as guided by the scissors-type supporting

4

bracket 20 such that the pressing portion 42 of the elastic actuator 40 will actuate the membrane switch 50 to close, as shown in FIG. 6. As a result, a signal will be generated. When the depressing force is released, the key top 10 may readily be bounced back by the potential force of the elastic actuator 40 as guided vertically by the scissors-type supporting brackets 20. When the pressing portion 42 of the elastic actuator 40 is removed from the membrane switch 50, the switch 50 is resumed to open status, as shown in FIG. 5.

By the provision of the present invention, the key top 10 is vertically guided by the scissors-type supporting brackets 20 during the downward and upward movement. Furthermore, those two supporting bracket 20 are identically to each other such that it can be replaced with each other. In light of this, the manufacturing cost can be considerably reduced since only one mold is required for making the supporting bracket 20. Besides, since those supporting brackets 20 are identically to each other, there is no possibility of misusing incorrect supporting bracket 20 during the assembling. Consequently, the performance can be increased and the throughput can be reduced.

As described above, the key top 10 is provided with four guiding ribs 14 which can be contacted with the outer portion of the connecting socket 32, this may also enhance the stability of the key top 10 during the downward and upward movement. On the other hand, when the key top 10 is moved downward, the key top 10 may contact with the base plate 24 of the supporting bracket 20, by this arrangement, the key top 10 will not slide thereof and a more substantial actuation is ensured.

From the forgoing description, the problems encountered by the conventional key switch can be readily solved by the provision of the scissors-type key switch which features a simplified structure resulted from reduced number of components and durable operation wherein the key top can readily move down and up without rolling thereof.

While particular embodiment of the present invention has been illustrated and described, it would be obvious to those skilled in the art that various other changes and modifications can be made without departing from the spirit and scope of the invention. It is therefore intended to cover in the appended claims all such changes and modifications that are within the scope of the present invention.

I claim:

1. A scissors-type key switch comprising,

a key top having four connecting slots thereof;

a pair of scissors-type supporting brackets, each of said supporting brackets including a pairs of supporting arms disposed opposite to each other, each of said supporting arm further including a pair of pin shafts at upper and lower end portions respectively, said supporting arms being connected to each other by a base plate, the lower portion of said base plate being provided with a circular cutout, one of said supporting arms being provided with an external teeth portion at the lower portion and the other supporting arm being provided with an internal teeth portion corresponding to the external teeth portion, wherein when said external and internal teeth portion are meshed together, said scissors-type supporting brackets can be moved in an interactive manner;

a base for receiving and supporting said supporting brackets, said base being provided with a through hole for passing through thereof the elastic actuator in the position corresponding to said key top, both sides of said through hole being provided with a connecting

socket respectively, each of said connecting sockets being provided with a connecting hole for pivotally receiving said pin shaft of said supporting arm of said supporting bracket;

an elastic actuator being disposed within said through hole of said base;

a membrane switch being disposed under said elastic actuator; and

a bottom plate being disposed under said membrane switch;

wherein said membrane switch, said elastic actuator and said base are disposed above said bottom plate and said scissors-type supporting brackets are well supported and received within said base by the pivotally engagement between said pin shafts and said connecting holes of said connecting sockets of said base, said key top is pivotally connected with said scissors-type supporting

brackets by the connecting slots of said key top and said pin shafts of said scissors-type supporting bracket.

2. A scissors-type key switch as recited in claim 1, wherein said key top further including auxiliary ribs thereof.

3. A scissors-type key switch as recited in claim 1, wherein said key top further including guiding ribs thereof.

4. A scissors-type key switch as recited in claim 1, wherein said key top further including an elastic positioning post to be positioned within a central hole in the top of said elastic actuator, said elastic actuator being provided with ventilating slot.

5. A scissors-type key switch as recited in claim 1, wherein said elastic actuator being provided with a pressing portion and a ventilating slot being disposed at the basic portion of said elastic actuator.

* * * * *



US005770824A

# United States Patent [19]

Tsai et al.

[11] Patent Number: 5,770,824

[45] Date of Patent: Jun. 23, 1998

[54] **KEY SWITCH ARRANGEMENT FOR NOTEBOOK COMPUTERS**

[75] Inventors: **Ching-Cheng Tsai**, Keelung; **Wen-To Chuo**; **Fu-Jen Hsu**, both of Taipei Hsien, all of Taiwan

[73] Assignee: **Chicony Electronics Co., Ltd.**, Taipei Hsien, Taiwan

[21] Appl. No.: **746,908**

[22] Filed: **Nov. 19, 1996**

[51] **Int. Cl.**[6] .......... **H01H 13/70**

[52] **U.S. Cl.** .......... **200/5 A**; 200/344

[58] **Field of Search** .......... 200/5 A, 512–517, 200/553, 557, 292, 293–307, 315, 316, 339, 341–345

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,278,371 1/1994 Watanabe et al. .......... 200/344

5,504,283 4/1996 Kako et al. .......... 200/5 A

5,555,971 9/1996 Takada et al. .......... 200/344 X

*Primary Examiner*—J. R. Scott

*Attorney, Agent, or Firm*—Morton J. Rosenberg; David I. Klein; Jun Y. Lee

[57] **ABSTRACT**

A key switch for notebook computers, including a bottom frame having two pairs of upright lugs spaced near two opposite sides, a membrane circuit mounted on the bottom frame, a key cap, a rubber cone supported on the membrane circuit and compressed by the key cap to trigger the membrane circuit in producing an electrical signal, a first link having an annular base and two pairs of springy extension rods respectively extended from the periphery of the annular base at two opposite sides and respectively coupled to the key cap and the bottom frame diagonally, and a substantially U-shaped second link pivotably connected to the annular base of the first link at two opposite sides and coupled between the key cap and the bottom frame diagonally for turning relative to the first link to guide the movement of the key cap vertically.

**3 Claims, 10 Drawing Sheets**

46
10
20
40
50
41
60
44
47
3Ba



FIG.1
(PRIOR ART)



FIG. 2



FIG. 2B



FIG. 2A



FIG. 3A



FIG.3B



FIG. 3Ba



FIG.4A



FIG. 4B



FIG. 5B



FIG. 5A



FIG. 5D

FIG. 5C

# KEY SWITCH ARRANGEMENT FOR NOTEBOOK COMPUTERS

## BACKGROUND OF THE INVENTION

The present invention relates to a key switch for notebook computers, and more particularly to such a key switch which is easy to assemble, and can be smoothly and positively operated.

FIG. 1 shows a key switch for notebook computers according to the prior art. This structure of prior art key switch 10a is comprised of a key cap 11a, a rubber cone 12a, a first link 13a, a second link 14a, a membrane circuit 15a, and a bottom frame 16a. The first link 13a and the second link 14a are pivotally connected into a crossed linkage coupled between the key cap 11a and the bottom frame 16a. When the key cap 11a is depressed, the rubber cone 12a is compressed to trigger the membrane circuit 15a, causing it to produce an electrical signal. On the contrary, when the key cap 11a is released from the hand, the rubber cone 12a immediately returns to its former shape, and therefore the membrane circuit 15a is switched off. This structure of key switch is complicated to assemble because a big number of screws shall be used to fix the rubber cone 12a, the membrane circuit 15a and the bottom frame 16a together. When the key switch is operated, the links 13a, 14a tend to be forced to vibrate by the sharp edges of the link mounting holes 17a, 18a of the bottom frame 16a. Another drawback of this structure of key switch is that the key cap 11a tends to oscillate when it is moved vertically, because the link mounting holes 18a to which the first link 13a is slidably coupled are oblong holes respectively sloping in one direction. Still another drawback of this structure of key switch is that the key cap 11a tends to be damaged when it is forced into engagement with respective pivot pins 19a, 20a of the links 13a, 14a. Because the links 13a, 14a are rigid and not deformable, the pivot pins 19a, 20a of the links 13a, 14a cannot be respectively squeezed inwards for coupling to the respective coupling portions of the key cap 11a conveniently. Still another drawback of this structure of key switch is that the rubber cone tends to deviate from course when it is compressed, thereby causing a malfunction. Furthermore, when the key switch is operated, heat cannot be quickly carried away.

## SUMMARY OF THE INVENTION

The present invention has been accomplished to provide a key switch for notebook computers which eliminates the aforesaid drawbacks. According to one aspect of the present invention, the key switch is comprised of a bottom frame, a key cap, a membrane circuit supported on the bottom frame, a rubber cone supported on the membrane circuit, a first link and a second link pivotally connected together and coupled between the key cap and the bottom frame to guide the movement of the key cap vertically, wherein the first link has an annular base and two pairs of springy extension rods respectively symmetrically extended from the periphery of the annular base at two opposite sides and respectively coupled to the key cap and the bottom frame diagonally. Because the two pairs of springy extension rods are symmetrically raised from the annular base at two opposite sides, the first link can be coupled between the key cap and the bottom frame in either direction. According to another aspect of the present invention, the second link has a substantially U-shaped configuration comprised of two parallel frame rods pivotally coupled to the annular base of the first link at two opposite sides, and a transverse connecting

rod connected between the frame rods at one end, wherein each frame rod has an arched middle section in the middle disposed in contact with the periphery of the annular base of the first link to smooth the relative movement between the first link and the second link. According to still another aspect of the present invention, the first link has a pair of pivot pins pivotally coupled to pivot holes in respective upright lugs of the bottom frame, the second link has a pair of pivot pins slidably coupled to horizontal oblong holes in respective upright lugs of the bottom frame. According to still another aspect of the present invention, the transverse connecting rod of the first link has a springy arched section in the middle so that the first link can be deformed for easy installation. According to still another aspect of the present invention, the rubber cone has bottom ventilation grooves and through holes, the bottom frame has through holes, and the membrane circuit has punch holes respectively provided for dissipation of heat quickly. According to still another aspect of the present invention, the key cap has ventilation grooves at the bottom for exhaust of air, therefore the key cap will not be adhered to the rubber cone when it is depressed.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. As a side plain view of a key switch for notebook computers according to the prior art;

FIG. 2 is an exploded view of a key switch for notebook computers according to the present invention;

FIG. 2A is an enlarged view of portion of the key cap of FIG. 2;

FIG. 2B is an enlarged view of portion of the bottom frame of FIG. 2;

FIG. 3A is a side plain view of the key switch according to the present invention;

FIG. 3B is similar to FIG. 3A but showing the key cap depressed, and the rubber cone compressed;

FIG. 3Ba is an enlarged view of a portion of FIG. 3B showing the structural relationship of the transverse connecting rod with respect to the flat base of the rubber cone;

FIG. 4A is another side plain view of the key switch according to the present invention;

FIG. 4B is similar to FIG. 3B but showing the key depressed, and the rubber cone compressed;

FIG. 5A is a top plain view showing the rubber cone coupled to the bottom frame according to the present invention;

FIG. 5B is top plain view showing the rubber cone and the second link coupled to the bottom frame according to the present invention;

FIG. 5C is a top plain view showing the rubber cone, the first link and the second link respectively coupled to the bottom frame according to the present invention; and,

FIG. 5D is a top plain view showing the key switch of the present invention assembled.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIGS. 2, 3A, 4A, and 5, a key switch in accordance with the present invention is generally comprised of a key cap 10, a first link 20, a second link 30, a rubber cone 40, a membrane circuit 50, and a bottom frame 60.

The key cap 10 has a substantially rectangular shape, a downward plunger 14 perpendicularly downwardly raised

from the center at the bottom, a plurality of radial ventilation grooves 11 disposed at the bottom and spaced around the plunger 14, two symmetrical hooks 12 bilaterally raised from the bottom and disposed adjacent to one side, two symmetrical axle housings 13 bilaterally raised from the bottom and disposed adjacent to one side remote from the downward hooks 12, and two guide grooves symmetrically disposed at the bottom near two opposite sides and spaced between the hooks 12 and the axle housings 13.

The first link 20 is coupled to the key cap 10 at the bottom, comprising two parallel frame rods 21 and a transverse connecting rod 23 connected between the parallel frame rods 21 at one end. Each of the parallel frame rods 21 comprises a first pivot pin 24 perpendicularly and outwardly raised from one end adjacent to the transverse connecting rod 23, a second pivot pin 25 perpendicularly and outwardly raised from an opposite end remote from the transverse connecting rod 23, and a pivot hole 22 in the middle spaced between the pivot pins 24, 25. The transverse connecting rod 23 has an arched springy middle section 26.

The second link 30 is coupled to the key cap 10 at the bottom, comprising an annular base 31, two first pivot pins 32 perpendicularly raised from the periphery of the annular base 31 at two opposite sides in transverse direction (in parallel to the transverse connecting rod 23 of the first link 20), a first pair of parallel springy extension rods 33 and a second pair of parallel springy extension rods 34 bilaterally perpendicularly raised from the periphery of the annular base 31 at two opposite sides in longitudinal direction (in parallel to the frame rods 21 of the first link 20), two second pivot pins 35 respectively and perpendicularly raised from the first pair of parallel springy extension rods 33 at one end remote from the annular base 31 and facing each other, and two third pivot pins 36 respectively and perpendicularly raised from the second pair of parallel springy extension rods 34 at one end remote from the annular base 31 and facing each other.

The rubber cone 40 is disposed below the first link 20 and the second link 30 at the bottom, having a recessed top hole 46 adapted for receiving the plunger 14 of the key cap 10, a downward triggering rod 44 suspended from the bottom below the recessed top hole 46 and spaced above the center hole 47 at the center of the flat base 41 of the rubber cone 40, a plurality of through holes 42, 43 through the flat base 41, and a plurality of ventilation grooves 45 at the bottom of the flat base 41.

The membrane circuit 50 is a multi-layer membrane circuit supported between the bottom frame 60 and the rubber cone 40, having a plurality of punch holes 51, 52 peripherally sealed with a bonding resin 53.

The bottom frame 60 supports the membrane circuit 50, comprising two first upright lugs 65 which define a respective axle hole 61 adapted for coupling the second link 30, two second upright lugs 66 which define a respective horizontal oblong hole 62 adapted for coupling the first link 20, and a plurality of vertical through holes 63 for ventilation.

The assembly process of the key switch is outlined hereinafter with reference to FIGS. 5A, 5B, 5C, and 5D. The membrane circuit 50 and the rubber cone 40 are mounted on the bottom frame 60 at the top in proper order, permitting the upright lugs 65, 66 to be inserted through the punch holes 51, 52 of the membrane circuit 5 and the through holes 42, 43 of the flat base 41 of the rubber cone 40 (see FIG. 5A), then the second pivot pins 35 of the second link 30 are respectively inserted into the axle holes 61 of the first

upright lugs 65 of the bottom frame 6 (see FIG. 5B), and then the second pivot pins 25 of the first link 20 are respectively inserted into the oblong holes 62 of the second upright lugs 66, and then the first link 20 is pivotally coupled to the second link 30 by forcing the first pivot pins 32 of the second link 30 into the pivot holes 22 of the first link 20 (see FIG. 5C), and then the key cap 10 is coupled to the first link 20 and the second link 30 by: coupling the hooks 12 and axle housings 13 of the key cap 10 to the first pivot pins 24 of the first link 20 and the third pivot pins 36 of the second link 30 respectively (see FIG. 5D).

Referring to FIGS. 3A, 3B, 4A, and 4B, when the key cap 10 is depressed, the links 20, 30 are turned relative to each other to guide the downward movement of the key cap 10 smoothly, and at the same time the downward triggering rod 44 of the rubber cone 40 is forced by the plunger 11 of the key cap 10 to trigger the membrane circuit 50, and therefore the key switch is switched on (see FIGS. 3B and 4B). When the key cap 10 is released from the hand, the rubber cone 40 immediately returns to its former shape, thereby causing the links 20, 30 to be turned relative each other reversely, and therefore the key cap 10 is returned to its former position. When the rubber cone 40 returns to its former shape, the triggering rod 44 of the rubber cone 40 is disconnected from the membrane circuit 50, and therefore the key switch is switched off (see FIGS. 3A and 4A).

Because of the design of the through holes 42, 43, 63, 64 in the flat base 41 of the rubber cone 40 and the bottom frame 60 and the punch holes 51, 52 in the membrane circuit 50, head can be quickly carried away from the key switch during the operation. The design of the ventilation grooves 11 of the key cap 10 prevents the key cap 10 from being adhered to the rubber cone 40 after the key cap 10 has been depressed. When the key cap 10 is moved to the lower limit position, the transverse connecting rod 23 of the first link 20 will touch the top side of the flat base 41 of the rubber cone 40, to prevent from making a noise (see FIG. 3B). The frame rods 21 of the first link 20 have a respective arched middle portion disposed in contact with the periphery of the annular base 31 of the second link 30, therefore the contact area between the first link 20 and the second link 30 is greatly increased, and the relative movement between the first link 20 and the second link 30 is stable. Because the oblong holes 62 of the second upright lugs 66 of the bottom frame 60 are horizontal holes, the key cap 10 can be maintained balanced when it is moved up and down. The direction-free design of the second link 30 permits the second link 30 to be quickly installed without worrying about its installation direction. Because the springy extension rods 33, 34 of the second link 30 are deformable, the pivot pins 35, 36 can be squeezed inwards for coupling to the pivot holes 61 of the bottom frame 60 and the axle housings 13 of the key cap 10 conveniently. The springy power of the springy extension rods 33, 34 of the second link 30 and the arched springy section 26 of the first link 20 can absorb shocks, to prevent the key cap 10 from being damaged. The arched springy section 26 of the first link 20 facilitates the connection of the first pivot pins 24 of the first link 20 to the hooks 12 of the key cap 10. Further, the first upright lugs 65 are rigid and have a substantially angled configuration adapted for matching with the deformable structure of the second link 30, so that the second link 30 can be conveniently coupled to the bottom frame 60 without the assistance of any tools or the use of screws. The second upright lugs 66 of the bottom frame 60 are also rigid and have a substantially angled configuration. The angled design of the second upright lugs 66 reinforces their structural strength. As the plunger 14 of

the key cap 10 is suspended in the recessed top hole 46 of the rubber cone 40, the trigger rod 44 of the rubber cone 40 can be positively downwardly compressed by the key cap 10 to positively trigger the membrane circuit 50 (see FIG. 4B).

It is to be understood that the drawings are designed for purposes of illustration only, and are not intended as a definition of the limits and scope of the invention disclosed.

What the invention claimed is:

1. A key switch comprising:

a key cap, said key cap comprising a bottom side, a downward plunger perpendicularly downwardly raised from the bottom side at the center, a plurality of radial ventilation grooves disposed at the bottom side and spaced around said plunger, two symmetrical pairs of downward hooks and two symmetrical axle housings bilaterally raised from the bottom side;

a bottom frame, said bottom frame comprising two first upright lugs which have an angled configuration and define a respective horizontal axle hole, two second upright lugs which have an angled configuration and define a respective horizontal oblong hole, and a plurality of vertical through holes respectively disposed around said first upright lugs and said second upright lugs;

a membrane circuit supported on said bottom frame, said membrane circuit having a plurality of punch angled holes through which the first upright lugs and second upright lugs of said bottom frame pass, said punch angled holes being respectively peripherally sealed with a layer of bonding resin;

a rubber cone mounted on said membrane circuit for pressing by the plunger of said key cap to trigger said membrane circuit in producing an electrical signal, said rubber cone comprising a flat base having a center hole, and a plurality of through holes through which the first upright lugs and second upright lugs of said bottom frame pass, a cone body raised from the periphery of the center hole of said flat base and having a downward trigger rod suspended on the inside spaced above the center hole of said flat base;

a first link coupled between said key cap and said bottom frame, comprising two parallel frame rods and a trans-

verse connecting rod connected between said parallel frame rods at one end, each of said parallel frame rods comprising a first pivot pin perpendicularly and outwardly raised from one end adjacent to said transverse connecting rod and pivoted to one hook of said key cap, a second pivot pin perpendicularly and outwardly raised from an opposite end remote from said transverse connecting rod and slidably inserted into the horizontal oblong hole of one second upright lug of said bottom frame, and a pivot hole in the middle, said transverse connecting rod having an arched springy middle section; and,

a second link coupled between said key cap and said bottom frame, said second link comprising an annular base, two first pivot pins perpendicularly raised from the periphery of said annular base at two opposite sides in transverse direction and respectively inserted into the pivot holes of the two frame rods of said first link, a first pair of parallel springy extension rods and a second pair of parallel springy extension rods bilaterally perpendicularly raised from the periphery of said annular base at two opposite sides in longitudinal direction, two second pivot pins respectively and perpendicularly raised from said first pair of parallel springy extension rods at one end remote from said annular base and respectively inserted into the pivot holes of the first upright lugs of said bottom frame, and two third pivot pins respectively and perpendicularly raised from said second pair of parallel springy extension rods at one end remote from said annular base and respectively pivoted to the axle housings of said key cap.

2. The key switch of claim 1 wherein the flat base of said rubber cone has a plurality of ventilation grooves at a bottom side respectively extended from the center hole of said flat base and facing said membrane circuit.

3. The key switch of claim 1 wherein said key cap has a plurality of guide grooves at the bottom side for guiding said key cap into coupling with said first link and said second link.

* * * * *



# United States Patent [19]

## Tsai et al.

| | |
|---|---|
| [11] | **Patent Number:** |
| [45] | **Date of Patent:** |

**6,040,540**

**Mar. 21, 2000**

[54] **KEYSWITCH STRUCTURE**

[75] Inventors: **Ching Cheng Tsai**, Keelung; **Wen To Chou**, Taipei Hsien, both of Taiwan

[73] Assignee: **Chicony Electronics Co., Ltd.**, Taipei Hsien, Taiwan

[21] Appl. No.: **09/229,557**

[22] Filed: **Jan. 13, 1999**

[51] Int. Cl.[7] .................................................. H01H 13/70
[52] U.S. Cl. .......................................... 200/344; 200/341
[58] Field of Search .................................... 200/341, 344, 200/345

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,829,579  11/1998  Tsai ........................................ 200/344

5,850,194  12/1998  Lin ............................................. 341/22
5,878,872   3/1999  Tsai ........................................ 200/344

*Primary Examiner*—Michael L. Gellner
*Assistant Examiner*—Nhung Nguyen
*Attorney, Agent, or Firm*—Rosenberg, Klein & Lee

[57] **ABSTRACT**

The inventive keyswitch comprises a base plate, a conductive membrane, an elastic member, a key support mechanism and a key wherein the first support lever and the second lever of the key support mechanism are of the same structure and pivotably joined in a scissors-form. The molding die can be simplified, the assembling efficiency can be enhanced and the cost is reduced.

**8 Claims, 5 Drawing Sheets**





FIG.1



FIG.2



FIG.3



FIG.4

PRIOR ART



FIG.5
PRIOR ART

# KEYSWITCH STRUCTURE

## FIELD OF THE INVENTION

The present relates to an improved keyswitch, more particularly, to an improved keyswitch the key support mechanism thereof comprising two pivotally-joined and identical support levers, whereby the cost is reduced for using only one set of molding die for the support lever.

## BACKGROUND OF THE INVENTION

As shown in FIG. 4, the conventional keyswitch 20 generally comprises a base plate 71, a printed circuit board 72, an insulating membrane 73, an elastic member 74, a key support mechanism 75 and key 76. The key support mechanism is formed by pivotally joining a first support lever 751 and a second support lever 752 in a scissors-form. However, as also shown in this figure, the shape and the structure of these two support levers are different, wherein the first support lever 751 is of □ shape and the second support lever 752 is of U shape, and the first support lever 751 is arranged between two arms of the second support lever 752. Therefore, two set of different molding dies are required to designed these two support levers. The cost is hard to reduce. Moreover, the orientation and order of the support levers 751 and 752 should be careful during assembling. For example, the support levers 751 and 752 may be assembled with the same or the opposite orientation. The assembling efficiency is therefore degraded.

Moreover, the conventional keyswitch generally has a stop pole formed by pressing at the pivoting groove 711 of the base plate 71 when the support levers 751 and 752 are pivotally connected to the base plate 71. The stop pole 712 is used to restrain the bump 753 of the support lever 751. However, the stop pole 712 is only provided at the center (as shown in FIG. 4) of the base plate 71, the support lever is wont to shake laterally and hard to be stably fixed on the base plate 71. Moreover, through hole must be formed between the stop pole 712 and the base plate 71, the openings 721 and 731 on the stop pole 712 and the base plate 71 is forced to be enlarged.

Moreover, as shown in FIG. 5, the key 76 is conventional keyswitch has pivoting recess 761 and sliding groove 762 for the pivotal engaging of the pivot shaft 754 and 755 of the support levers 751 and 752, respectively. The pivoting recess 761 is generally formed by two retaining arms 763 and 764, as shown in FIG. 4, which is separated by a predetermined distance to clamp the pivot shaft 754 of the support lever 752. However, the pivot shaft 754 is wont to release because the retaining arms 763 and 764 only clamp one forth length of the pivot shaft. The two retaining arms 763 and 764 are wont to break because they have the same thickness.

It is the object of the invention to provide an improved keyswitch to overcome above problems.

In one aspect of the invention, the inventive keyswitch comprises a base plate, a conductive membrane, an elastic member, a key support mechanism and a key wherein the first support lever and the second lever of the key support mechanism are of the same structure and pivotally joined in a scissors-form. The molding die can be simplified, the assembling efficiency can be enhanced and the cost is reduced.

In another aspect of the invention, the inventive keyswitch has pivoting recess formed by two retaining walls separated by such distance that the pivot shaft of the support lever is just fitted therebetween. A hook is formed on the free end of one of the retaining walls and has length exceeding the half length of the pivot shaft. The other one of the retaining walls has thinner thickness such that it has flexibility to shift outward to prevent the break thereof.

In still other aspect of the invention, two stop poles separated by a predetermined distance are formed on one side of the pivot recess on the base plate to prevent the release of the pivot shaft retained within the pivot recess. The stop poles has chamfered edge to facilitate the insertion of the pivot shaft and has augmented number to more firmly retain the pivot shaft of the support lever and prevent the lateral movement of the pivot shaft.

The various objects and advantages of the present invention will be more readily understood from the following detailed description when read in conjunction with the appended drawing, in which:

## BRIEF DESCRIPTION OF DRAWING

FIG. 1 shows the exploded view of the inventive keyswitch.

FIG. 2 is the cross-section view of the inventive keyswitch.

FIG. 3 is the perspective view of the inventive keyswitch.

FIG. 4 is the exploded view of a conventional keyswitch.

FIG. 5 is the cross-section view of a conventional keyswitch.

## DETAIL DESCRIPTION OF PREFERRED EMBODIMENT

As shown in FIG. 1, the inventive keyswitch 10 comprises a base plate 1, a conductive membrane 2, an elastic member 3, a key support mechanism 4 and a key 5. The detailed description of the conductive membrane 2, the elastic member 3, the support mechanism 4 and the key 5 are omitted here because they are not features of the present invention. The support mechanism 4 is formed by pivotally joining a first support lever 41 and a second support lever 42 in a scissors-form. The first and second support levers 41 and 42 have the same structure, therefore only the structure of the first support lever 41 is explained below. The first support lever 41 comprises a first lateral shaft 411 used to pivotally engage within the recess 11 of the base plate 1, a semi-circle shape rib 412 formed on the inner portion of the first lateral shaft 411 to enhance the structural strength there. The two ribs 412 and 422 are both of semi-circle shape and together form a circular groove 43 for clamping the elastic member 3 such that the support levers 41 and 42 are assembled together. An opening groove 419 is arranged on each of two lateral sides of the rib 412.

Moreover, first vertical shaft 413 and second vertical shaft 414 are provided on both sides of the first lateral shaft 411, and first pivot shaft 415 extends from the free end of the first vertical shaft 413 and second vertical shaft 414. The pivot shaft 415 is pivotally engaged into the pivot groove 52 of the key 5 and is not on same altitude with the first lateral shaft 411. Moreover, a dent 416 is formed near the first pivot shaft 415, a through hole 417 is formed on the center position of the first vertical shaft 413, a projecting bar 418 is formed on the corresponding location of second vertical shaft 414.

As shown in FIGS. 1 and 2, a pivot groove 52 is provided on the key 5 for the pivotal connection of the first support lever 41, wherein the pivot shaft 415 of the first support lever 41 is slidable within the groove 52. A pivot recess 51 is formed on the key 5 and corresponding to the second support

3

lever 42. The pivot recess 51 is formed by two adjacent retaining walls 511 and 512, the separation therebetween enables the two walls to clamp the second pivot shaft 425. One of the wall 512 has a hook 513 formed on the free end thereof. The hook 513 sustains at least half-length portion of the second pivot shaft 425 of the support lever 42. A bevel 514 is formed on the exterior portion of the hook 513 by which the second pivot shaft 425 is easier to engage into the pivot recess 51. The other wall 511 has thinner thickness than the wall 512 and therefore is more flexible.

As shown in FIG. 3, two pivot grooves 11 and 12 are arranged on the base plate and corresponding to the two support levers 41 and 42, and have L shape. When assembling, the L-shaped pivot grooves 11 and 12 first are passed through the opened grooves 419 and 429 of the support levers 41 and 42 and then drawn back such that the first lateral shaft 411 and second lateral shaft 421 are engaged within the grooves 11 and 12. Two stop poles 13 are arranged on the base plate 1 and beside the groove 11. The two stop poles 13 are separated by a predetermined distance and have chamfered side 131. Moreover, the base plate 1 has no opening formed between the two stop poles 13, the through holes 21 on the conductive membrane 2 and corresponding to the stop poles 13 is not necessary to be large.

With reference again to FIG. 1, when the key support mechanism 4 is to be assembled within the keyswitch 10, the two support levers 41 and 42 are arranged in a scissors-form and have the same orientation. At this time, the first and second vertical shafts 413, 414 and the third and vertical shafts 423, 424 of the two support levers 41 and 42 are arranged in cross fashion such that the through holes 417, 427 and the projecting bar 418, 428 of the vertical shafts 413, 414 and 423, 424 are pivotally connected to each other. The pivot shafts 415 and 425 of the vertical shaft 413, 414 and 423, 424 of the two support levers 41 and 42 are pivotally engaged within the pivot recess 51, 52 of the cap 5, and the hook 513 of the pivot recess 51 clamps the pivot shaft 425, as shown in FIG. 2. Moreover, when the two support levers 41 and 42 are in horizontal state, the lateral shaft 411 (421) of the support lever 41 (42) is just engaged within the dent 426 (416) formed in another support lever 42 (41). Afterward, the two support levers 41 and 42 are pivotally arranged on the base plate 1. The pivot grooves 12 are first passed the opened groove 429 of the support lever 42 such that the lateral shaft 421 of the support lever 42 is engaged into the pivot groove 12. Afterward, the pivot groove 11 is passed through the opened groove 419 of the support lever 41 such that the lateral shaft 11 of the support lever 41 is engaged within the pivot groove 11 of the base plate. The assembling of whole key support mechanism 4 is thus completed.

In the present invention, the support levers 41 and 42 are assembled by arranging between the key the base plate 1 in cross fashion and with same orientation because they are of same structure. The assembling task is more convenient. Moreover, the hook 513 of the pivot recess 51 on the cap 5 has length exceeding half length of the second pivot shaft 425. The wall 511 is thinner and has flexibility such that the wall 511 can be pull outward without the problem of breaking during extraction. Moreover, two stop poles 13 are arranged beside the pivot groove 11 to retain the first lateral shaft 411 of the support lever 41 within the pivot groove 11, when the first lateral shaft 411 is arranged on the base plate 1. Therefore, the support lever 41 will not shake laterally. The edge of the stop pole 13 is provided with chamfered portion 131 to facilitate the pivotal engagement of the support lever 41 into the pivot recess 11.

4

Although the present invention has been described with reference to the preferred embodiment thereof, it will be understood that the invention is not limited to the details thereof. Various substitutions and modifications have suggested in the foregoing description, and other will occur to those of ordinary skill in the art. Therefore, all such substitutions and modifications are intended to be embraced within the scope of the invention as defined in the appended claims.

We claim:

1. A key switch comprising:

a base plate member having a lower pivot groove formed therein;

a conductive membrane fixedly mounted on said base plate member;

an elastic member;

a key having an upper pivot groove and a pivot recess formed therein;

a key support mechanism having first and second support levers, said first and second support levers being centrally pivotally mounted each to the other and having identical U-shaped structural contours, said first support lever forming first and second vertical shafts and having a first pivot shaft slidably mounted within said upper pivot groove of said key and having a first lateral shaft pivotally mounted within said lower pivot groove of said base plate member, said second support lever forming a third and a fourth vertical shaft and having a second pivot shaft pivotally secured within said pivot recess of said key, said pivot recess containing at least one-half of the length of said second pivot shaft, said pivot recess forming first and second walls, said first and second walls being contiguous with said second pivot shaft, said first wall having a hook formed thereon, said hook having a length greater than a radius of said second pivot shaft, said second wall having a thickness less than that of said first wall to allow for structural flexibility, said second support lever having a second lateral shaft in slidable electrical contact with said conductive member.

2. The key switch as recited in claim 1 wherein said first and second pivot shafts lie in a separate plane from said first and second lateral shafts.

3. The key switch as recited in claim 2 wherein said first and second support levers have respective dents formed within said first and second vertical shafts, adjacent said first and second pivot shafts.

4. The key switch as recited in claim 2 wherein said first and third vertical shafts each have a projecting bar formed at the center thereof and extending therefrom, and said second and fourth vertical shafts each having a through hole formed at the center thereof for mating with the corresponding said projecting bar.

5. A key switch comprising:

a base plate member having a lower pivot groove formed therein;

a conductive membrane fixedly mounted on said base plate member;

an elastic member;

a key having an upper pivot groove and a pivot recess formed therein;

a key support mechanism having first and second support levers, said first and second levers being centrally pivotally mounted each to the other and having identical U-shaped structural contours, said first support

lever forming first and second vertical shafts and having a first pivot shaft slidably mounted within said upper pivot groove of said key and having a first lateral shaft pivotally mounted within said lower pivot groove of said base plate member, said second support lever forming a third and a fourth vertical shaft and having a second pivot shaft pivotally secured within said pivot recess of said key, said pivot recess containing at least one-half of the length of said second pivot shaft, said pivot recess forming first and second walls, said second support lever having a second lateral shaft in slidable electrical contact with said conductive member, said first and second pivot shafts lie in a separate plane from said first and second lateral shafts, said first and second lateral shafts each having a semi-circular shaped rib formed thereon, said semi-circular shaped ribs together forming a circular groove for clamping said elastic member.

6. The key switch as recited in claim 5 wherein said pivot recess comprises first and second walls, said first and second walls contiguous with said second pivot shaft, said first wall having a hook formed thereon, said hook having a length greater than the radius of said second pivot shaft, said second wall having a thickness less than that of said first wall to allow for structural flexibility.

7. The key switch as recited in claim 6 wherein a bevel is formed on an outer side of said hook.

8. The key switch as recited in claim 5 wherein first and second stop poles are formed on said base plate, said stop poles positioned to retain said first lateral shaft within said lower pivot groove, said first and second stop poles having chamfered edges.

* * * * *



(12) **United States Patent**

Tsai et al.

(10) Patent No.: **US 6,169,255 B1**

(45) Date of Patent: **Jan. 2, 2001**

(54) **FLEXIBLE MEMBRANE CIRCUIT STRUCTURE FOR KEYSWITCH**

(75) Inventors: **Ching Cheng Tsai**, Keelung; **Wen To Chou**, Taipei Hsien, both of (TW)

(73) Assignee: **Chicony Electronics Co., Ltd.**, Taipei Hsien (TW)

( * ) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

(21) Appl. No.: **09/393,974**

(22) Filed: **Sep. 10, 1999**

(51) Int. Cl.$^7$ .................................................. **H01H 13/70**

(52) U.S. Cl. ............................................ **200/5 A; 200/5.7**

(58) Field of Search ........................... 200/5 A, 5.2, 5.7, 200/341, 342–345; 400/472, 473, 477, 479, 490–496; 361/680

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,450,324 | * | 5/1984 | Fukukura et al. | 200/5 A |
| 4,837,412 | * | 6/1989 | Tachibana | 200/5 A |
| 4,901,193 | * | 2/1990 | Kinugawa et al. | 361/212 |
| 6,057,517 | * | 5/2000 | Meyer | 200/5 A |

* cited by examiner

*Primary Examiner*—Michael Friedhofer

(74) *Attorney, Agent, or Firm*—Rosenberg, Klein & Lee

(57) **ABSTRACT**

A flexible membrane circuit structure for keyboard comprises a substrate; a membrane circuit structure arranged on the substrate and comprising an upper membrane layer and a lower circuit layer, a plurality of movable keytops depressibly arranged on the substrate and each corresponding to one the conductive contact; at least one fixed keytop arranged on marginal location of the keyboard and being not depressible. Each membrane circuit layer has conductive contacts. The conductive contacts on the upper membrane layer has a predetermined separation with corresponding conductive contacts on the lower membrane layer. The upper membrane layer and the lower circuit layer is bridged by at least one folded plate such that the upper membrane layer electrically and mechanically connected with the lower circuit layer. The folded plate received within the fixed keytop to prevent the breaking of the folded plates.

**6 Claims, 6 Drawing Sheets**





FIG.1
PRIOR ART



FIG. 1A
PRIOR ART



FIG. 2
PRIOR ART

FIG. 3
PRIOR ART



FIG.4



FIG. 4A



FIG.5

1

# FLEXIBLE MEMBRANE CIRCUIT STRUCTURE FOR KEYSWITCH

## FIELD OF THE INVENTION

The present invention relater to a flexible membrane circuit structure for keyswitch, especially to a flexible membrane circuit structure for low-profile keyswitch, by which the cost is reduced and the endurance is enhanced.

## BACKGROUND OF THE INVENTION

The portable electronic apparatus such notebook computer, electronic dictionary and PDA generally use low-profile keyboard to enhance the portability thereof These low-profile keyboards generally uses flexible membrane circuit with single layer, double layer or triple layer structure to minimize the height thereof. In the flexible membrane circuit with double layer or triple layer structure, there are an upper membrane circuit layer and a lower membrane circuit layer each with a plurality of conductive contacts corresponding to the location of the keyswitch to be assembled on the upper membrane circuit and the lower membrane circuit. More particularly, in the flexible membrane circuit with double layer structure, a circular spacer is arranged around one conductive contact on the upper or lower membrane circuit layer. In the flexible membrane circuit with triple layer structure, a spacer layer with a plurality of through holes each corresponding to one conductive contact is sandwiched between the upper and lower membrane circuit layer. However, in the flexible membrane circuit with double layer or triple layer structure, the upper and lower membrane circuit layer with printed circuit thereon are separately formed and then the upper and lower membrane circuit layer with printed circuit are assembled. The manufacture is complicated and the cost is high.

As shown in FIG. 1 and FIG. 1A, the above-mentioned problem can be solved by using a larger flexible membrane circuit layer composed of two upper membrane circuit layers bridged by a plurality of folded plates 12. Therefore, the area of the larger flexible membrane circuit layer is about two times of an upper membrane circuit layer 10 or a lower membrane circuit layer 11 in previously-described keyboard. The circuit trace is formed on the surface of the larger flexible membrane circuit and then the larger flexible membrane circuit is folded by bending the folded plates 12 such that a connected upper membrane circuit layer 10 and lower membrane circuit layer 11 is formed. Moreover, a spacer layer 13 can be provided between the upper membrane circuit layer 10 and the lower membrane circuit layer 11. However, when assembled in a keyboard 1, the folded plates 12 are arranged on the edge of the keyboard 1 and between the movable keytop 14 and the substrate 15 of the keyboard 1. As shown in FIGS. 2 and 3, the folded plates 12 are subjected to repeated striking force of the movable keytop 14 such that the bent portion 120 of the folded plate 12 is probably broken.

It is an object of the present invention to provide a flexible membrane circuit structure for low-profile keyswitch, by which the above mentioned problems are solved, and the keyboard cost is reduced.

To achieve above objects, the present invention provides a flexible membrane circuit structure for keyboard comprising a substrate; a membrane circuit structure arranged on the substrate and comprising an upper membrane layer and a lower circuit layer, a plurality of movable keytops depressibly arranged on the substrate and each corresponding to one the conductive contact; at least one fixed keytop arranged on

2

marginal location of the keyboard and being not depressible. Each membrane circuit layer has conductive contacts. The conductive contacts on the upper membrane layer has a predetermined separation with corresponding conductive contacts on the lower membrane layer. The upper membrane layer and the lower circuit layer is bridged by at least one folded plate such that the upper membrane layer electrically and mechanically connected with the lower circuit layer. The folded plate received within the fixed keytop to prevent the breaking of the folded plates.

The various objects and advantages of the present invention will be more readily understood from the following detailed description when read in conjunction with the appended drawing, in which:

## BRIEF DESCRIPTION OF DRAWING

FIG. 1 is a partial perspective view of a flexible membrane circuit structure in a conventional low-profile keyswitch;

FIG. 1A is the enlarged view of taken from a part in FIG. 1;

FIG. 2 is partial cross sectional view of a conventional flexible membrane circuit structure when the keyswitch is not pressed;

FIG. 3 is partial cross sectional view of a conventional flexible membrane circuit structure when the keyswitch is pressed;

FIG. 4 is a partial perspective view of a flexible membrane circuit structure according to the present invention;

FIG. 4A is the enlarged view of taken from a part in FIG. 4;

FIG. 5 is a partial cross sectional view showing the flexible membrane circuit structure according to the present invention housed by a fixed keyswitch.

## DETAIL DESCRIPTION OF PREFERRED EMBODIMENT

With reference now to FIGS. 4, 4A and 5, the present invention provides a flexible membrane circuit structure for low-profile keyboard, by which the cost is reduced and the endurance is enhanced. The keyboard 2 comprises a substrate 20, a flexible membrane circuit structure 21, a plurality of rubber cones 22, a plurality of movable keytops 23 and at least one fixed keytop 24.

The flexible membrane circuit structure 21 is arranged on the substrate 20 and comprises a double-layer structure composing an upper membrane circuit layer 210 and a lower membrane circuit layer 211. The upper membrane circuit layer 210 and the lower membrane circuit layer 211 have conductive contacts corresponding to those keytops. Moreover, in this embodiment, a spacer layer 212 is sandwiched between the upper membrane circuit layer 210 and the lower membrane circuit layer 211 to form a three-layer structure. Moreover, the spacer layer 212 has a plurality of through holes each corresponding to one conductive contact on the upper membrane circuit layer 210 and the lower membrane circuit layer 211. The plurality of movable keytops 23 are arranged on the upper membrane circuit layer 210 and each corresponding to one conductive contact. Alternatively, the plurality of movable keytops 23 can be mounted on a base plate 220 and then arranged on the upper membrane circuit layer 210, as shown in FIG. 5. The movable keytop 23 is mounted atop the rubber cone 22 through a lever frame 234 arranged on the substrate 20. The movable keytop 23 is guide by the lever frame 234 to

3

collapse the rubber cone 22 such that the conductive contacts on the upper membrane circuit layer 210 and the lower membrane circuit layer 211 are electrically connected. Moreover, the fixed keytop 24 is arranged on marginal portion of the keyboard 2. For example, in the keyboard 2 of a notebook computer, a plurality of movable keytops 23 are located on the right bottom side of the keyboard 2. The movable keytops 23 are arranged in an inverse T-shape pattern and comprises an upper arrow key 230, a down arrow key 231, a left arrow key 232 and a right arrow key 233. Moreover, two fixed keytops 24 are arranged on both sides of the upper arrow key 230.

The flexible membrane circuit structure 21 comprises a large membrane circuit layer having two membranes printed with circuit trace and bridged by a plurality of folded plates 213. The total area of the large membrane circuit layer is about two times of the area of the keyboard 2. The larger membrane circuit layer is folded by bending the folded plates 213 such that an upper membrane circuit layer 210 and a lower membrane circuit layer 211 are provided. Moreover, the folded plates 213 are received within the fixed keytops 24.

The fixed keytops 24 are provided for filling the remaining space not occupied by the movable keytops 23 and essentially not movable. Therefore, the folded plates 213 received within the fixed keytops 24 can be prevented from breaking due to repeated striking of the movable keytops 23.

To sum up, the present invention provides a flexible membrane circuit structure for low-profile keyboard, wherein the folded plates are received within the fixed keytops to prevent the breaking of the folded plates.

Although the present invention has been described with reference to the preferred embodiment thereof, it will be understood that the invention is not limited to the details thereof Various substitutions and modifications have suggested in the foregoing description, and other will occur to those of ordinary skill in the art. Therefore, all such substitutions and modifications are intended to be embraced within the scope of the invention as defined in the appended claims.

What is claimed is:

1. A flexible membrane circuit structure for keyboard, comprising

a substrate;

4

a membrane circuit structure arranged on said substrate and comprising an upper membrane layer and a lower circuit layer, each of the layers having conductive contacts, the conductive contacts on said upper membrane layer having a predetermined separation with corresponding conductive contacts on said lower membrane layer;

a plurality of movable keytops depressibly arranged on said substrate and each of the keytops corresponds to one of said conductive contacts;

at least one fixed keytop arranged on marginal location of said keyboard and being not depressible;

said upper membrane layer and said lower circuit layer being bridged by at least one folded plate such that said upper membrane layer electrically and mechanically connected with said lower circuit layer; said folded plate received within said at least one fixed keytop.

2. The flexible membrane circuit structure for keyboard as in claim 1, wherein said membrane circuit structure further comprising a spacer layer sandwiched between said upper membrane layer and said lower circuit layer.

3. The flexible membrane circuit structure for keyboard as in claim 1, wherein at least one of said upper membrane layer and said lower circuit layer is provided with a spacing body around said conductive contact.

4. The flexible membrane circuit structure for keyboard as in claim 1, further comprising a plurality of rubber cones arranged on said upper membrane layer and each of the cones corresponding to one of the conductive contacts on said upper membrane layer.

5. The flexible membrane circuit structure for keyboard as in claim 1, further comprising a base plate on said upper membrane layer, and a plurality of rubber cones arranged on said base plate and each of the cones corresponds to one of the conductive contacts on said upper membrane layer.

6. The flexible membrane circuit structure for keyboard as in claim 1, wherein said movable keytops are arranged in an inverse T-shape pattern and comprises an upper arrow key, a down arrow key, a left arrow key and a right arrow key, said at least one fixed keytop arranged on A side of said upper arrow key.

*    *    *    *    *



# United States Patent [19]

## Tsai

[11] **Patent Number:** 6,056,459

[45] **Date of Patent:** May 2, 2000

[54] **BALANCE DEVICE FOR KEY**

[75] Inventor: **Ching Cheng Tsai**, Keelung, Taiwan

[73] Assignee: **Chicony Electronics Co., Ltd.**, Taipei Hsien, Taiwan

[21] Appl. No.: **09/225,331**

[22] Filed: **Jan. 5, 1999**

[51] Int. Cl.[7] ................................................ B41J 5/08

[52] U.S. Cl. ................................................ 400/496; 200/344

[58] Field of Search ...................... 400/472, 490,
400/495, 495.1, 496, 491.2, 473, 479, 480,
481, 488, 491, 491.1, 491.3, 492, 682,
691, 692, 693; 248/584, 585; 345/167,
168, 169; 235/1 D, 145 R, 146; 361/680,
683; 341/21, 23; 200/341, 344, 345, 339,
520, 342, 329

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,433,225 | 2/1984 | Cowles | 200/340 |
| 4,580,022 | 4/1986 | Oelsch et al. | 400/496 |
| 5,819,914 | 10/1998 | Yoneyama | 200/344 |
| 5,823,325 | 10/1998 | Lin | 300/344 |
| 5,941,373 | 8/1999 | Cheng | 200/344 |

*Primary Examiner*—John S. Hilten
*Assistant Examiner*—Amanda B. Sandusky
*Attorney, Agent, or Firm*—Rosenberg, Klein & Lee

[57] **ABSTRACT**

A balance device for key comprises two balance rods each arranged on the front side and rear side of the cap of the key. The two balance rods are arranged in a forficiform arrangement. The base plate of the key and the cap being provided with pivoting parts such that the balance rods being pivotably engaged within the pivoting part. Therefore, the key can be uniformly pressed, no matter where the pressing force for key is applied.

8 Claims, 3 Drawing Sheets





FIG.1



**FIG.2**



FIG.3
PRIOR ART

**1**

# BALANCE DEVICE FOR KEY

## FIELD OF THE INVENTION

The present invention relates to a balance device which comprises two balance rods arranged adjacent a front edge and a rear edge of a key cap in crossed orientation, whereby a depression force applied to the key cap is balanced to produce the key cap's stable displacement.

## BACKGROUND OF THE INVENTION

Some keys of a conventional keyboard, such as a space key, are generally of an extended, long strip configuration. Therefore, a balance device is necessary for such keys. As shown in FIG. 3, a prior art balance rod 71 is pivotally arranged within a support assembly for a space key 7. One end of the balance rod 71 is pivotally connected at a front side of the space key 7. The balance rod 71 extends in angled orientation, with its other end pivotally connected to the base plate 72 of the keyboard. When the finger of a user presses at the side of the space key 7 which is pivotally connected to the balance rod 71, the pressing force is uniformly applied over the key. However, when the user's finger presses at the side of the space key 7 not connected to the balance rod 71, the pressing force is not uniformly applied over the key. Consequently, the key stroke operation may not be performed effectively. This problem is heightened in notebook type computers, the keys of which are arranged in more compact manner.

It is the object of the present invention to provide a balance device for a key, which has two balance rods having pivoting pole portions arranged, respectively, to extend adjacent the front and back edges of a key cap and supporting pole portions arranged in crossed manner. By use of the balance device, the key cap may be uniformly depressed, no matter where on the key cap the pressing force is applied.

## BRIEF DESCRIPTION OF THE DRAWINGS

The various objects and advantages of the present invention will be more readily understood from the following detailed description when read in conjunction with the appended Drawings, in which:

FIG. 1 is an exploded view of one embodiment of the present invention;

FIG. 2 is a cross-section view of one embodiment of the present invention; and,

FIG. 3 is a cross-section view of a prior art support assembly balance device.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

As shown in FIG. 1, the inventive balance device 10 is shown used in a space key having an extended, long strip configuration. However, the inventive device 10 is also applicable to other keys on a keyboard. The balance device, or assembly, 10 comprises two balance rods 2 and 2' respectively coupled to the space key along front and back edges, and arranged to cross one another. In this embodiment, the first balance rod 2 has a first pivoting pole portion 21, two supporting pole portions 22 extending transversely from opposing ends of the first pivoting pole portion 21, and second pivoting pole portions 23 bent from the supporting pole portions 22 to extend in parallel relation to the first pivoting pole portion 21. A base plate 3 of the keyboard is provided with pivoting parts 31 along front and rear sides thereof. Each pivoting part 31 is configured as an

**2**

open, slide-accessible groove. Formed on cap 1 of the space key are pivoting parts 11 configured as fixed grooves, adapted for captively receiving a pole portion.

As shown in FIG. 2, when assembling the balance structure, the first pivoting pole portions 21 of the balance rods 2, 2' pivotally engage the pivoting parts 31 of the base plate 3, respectively. The second pivoting pole portions 23 of the balance rods 2, 2' are pivotally arranged within the pivoting parts 11. When the finger of a user presses the space key, the pivoting shaft 41 of a bridge assembly frame 4 is displaced accordingly. The second pivoting pole portions 23 of the balance rods 2, 2' are correspondingly displaced such that the space key is uniformly depressed. An elastic member within the bridge assembly is also uniformly depressed to contact the circuit on the circuit board beneath it, thus forming a closed circuit.

In the present invention, the balance rods 2, 2' are provided to extend respectively adjacent the front and back edges of the space key. This enables the space key to be uniformly depressed, no matter where along its length the depressing force is applied.

In summary, the inventive balance device can substantially improve the problem of non-uniform depression of a key, especially for such keys as those of a compact notebook computer. The provisions of the invention are industrially advantageous.

Although the present invention has been described with reference to the preferred embodiments thereof, it will be understood that the invention is not limited to the details thereof. Various substitutions and modifications have been suggested in the foregoing description. Other substitutions and modifications will occur to those of ordinary skill in the art. Therefore, all such substitutions and modifications are intended to be embraced within the scope of the invention as defined in the appended Claims.

I claim:

1. A key switch device comprising:

   (a) a key cap having longitudinally extending first and second edges;

   (b) a base plate;

   (c) a collapsible bridge assembly coupled to said key cap and said base plate, said collapsible bridge assembly resiliently supporting said key cap on said base plate to be displaceable between actuating and non-actuating positions; and,

   (d) a balance assembly coupled to said key cap and said base plate for distributing a depression force applied to said key cap; said balance assembly including first and second balance rods, each said first and second balance rod having at least a pair of longitudinally extended balance pole portions spaced one from the other by a supporting pole portion extending transversely therebetween, at least one said balance pole portion of each said first and second balance rod being pivotally coupled to said base plate, said first balance rod having at least one said balance pole portion pivotally coupled to said key cap adjacent said first edge thereof, said second balance rod having at least one said balance pole portion pivotally coupled to said key cap adjacent said second edge thereof.

2. The key switch device as recited in claim 1 wherein at least one said supporting pole portion of said first balance rod being oriented in crossed relation to at least one said supporting pole of said second balance rod when said key cap is in said non-actuating position.

3. The key switch device as recited in claim 1 wherein said key cap is elongated longitudinally in contour.

4. The key switch device as recited in claim 1 wherein each said first and second balance rod includes a pair of said supporting pole portions extending transversely from distal ends of a primary one of said balance pole portions, and a secondary one of said balance pole portions extending from a terminal end of each said supporting pole portion.

5. The key switch device as recited in claim 4 wherein each said first and second balance rod is integrally formed.

6. The key switch device as recited in claim 5 wherein said primary balance pole portion of each said first and second balance rods is pivotally coupled to said key cap.

7. The key switch device as recited in claim 1 wherein said base plate includes a plurality of pivoting parts each defining an open groove pivotally receiving one said balance pole portion of said balance rods.

8. The key switch device as recited in claim 1 wherein said key cap includes a plurality of pivoting parts each pivotally receiving in captive manner one said balance pole portion of said balance rods.

*   *   *   *   *



(12) **United States Patent**
Tsai

(10) Patent No.: **US 6,392,176 B1**
(45) Date of Patent: **May 21, 2002**

(54) **KEYSWITCH OF KEYBOARD**

(75) Inventor: **Ching Cheng Tsai**, Keelung (TW)

(73) Assignee: **Chicony Electronics Co., Ltd.**, Taipei Hsien (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/797,560**

(22) Filed: **Mar. 5, 2001**

(51) Int. Cl.⁷ ............................................... **H01H 13/70**
(52) U.S. Cl. ........................................................ **200/344**
(58) Field of Search ................................. 200/5 A, 517, 200/344, 345; 400/490–496

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,829,579 | A | * | 11/1998 | Tsai | ........................... 200/344 |
| 6,031,189 | A | * | 2/2000 | Watanabe et al. | ........... 200/5 A |
| 6,156,985 | A | * | 12/2000 | Chiang | ....................... 200/344 |
| 6,160,233 | A | * | 12/2000 | Hu | ............................. 200/344 |
| 6,179,497 | B1 | * | 1/2001 | Hu | ............................. 400/495 |

* cited by examiner

*Primary Examiner*—Michael Friedhofer
(74) *Attorney, Agent, or Firm*—Rosenberg, Klein & Lee

(57) **ABSTRACT**

A keyswitch comprises a keytop, a resilient dome, a first lever, a second lever and a base with pivotal stages. The first lever has two convex parts on centers of two lateral sides thereof and the second lever has two concave parts on centers of two lateral sides thereof and corresponding to the two convex parts. The convex part has an opened groove and the concave part has a pivotal rod corresponding to the opened groove and pivotally arranged into the opened groove. Therefore, the first lever can be vertically assembled to the second lever. The second lever has two clamping parts on two lateral sides thereof and clamping the pivotal stages of the base. Therefore, the first lever and the second lever are firmly retained on the base and stably guide the keytop such that the keytop will not be shaken during operation.

**5 Claims, 4 Drawing Sheets**





*FIG.1*
*PRIOR ART*



FIG.2



*FIG.3*



*FIG.4*

1

## KEYSWITCH OF KEYBOARD

### FIELD OF THE INVENTION

The present invention relates to a keyswitch, especially to a keyswitch assembled from top direction to simply process and prevent lateral shake.

### BACKGROUND OF THE INVENTION

FIG. 1 shows a conventional computer keyswitch, which is a lever type keyswitch and comprises a keytop $10a$, a resilient dome $11a$, a first lever $12a$, a second lever $13a$ and a base $14a$. The first lever $12a$ and the second lever $13a$ are in scissors arrangement. The first lever $12a$ has a pivotal shaft $15a$ on bottom thereof and the second lever $13a$ has a pivotal shaft $16a$ on bottom thereof, the pivotal shafts $15a$ and $16a$ are pivotally arranged into pivotal stages $17a$ and $18a$ on top of the base $14a$. The top end of the first lever $12a$ and the second lever $13a$ are pivotally arranged into bottom of the keytop $10a$, whereby the first lever $12a$ and the second lever $13a$ forms a link mechanism. The resilient dome $11a$ is placed within the moving stroke of the keytop $10a$. When the keytop $10a$ is pressed downward or lifted upward; and guided by the first lever $12a$ and the second lever $13a$, the resilient dome $11a$ below the keytop $10a$ can switch on and off the membrane circuit $19a$.

However, in above-mentioned keyswitch with a first lever $12a$ and a second lever $13a$ in scissors arrangement, the first lever $12a$ and the second lever $13a$ should be assembled along a specific inclined angle. The assembling thereof is cumbersome, and hard to automatic.

Moreover, in above-mentioned keyswitch, the pivotal shafts $15a$ and $16a$ of the first lever $12a$ and the second lever $13a$ are pivotally arranged into pivotal stages $17a$ and $18a$ on top of the base $14a$. The first lever $12a$ and the second lever $13a$ cannot be firmly retained by the base $14a$. The keytop $10a$ is shaken during key pressing operation.

Moreover, in above-mentioned keyswitch, the pivotal stages $17a$ and $18a$ of the base $14a$ have the problem of material congestion when being bent. The pivotal shafts $15a$ and $16a$ of the first lever $12a$ and the second lever $13a$ cannot be tightly fit into the pivotal stages $17a$ and $18a$ on top of the base $14a$. The first lever $12a$ and the second lever $13a$ cannot be firmly retained by the base $14a$.

### SUMMARY OF THE INVENTION

It is an object of the present invention to provide a keyswitch wherein the first lever thereof can be vertically assembled to the second lever thereof. The assembling of the lever mechanism in the present invention does need specific inclined angle and cumbersome process.

It is another object of the present invention to provide a keyswitch when the two lower pivotal shafts of the second lever thereof are pivotally arranged in the second pivotal stages, the two clamping parts below the second lever clamp the second pivotal stages, respectively. Therefore, the first lever and the second lever are firmly retained on the base and stably guide the keytop such that the keytop will not be shaken during operation.

It is another object of the present invention to provide a keyswitch wherein the first pivotal stage thereof has two broken edges on two lateral bending sides thereof, the first pivotal stage will not have the problem of material congestion during manufacture. The lower pivotal shaft on bottom of the first lever is precisely arranged in the first pivotal stage. Therefore, the first lever and the second lever are firmly retained on the base and stably guide the keytop.

2

To achieve above object, the present invention provides a keyswitch comprising a keytop, a resilient dome, a first lever, a second lever and a base with pivotal stages. The first lever has two convex parts on centers of two lateral sides thereof and the second lever has two concave parts on centers of two lateral sides thereof and corresponding to the two convex parts. The convex part has an opened groove and the concave part has a pivotal rod corresponding to the opened groove and pivotally arranged into the opened groove. Therefore, the first lever can be vertically assembled to the second lever. The second lever has two clamping parts on two lateral sides thereof and clamping the pivotal stages of the base. Therefore, the first lever and the second lever are firmly retained on the base and stably guide the keytop such that the keytop will not be shaken during operation.

The various objects and advantages of the present invention will be more readily understood from the following detailed description when read in conjunction with the appended drawing, in which:

### BRIEF DESCRIPTION OF DRAWING

FIG. 1 shows the sectional view of prior art keyswitch;

FIG. 2 shows the exploded view of the keyswitch of the present invention;

FIG. 3 shows the perspective view of the keyswitch of the present invention;

FIG. 4 shows the perspective view of the keyswitch of the present invention with the keytop being removed.

### DETAILED DESCRIPTION OF THE INVENTION

With reference now to FIGS. 2, 3, and 4, the present invention provides a keyswitch suitable for the keyboard of notebook computer. The keyswitch of the present invention comprises a keytop 10, a resilient dome 20, a first lever 30, a second lever 40 and a base 50. The keytop 10 is of rectangular cap shape with an operative surface 11 on topside thereof and an assembling surface 12 on bottom side thereof.

The resilient dome 20 is made of resilient material such as rubber and arranged below the keytop 10 and between the keytop 10 and the base 50. The resilient dome 20 is placed within the key-pressing stroke of the keytop 10 and provides an upward restoring force to the keytop 10.

The first lever 30 and the second lever 40 are arranged between the assembling surface 12 of the keytop 10 and the base 50. The first lever 30 is of hollow frame shape and has a through hole 35 through which the resilient dome 20 passes. The second lever 40 is a U-shaped rack. The first lever 30 has an upper pivotal shaft 31 on topside thereof and the second lever 40 has an upper pivotal shaft 41 on topside thereof, the pivotal shafts 31 and 41 are pivotally connected to the assembling surface 12. The first lever 30 is smaller than the second lever 40 such that the first lever 30 is fit within the second lever 40. The first lever 30 has two convex parts 32 on centers of two lateral sides thereof; the second lever 40 has two concave parts 42 on centers of two lateral sides thereof and corresponding to the two convex parts 32 of the first lever 30. The convex part 32 has an opened groove 33 and the concave part 42 has a pivotal rod 43 corresponding to the opened groove 33 and pivotally arranged into the opened groove 33. Therefore, the first lever 30 and the second lever 40 can be assembled in scissors arrangement.

The first lever 30 has a lower pivotal shaft 34 on bottom thereof and pivotally connected to the base 50. The second

3

lever **40** has two U-shaped clamping parts **44** on two lateral sides thereof. The second lever **40** has two lower pivotal shafts **45** pivotally connected to the base **50**.

The base **50** is arranged below the keytop **10**, the resilient dome **20**, the first lever **30**, and the second lever **40**. The base **50** has a first through hole **51** and two second through holes **52** corresponding to the lower pivotal shaft **34** on bottom of the first lever **30** and the two lower pivotal shafts **45** on bottom of the second lever **40**. The first through hole **51** has an upward-extended first pivotal stage **53** of L-shape. The first pivotal stage **53** has two broken edges **54** on two lateral bending sides thereof. The second through hole **52** has an upward-extended second pivotal stage **55** of L-shape and a baffle plate **56** beside the second pivotal stage **55**.

The lower pivotal shaft **34** on bottom of the first lever **30** is pivotally arranged in the first pivotal stage **53** and the first pivotal stage **53** retains the upward movement of the lower pivotal shaft **34** of the first lever **30**. The two lower pivotal shafts **45** of the second lever **40** are pivotally arranged in the second pivotal stages **55**; and the second pivotal stages **55** retain the upward movement of the two lower pivotal shafts **45** of the second lever **40**. Moreover, the two U-shaped clamping parts **44** on two lateral sides of the second lever **40** clamp the second pivotal stages **55**, respectively.

Moreover, a membrane circuit **60** is arranged between the base **50** and the resilient dome **20** and has openings **61** and **62** corresponding to the lower pivotal shaft **34** of the first lever **30** and the two lower pivotal shafts **45** of the second lever **40**. Therefore, the lower pivotal shaft **34** of the first lever **30** passes the opening **61** and is pivotally arranged in the first pivotal stage **53**; the two lower pivotal shafts **45** of the second lever **40** pass the openings **62** and are pivotally arranged in the second pivotal stages **55**, respectively.

When the keytop **10** is pressed downward or lifted upward; and guided by the first lever **30** and the second lever **40**, the resilient dome **20** below the keytop **10** can switch on and off the membrane circuit **60**.

The first lever **30** has two convex parts **32** on centers of two lateral sides thereof and the second lever **40** has two concave parts **42** on centers of two lateral sides thereof. The convex part **32** has an opened groove **33** and the concave part **42** has a convex rod **43** corresponding to the opened groove **33** and pivotally arranged into the opened groove **33**. Therefore, the first lever **30** can be directly assembled to the second lever **40** in vertically down direction. The assembling of the lever mechanism in the present invention does need specific inclined angle and cumbersome process.

When the two lower pivotal shafts **45** of the second lever **40** pass the openings **62** and are pivotally arranged in the second pivotal stages **55**, the two U-shaped clamping parts **44** clamp the second pivotal stages **55**, respectively. Therefore, the first lever **30** and the second lever **40** are firmly retained on the base **50** and stably guide the keytop **10** such that the keytop **10** will not be shaken during operation.

Moreover, the first pivotal stage **53** has two broken edges **54** on two lateral bending sides thereof, the first pivotal stage **53** will not have the problem of material congestion during manufacture. The lower pivotal shaft **34** on bottom of the first lever **30** is precisely arranged in the first pivotal stage **53**. Therefore, the first lever **30** and the second lever **40** are firmly retained on the base **50** and stably guide the keytop **10**.

Although the present invention has been described with reference to the preferred embodiment thereof, it will be understood that the invention is not limited to the details thereof. Various substitutions and modifications have sug-

4

gested in the foregoing description, and other will occur to those of ordinary skill in the art. Therefore, all such substitutions and modifications are intended to be embraced within the scope of the invention as defined in the appended claims.

I claim:

1. A keyswitch comprising:

a keytop defining a bottom assembling surface;

a resilient dome disposed below said keytop;

a first lever having a first top end portion coupled to said assembling surface of said keytop, said first lever including a first pivotal shaft and pair of first lateral side portions extending therefrom to said first top end portion, said first lever defining a through hole for receiving said resilient dome, each said first lateral side portion having intermediately protruding therefrom a convex part having an axially extended opened groove formed therein;

a second lever having a second top end portion coupled to said assembling surface of said keytop, said second lever including a pair of second lateral side portions extending from said second top end portion, each said second lateral side portion defining an intermediate concave part having a pivotal rod projecting therefrom to pivotally engage said opened groove of one said first lateral side portion convex part, each said second lateral side portion having formed at a free end thereof a clamping part and a second pivotal shaft; and,

a base disposed below said keytop, said resilient dome, and said first and second levers, said base having formed therein a first through hole and a pair of second through holes, said base including:

a first pivotal stage defining a raised portion disposed adjacent said first through hole to engage said first pivotal shaft, said first raised portion having an elongate intermediate portion extending laterally between a pair of broken edges;

a pair of second pivotal stages each defining a second raised portion disposed adjacent one of said second through holes to engage in pivotally displaceable manner one of said second pivotal shafts, each said second pivotal stage engaging one of said clamping parts; and,

a pair of baffle plates each disposed adjacent one of said second pivotal stages.

2. A keyswitch comprising:

a keytop defining a bottom assembling surface;

a resilient dome disposed below said keytop;

a first lever having a first top end portion coupled to said assembling surface of said keytop, said first lever including a pair of first lateral side portions extending from said first top end portion and defining a through hole for receiving said resilient dome, each said first lateral side portion having intermediately protruding therefrom a convex part;

a second lever having a second top end portion coupled to said assembling surface of said keytop, said second lever including a pair of second lateral side portions extending from said second top end portion, each said second lateral side portion defining an intermediate concave part, each said concave part receiving one said convex part in substantially conforming manner to form a pivotal joint thereat;

one of said concave and convex parts at each said pivotal joint having an axially extended opened groove formed

5

therein, and the other of said concave and convex parts at each said pivotal joint having a pivotal rod projecting therefrom to coaxially engage in pivotally displaceable manner said opened groove, said opened groove defining a slotted axial opening for receiving said pivotal rod transversely therethrough in snap fit manner; and,

a base disposed below said keytop, said resilient dome, and said first and second levers, said base engaging a bottom end portion of each of said first and second levers.

**3.** The keyswitch as recited in claim **2** wherein said first and second top end portions respectively include first and second upper pivotal shafts pivotally coupled to said assembling surface of said keytop.

**4.** A keyswitch comprising:

a keytop defining a bottom assembling surface;

a resilient dome disposed below said keytop;

a first lever having a first top end portion coupled to said assembling surface of said keytop, said first lever including a pair of first lateral side portions extending from said first top end portion and defining a through hole for receiving said resilient dome, each said first lateral side portion having intermediately protruding therefrom a convex part;

a second lever having a second top end portion coupled to said assembling surface of said keytop, said second lever including a pair of second lateral side portions extending from said second top end portion, each said second lateral side portion defining an intermediate concave part, each said concave part receiving one said convex part to form a pivotal joint thereat;

6

one of said concave and convex parts at each said pivotal joint having an axially extended opened groove formed therein, and the other of said concave and convex parts at each said pivotal joint having a pivotal rod projecting therefrom to coaxially engage in pivotally displaceable manner said opened groove; and,

a base disposed below said keytop, said resilient dome, and said first and second levers, said base engaging a bottom end portion of each of said first and second levers;

said first lever including a first pivotal shaft, and each said second lateral side portion of said second lever having formed at a free end thereof a clamping part and a second pivotal shaft.

**5.** The keyswitch as recited in claim **4** wherein said base includes:

a first pivotal stage defining a raised portion disposed adjacent said first through hole to engage said first pivotal shaft, said first raised portion having an elongate intermediate portion extending laterally between a pair of broken edges;

a pair of second pivotal stages each defining a second raised portion disposed adjacent one of said second through holes to engage in pivotally displaceable manner one of said second pivotal shafts, each said second pivotal stage engaging one of said clamping parts; and,

a pair of baffle plates each disposed adjacent one of said second pivotal stages.

*  *  *  *  *

**EXHIBIT F**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINEBEA CO., LTD., a Japanese corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 01CV771BTM(POR) ) |
| THINK OUTSIDE, INC., a California corporation, and PERIPHERAL TECHNOLOGY, INC., a Taiwan corporation, | ) ) ) ) ) |
| Defendants. | ) ) |

Deposition Upon Oral Examination

of

DEAN STUART COWLES

Taken at 1215 Fourth Avenue

Seattle, Washington


SCHULTE ROTH & ZABEL LLP

DEC 2 3 2002

RECEIVED

DATE:  Thursday, December 12, 2002

REPORTED BY:  Mindy L. Suurs, RPR
              CSR No. SUURSML 454Q9

## A P P E A R A N C E S

For the Plaintiff:    JOEL E. LUTZKER and TODD SICKLINGER
    Schulte Roth & Zabel
    919 Third Avenue
    New York, New York 10022


For Think Outside:    PAUL A. FRIEDMAN
    Morrison & Foerster
    425 Market Street
    San Francisco, California 94105-2482


For Peripheral    PAMELA J. WONG
Technology, Inc.:    Baker & McKenzie
    101 West Broadway
    12th Floor
    San Diego, California 92101-3890


--o0o--

1    Q.    Do you receive any trade publications now?

2    A.    No.

3    Q.    Are you a member of any kind of professional

4    societies now?

5    A.    No.

6    Q.    So throughout your career you've never received

7    trade publications?

8              MR. LUTZKER:  Objection, mischaracterizes

9    the testimony.

10             THE WITNESS:  Well, I -- I don't understand

11   what you're saying as a trade publication.  I receive

12   engineering magazines.

13   BY MR. FRIEDMAN:

14   Q.    That's exactly what I mean.

15   A.    Okay.

16   Q.    Tell me about some of the engineering magazines

17   that you receive.

18             MR. LUTZKER:  At present?

19             MR. FRIEDMAN:  At present.

20             THE WITNESS:  "Design News."

21   Q.    Anything else?

22   A.    "Plumbing Today."

23   Q.    I don't think we need to ask you any questions

24   about that.  What else?

25   A.    That's all that I'm receiving at this time.

1      Q.   Did you see it before approximately a week ago?

2      A.   Not that I recall.

3      Q.   So you didn't see this document before you filed

4  a patent application?

5      A.   No, I did not.

6      Q.   Let me ask you a few questions on a different

7  topic.  Do you intend to testify at the trial in this case?

8      A.   I don't understand.  You need to be more specific

9  there.

10     Q.   What is not clear about my question?

11     A.   I don't know about a trial.

12     Q.   So is it fair for me to say that you do not

13 intend to testify at the trial in this case at the present

14 moment?

15     A.   Can't answer that.  I don't understand it.

16     Q.   And again, what don't you understand?

17     A.   The -- I don't understand your question.

18     Q.   Okay.  Are you being paid by Minebea currently?

19     A.   No.

20     Q.   Are you being paid by Minebea's lawyers?

21     A.   No.

22     Q.   Do you have any pecuniary interest in the outcome

23 of this litigation?

24     A.   I don't understand your question.

25     Q.   What don't you understand about it?

1      A.    Terminology.

2      Q.    Which term?

3      A.    I can't even pronounce it.

4      Q.    Pecuniary?

5      A.    There.

6      Q.    Okay.  Let me reask the question.  Do you have

7  any financial interest in the outcome of this litigation?

8      A.    No.

9      Q.    Well, with that, Mr. Cowles, I have no further

10  questions for you, but I understand that Ms. Wong does.

11

12                    E X A M I N A T I O N

13  BY MS. WONG:

14     Q.    Did you need another break before we go, or do

15  you want to keep going?  It's up to you.

16     A.    I'm good for a little while here.

17     Q.    All right.  I'm thinking the best way to do this

18  is perhaps -- I know it's going to seem like we're going

19  all the way back to the beginning, and basically, all I'm

20  going to do is just try to clarify some of the things that

21  we went over today, so maybe I'll tell you where we're

22  going and then maybe you can help me clarify some

23  questions.

24          You were saying that you worked at Automix and

25  you were working on keyboard technology and you were also

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE BARRY TED MOSKOWITZ, JUDGE PRESIDING

| | |
|---|---|
| MINEBEA COMPANY LTD.,      )<br>          PLAINTIFF,  )<br>    VS.           )<br>               )<br>THINK OUTSIDE, INC., ET AL.,  )<br>         DEFENDANTS.  )<br>               ) | CASE NO. 01CV0771-BTM<br>SAN DIEGO, CALIFORNIA<br>WEDNESDAY, SEPTEMBER 5, 2001<br>10:00 O'CLOCK A.M. |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

COUNSEL APPEARING:
  FOR PLAINTIFF:        JOES LUTZKER, ESQ.
                        DAVID KAGAN, ESQ.
                        SCHULTE ROTH AN DZABEL
                        919 THIRD AVENUE
                        NEW YORK, NEW YORK 10022

                        JAMES BLACKBURN, ESQ.
                        ARNOLD AND PORTER
                        777 SOUTH FIGUEROA STREET
                        44TH FLOOR
                        LOS ANGELES, CALIFORNIA 90017

  FOR DEFENDANT:        MICHAEL A. JACOBS, ESQ.
                        PAUL A. FRIEDMAN, ESQ.
                        MORRISON & FOERSTER
                        425 MARKET STREET
                        SAN FRANCISCO, CALIFORNIA 94105

                        CHARLES H. DICK, ESQ.
                        BAKER & MCKENZIE
                        101 WEST BROADWAY, TWELFTH FLOOR
                        SAN DIEGO, CALIFORNIA 92101

      REPORTED BY:        LEE ANN PENCE,
                        OFFICIAL COURT REPORTER
                        UNITED STATES COURTHOUSE
                        940 FRONT STREET, ROOM 5160
                        SAN DIEGO, CALIFORNIA 92101
                        TELEPHONE: (619) 238-5576

1   WHATEVER.

2         THE COURT:  RIGHT.

3         MR. JACOBS:  BUT LET'S SERVE UP THE CLAIM

4   CONSTRUCTION ISSUE TO YOU AS A MATTER OF LAW.

5         THE COURT:  RIGHT.  OTHERWISE WHAT HAPPENS IS, THEY

6   MAKE A MOTION FOR SUMMARY JUDGMENT, LIKE THEY HAVE DONE HERE.

7   I GRANT IT OR DENY IT.  LET'S SAY I DENY IT.  THEN WE GO ON.

8   THEN THEY MAKE ANOTHER ONE, OR YOU MAKE ONE.  THEN WE GO BACK

9   AND FORTH, AND I DEAL WITH THIS PIECEMEAL.

10        BUT, LET ME TELL YOU, EVERY TIME I DEAL WITH IT

11  PIECEMEAL, I HAVE FORGOTTEN 90 PERCENT OF THIS CASE, BECAUSE

12  WE ARE THE BUSIEST DISTRICT IN THE COUNTRY.  AND THE FICTION

13  THAT JUDGES WILL REMEMBER ALL OF THIS IS JUST A FICTION.

14        I HAVE TO GET UP TO SPEED AGAIN, AND I WOULD RATHER

15  ONLY GET UP TO SPEED ONCE.  AND ONCE WE FIGURE OUT WHAT THE

16  PATENT MEANS, IT IS GOING TO BE A NICE DESCRIPTION THAT WILL

17  BE A REFERENCE FOR ALL OF US.  IT WILL BE WHAT I GIVE TO THE

18  JURY IF IT GOES TO TRIAL.  IT WILL BE WHAT WE USE TO RESOLVE

19  THE MOTIONS FOR SUMMARY JUDGMENT.  AND ONE DOESN'T HAVE TO GET

20  BACK IN AND START THINKING ABOUT THIS AGAIN AND CONFUSE IT

21  WITH OTHER PATENT CASES THAT I HAVE OR I HAD IN THE PAST.

22        I WOULD RATHER FOCUS, GIVE IT MY BEST SHOT, AND MOVE

23  ON TO THE NEXT ISSUE.

24        SO, WHEN DID YOU FILE THE MOTION FOR SUMMARY

25  JUDGMENT?

# EXHIBIT H

 

 **YAHOO! TRAVEL**  Travel Home - Yahoo! - Help  **Travel**

 Maps · Yellow Pages · City Guides

**Make Sure You Will Always Be His Hero** *ReliaQuo* A Better Way to Buy Life I **CLICK HERE INSTANT QU(**

## Yahoo! Travel

**Home**   **Travel Guides**   **Flights**   **Hotels**   **Cars**   **Vacation Packages**   **Cruises**   **Deals**   **My**

**Select an Airline**                                                                             Help with this section

**Modify Your Search**
Show me the lowest Economy-class fares for travel during the period:

**Starting:**
 Today ▼

**Through:**
Sep ▼

 Search Now

 CRUISES from your area!

Taipei, Taiwan (TPE) to Seattle/Tacoma, WA (SEA)

**Lowest Economy/Coach Fares valid for travel through September 2003**
Any applicable discounts will be added after you choose your flights.

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 512.00**

  **United Airlines** offers connecting service

Advance Purchase: See Rules
Latest Return:12 months   Rules

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 541.00**

  **United Airlines** offers connecting service

Advance Purchase: See Rules
Latest Return:12 months   Rules

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 648.00**

  **United Airlines** offers connecting service

Advance Purchase: See Rules
Latest Return:12 months   Rules

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 688.00**

  **Continental Airlines** offers non-stop service

Advance Purchase: See Rules
Latest Return:6 months   Rules

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 688.00**

  **Northwest Airlines** offers connecting service

Advance Purchase: See Rules
Latest Return:6 months   Rules

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 727.00**

  **Continental Airlines** offers non-stop service

Advance Purchase: See Rules
Latest Return:12 months   Rules

**Round-Trip not including applicable taxes and fees\***                 **Price: USD 727.00**

**Northwest Airlines**

Advance Purchase: See Rules   Rules

  offers connecting service     Latest Return:12 months

**Round-Trip not including applicable taxes and fees***      **Price: USD 808.00**

  **Continental Airlines** offers non-stop service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***      **Price: USD 808.00**

  **Northwest Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***      **Price: USD 866.00**

  **Continental Airlines** offers non-stop service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***      **Price: USD 866.00**

  **Northwest Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***      **Price: USD 894.00**

  **Continental Airlines** offers non-stop service     Advance Purchase: See Rules   Rules   Latest Return:6 months

**Round-Trip not including applicable taxes and fees***      **Price: USD 894.00**

**Northwest Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:6 months

  

*****Taxes, Charges and Government Fees.**Where noted on the site with an asterisk (*) or plus sign (+), prices shown for air-only transactions and travel packages that include air are for one adult and are subject to additional charges, including but not limited to: (i) Airport Passenger Facility Charges that range from $2-$18, depending on itinerary; (ii) Federal Segment Fees of $3.00 USD per segment (defined as a takeoff and a landing); (iii) the September 11th Security Fee of $2.50 USD per flight segment (maximum charge per trip of $5.00 USD one-way, $10.00 USD round-trip; (iv) a Travel Facilities Tax of up to $13.20 USD per round-trip for domestic flights beginning or ending in Alaska or Hawaii; and (v) for international itineraries, foreign and U.S. government-imposed charges of up to $200.00 USD per round trip, depending on routing and destination.

**Total price per person for any transaction with Travelocity, including all charges payable to Travelocity, will always be displayed to you prior to final purchase.** Air fares may be subject to additional restrictions, may not be available on all flights, and may change without notice. Specific fare rules are provided prior to your purchase decision.

Copyright© 2003 Yahoo! Inc. All rights reserved. Terms of Service - Ad Feedback

Travelocity.com, one of Yahoo!'s travel service providers, collects information on this site in order to fulfill your request for travel services, consistent with the Yahoo! Privacy Policy. To learn about how Yahoo! uses your information please read our Privacy Policy.

© 2003 Travelocity.com LP. Travelocity®, Travelocity.com and the Travelocity skyline logo are trademarks and/or service marks of Travelocity.com LP.

 

Travel Home - Yahoo! - Help

Maps    Yellow Pages    City Guides



# Yahoo! Travel

**Home**    **Travel Guides**    **Flights**    **Hotels**    **Cars**    **Vacation Packages**    **Cruises**    **Deals**    My

## Select an Airline                                    Help with this section

**Modify Your Search**

Show me the lowest Economy-class fares for travel during the period:

**Starting:**
 Today

**Through:**
Sep

Search Now


Cruise with Carnival!

Tokyo, Japan (TYO) to San Diego, CA (SAN)

**Lowest Economy/Coach Fares valid for travel through September 2003**
Any applicable discounts will be added after you choose your flights.

Round-Trip not including applicable taxes and fees*                **Price: USD 658.00**

| Select |  | **Northwest Airlines**<br>offers connecting service | Advance Purchase: See Rules<br>Earliest Return:03 days<br>Latest Return:2 months | Rules |

Round-Trip not including applicable taxes and fees*                **Price: USD 675.00**

| Select | | **Continental Airlines**<br>offers connecting service | Advance Purchase: See Rules<br>Latest Travel:30Sep03<br>Earliest Return:03 days<br>Latest Return:2 months | Rules |

Round-Trip not including applicable taxes and fees*                **Price: USD 708.00**

| Select |  | **Japan Airlines**<br>offers connecting service | Advance Purchase: See Rules<br>Latest Travel:30Sep03<br>Earliest Return:03 days<br>Latest Return:1 months | Rules |

Round-Trip not including applicable taxes and fees*                **Price: USD 718.00**

| Select |  | **American Airlines**<br>MORE ROOM<br>offers connecting service | Advance Purchase: See Rules<br>Latest Travel:30Sep03<br>Earliest Return:03 days<br>Latest Return:1 months | Rules |

Round-Trip not including applicable taxes and fees*                **Price: USD 726.00**

| Select | | **Northwest Airlines**<br>offers connecting service | Advance Purchase: See Rules<br>Earliest Return:03 days<br>Latest Return:2 months | Rules |

Round-Trip not including applicable taxes and fees*                **Price: USD 735.00**

| Select | | **Continental Airlines**<br>offers connecting service | Advance Purchase: See Rules<br>Latest Travel:30Sep03<br>Earliest Return:03 days<br>Latest Return:2 months | Rules |

Round-Trip not including applicable taxes and fees*                **Price: USD 743.00**

 

**Northwest Airlines**
offers connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:2 months

**Round-Trip not including applicable taxes and fees***

**Price: USD  750.00**

 

**All Nippon Airways**
offers connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:1 months

  

**\*Taxes, Charges and Government Fees.** Where noted on the site with an asterisk (*) or plus sign (+), prices shown for air-only transactions and travel packages that include air are for one adult and are subject to additional charges, including but not limited to: (i) Airport Passenger Facility Charges that range from $2-$18, depending on itinerary; (ii) Federal Segment Fees of $3.00 USD per segment (defined as a takeoff and a landing); (iii) the September 11th Security Fee of $2.50 USD per flight segment (maximum charge per trip of $5.00 USD one-way, $10.00 USD round-trip; (iv) a Travel Facilities Tax of up to $13.20 USD per round-trip for domestic flights beginning or ending in Alaska or Hawaii; and (v) for international itineraries, foreign and U.S. government-imposed charges of up to $200.00 USD per round trip, depending on routing and destination.

**Total price per person for any transaction with Travelocity, including all charges payable to Travelocity, will always be displayed to you prior to final purchase.** Air fares may be subject to additional restrictions, may not be available on all flights, and may change without notice. Specific fare rules are provided prior to your purchase decision.

Copyright© 2003 Yahoo! Inc. All rights reserved. Terms of Service - Ad Feedback

Travelocity.com, one of Yahoo!'s travel service providers, collects information on this site in order to fulfill your request for travel services, consistent with the Yahoo! Privacy Policy. To learn about how Yahoo! uses your information please read our Privacy Policy.

© 2003 Travelocity.com LP. Travelocity®, Travelocity.com and the Travelocity skyline logo are trademarks and/or service marks of Travelocity.com LP.

 

**YAHOO! TRAVEL**  ——— <u>Travel Home</u> - <u>Yahoo!</u> - <u>Help</u>  **Travel**

 <u>Maps</u>  <u>Yellow Pages</u>  <u>City Guides</u>

**Protect Your Family's Future for only a ... a Day** *ReliaQuo* A Better Way to Buy Life I **CLICK HERE INSTANT QU**

## Yahoo! Travel

<u>Home</u>    <u>Travel Guides</u>    <u>**Flights**</u>   <u>Hotels</u>   <u>Cars</u>   <u>Vacation Packages</u>   <u>Cruises</u>   <u>Deals</u>   M

**Select an Airline**                                     <u>Help with this section</u>

**Modify Your Search**
Show me the lowest
Economy-class
fares for
travel during the
period:
**Starting:**
[Today ▾]
**Through:**
[Sep ▾]

[Search Now]

 **★ CRUISING ★**

*close to* HOME
<u>Cruise from a City Near You!</u>

Tokyo, Japan (TYO) to Seattle/Tacoma, WA (SEA)

**Lowest Economy/Coach Fares valid for travel through September 2003**
Any applicable discounts will be added after you choose your flights.

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  530.00**

[Select]   **Northwest Airlines**          Advance Purchase: See Rules
offers non-stop service and      Earliest Return:03 days   <u>Rules</u>
connecting service               Latest Return:14 days

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  530.00**

[Select]   **United Airlines**            Advance Purchase: See Rules
offers non-stop service and      Earliest Return:03 days   <u>Rules</u>
connecting service               Latest Return:14 days

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  530.00**

[Select]   **American Airlines**          Advance Purchase: See Rules
offers connecting service        Earliest Return:03 days   <u>Rules</u>
                                 Latest Return:14 days

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  530.00**

[Select]   **Delta Air Lines**           Advance Purchase: See Rules
offers connecting service        Earliest Return:03 days   <u>Rules</u>
                                 Latest Return:14 days

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  580.00**

[Select]   **All Nippon Airways**         Advance Purchase: See Rules
offers non-stop service and         Latest Travel:30Sep03
connecting service               Earliest Return:03 days   <u>Rules</u>
                                 Latest Return:1 months

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  584.00**

[Select]   **Air Canada**                Advance Purchase: See Rules
offers connecting service           Latest Travel:30Sep03
                                 Earliest Return:03 days   <u>Rules</u>
                                 Latest Return:1 months

**Round-Trip not including** <u>applicable taxes and fees</u>*                **Price: USD  598.00**

 

**Northwest Airlines**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:14 days

**Round-Trip not including applicable taxes and fees\***          Price: USD 598.00

 

**United Airlines**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:14 days

**Round-Trip not including applicable taxes and fees\***          Price: USD 598.00

 

**American Airlines**
offers connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:14 days

**Round-Trip not including applicable taxes and fees\***          Price: USD 598.00

 

**Delta Air Lines**
offers connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:14 days

**Round-Trip not including applicable taxes and fees\***          Price: USD 615.00

 

**Northwest Airlines**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:2 months

**Round-Trip not including applicable taxes and fees\***          Price: USD 665.00

 

**All Nippon Airways**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:3 months



**All Nippon Airways**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:1 months



**All Nippon Airways**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:1 months

**Round-Trip not including applicable taxes and fees\***          Price: USD 669.00

 

**Air Canada**
offers connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:1 months

 

**Air Canada**
offers connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:1 months

**Round-Trip not including applicable taxes and fees\***          Price: USD 675.00

 

**Continental Airlines**
offers non-stop service and
connecting service

Advance Purchase: See Rules
Latest Travel:30Sep03
Earliest Return:03 days    Rules
Latest Return:2 months

    

●                                   ●

**\*Taxes, Charges and Government Fees.**Where noted on the site with an asterisk (\*) or plus sign (+), prices shown for air-only transactions and travel packages that include air are for one adult and are subject to additional charges, including but not limited to: (i) Airport Passenger Facility Charges that range from $2-$18, depending on itinerary; (ii) Federal Segment Fees of $3.00 USD per segment (defined as a takeoff and a landing); (iii) the September 11th Security Fee of $2.50 USD per flight segment (maximum charge per trip of $5.00 USD one-way, $10.00 USD round-trip; (iv) a Travel Facilities Tax of up to $13.20 USD per round-trip for domestic flights beginning or ending in Alaska or Hawaii; and (v) for international itineraries, foreign and U.S. government-imposed charges of up to $200.00 USD per round trip, depending on routing and destination.

**Total price per person for any transaction with Travelocity, including all charges payable to Travelocity, will always be displayed to you prior to final purchase.** Air fares may be subject to additional restrictions, may not be available on all flights, and may change without notice. Specific fare rules are provided prior to your purchase decision.

---

Copyright© 2003 Yahoo! Inc. All rights reserved. Terms of Service - Ad Feedback

Travelocity.com, one of Yahoo!'s travel service providers, collects information on this site in order to fulfill your request for travel services, consistent with the Yahoo! Privacy Policy. To learn about how Yahoo! uses your information please read our Privacy Policy.

© 2003 Travelocity.com LP. Travelocity®, Travelocity.com and the Travelocity skyline logo are trademarks and/or service marks of Travelocity.com LP.

.

 Travel Home - Yahoo! - Help    Travel

 Maps    Yellow Pages    City Guides

 Thousands of businesses have their site listed on Yahoo! **SUBMIT YOUR SITE FOR CONSIDERATION** YAHOO! Express

## Yahoo! Travel

**Home**   **Travel Guides**   **Flights**   **Hotels**   **Cars**   **Vacation Packages**   **Cruises**   **Deals**   M

**Select an Airline**            Help with this section

**Modify Your Search**

Show me the lowest Economy-class fares for travel during the period:

**Starting:**
 Today

**Through:**
Sep

 Search Now

★ CRUISING ★
close to HOME
Cruise from a City Near You!

Taipei, Taiwan (TPE) to San Diego, CA (SAN)

**Lowest Economy/Coach Fares valid for travel through September 2003**
Any applicable discounts will be added after you choose your flights.

**Round-Trip not including applicable taxes and fees\***     **Price: USD 512.00**

 **Select**  **United Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***     **Price: USD 541.00**

 **Select**  **United Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***     **Price: USD 648.00**

 **Select**  **United Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***     **Price: USD 688.00**

 **Select**  **Continental Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:6 months

**Round-Trip not including applicable taxes and fees\***     **Price: USD 688.00**

 **Select**  **Northwest Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:6 months

**Round-Trip not including applicable taxes and fees\***     **Price: USD 727.00**

 **Select**  **Continental Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***     **Price: USD 727.00**

 **Select**  **Northwest Airlines** offers connecting service     Advance Purchase: See Rules   Rules   Latest Return:12 months



**Round-Trip not including applicable taxes and fees\***                     Price: USD 808.00

  **Continental Airlines**        Advance Purchase: See Rules    Rules
offers connecting service                                Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***                     Price: USD 808.00

  **Northwest Airlines**        Advance Purchase: See Rules    Rules
offers connecting service                                Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***                     Price: USD 866.00

  **Northwest Airlines**        Advance Purchase: See Rules    Rules
offers connecting service                                Latest Return:12 months

**Round-Trip not including applicable taxes and fees\***                     Price: USD 894.00

  **Continental Airlines**        Advance Purchase: See Rules    Rules
offers connecting service                                Latest Return:6 months

**Round-Trip not including applicable taxes and fees\***                     Price: USD 894.00

  **Northwest Airlines**        Advance Purchase: See Rules    Rules
offers connecting service                                Latest Return:6 months

  

**\*Taxes, Charges and Government Fees.**Where noted on the site with an asterisk (\*) or plus sign (+), prices
shown for air-only transactions and travel packages that include air are for one adult and are subject to
additional charges, including but not limited to: (i) Airport Passenger Facility Charges that range from $2-$18,
depending on itinerary; (ii) Federal Segment Fees of $3.00 USD per segment (defined as a takeoff and a
landing); (iii) the September 11th Security Fee of $2.50 USD per flight segment (maximum charge per trip of
$5.00 USD one-way, $10.00 USD round-trip; (iv) a Travel Facilities Tax of up to $13.20 USD per round-trip for
domestic flights beginning or ending in Alaska or Hawaii; and (v) for international itineraries, foreign and U.S.
government-imposed charges of up to $200.00 USD per round trip, depending on routing and destination.

**Total price per person for any transaction with Travelocity, including all charges payable to
Travelocity, will always be displayed to you prior to final purchase.** Air fares may be subject to additional
restrictions, may not be available on all flights, and may change without notice. Specific fare rules are
provided prior to your purchase decision.

Copyright© 2003 Yahoo! Inc. All rights reserved. Terms of Service - Ad Feedback

Travelocity.com, one of Yahoo's travel service providers, collects information on this site in order to fulfill your request for travel services, consistent
with the Yahoo! Privacy Policy. To learn about how Yahoo! uses your information please read our Privacy Policy.

© 2003 Travelocity.com LP. Travelocity®, Travelocity.com and the Travelocity skyline logo are trademarks and/or service marks of Travelocity.com LP.

 

  

Maps   Yellow Pages   City Guides

 
MULTIPLE QUOTES WITH ONE CLICK
Free, quick and easy!
Choose your car now!
- Make -   Go
YAHOO! Autos

## Yahoo! Travel

**Home**   **Travel Guides**   **Flights**   **Hotels**   **Cars**   **Vacation Packages**   **Cruises**   **Deals**   **My**

### Select an Airline                                    Help with this section

---

**Modify Your Search**

Show me the lowest Economy-class fares for travel during the period:

**Starting:**
    Today

**Through:**
Sep

 Search Now

CRUISES from your area!

**Taipei, Sung Shan, Taiwan (TSA) to San Diego, CA (SAN)**

**Lowest Economy/Coach Fares valid for travel through September 2003**
Any applicable discounts will be added after you choose your flights.

**Round-Trip not including applicable taxes and fees***          **Price: USD  512.00**

Select   **United Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***          **Price: USD  541.00**

Select   **United Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***          **Price: USD  648.00**

Select   **United Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***          **Price: USD  999.00**

Select   **China Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:1 months

**Round-Trip not including applicable taxes and fees***          **Price: USD  1029.00**

Select   **China Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:1 months

**Round-Trip not including applicable taxes and fees***          **Price: USD  1039.00**

Select   **United Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:12 months

**Round-Trip not including applicable taxes and fees***          **Price: USD  1086.00**

Select   **China Airlines**   Advance Purchase: See Rules   Rules
offers connecting service   Latest Return:6 months

 


**Round-Trip not including applicable taxes and fees***

**Price: USD 1089.00**

  

**Singapore Airlines**
offers connecting service

Advance Purchase: See Rules
Earliest Return:03 days    Rules
Latest Return:6 months

**\*Taxes, Charges and Government Fees.**Where noted on the site with an asterisk (\*) or plus sign (+), prices shown for air-only transactions and travel packages that include air are for one adult and are subject to additional charges, including but not limited to: (i) Airport Passenger Facility Charges that range from $2-$18, depending on itinerary; (ii) Federal Segment Fees of $3.00 USD per segment (defined as a takeoff and a landing); (iii) the September 11th Security Fee of $2.50 USD per flight segment (maximum charge per trip of $5.00 USD one-way, $10.00 USD round-trip); (iv) a Travel Facilities Tax of up to $13.20 USD per round-trip for domestic flights beginning or ending in Alaska or Hawaii; and (v) for international itineraries, foreign and U.S. government-imposed charges of up to $200.00 USD per round trip, depending on routing and destination.

**Total price per person for any transaction with Travelocity, including all charges payable to Travelocity, will always be displayed to you prior to final purchase.** Air fares may be subject to additional restrictions, may not be available on all flights, and may change without notice. Specific fare rules are provided prior to your purchase decision.

Copyright© 2003 Yahoo! Inc. All rights reserved. Terms of Service - Ad Feedback

Travelocity.com, one of Yahoo!'s travel service providers, collects information on this site in order to fulfill your request for travel services, consistent with the Yahoo! Privacy Policy. To learn about how Yahoo! uses your information please read our Privacy Policy.

© 2003 Travelocity.com LP. Travelocity®, Travelocity.com and the Travelocity skyline logo are trademarks and/or service marks of Travelocity.com LP.

_____FILED _____ENTERED
_____LODGED_____RECEIVED

JUN 02 2003   PM

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

CV 03-00295 #00000022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MINEBEA CO., LTD. ) | CIVIL ACTION NO. CV 03 0295R |
| Plaintiff, ) | |
| vs. ) | **MINEBEA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO TRANSFER** |
| CHICONY ELECTRONICS CO., LTD. and ) CHICONY AMERICA, INC. ) | |
| Defendants. ) | **ORAL ARGUMENT REQUESTED** |

Plaintiff Minebea Co. Ltd. ("Minebea") submits this memorandum in opposition to

Defendants Chicony Electronics Co., Ltd. ("Chicony Electronics") and Chicony America, Inc.'s

("Chicony America") (collectively "Chicony") Joint Motion to Transfer.[1]

## I.    INTRODUCTION

In this action, Minebea accuses Chicony of intentionally infringing United States Patent

No. 4,443,225 ("the '225 patent"). Relying on the notions advanced in its Memorandum in

Support ("Supp. Mem."), Chicony would have this Court believe that this action should be

transferred to the U.S. District Court for the Southern District of California to be consolidated

with an action that is pending there. This action no more belongs in San Diego than a fox

---

[1]    Chicony has also filed a Motion to Dismiss; however, pursuant to the Order of the Court dated May 16, 2003, Chicony's Motion to Dismiss

ORIGINAL   DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

belongs in a hen house. The suggestions advanced by Chicony fall far short of satisfying the burdens that it, as movant, must overcome. Not only do Chicony's notions fall short, they also ignore critical considerations that actually disfavor transfer and strongly support denial of Chicony's motion.

For example, Chicony contends that transfer to the U.S. District Court for the Southern District of California is warranted because the present action could be consolidated with a separate action, pending in that district, in which Minebea has asserted the '225 patent.[2] However, the Think Outside Action has progressed much too far to be consolidated with this newly-filed case. Moreover, the present case is more complicated than the Think Outside Action and the cases share few common factual issues. Accordingly, it would be impracticable to join the present case with the case pending in the Southern District of California.

The Western District of Washington is a proper forum for adjudicating Minebea's claims. "Before the court is warranted in depriving the plaintiff of the right to proceed in a proper forum it must appear that continuance of the action in that forum would be oppressive, harassing and vexatious to the defendant." *Crawford Transport Co. v. Chrysler Corp.*, 191 F.Supp. 223, 228(D.C.Ky. 1961). A defendant's motion to transfer may be granted only where the defendant "make[s] a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Asymetrix Corp. v. Lex Computer and Management Corp.*, No. C94-588Z, 1995 U.S. Dist. LEXIS 20388, at *11 (W.D. Wash. Jan. 25, 1995). Here, Chicony has made neither a showing that the continuance of this action would be oppressive, harassing or vexatious to it nor a "strong showing of inconvenience to warrant upsetting [Minebea's] choice of forum." Not only have Defendants failed to identify any substantial convenience factors that support transferring the

---

[2] has been deferred and Minebea addresses herein only Chicony's Motion to Transfer.

That case, captioned *Minebea Co. Ltd. v. Think Outside, Inc. and Peripheral Technology, Inc.*, No. 01 cv 0771 (BTM) (POR) (S.D. Cal.) (the "Think Outside Action"), does not involve Chicony. In fact, because Chicony's counsel also represents defendants in the Think Outside

MINEBEA'S MEMO OF LAW IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO TRANSFER     -2-
CV 03 0295R

**DORSEY & WHITNEY LLP**
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

case to the Southern District of California, they have ignored several critical convenience factors that support retaining this case in the Western District of Washington. For example, a material non-party witness, who has indicated his unwillingness to be a witness at trial, is subject to subpoena power only in the Western District of Washington. Additionally, a judicial emergency has been declared in the Southern District of California and transferring a complex case to that district would add to judicial congestion and be contrary to the interest of justice.

## II.    BACKGROUND

Minebea brought this action against Chicony on February 11, 2003. On April 4, 2003, in lieu of answering Minebea's complaint, Defendants moved to transfer the action to the Southern District of California for the alleged convenience of the parties and the witnesses or to dismiss the action for alleged lack of personal jurisdiction or want of proper venue.

On April 18, 2003, the parties conferred as required by Rule 26(f) of the Federal Rules of Civil Procedure. During the conference, Defendants agreed to provide Minebea with expedited discovery pertaining to the issues of personal jurisdiction and venue. On May 14, 2003, after it became clear that Defendants would not be able to provide the necessary discovery in time for Minebea to prepare its opposition to Defendants motion, the parties contacted the Court. Judge Rothstein ordered that the hearing for the motion to transfer be noted for consideration on June 6, 2003 and that the hearing for defendants motion to dismiss be noted for consideration on July 11, 2003.

The patent at issue in this case, the '225 Patent, which is entitled "Keytop Levelling [sic] Mechanism," is directed to a durable and economical keytop leveling mechanism for assisting the keys of an electronic keyboard to move evenly through their travel when they are depressed and then return to their original position. The keytop leveling mechanism claimed in the '225

Action, it is likely that Chicony has brought this motion – not for the convenience of any party or witness but, rather – for the convenience

**DORSEY & WHITNEY LLP**
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

Patent was invented by Dean Cowles, a citizen of Washington State who resides in Snohomish, Washington. It is anticipated that Mr. Cowles will be providing critical testimony regarding his invention, which is especially useful in compact electronic keyboards such as those used in notebook or laptop computers.

Chicony is one of the largest keyboard manufacturers in the world and it manufactures a large variety of keyboard models, including notebook computer keyboards and PDA keyboards, that utilize keytop leveling mechanisms of the type invented by Mr. Cowles. Chicony's keyboards, including keyboards contained in other products such as laptop computers, are sold by retailers to consumers throughout the United States. In particular, Chicony's keyboards are sold to consumers in the Western District of Washington. Additionally, Chicony has relationships with numerous U.S. companies, including an extensive relationship with Microsoft Corporation, which is located in Redmond, Washington. Further, Chicony has websites that advertise infringing products and that are accessed by residents of Washington State.

Chicony has willfully infringed the '225 Patent by importing keyboards that use Mr. Cowles' invention into the United States, by selling such keyboards in the United States, and by inducing others to either import such keyboards into the United states or to sell such keyboards in the United States. In particular, Chicony Electronics and its subsidiary Chicony America have actively induced others to infringe the '225 patent in the Western District of Washington.

## III. BECAUSE CHICONY HAS FAILED TO SATISFY ITS BURDEN TO WARRANT UPSETTING MINEBEA'S CHOICE OF FORUM, CHICONY'S MOTION SHOULD BE DENIED

28 U.S.C. § 1404(a) provides "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." However, "the plaintiff's choice of forum is entitled to great

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX. (206) 903-8820

deference" and "the moving party must show that the balance of convenience and justice weighs heavily in favor of the transfer." *State Street Capital Corp. v. Dente*, 855 F.Supp. 192, 197 (S.D.Tex. 1994); *accord Asymetrix Corp.*, 1995 U.S. Dist. LEXIS 20388, at 11 (W.D.Wash 1995) ("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum").[3]

The Ninth Circuit has identified several private interest factors and public interest factors that should be considered in determining whether the defendant has met its heavy burden.

> The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum. As part of this inquiry, the court should consider private and public interest factors affecting the convenience of the forum. Private factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Public factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty."

*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

Defendants motion to transfer is supported only by general allegations rather than by specific facts sufficient to demonstrate that the public and private interest factors favor transfer to the Southern District of California.[4] The facts used by a defendant to establish that the private and public interest factors favor transfer must be identified with specificity. *See Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979) ("Savage had the burden to justify by particular circumstances that the transferor forum was inappropriate").

---

[3] Defendants contend that Minebea's choice of forum should be afforded no deference. However, the 9th Circuit has expressly rejected Defendants' contention. *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000)("less deference is not the same thing as no deference. We hold that it was an abuse of discretion for the district court to deny plaintiffs their choice of federal district court in San Francisco as their forum").

[4] Defendants have identified four specific Chicony employee witnesses who it alleges would be inconvenienced by a trial in the Western District of Washington. However, the convenience of party witnesses is afforded little or no significance in a transfer enquiry under 28 U.S.C.

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

*Richards v. Upjohn Co.*, 406 F.Supp. 405, 406 -407(D.C.Mich. 1976) ("Defendant has pointed to no specific hardship, but simply to the fact that its home office, records, and potential witnesses are in Kalamazoo. It does not claim that a large and unwieldy volume of records or equipment will have to be transported, or, indeed, that anything of great substance will have to be moved").

As between the Western District of Washington and the Southern District of California, the public and private interest factors either favor the Western District of Washington or they are neutral.

| Interest Factors | The District Favored by the Interest Factor |
| --- | --- |
| The plaintiff's choice of forum | Western District of Washington |
|  |  |
| Private Factors |  |
| The relative ease of access to sources of proof | Neutral |
| The availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses | Western District of Washington |
| The possibility of view of premises, if view would be appropriate to the action | Neutral |
| All other practical problems that make trial of a case easy, expeditious and inexpensive | Western District of Washington |
|  |  |
| Public Factors |  |
| The administrative difficulties flowing from court congestion | Western District of Washington |
| The local interest in having localized controversies decided at home | Neutral |
| The avoidance of unnecessary problems in conflict of laws, or in the application of foreign law | N/A |
| The unfairness of burdening citizens in an unrelated forum with jury duty | Neutral |

Accordingly, the overall balancing of the factors indicates that the Western District of Washington is the more convenient forum for trying the case. Defendants have failed to meet

§ 1404(a). *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879(3rd Cir. 1995).

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1  their burden of showing that the balance of convenience and justice weighs heavily in favor of

2  the transfer.

### A. The Inventor of the '225 Patent Resides in the Western District of Washington

5  The convenience of the non-party witnesses is recognized as the most important factor in

6  ruling on a motion to transfer under 28 U.S.C. § 1404(a). *Gundle Lining Construction corp. v.*

7  *Fireman's Fund Insurance Co.*, 844 F.Supp. 1163, 1166 (S.D.Tex. 1994); *see also, Aquatic*

8  *Amusement Associates, Ltd. v. Walt Disney World Co.*, 734 F.Supp. 54, 57(N.D.N.Y. 1990)("the

9  convenience of non-party witnesses is the more important factor"). The lone non-party witness

10  who is likely to testify at trial is Dean Cowles, the inventor of the '225 Patent, which is the patent

11  at issue in this case.[5] Mr. Cowles is a material witness whose testimony is relevant to

12  infringement, validity, and enforceability issues pertaining to the '225 Patent.[6] Mr. Cowles is not

13  and has never been an employee of Minebea and is not in any sense under Minebea's control.[7]

14  
15  Indeed, Mr. Cowles deposition testimony in the Southern District of California case was

16  obtainable only by subpoena issued by this Court and has been cited in memoranda filed both by

17  Minebea and by the defendants in the Southern District of California case that involves the '225

18  Patent.[8] Mr. Cowles is a resident of Snohomish Washington. He is beyond the subpoena power

19  of the Southern District of California and his appearance at trial can only be assured if trial is

---

[5] Defendants argue based on *Asymetrix Corp.*, 1995 U.S. Dist. LEXIS 20388 (W.D.Wash 1995) that the location of the inventor is not as important as the location of other evidence. However, in *Asymetrix*, there is no indication that the inventors were not employees of the plaintiff, which is usually the case in patent infringement actions. Accordingly, the inventors in *Asymetrix* were likely party witnesses and like all party witnesses their convenience or availability was not an important factor.

[6] *See, e.g., Neupak, Inc. v. Ideal Mfg. and Sales Corp.*, 41 Fed.Appx. 435, 440, 2002 WL 1363568, at 4 (Fed. Cir. 2002) ("The inventors' testimony was relevant to whether the inventions would have been obvious to a person of ordinary skill in the art"); *Slip Track Systems, Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1263 (.Fed. Cir. 2002)(using inventor testimony to establish the priority of the invention); *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*, 1997 U.S. App. Lexis 36111, at 7 (Fed. Cir. 1997) ("When interpreting a claim,. . . [i]f an ambiguity remains after considering extrinsic evidence, then the court may refer to extrinsic evidence, such as expert and inventor testimony"); *Texas Instruments, Inc. v. U.S. Intern. Trade Com'n*, 805 F.2d 1558, 1571 (Fed. Cir. 1986) (relying on inventor testimony to determine whether an accused product infringes a patent claim under the doctrine of equivalence); *Pentec, Inc. v. Graphic Controls Corp.* 776 F.2d 309, 315(Fed. Cir. 1985) (relying on inventor testimony to determine whether an accused product literally infringes a patent claim).

[7] *See* The Deposition of Dean Cowles, at 132-133 (Sicklinger Declaration, Exhibit F).

[8] Unlike the defendants in the present case, one of the defendants in the case pending in the Southern District of California may not have been

MINEBEA'S MEMO OF LAW IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO TRANSFER          -7-
CV 03 0295R

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

held here in THE Western District of Washington.[9] Minebea would be substantially prejudiced in this case if it could not proceed with the live trial testimony of the inventor of the patent in suit.

Unlike Mr. Cowles, all of the witnesses that have been identified by Defendants as residing in California are under the control of the parties to this action. The convenience of party witnesses is given little or no weight in a transfer analysis under 28 U.S.C. § 1404(a). *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879(3rd Cir. 1995)(" The private interests [considered by courts] have included : .. the convenience of the witnesses--but only to the extent that the witnesses may actually be unavailable for trial in one of the fora"); *Designs By Glory, Ltd. v. Manhattan Creative Jewelers, Inc.*, 657 F.Supp. 1257, 1260 (S.D.N.Y. 1987)("Designs has not listed a single non-party witness it expects to call, let alone a witness who would be inconvenienced by traveling to Texas"); *Country Maid, Inc. v. Haseotes*, 312 F.Supp. 1116, 1119(D.C.Pa. 1970) ("The defendants' prospective witnesses, on the other hand, while not residing within one hundred miles of this courthouse, are nevertheless subject to the control of the defendants and can be brought here without compulsory process"); *Cullinan v. New York Cent R Co*, 83 F.Supp. 870, 871(D.C.N.Y. 1948) ("All the witnesses, except the doctors, are employees of defendant, and so presumably there will be no difficulty in securing their appearance here").

On the other hand, the fact that a material non-party witness is outside the subpoena power of one of the fora and that he may be unavailable to testify at trial is a heavily weighted consideration. *Designs By Glory, Ltd. v. Manhattan Creative Jewelers, Inc.*, 657 F.Supp. 1257, 1260 (S.D.N.Y. 1987)("There is no good reason to require five witnesses (who will most likely

---

subject to personal jurisdiction in the Western District of Washington. Accordingly, Minebea was forced to bring that action in the Southern District of California despite the potential unavailability of Mr. Cowles as a trial witness.

[9] *See* The Deposition of Dean Cowles, at 22 (Sicklinger Declaration, Exhibit F).

**DORSEY & WHITNEY LLP**
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

testify for Manhattan in the first-filed action in Texas) to travel to New York, or to require Manhattan to prove much of its case via deposition testimony should the witnesses be unwilling to travel to New York, when a more desirable and convenient forum for this litigation exists in the Southern District of Texas").  Not only is Mr. Cowles outside of the subpoena power of the Southern District of California, but, as recognized by Defendants, Mr. Cowles has indicated his unwillingness to be a witness at trial.[10]  Minebea and the jury should not be deprived of the ability to present Mr. Cowles' testimony in the courtroom.  As the inventor of the keytop leveling mechanism claimed in the '225 patent and as an expert in the field of the invention who is not affiliated with any of the parties, Mr. Cowles is capable of providing testimony that is unique in both its scope and its credibility.  In the interests of justice, the parties should be afforded the opportunity to present such testimony and the jury should be afforded the opportunity to hear such testimony.

## B.    A Judicial Emergency Has Been Declared In The Southern District Of California

Judicial congestion is an important consideration both as a public interest factor and as a private interest factor when deciding a motion to transfer under 28 U.S.C. § 1404(a).  *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508(1947) ("Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin"); and *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)("Public factors include the administrative difficulties flowing from court congestion");  See also, *First Nat. Bank of Boston v. Fidelity & Deposit Co. of MD*, 107 F.Supp. 894, 895(D.C.Mass. 1952)("A further fact to be considered is that the congested state of the docket in the district to which transfer is sought would impose serious delay upon the plaintiff").  The District Court for the

---

[10] *See Defendants' Joint Motion to Transfer or Dismiss; Memorandum of Law in Support, at 7.*

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX (206) 903-8820

Southern District of California is one of the most congested courts in the country.[11] It ranks ahead of the Western District of Washington in virtually every measure of judicial congestion, including filings per judge and pending cases per judge.[12] Indeed, a judicial emergency has been declared in the Southern District of California.[13] Accordingly, transferring this case to the Southern District of California would be contrary to the interest of justice, since it would add to the burdens of an already overburdened judicial district.

## C. · It Is Not a Substantial Burden on the Parties to Bring Their Witnesses and Evidence to the Western District of Washington

The private interest factors include the relative ease of access to sources of proof, the cost of obtaining the attendance of willing witnesses, and the possibility of viewing of premises. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). However, no premises, witnesses, or evidence are located in the Southern District of California. Additionally, although some documents and keyboards are located in Central District of California, these sources of proof are not the type of evidence that is difficult to transport to Seattle especially for a multi-billion dollar company such as Chicony. *See Schindelheim v. Braniff Airways, Inc.*, 202 F.Supp. 313, 316 (D.C.N.Y. 1962) ("There is no reason why there should be any difficulty in producing in New York such limited relevant records as may be located in Texas"). Indeed, all such evidence is likely to be produced to Minebea's attorneys in New York. Likewise, the transportation of at most four party witnesses from Los Angeles to Seattle should pose little burden to Chicony. Finally, many of the potential witnesses and much of the potential evidence

---

[11] *See* the transcript of the September 5, 2001 Status Conference before Judge Moskowitz in the Southern District of California (Sicklinger Declaration, Exhibit G) ("we are the busiest district in the country").

[12] *See* The U.S. District Court – Judicial Caseload Profile (Sicklinger Declaration, Exhibit A).

[13] *See* Southern District of California General Order 486 (Sicklinger Declaration, Exhibit B).

**DORSEY & WHITNEY LLP**
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

are located in either Taiwan or Japan and it poses less of a burden to transport such witnesses and evidence to Seattle than to San Diego.[14]

### D.    The Western District of Washington Has an Interest in This Litigation

The Public interest factors include the local interest in having localized controversies decided at home, and the unfairness of burdening citizens in an unrelated forum with jury duty. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). However, Chicony's infringement is not a localized controversy, since it occurs in each of the 50 states and in the territories of the United States. Additionally, the Western District of Washington is not a forum unrelated to Chicony's infringement. Infringing products that are manufactured by Chicony are imported into and sold in the Western District of Washington. Washington has an interest in preventing the importation of infringing goods into its territory. Further, Chicony's activities with respect to such products constitute the tort of inducement to infringe a patent and this tort is considered to occur in Washington State. *See Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1141 (7th Cir. 1975)(holding that the acts of foreign defendant occurring wholly in Europe could constitute the tort of inducement to infringe a U.S. patent in Illinois). Accordingly, Washington has an interest in this controversy and it would be fair to have it decided by a jury in Washington.

### IV.    IT WOULD BE IMPRACTICAL TO JOIN THIS ACTION WITH THE EXISTING ACTION IN THE SOUTHERN DISTRICT OF CALIFORNIA

Defendants suggest that this case can be joined with a pending litigation in the Southern District of California that involves the '225 Patent ("the California Litigation"). However, the California Litigation is much too far along to join additional parties or to consolidate the present

---

[14] Direct flights are available from Taiwan and Japan to Seattle, whereas no direct flights are available from either Taiwan or Japan to San Diego. *See* the travel reservation print outs attached as Exhibit H to the Sicklinger Declaration.

MINEBEA'S MEMO OF LAW IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO TRANSFER        -11-
CV 03 0295R

Dorsey & Whitney LLP
1420 Fifth Avenue, Suite 3400
Seattle, Washington 98101
Phone: (206) 903-8800
Fax: (206) 903-8820

action with the California Litigation. *See Mills v. Beech Aircraft Corp, Inc.*, 886 F.2d 758, 762(5th Cir. 1989) ("Consolidation may properly be denied in instances where the cases are at different stages of preparedness for trial"). According to the applicable scheduling order, the last day to join additional parties in the California Litigation was December 9, 2002.[15] Additionally, discovery has already closed in the California Litigation[16] and Judge Moskowitz has indicated that the trial will likely begin in the fall of 2003. Consolidating the present action with the California Litigation at this late stage would needlessly delay the California litigation and it would adversely affect judicial economy. *See Transeastern Shipping Corp. v. India Supply Mission*, 53 F.R.D. 204, 206 (S.D.N.Y. 1971). ("If the court were to order consolidation now, the cases which were ready for or close to trial would have to be held up pending completion of pretrial in the other cases").

Defendants allege that "some of the same devices" which are at issue in the California Litigation are also at issue in this litigation. However, only one product, the Stowaway XT Ultra-Thin keyboard ("the Ultra-Thin"), that is at issue in this litigation is also at issue in the California Litigation. Additionally, the sales of this one product constitute less than 2% of the total sales of accused products in the California Litigation.[17] With the exception of the Ultra-Thin, the remaining products in the California Litigation utilize a keyswitch leveling mechanism manufactured by Peripheral Technology, Inc.

On the other hand, Chicony manufactures dozens of products that are at issue in this litigation, including mobile keyboards and keyboards incorporated in laptop computers sold by IBM.[18] These products incorporate a variety of infringing keytop leveling mechanisms that are

---

[15] Scheduling Order Regulating Discovery and Other Pretrial Proceedings (Sicklinger Declaration, Exhibit C, at 2).

[16] Scheduling Order Regulating Discovery and Other Pretrial Proceedings (Sicklinger Declaration, Exhibit C, at 2).

[17] Defendants Joint Motion for Summary Judgment.

[18] See printouts from Chicony's website (Sicklinger Declaration, Exhibit D).

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

distinct from the keytop leveling mechanism used in the Ultra-Thin.[19] Each such keytop leveling mechanism will require a distinct set of evidence to establish its infringement. For example, the Chicony manufactured Stowaway XT Ultra-Thin and the Chicony manufactured IBM ThinkPad laptop keyboard contain keyswitch mechanisms that differ from each other in the manner in which the keyswitches are mounted to the circuit boards. Accordingly, establishing the presence of the '225 Patent's claim element "a keyswitch mounted on a circuit board" will require distinct evidence and testimony and is a distinct question of fact for each keyboard.

These additional accused keytop leveling mechanisms will likely bring new claim elements into consideration, which will require further construction of the '225 Patent's claims. Since each of these distinct keytop leveling mechanisms will have distinct issues of law and fact associated with it, there are very few common issues of law and fact between the current litigation and the California Litigation. Accordingly, the present litigation is larger and more complex than the California litigation and it would be impractical to graft this present litigation onto the California Litigation. *See Southwest Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F.Supp. 805, 807(N.D.Cal. 1989) (Denying consolidation on the basis that the "facts necessary to prove the claims in the respective actions are not in common").

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion to transfer should be denied.

---

[19] *See* Chicony's patents directed to keyswitches(Sicklinger Declaration, Exhibit E);

MINEBEA'S MEMO OF LAW IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO TRANSFER      -13-
CV 03 0295R

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

DORSEY & WHITNEY LLP

_[signature]_

Peter Ehrlichman, WSBA #6591
1420 Fifth Avenue, Suite 3400
Seattle, Washington 98101
Telephone: (206) 903-8800
Fax: (206) 903-8820

SCHULTE ROTH & ZABEL LLP
Joel E. Lutzker
David H. Kagan
Benjamin Levi
Todd Sicklinger
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000

Attorneys for Plaintiff Minebea Co. Ltd.

MINEBEA'S MEMO OF LAW IN OPPOSITION
TO DEFENDANTS' JOINT MOTION TO TRANSFER          -14-
CV 03 0295R

DORSEY & WHITNEY LLP
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD., | No.    CV 03 0295 R |
| Plaintiff, | **SPECIALLY APPEARING DEFENDANTS' CERTIFICATE OF INTERESTED PARTIES** |
| v. | [Fed. R. Civ. P. 7.1] |
| CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC., | |
| Defendants. | |

CV 03-00295  #00000021

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Specially Appearing Defendants CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC. provide the following Certificate of Interested Entities. In submitting this disclosure, Defendants do not waive their pending motion to dismiss for want of personal jurisdiction, nor prejudice their right to assert any defense that they could have raised in the absence of this filing.

1.    Identity of Defendants' parent corporations: Chicony Overseas, Inc. is the parent corporation of Defendant Chicony America, Inc. Defendant Chicony Electronics Co., Ltd. is the parent corporation of Chicony Overseas, Inc. Defendant Chicony Electronics Co., Ltd. is publicly traded, and has no parent corporation.

2.    List of any publicly held company that owns 10% or more of Defendants' stock: Chicony Overseas, Inc. owns 100% of the stock of Defendant Chicony America, Inc. Defendant Chicony Electronics Co., Ltd. owns 100% of the stock of Chicony Overseas, Inc. Defendant Chicony Electronics Co., Ltd. is publicly traded, and no publicly held corporation owns 10% or more of its stock.

Dated: May 19, 2003

YARMUTH WILSDON CALFO PLLC

By: _____
Scott Wilsdon

Attorneys for Specially Appearing
Defendants CHICONY ELECTRONICS
CORP. and CHICONY AMERICA, INC.

Additional Counsel of Record:

Michael A. Jacobs (Pro Hac Vice)
Paul A. Friedman (Pro Hac Vice)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

S. J. Christine Yang (Pro Hac Vice)
LAW OFFICES OF S. J. CHRISTINE YANG
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, California 92708
Telephone: (714) 641-4022
Facsimile: (714) 641-2082

DEFENDANTS' CERTIFICATE OF INTERESTED
PARTIES (CV 03 0295 R)

Honorable Barbara J. Rothstein

*FILED*
*LODGED*
*ENTERED*
*RECEIVED*

MAY 1 8 2003

BY CLERK U.S. DISTRICT COURT AT SEATTLE
WESTERN DISTRICT OF WASHINGTON
DEPUTY

MR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

MINEBEA CO., LTD.,

    Plaintiff,

    v.

CHICONY ELECTRONICS CO., LTD. and
CHICONY AMERICA, INC.,

    Defendants.

No. CV 03 0295 R

CERTIFICATE OF SERVICE

## CERTIFICATE OF SERVICE

I certify that on this date, I caused true and correct copies of Specially Appearing

Defendants' Certificate of Interested Parties to be served as follows:

**COUNSEL FOR CHICONY**
S. J. Christine Yang
Attorneys at Law
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, CA 92708
Phone: (714) 641-4022
Fax:   (714) 641-2082
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

**COUNSEL FOR CHICONY**
Paul Friedman
Morrison & Foerster
425 Market Street
San Francisco CA 94105-2482
Phone: (415) 268-6220
Fax:   (415) 276-7377
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

CERTIFICATE OF SERVICE
NO. CV 03 0295 R – Page 1

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

| | |
|---|---|
| 1 | |
| 2 | Peter Ehrlichman |
| 3 | Dorsey & Whitney |
| 4 | 1420 Fifth Avenue, #3400 |

Peter Ehrlichman
Dorsey & Whitney
1420 Fifth Avenue, #3400
Seattle, WA 98101
Phone: (206) 903-8800
Fax:    (206) 903-8820
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

Joel Lutzker
Schulte Roth Zabel LLP
919 Third Ave.
New York, New York 10022
Phone: 212-756-2520
Fax:    (212) 593-5955
Email:

☐ Via Email
☐ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated this 19th day of May, 2003 at Seattle, Washington.

*Shelley Meyer*

Shelley Meyer
Legal Assistant

CERTIFICATE OF SERVICE
NO. CV 03 0295 R – Page 2

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

263.01 de194807 5/19/03

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

——FILED ——ENTERED
——LODGED ——RECEIVED

MAY 1 6 2003

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY
DEPUTY

PRESENT: THE HONORABLE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

DATE: May 16, 2003

| | |
|---|---|
| MINEBEA CO., LTD, | |
|      Plaintiff, | |
|     v. | NO. C03-0295R |
| CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC., | |
|      Defendants. | |

IN CHAMBERS PROCEEDINGS:

The court held a telephone conference with counsel for the parties, during which the court conferred with the parties about the scheduling of certain motions that are now pending in this case.

The court determined that defendants' motion to transfer should be noted for consideration on June 6, 2003, and plaintiff's opposition thereto shall be filed no later than June 2, 2003.

Plaintiff has represented that it needs additional time to conduct discovery regarding the jurisdictional issues raised in defendants' motion to dismiss. Defendants do not oppose such an extension. Accordingly, defendants' motion to dismiss shall be noted for July 11, 2003. Plaintiff's opposition brief shall be filed no later than July 7, 2003, and defendants' reply, if any, shall be filed by July 10, 2003.

MINUTE ENTR 

CV 03-00295 #00000020



United States District Court
for the
Western District of Washington
May 19, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:

        Peter Scott Ehrlichman, Esq.
        DORSEY & WHITNEY LLP
        STE 3400
        1420 5TH AVE
        SEATTLE, WA  98101
        FAX 903-8820

        Benjamin Levi, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Joel E Lutzker, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Lisa Knight, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Todd Sicklinger, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        David Kagan, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022

FAX 1-212-593-5955

Angelo J Calfo, Es
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Scott T Wilsdon, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

Christine Yang, Esq.
STE 101 & 102
17220 NEWHOPE ST
FOUNTAIN VALLEY, CA  92708
FAX 1-714-641-2082

HONORABLE HONORABLE BARBARA J. ROTHSTEIN

CC TO JUDGE DJ    ENTERED
     LODGED     RECEIVED

MAY   5   2003   DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                DEPUTY



CV 03-00295 #00000019

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

|  |  |
|---|---|
| MINEBEA CO. LTD.<br><br>            Plaintiff,<br><br>    vs.<br><br>CHICONY ELECTRONICS CO., LTD. AND<br>CHICONY AMERICA, INC.<br><br>       Defendants. | CIVIL ACTION NO. CV 03 0295R<br><br>**JOINT STATUS REPORT &<br>DISCOVERY PLAN** |

     Plaintiff Minebea Co. Ltd. Inc. ("Minebea") and Defendants Chicony Electronics Corporation and Chicony America, Inc. (jointly referred to as "Chicony") through their respective counsel of record, hereby submit the following Joint Status Report & Discovery Plan. Defendants do so without prejudice to their contention that they are not subject to personal jurisdiction in this District or to their pending motion to dismiss this case for lack of personal jurisdiction.

**ORIGINAL**

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## 1. **Statement of the Nature and Complexity of the Case**

This is an action for infringement of U.S. Patent No. 4,433,225 ("the '225 Patent"), entitled "Keytop Levelling Mechanism." This patent expired on February 21, 2003. Minebea contends that the '225 Patent is directed to a durable and economical keytop leveling mechanism for assisting the keys of a computer keyboard to move evenly through their travel when they are depressed and then return to their original position. Minebea believes that the patented keytop leveling mechanism is especially useful in compact keyboards such as those used in notebook computers and Palm type PDAs. Minebea alleges that Chicony, one of the largest keyboard manufacturers in the world, manufactured and sold keyboards that utilize keytop leveling mechanisms of the type claimed in the '225 Patent. Minebea alleges that Chicony willfully infringed the '225 Patent by importing such keyboards into the United States, by selling such keyboards in the United States, and by inducing others to either import its keyboards into the United States or to sell its keyboards in the United States. Minebea seeks treble damages, interest, costs and attorney's fees.

Chicony has not answered Minebea's complaint, but has filed a motion to transfer or dismiss the case. Chicony believes that the '225 patent is invalid and that none of the products that it sells, designs, or manufactures infringed any of the patent's claims. Using the claim construction rulings rendered last year in the Southern District of California as a guide, Chicony believes there are no fewer than three separate reasons why its products do not infringe this patent. Moreover, Chicony believes that the vast majority of the products that Minebea seeks to put at issue in this litigation are not subject to the '225 patent because they are manufactured and sold entirely outside of the United States.

Chicony has moved to dismiss this case for lack of personal jurisdiction or to transfer this case to the United States District Court for the Southern District of California, where there is already pending litigation raising many of the same matters as are at issue in this case.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## 2. Statement of Which ADR Method Will Be Used

The parties agree that alternative dispute resolution ("ADR") is not practical at this time. However, as explained in Paragraph 3 below, the parties agree that ADR may be of value at a later stage in this case. The parties will revisit this issue at the appropriate time.

## 3. Statement of When ADR Should Take Place

The parties agree that ADR should be considered only after discovery progresses and certain legal and factual issues are resolved. One such issue is whether Chicony's sale of keyboard components in Taiwan with the knowledge that some of them may ultimately be resold as components in laptop computers in the United States is inducement to infringe a United States patent under 35 U.S.C. § 271(b). Minebea contends that Chicony Electronics' activities in Taiwan constitute inducement to infringe a patent and believes that its position finds support in Honeywell, Inc. v. Metz Apparatewerke, 509 F.2d 1137, 1141 (7th Cir. 1975) (holding that acts of foreign defendant occurring wholly in Europe could constitute inducement to infringe a U.S. patent). Chicony contends that its activities in Taiwan do not constitute inducement to infringe a patent. This issue may be susceptible of early resolution on summary judgment.

## 4. Proposed Deadline for Joining Additional Parties

The parties agree that deadline for joining additional parties should be July 22, 2003.

## 5. Proposed Discovery Plan

### A. The FRCP 26(f) Conference and the FRCP 26(a) Initial Disclosures

The FRCP 26(f) Conference occurred on April 18, 2003. Initial disclosures under Rule 26(a) will be due on May 19, 2003.

### B. The Scope of Discovery

The parties agree that discovery should go forward on all issues simultaneously.

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

C.     Changes to Discovery Limitations

The parties agree that a stipulated protective order should be entered in this case.

Minebea's Position

Minebea proposes altering the limit on depositions under Federal Rule of Civil Procedure 30(a)(2) such that each party is allowed a total of 20 deposition days with no specific time limit for any individual witness. Minebea's proposal provides needed flexibility, particularly with respect to depositions of witnesses from Taiwan or Japan which may require translators.

Chicony's Position

Chicony does presently believe circumstances warrant altering the discovery limitations imposed by the Federal Rules of Civil Procedure, but is prepared to work with Minebea to discuss specific changes if the need arises.

D.     Statement of How Discovery Will be Managed to Limit Expenses

Chicony proposes an agreement whereby all discovery obtained in the Minebea v. Think Outside, Inc. and Peripheral Technology, Inc. case, which is pending in the Southern District of California, can be used in this case. Chicony will contact Peripheral Technology and Think Outside to request their consent to the use of discovery that may contain their confidential or proprietary information. If Chicony obtains the consent of Think Outside and Peripheral Technology, Minebea is willing to accept Chicony's proposal.

E.     Orders Under FRCP 26(c) or Under Local Rules 16(b) and 16(c)

The parties agree that a stipulated protective order should be entered in this case under FRCP 26(c). The parties agree that no orders concerning ADR should be entered under Local Civil Rules 16(b) or 16(c).

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## 6. The Date When Discovery Can Be Completed

The parties agree that discovery can be completed in six months (i.e., by October 22, 2003), except that Chicony believes that discovery may require nine months or longer if discovery from the Minebea v. Think Outside, Inc. and Peripheral Technology, Inc. case cannot be used in this case and if depositions need to occur outside of the United States. The parties are hopeful that an arrangement can be made whereby all depositions of parties or persons under their control will occur in the United States. Additionally, neither party currently anticipates the need to take the depositions of third parties located outside of the United States.

## 7. Whether a Full Time Magistrate May Conduct all Proceedings

The parties agree that a full-time magistrate should not be used to conduct all proceedings in this case.

## 8. Whether the Case Should be Bifurcated

The parties agree that the trial should not be bifurcated.

## 9. Whether Pretrial Statements and the Pretrial Order Should Be Dispensed With

The parties agree that the Court should not dispense with pretrial statements and the pretrial order.

## 10. Suggestions for Shortening or Simplifying the Case

Minebea's Position

Minebea believes that filing premature motions will unnecessarily complicate the case and it suggests that the filing of non-discovery related motions should require the prior approval of the court until after the close of discovery.

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

<u>Chicony's Position</u>

Chicony may file certain motions which it believes may shorten or simplify the case. For example, Chicony believes early determination of whether products sold entirely outside of the United States are subject to United States patents would allow the parties to focus this litigation and facilitate settlement.

## 11.    **The Date When the Case Will Be Ready for Trial**

The parties agree that this case should be ready for trial by February 13, 2004, which is one year after the date that all parties were served, except that Chicony believes that additional time may be required if depositions need to be taken outside the United States.

## 12.    **Whether the Trial Will Be a Jury Trial**

The parties agree that trial should be by jury.

## 13.    **The Number of trial days Required**

Minebea believes the trial will take approximately five days and Chicony believes it will take approximately seven days.

## 14.    **The Names Addresses and Telephone Numbers of Trial Counsel**

Minebea's Trial Counsel
SCHULTE ROTH & ZABEL LLP
Joel E. Lutzker
David H. Kagan
Benjamin Levi
Todd Sicklinger
919 Third Avenue
New York, New York 10022
(212) 756-2000

DORSEY & WHITNEY LLP
Peter S. Ehrlichman
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

Chicony's Trial Counsel
Michael A. Jacobs
Paul A. Friedman

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
(415) 268-7000
Telefacsimile: (415) 268-7522

Scott Wilsdon
YARMUTH WILSDON & CALFO LLP
3080 Washington Mutual Tower
1201 Third Ave
Seattle Washington 98101
(206) 516-3800
Telefacsimile: (206) 516-3888

S. J. Christine Yang
LAW OFFICES OF S. J. CHRISTINE YANG
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, California 92708
(714) 641-4022
Telefacsimile: (714) 641-2082

**15.** **Service of Defendants and Respondents**

The parties agree that all Defendants have been served in accordance with the Federal Rules of Civil Procedure

**16.** **Whether Any Party Wishes a Scheduling Conference**

Minebea may request a scheduling conference if the discovery necessary to oppose Defendants' Joint Motion to Transfer or Dismiss is not provided in a timely manner.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

DORSEY & WHITNEY LLP

_[signature]_

Peter S. Ehrlichman
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

SCHULTE ROTH & ZABEL LLP
Joel E. Lutzker
David H. Kagan
Benjamin Levi
Todd Sicklinger
919 Third Avenue
New York, New York 10022
(212) 756-2000
Attorneys for Plaintiff Minebea Co. Ltd.

MORRISON & FOERSTER LLP

_[signature]_

Michael A. Jacobs
Paul A. Friedman
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
(415) 268-7000

Scott Wilsdon
YARMUTH WILSDON CALFO PLLC
3080 Washington Mutual Tower
1201 Third Ave
Seattle Washington 98101
(206) 516-3800

S. J. Christine Yang
LAW OFFICES OF S. J. CHRISTINE YANG
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102

9428474.1

JOINT STATUS REPORT & DISCOVERY PLAN -8-
cv 03 0295r

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

Fountain Valley, California 92708
(714) 641-4022

Attorneys for Defendants Chicony Electronics
Corporation and Chicony America, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820




The Honorable Barbara Jacobs Rothstein

FILED
LODGED

APR 1 8 2003

CC: TO JUDGE MR
ENTERED
RECEIVED

MR

BY

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

DEPUTY

FILED          ENTERED
LODGED         RECEIVED

APR 2 2 2003

AT SEATTLE
CLERK U.S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Minebea Co. Ltd. <br><br>       Plaintiffs, <br><br> vs. <br><br> Chicony Electronics Co., Ltd. and Chicony America, Inc. <br><br>       Defendants. | CIVIL ACTION NO. CV 03 0295R <br><br> **STIPULATION AND [PROPOSED] ORDER CONTINUING HEARING DATE AND SETTING BRIEFING SCHEDULE ON DEFENDANTS JOINT MOTION TO TRANSFER OR DISMISS** |



CV 03-00295 #00000018

## STIPULATED EXTENSION ORDER

Plaintiff Minebea Co. Ltd. Inc. ("Minebea") and Defendants Chicony Electronics Corporation and Chicony America, Inc. ("Defendants") through their respective counsel of record, hereby stipulate and agree as follows:

Whereas, Minebea commenced an action for patent infringement against Chicony in the Western District of Washington on February 11, 2003;

Minebea agreed to a one month extension for Chicony to answer said complaint in exchange for a reciprocal grant of an extension from Chicony;



**ORIGINAL**

CV 03 0295R

In lieu of answers, Defendants move to transfer or dismiss the above-caption action by filing Defendants' Joint Motion to Transfer or Dismiss; Memorandum of Law in Support of April 4, 2003;

Defendants' motion has a hearing date of May 2, 2003;

Minebea's opposition to Defendants' Joint Motion to Transfer or Dismiss is currently due on April 28, 2003;

Minebea requires additional time to prepare its opposition to Defendants' Joint Motion to Transfer or Dismiss;

In light of the foregoing, the parties have agreed to continue the hearing date for Defendants' Motion, from May 2, 2003 to May 23, 2003, to allow Minebea an additional three weeks to file its opposition to Defendant's motion.

Stipulated this ___ day of April, 2003.


DORSEY & WHITNEY LLP


PETER S. EHRLICHMAN
U.S. Bank Centre
1420 Fifth Avenue, Suite 3400
Seattle, WA 98101-4010
Telephone: (206) 903-8800
Facsimile: (206) 903-8820

SCHULTE ROTH & ZABEL LLP
Joel E. Lutzker
David H. Kagan
Benjamin Levi
Todd Sicklinger
919 Third Avenue
New York, New York 10022
(212) 756-2000
Attorneys for Plaintiff Minebea Co. Ltd.

YARMUTH WILSDON CALFO PLLC

*Paul A Friedman* (signature)

Scott Wilsdon, Esq.
3080 Washington Mutual Tower
1201 Third Ave
Seattle Washington 98101
206 516 3800

MORRISON & FOERSTER LLP
Michael A. Jacobs
Paul A. Friedman
425 Market Street
San Francisco, California 94105
(415) 268 7000
Attorneys for Defendants Chicony Electronics
Corporation and Chicony America, Inc.

## ORDER

Based upon the foregoing Stipulation of the parties, now, therefore,

It is hereby Ordered as follows:

1. The hearing date for Defendants' Joint Motion to Transfer or Dismiss is continued from May 2, 2003 to May 23, 2003;

2. Minebea shall have until May 19, 2003 to serve and file its opposition to Defendants' Joint Motion to Transfer or Dismiss; and

3. Defendants shall have until May 22, 2003 to serve and file their reply memorandum in support of Defendants' Joint Motion to Transfer or Dismiss.

Dated: April 21, 2003

_Barbara J. Rothstein_
HON. BARBARA JACOBS ROTHSTEIN
United States District Judge

PRESENTED BY:

DORSEY & WHITNEY LLP

_Peter S. Ehrlichman_
Peter S. Ehrlichman, WSBA #6591
Attorneys for Plaintiff Minebea Co. Ltd.

United States District Court
for the
Western District of Washington
April 23, 2003

\* \* MAILING CERTIFICATE OF CLERK \* \*

Re:  2:03-cv-00295

True and correct copies of the attached were mailed by the clerk to the
following:

        Peter Scott Ehrlichman, Esq.
        DORSEY & WHITNEY LLP
        STE 3400
        1420 5TH AVE
        SEATTLE, WA  98101
        FAX 903-8820

        Benjamin Levi, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Joel E Lutzker, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Lisa Knight, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Todd Sicklinger, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        David Kagan, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022

FAX 1-212-593-595̶5̶

Angelo J Calfo, ▉
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

Christine Yang, Esq.
STE 101 & 102
17220 NEWHOPE ST
FOUNTAIN VALLEY, CA  92708
FAX 1-714-641-2082

CC TO JUDGE ____ pm ____

Honorable Barbara J. Rothstein

____✓ FILED ____ ENTERED
____ LODGED ____ RECEIVED

APR 04 2003   PM

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

CV 03-00295 #00000017

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

MINEBEA CO., LTD.,

      Plaintiff,

    v.

CHICONY ELECTRONICS CO., LTD. and
CHICONY AMERICA, INC.,

      Defendants.

No. CV 03 0295 R

CERTIFICATE OF SERVICE

## CERTIFICATE OF SERVICE

I certify that on this 4th day of April, 2003, I caused true and correct copies of

1.    Defendant's Joint Motion to Transfer or Dismiss; Memorandum of Law in Support;

2.    Declaration of Paul A. Friedman in Support of Defendants' Joint Motion to Transfer or Dismiss;

3.    Declaration of Bruce Chang in Support of Defendants' Joint Motion to Transfer or Dismiss; and

4.    [Proposed] Order Granting Defendants' Joint Motion to Transfer or Dismiss

to be served upon:

CERTIFICATE OF SERVICE
NO. CV 03 0295 R – Page 1

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

Peter Ehrlichman
Dorsey & Whitney
1420 Fifth Avenue, #3400
Seattle, WA 98101

☐ Via Email
☒ Via Facsimile
☐ Via Federal Express
☒ Via Hand Delivery
☐ Via U.S. Mail

Joel Lutzker
Schulte Roth Zabel LLP
919 Third Ave.
New York, New York 10022

☐ Via Email
☒ Via Facsimile
☐ Via Federal Express
☐ Via Hand Delivery
☒ Via U.S. Mail

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated this 4th day of April, 2003 at Seattle, Washington.

*Shelley Meyer*
Shelley Meyer

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

263.01 dd044809 4/4/03

HONORABLE BARBARA J. ROTHSTEIN

CV 03-00295 #00000016

FILED _____ ENTERED
LODGED_____ RECEIVED

APR 04 2003  PM

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD.,<br><br>                  Plaintiff,<br><br>v.<br><br>CHICONY ELECTRONICS CO., LTD. and<br>CHICONY AMERICA, INC.,<br><br>                  Defendants. | No.     CV 03 0295 R<br><br>**DECLARATION OF BRUCE CHANG IN SUPPORT OF DEFENDANTS' JOINT MOTION TO TRANSFER OR DISMISS**<br><br>NOTE ON MOTION CALENDAR: May 2, 2003 |

I, Bruce Chang, declare as follows:

1.  I am the Vice President of Chicony America, Inc.  Unless otherwise noted, I have personal knowledge of the facts set forth herein and, if called as a witness, I could competently testify thereto.

2.  I work in Irvine, California.

3.  I am knowledgeable about many aspects of the keyboards that Minebea alleges infringe United States Patent No. 4,433,225.

DECL. OF B. CHANG IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR TRANSFER (C03 0295 R) –
PAGE 1

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888



1    4. For example, I am familiar with the structure of the mechanisms used to support the

2    keytops in the accused keyboards, and other keyboards manufactured by Chicony.

3    5. I also negotiated the agreement with Think Outside, Inc., to which Chicony

4    Electronics sells the Stowaway XT Keyboard, which I understand to be one of the accused

5    keyboards.

6    6. I manage the relationships with the customers to whom Chicony Electronics and

7    Chicony America sell these keyboards.  For example, if a customer has a question about a

8    product, they will sometimes contact me.  They might also contact Elain Maio.

9    7. I also have knowledge regarding the supply chain according to which the accused

10   keyboards enter the United States.

11   8. I have knowledge regarding the corporate structure of both Chicony Electronics and

12   Chicony America.

13   9.  Chicony Electronics Corp. is a corporation organized under the laws of Taiwan.

14   10. Chicony Electronics has its principal place of business in Taipei, Taiwan.

15   11. Chicony Electronics does not have an office in the State of Washington.

16   12. Chicony Electronics has a wholly-owned subsidiary in the United States, Chicony

17   America, Inc.

18   13. Chicony America is a corporation organized under the laws of California.

19   14. Chicony America has its principal place of business in Irvine, California.

20   15. Chicony America does not have an office in the State of Washington.

21   16. Neither Chicony Electronics nor Chicony America has an agent for service of process

22   in the State of Washington.

23   17. Neither Chicony Electronics nor Chicony America has employees located in the State

24   of Washington.

25   18. Neither Chicony Electronics nor Chicony America has a bank account located in the

26   State of Washington.

27

28   DECL. OF B. CHANG IN SUPPORT OF DEFENDANTS'
     MOTION TO DISMISS OR TRANSFER (C03 0295 R) –
     PAGE 2

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

19. Neither Chicony Electronics nor Chicony America has a telephone number in the State of Washington.

20. Neither Chicony Electronics nor Chicony America own property in the State of Washington.

21. Neither Chicony Electronics nor Chicony America is licensed to conduct business in the State of Washington.

22. Some of the keyboards that Chicony Electronics and Chicony America manufacture and sell employ a mechanism resembling a scissors underneath the keytops in these keyboards. These are the keyboards that I understand Minebea alleges infringe its patent.

23. Neither Chicony America nor Chicony Electronics ship the accused keyboards into the State of Washington.

24. Neither Chicony America nor Chicony Electronics advertise the accused keyboards within the State of Washington.

25. Microsoft Corporation is the only customer that Chicony America or Chicony Electronics have in the State of Washington.

26. The keyboards that Chicony sells to Microsoft use a traditional shaft-and-rod structure to support the keytops in the keyboard.

27. The keyboards that Chicony sells to Microsoft do not contain a scissors-like mechanism underneath the keytops.

28. Much of Chicony's activities relating to the accused keyboards take place in California.

29. For example, marketing decisions about the accused keyboards are made in California.

30. It is also in California that Chicony manages relationships with the customers to whom Chicony sells the accused keyboards.

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

31. California is also the location of many documents concerning these keyboards. For example, Chicony has at its Irvine locations numerous accounting documents related to the sale and shipment of these keyboards.

32. I am aware of no activity that Chicony undertook in the State of Washington related to the accused keyboards.

33. Neither Chicony Electronics nor Chicony America plays any role in devising the channels of distribution that its customers use for products containing the accused keyboards.

34. Neither Chicony Electronics nor Chicony America helps its customers make decisions about how they market these keyboards in Washington.

35. Neither Chicony Electronics nor Chicony America provides advice or support to residents of the State of Washington who use these keyboards.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 3, 2003, in Irvine, California.

Bruce Chang                                 4/03/03

DECL. OF B. CHANG IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR TRANSFER (C03 0295 R) –
PAGE 4

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800   F 206 516 3888





1
2

HONORABLE BARBARA J. ROTHSTEIN

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

**APR 04 2003   PM**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

CV 03-00295 #00000015

7
8
9
10
11
12

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

### SEATTLE DIVISION

13   MINEBEA CO., LTD.,

14                          Plaintiff,

15        v.

16   CHICONY ELECTRONICS CO., LTD. and
     CHICONY AMERICA, INC.,

17                          Defendants.

18
19
20

No.      CV 03 0295 R

**DECLARATION OF PAUL A. FRIEDMAN IN SUPPORT OF DEFENDANTS' JOINT MOTION TO TRANSFER OR DISMISS**

NOTE ON MOTION CALENDAR:
May 2, 2003

21        I, Paul A. Friedman, declare as follows:

22        1.   I am a member of the bar of the State of California and am admitted pro hac vice

23   before this Court. I am an attorney with the law firm of Morrison & Foerster LLP, counsel of

24   record for the Defendants in the above-captioned action. Unless otherwise noted, I have personal

25   knowledge of the facts set forth herein and, if called as a witness, I could competently testify

26   thereto.

27
28

DECL. OF P.A. FRIEDMAN IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR TRANSFER
(C03 0295 R) – PAGE 1

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888





2.    In my capacity as one of the attorneys representing the Defendants in this matter, I have investigated which witnesses have knowledge relevant to this dispute.

3.    My investigation has revealed at least four employees of Chicony America with knowledge relevant to this dispute: Bruce Chang, Elain Maio, Hank Fu, and Susie Ho.

4.    Based on the facts and issues as currently understood by the legal team representing the Defendants in this action, there is a substantial possibility that Chicony would call each of these individuals as witnesses at trial.

5.    Each of these individuals work in Irvine, California.

6.    Bruce Chang is Chicony America's Vice President. Mr. Chang's knowledge is set forth in greater detail in the declaration he is filing contemporaneously with my declaration. Among other things, Mr. Chang has knowledge of the structure of the keylift mechanisms used in the accused keyboards, negotiations and agreements with one of Chicony's customers regarding the accused device, the supply chain according to which certain of the accused devices are shipped into the United States, and the corporate structure of both Chicony America and Chicony Electronics.

7.    Elain Maio is a Sales Manager with Chicony America. Ms. Maio is responsible for the day-to-day handling of relationships with Chicony America's customers. Ms. Maio processes orders for the accused devices. Ms. Maio is knowledgeable regarding the quantities of certain accused devices shipped and sold by Chicony America. Ms. Maio has sales documents and other documents relevant to this litigation, and would be in a position to authenticate these materials.

8.    Hank Fu is a Sales Manager with Chicony America. Mr. Fu's duties differ from Ms. Maio's. Mr. Fu is knowledgeable about the sales by Chicony Electronics, Chicony America's parent, of the accused device to the third parties that incorporate these devices into products that these third parties then market and sell. Mr. Fu also has substantial technical knowledge regarding keyboards marketed and sold by Chicony. Mr. Fu is the United States contact point for many of Chicony Electronics' Taiwanese customers to whom the accused

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800   F 206 516 3888



1  keyboards are sold. Mr. Fu has sales documents, invoices, and other documents relevant to this

2  litigation, and would be in a position to authenticate these materials.

3      9.   Susie Ho is Chicony America's Controller. Ms. Ho has knowledge regarding the

4  quantity and dollar amounts of accused devices sold by Chicony. Ms. Ho is also knowledgeable

5  regarding the amount of Chicony's accounts receivable related to the accused devices. She is

6  knowledgeable regarding the accounting systems employed by Chicony, and would also be able

7  to testify as to the financial status of Chicony America, and provide financial details regarding the

8  accused device. Ms. Ho would also be able to authenticate much of the accounting and financial

9  documents related to the accused device.

10      10.   Attached as Exhibit A is a true and correct copy of the Minebea directory of

11  subsidiaries web page available at http://www.minebea.co.jp/english/company/business/directory/

12  america.html.

13      11.   Attached as Exhibit B is a true and correct copy of a letter dated October 4, 2002

14  from Joel Lutzker to Christine Yang.

15      12.   Attached as Exhibit C is a true and correct copy of a letter dated January 16, 2003

16  from Joel Lutzker to Christine Yang.

17      13.   Attached as Exhibit D is a true and correct copy of the complaint filed by Minebea

18  Co., Ltd. against Think Outside, Inc. and Peripheral Technologies, Inc. on May 3, 2001 in the

19  Southern District of California.

20      14.   Attached as Exhibit E is a true and correct copy of the Court's August 17, 2002

21  order regarding claim construction in *Minebea Co., Ltd. v. Think Outside, Inc.*

22      15.   Attached as Exhibit F is a true and correct copy of the Court's October 21, 2002

23  order regarding claim construction in *Minebea Co., Ltd. v. Think Outside, Inc.*

24      16.   Attached as Exhibit G is a true and correct copy of Applicant Chicony America,

25  Inc.'s Memorandum of Points and Authorities in Support of Motion to Intervene in *Minebea Co.,*

26  *Ltd. v. Think Outside, Inc.*

27

28  DECL. OF P.A. FRIEDMAN IN SUPPORT OF
    DEFENDANTS' MOTION TO DISMISS OR TRANSFER
    (C03 0295 R) – PAGE 3

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888



17.     Attached as Exhibit H is a true and correct copy of excerpts of the transcript of the Rule 30(b)(6) deposition of Think Outside, Inc., taken December 11, 2002.

18.     Attached as Exhibit I is a true and correct copy of a letter dated October 14, 2002 from David H. Kagan to Paul A. Friedman and Pamela J. Wong.

19.     Attached as Exhibit J is a true and correct copy of Plaintiff Minebea Co., Ltd.'s Supplemental Responses and Objections to Defendant Think Outside, Inc.'s Interrogatory Nos. 6, 7, 10, and 13 dated January 6, 2003.

20.     Attached as Exhibit K is a true and correct copy of Plaintiff Minebea's Rule 26(a)(1) Initial Disclosures dated August 3, 2001.

21.     Attached as Exhibit L is a true and correct copy of excerpts of the transcript of the deposition of Dean Stuart Cowles taken December 12, 2002.

22.     Attached as Exhibit M is a true and correct copy of driving directions from NMB Technologies Corporation's Chatsworth location to the federal courthouse in San Diego, available at www.mapquest.com.

23.     Attached as Exhibit N is a true and correct copy of driving directions from NMB Technologies Corporation's Chatsworth location to the federal courthouse in Seattle, available at www.mapquest.com.

24.     Attached as Exhibit O is a true and correct copy of driving directions from Chicony America, Inc.'s Irvine location to the federal courthouse, in San Diego, available at www.mapquest.com.

25.     Attached as Exhibit P is a true and correct copy of driving directions from Chicony America, Inc.'s Irvine location to the federal courthouse in Seattle, available at www.mapquest.com

DECL. OF P.A. FRIEDMAN IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR TRANSFER
(C03 0295 R) – PAGE 4

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888



1      26.    Attached as Exhibit Q is a true and correct copy of Southern District of California

2  Local Civil Rule 40.1(f)(1).

3      I declare under penalty of perjury that the foregoing is true and correct. Executed on

4  April 3, 2003, in San Francisco, California.

5

6                        Paul A. Friedman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  DECL. OF P.A. FRIEDMAN IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR TRANSFER
(C03 0295 R) – PAGE 5

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

Exhibit A

 **Minebea**

 Search [                    ] Go   Japanese

| Home | News | Products | Company | Investors |

About us | Business | Factories | Strength of Minebea

**Business**
- Outline of operations
- Industry categories
- Global operation
- Environmental protection
- ⊙ Directory
- Sales offices

**Information**
- Press Release
- Profile
- FAQ
- Contact us
- Materials
- Directory
- Group sites
- Sitemap

## Directory

| Domestic | Offices and Manufacturing Units | | Subsidiaries and Affiliates | | Sales Divisions, Branches and Offices |
| Overseas | Asia(ex-Japan) | North America | Europe |

### North America

**NMB (USA) Inc.**
9730 Independence Avenue, Chatsworth, California 91311, U.S.A.
TEL : 1-818-709-1770 / FAX : 1-818-718-0435
http://www.nmbusa.com

**NMB Technologies Corporation**
http://www.nmbtc.com
9730 Independence Avenue, Chatsworth, California 91311, U.S.A.
TEL : 1-818-341-3355 / FAX : 1-818-341-8207
[Technical Center]
28700 Beck Road, Wixom, Michigan 48393, U.S.A.
TEL : 1-248-926-0026 / FAX : 1-248-926-0025

**New Hampshire Ball Bearings, Inc.**
http://www.nhbb.com
[Peterborough Plant]
175 Jaffrey Road, Peterborough, New Hampshire 03458-1709, U.S.A.
TEL : 1-603-924-3311 / FAX : 1-603-924-6632
[Laconia Plant]
155 Lexington Drive, Laconia, New Hampshire 03246, U.S.A.
TEL : 1-603-524-0004 / FAX : 1-603-524-7422
[Chatsworth Plant]
9730 Independence Avenue, Chatsworth, California 91311, U.S.A.
TEL : 1-818-407-9300 / FAX : 1-818-709-0387

**IMC Magnetics Corp.**
1900 East 5th Street, Tempe, Arizona 85281, U.S.A.
TEL : 1-480-968-4441 / FAX : 1-480-968-5026

**Hansen Corporation**
901 South First Street, Princeton, Indiana 47670-0023, U.S.A.
TEL : 1-812-385-3000 / FAX : 1-812-386-6387
http://www.hansen-motor.com

Go to the top

| Terms and Conditions | Security | | Copyright 2000-2002 Minebea Co.,Ltd. |

Exhibit B

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Joel E. Lutzker
(212) 756-2520

October 4, 2002

E-mail
joel.lutzker@srz.com

## VIA FACSIMILE and CERTIFIED MAIL

Christine Yang, Esq.
S.J. Christine Yang
Plaza Del Lago
17220 Newhope Street
Fountain Valley, CA 92708

> RE: Minebea/Chicony
> Our Ref: 861975/0001

Dear Ms. Yang:

This letter responds to your letter of July 30, 2002. In your letter, you state that your client, Chicony America, Inc., believes that it does not infringe United States Patent No. 4,433,225 ("the '225 Patent"). Additionally, your letter indicates that the basis for Chicony's belief is that Chicony's keyboards use metal brackets as the leveling mechanisms for their rectangular and L-Shaped keys. However, as shown in the attached photographs of a Chicony keyboard (Model No. CG87-US, IBM Parts No. 02K6213) that is sold to IBM in the United States, Chicony keyboards utilize scissors type keytop leveling mechanisms for their keys, including their rectangular and L-shaped keys. Additionally, the '225 patent is not limited to rectangular or L-Shaped keys.

Claim 1 of the '225 Patent is directed to a keytop leveling mechanism for keys with keytops "having a main portion and a stem portion cantilevered from said main portion." Accordingly, Claim 1 of the '225 Patent is not limited to keys having keytops of any particular shape. Instead, Claim 1 includes within its scope keys having keytops of any shape provided that the keytops have a main portion and a cantilevered portion. A cantilever is that portion of a horizontal structure that extends beyond its vertical support. In the Chicony keyboard, the keyswitch provides the vertical support. The portion of the keytop that is directly supported by the keyswitch is the main portion of the keytop, and the portion of the keytop that extends beyond the keyswitch is the cantilevered portion.

Per your request, we have attached a claim chart that reads a representative claim on an accused product. As shown in the attached claim chart, the scissors type keytop leveling mechanism used in the Chicony keyboard includes all claim elements of the '225 Patent.

9307247.1



Accordingly, Chicony is infringing the '225 Patent by selling these and similar keyboards in the United States.

I trust that the above explanations respond to the questions that you or your client have with respect to your client's infringement of U.S. Patent No. 4,433,225. I also trust that the confirmations, which we requested in our letter of July 16, 2002, will be immediately forthcoming.

We ask for your response within no later that two weeks from the date of this letter. If a response if not forthcoming within this timeframe, we will be forced to assume that Chicony intends to continue its willful violation of our client's patent rights and will consider further action.

Very truly yours,

SCHULTE ROTH & ZABEL

Joel E. Lutzker

Attachment
cc:     Takuya Naka
        Minebea Co., Ltd.



| Claim 1 of the '225 Patent | Chicony Keyboard<br>Model No. CG87-US, IBM Parts No. 02K6213 |
|---|---|
| 1. A keytop levelling mechanism for use in conjunction with: | <u>Yes</u>. |
| a keytop having a main portion and a stem portion cantilevered from said main portion; and | <u>Yes</u>, each keytop has a main portion, which is directly supported by its associated keyswitch, and it has a cantilevered stem portion that extends laterally from the main portion beyond the support provided by its associated keyswitch. |
| a keyswitch, mounted on a circuit board, which is adapted to be actuated when said keytop is pressed; | <u>Yes</u>, the keyswitches are mounted on circuit a board and they are actuated when the keytop is pressed. |
| said levelling mechanism comprising: | |
| a pair of level arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends; | <u>Yes</u>, the lever arms are connected at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends. |
| means for pivotally mounting said first and second ends to longitudinally opposed ends of said cantilevered portion; | <u>Yes</u>, the first and second ends are mounted to longitudinally opposed ends of said cantilevered portion of the keytop. |
| means for pivotally mounting said third and fourth ends to separate joints adjacent said circuit board under said cantilevered portion; and | <u>Yes</u>, the third and fourth ends are pivotally mounted to separate joints adjacent said circuit board under said cantilevered portion. |
| means for enabling at least two of said first, second, third, and fourth ends to slide in addition to pivot. | <u>Yes</u>, the first end is mounted to the keytop by an elongated groove and the third end is mounted to a joint adjacent the circuit board by an elongated open ended pivot groove such that the first end and the third end can slide in addition to pivot. |







Exhibit C

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Joel E. Lutzker
(212) 756-2520

E-mail
Joel.Lutzker@srz.com

January 16, 2003

## VIA FACSIMILE

Christine Yang, Esq.
S.J. Christine Yang
Plaza Del Lago
17220 Newhope Street
Fountain Valley, CA 92708

RE:     Minebea/Chicony
        Our Ref: 861975/0232

Dear Ms. Yang:

This letter responds to your letter of October 31, 2002. Additionally, we write to inform you that we have identified an additional Chicony manufactured product that incorporates Chicony's infringing keytop leveling mechanism.

In your letter, you continue to assert that the keytops in the keyboards manufactured or sold by Chicony America, Inc., do not contain keytops having both a main portion and a cantilevered stem portion. Based upon this assertion, you argue that Chicony is not infringing United States Patent No. 4,433,225 ("the '225 Patent"). However, as we explained in our letter of October 4, 2002, the portion of a keytop that is directly supported by the keyswitch is the main portion of the keytop, and the portion of the keytop that extends beyond the keyswitch is the cantilevered stem portion of the keytop. Accordingly, the keytops in the Chicony keyboards have both a main portion and a stem portion.

For your reference, we enclose a copy of the *Order Re: Claim Construction*, which was issued by Judge Moskowitz in the United States District Court for the Southern District of California on August 17, 2002. On page 8 of the *Order*, Judge Moskowitz construes the term "main portion" as "the part of the keytop that is supported by the keyswitch" and he construes "stem portion cantilevered from said main portion" as "the part of the keytop that extends laterally away from the main portion." Additionally, on page 7 of the *Order*, Judge Moskowitz confirms that there is no limitation on the shapes of the keytops.

In your letter, you state that the Chicony keyboards are more like the prior art (U.S. Patent No. 3,741,512 to Olson). However, the Olson patent was considered during prosecution of the '225 Patent and the patent examiner allowed the '225 Patent and indicated that there was no prior disclosure or suggestion of utilizing a scissors type linkage to stabilize a

keytop. Any superficial resemblance that exists between the Chicony keytop stabilizing mechanisms and the mechanism disclosed in the Olson patent has no bearing on whether the Chicony mechanism is within the scope of the '225 patent. Accordingly, Chicony has no basis for asserting that it does not infringe the '225 Patent.

Additionally, We have recently learned that the Stowaway XT Ultra-Thin Keyboard, which is manufactured by Chicony and sold to Think Outside, Inc., includes Chicony's infringing keytop leveling mechanism.

I trust that, in light of the above explanations, Chicony will promptly cease its infringement of U.S. Patent No. 4,433,225, including its infringing activities related to the Stowaway XT Ultra-Thin Keyboard. Please contact us within one week of receiving this letter to confirm that Chicony's infringing activities have stopped and to discuss the appropriate corrective action for the harm caused to Minebea by Chicony's willful infringement of its patent.

Very truly yours,

SCHULTE ROTH & ZABEL

Joel E. Lutzker

Enclosure

cc: Takuya Naka, Esq. (by fax)
Minebea Co., Ltd.

Exhibit D

1
ARNOLD & PORTER
RONALD L. JOHNSTON (State Bar No. 57418)
2
SUZANNE V. WILSON (State Bar No. 152399)
JAMES S. BLACKBURN (State Bar No. 169134)
3
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
4
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
5

6
Attorneys for Plaintiff Minebea Co., Ltd.

7

8
UNITED STATES DISTRICT COURT

9
SOUTHERN DISTRICT OF CALIFORNIA

10
'01 CV 0771 BTM (POR)

11
MINEBEA CO., LTD., a Japanese          )   Case No. _____
corporation,                           )
12                                     )   COMPLAINT FOR PATENT
            Plaintiff,                 )   INFRINGEMENT
13                                     )
    v.                                 )   DEMAND FOR JURY TRIAL
14                                     )
THINK OUTSIDE, INC., a California      )
15  corporation; and PERIPHERAL        )
TECHNOLOGY, INC., a Taiwan             )
16  corporation.                       )
                                       )
17          Defendants.                )

18

19
        Plaintiff Minebea Co., Ltd. ("Minebea") by its attorneys for its complaint against defendants

20
Think Outside, Inc. ("Think Outside") and Peripheral Technology, Inc., ("Per Tech") alleges as

21
follows:

22
                            JURISDICTION AND VENUE

23
        I.    This complaint contains an action for patent infringement arising under Title 35 of the

24
United States Code.   This Court has jurisdiction over this action for patent infringement pursuant to

25
28 U.S.C. § 1338.

26

27

28
224293_1

2.     This Court is a proper venue for this patent infringement action pursuant to 28 U.S.C. §§ 1391 and 1400(b) in that, among other things, Think Outside resides in this district and Per Tech is an alien corporation that may be sued in any district.

<div align="center">

**THE PARTIES**

</div>

3.     Plaintiff Minebea is a corporation organized under the laws of Japan with its principal place of business at ARCO Tower, 19th Floor, No. 1-8-1, Shimo-Meguro 1-chrome, Meguro-ku, Tokyo 153, Japan. Minebea is a manufacturer of electronic devices including computer keyboards.

4.     On information and belief, Defendant Think Outside is a corporation organized under the laws of the State of California with its principal place of business located at 5790 Fleet Street, Suite 130, Carlsbad, California 92008 and with a research and development facility located in Santa Clara, California. Defendant Think Outside designs, markets, arranges for the manufacture of, purchases and sells computer keyboards, including a line of keyboards known as the Stowaway Portable Keyboard, in the United States.

5.     On information and belief, Defendant Per Tech is a corporation organized under the law of Taiwan with its principal place of business located at 2F. No. 5, Lane 50, Sec. 3, Nan-Kang Rd., Taipei City, Taiwan. Defendant Per Tech manufactures computer keyboards and imports or causes the importation of computer keyboards, including the Stowaway Portable Keyboard, into the United States.

<div align="center">

**FIRST CLAIM FOR RELIEF**

**(Patent Infringement)**

</div>

6.     Plaintiff Minebea repeats and realleges Paragraphs 1 through 5, inclusive, as though fully set forth herein and incorporates them by reference.

7.     United States Patent No. 4,433,225 ("the '225 Patent"), a copy of which is attached hereto as Exhibit A, was duly and legally issued by the United States Patent and Trademark Office on February 21, 1984. The '225 Patent relates to a keytop leveling mechanism useful in computer keyboards.

8.     Plaintiff Minebea is the assignee of all right title and interest in and to the '225 Patent.

9.     One or more of the inventions claimed in the '225 Patent are implemented in the Stowaway Portable Keyboard.

10.     The Stowaway Portable Keyboard is imported or caused to be imported by Per Tech into the United States and sold by Per Tech to Think Outside in the United States for use in the United States.

11.     The Stowaway Portable Keyboard is offered for sale and sold by Think Outside to entities in the United States, including Palm, Inc., Targus, Hewlett Packard, and Compaq.

12.     Defendant Think Outside is infringing the '225 Patent by using, offering to sell, and selling the inventions claimed in the '225 patent in the United States without authority.

13.     Defendant Think Outside's infringement of the '225 patent is willful.

14.     Defendant Per Tech is infringing the '225 Patent by offering to sell, selling, importing or causing to be imported the inventions claimed in the '225 patent in the United States without authority.

15.     Defendant Per Tech's infringement of the '225 patent is willful.

## SECOND CLAIM FOR RELIEF

### (Inducing Patent Infringement)

16.     Plaintiff Minebea repeats and realleges Paragraphs 1 through 5 and Paragraphs 7 through 15, inclusive, as though fully set forth herein and incorporates them by reference.

17.     Defendant Think Outside is actively inducing others to infringe the '225 Patent, in that Think Outside has been advised of Minebea's patent rights and has nonetheless continued to engage in the activities described above.

18.     Defendant Per Tech is actively inducing others to infringe the '225 Patent, in that Think Outside has been advised of Minebea's patent rights and has nonetheless continued to engage in the activities described above.

## DEMAND FOR JUDGMENT

WHEREFORE, Minebea prays for judgment as follows:

A.     This Court award damages adequate to compensate Minebea for Defendants' infringement, not less than a reasonable royalty together with interest and costs.

1    B.    This Court enhance the damage award to three times the damages prayed for above in

2    Paragraph A.

3    C.    This Court preliminarily and permanently enjoin Defendants from infringing the '225

4    Patent.

5    D.    This Court award reasonable attorney fees to Minebea.

6    E.    This Court award such other additional relief as the court deems just and proper.

7

8

9    Dated: May 3, 2001                      ARNOLD & PORTER
                                             RONALD L. JOHNSTON
10                                           SUZANNE V. WILSON
                                             JAMES S. BLACKBURN
11

12

13                                    By: _Suzanne V. Wilson_____
14                                           Suzanne V. Wilson
                                             Attorneys for Plaintiff
15                                           Minebea Co., Ltd.

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Minebea Co., Ltd. hereby

demands trial by jury of all issues so triable that are raised herein or which hereafter may be raised

in this action.

Dated: May 3, 2001

ARNOLD & PORTER
RONALD L. JOHNSTON
SUZANNE V. WILSON
JAMES S. BLACKBURN

By: _____
Suzanne V. Wilson
Attorneys for Plaintiff
Minebea Co., Ltd.

224293_1

4

# United States Patent [19]

**Cowles**

[11]    **4,433,225**

[45]    **Feb. 21, 1984**

[54] **KEYTOP LEVELLING MECHANISM**

[75] Inventor: Dean S. Cowles, Spokane, Wash.

[73] Assignee: General Instrument Corporation, New York, N.Y.

[21] Appl. No.: 468,127

[22] Filed: Feb. 22, 1983

[51] Int. Cl.³ .......................................... H01H 3/12
[52] U.S. Cl. .......................................... 200/340
[58] Field of Search ........... 200/5 A, 159 R, 159 A, 200/159 B, 340; 248/584, 585

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,164,720 | 1/1964 | Blancia | 248/584 |
| 3,741,512 | 6/1973 | Cicon | 248/585 |
| 3,916,150 | 10/1975 | Abernathy et al. | 200/340 |
| 3,943,578 | 2/1976 | Pohnan | 200/340 |
| 4,392,037 | 7/1983 | Fleming | 200/340 |

**FOREIGN PATENT DOCUMENTS**

2309367 11/1976 France ...................... 248/584

*Primary Examiner*—John W. Shepperd
*Attorney, Agent, or Firm*—Barry R. Lipsitz

[57] **ABSTRACT**

A keytop levelling mechanism for use in conjunction with a keytop having a main portion and a stem portion cantilevered from the main portion, e.g., an L-shaped keytop. When pressed, the keytop actuates a keyswitch mounted on a circuit board. The levelling mechanism comprises a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage. The scissors-like linkage is mounted between the stem portion of the keytop and the circuit board in a manner such that it collapses in scissors-like fashion when the keytop is pressed toward the circuit board. In this manner, the scissors-like linkage maintains the keytop level throughout its movement toward and away from the circuit board.

9 Claims, 12 Drawing Figures



EX. A PG. 4

## FIG. 1.



## FIG. 2.



EX. A   PG. 5



_FIG. 3._

_FIG. 4._

_FIG. 5._

_FIG. 6._

EX. A PG. 6



FIG. 7.



FIG. 8.



FIG. 9.



FIG. 10.



FIG. 11.



FIG. 12.

EX. A PG. 7

1

## KEYTOP LEVELLING MECHANISM

### BACKGROUND OF THE INVENTION

The present invention relates to keyboards for use in computer terminals, typewriters, and the like, and more particularly to a mechanism for maintaining an oddly-shaped keytop level during its downward and upward travel when used on a keyboard.

Various types of keyboards are used on typewriters, computer terminals and the like for typing or entering data into a computer. Such keyboards are typically manufactured from a plurality of separate keyswitches which are lined up on a circuit board. Each individual keyswitch has a keytop thereon which is generally stamped or otherwise marked with the number or letter which that keyswitch represents. Thus, a keyboard for a conventional typewriter will have something on the order of 50 separate keyswitches, 26 of them representing the letters of the alphabet, 10 representing the digits 0-9, with additional switches for various punctuation and machine functions.

Most keytops used in conventional keyboards are square or rectangular in shape. However, for some machine functions, keytops of different shapes are used. One shape which is often used for certain keyboard functions is an L-shaped keytop. Such keytops provide a convenient way of increasing the useable keytop area by providing an extension into an adjacent row of the keyboard without upsetting the esthetics of the keyboard. Typically, one portion of the L-shaped keytop is used while typing on the main or "alpha" portion of the keyboard while the other portion of the keytop (usually the "ascender" portion of an L-shaped keytop) is used while making entries on an auxiliary group of keyswitches located beside the main keyboard array. It is therefore important that an oddly-shaped keytop, such as an L-shaped keytop, be capable of use by pressing any part thereof. This feature is known as "full top surface utilization".

Full top surface utilization of oddly-shaped keytops is often difficult to provide, e.g., when used in conjunction with low profile keyswitches, when the keyswitch itself does not provide sufficient support for the entire keytop.

In the past, attempts to provide full top surface utilization of L-shaped keytops have not been entirely adequate. The objective of any solution is to prevent the keyswitch from binding when pressing the keytop at a point which is not directly over the keyswitch. One prior solution has been to limit the useable area of the keytop so that the forces created by a keyboard user pressing upon the keytop are directed to an area compatible with the action of the keyswitch. A disadvantage of this solution, however, is that the limited area defeats the purpose of the specially shaped keytop, i.e., the provision of additional keytop area. Another solution has been to incorporate a lever stabilizer mechanism similar to those used for multi-wide keytops such as space bars. However, due to the limited widths that can be obtained in oddly shaped keytops, for example in the narrow ascender portion of an L-shaped keytop, such lever stabilizer mechanisms are not adequate.

It would be advantageous to provide full top surface utilization of an oddly shaped keytop, such as an L-shaped keytop, along with smooth, level keyswitch actuation. Such features should be available even when only a narrow keytop section, such as a narrow as-

2

cender portion of an L-shaped keytop, is to be maintained level. Such a levelling mechanism should be economical, easy to manufacture, and capable of being fabricated from a minimal number of parts. This invention relates to such a keytop levelling mechanism.

### SUMMARY OF THE INVENTION

In accordance with the present invention, a keytop levelling mechanism is provided. The levelling mechanism is adapted for use in conjunction with a keytop which has a main portion along with a stem portion cantilevered from the main portion. The keytop is used to actuate a keyswitch, which is mounted on a circuit board. The levelling mechanism comprises a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends. Means is provided for pivotally mounting the first and second ends to longitudinally opposed ends of the cantilevered portion of the keytop. Means is also provided for pivotally mounting the third and fourth ends to separate joints adjacent the circuit board under the cantilevered portion. Finally, means is provided for enabling at least one end of each lever arm to slide in addition to pivot.

In a preferred embodiment, the first and second ends of the scissors-like linkage are designed to pivot and slide within the cantilevered portion of the keytop. In this preferred embodiment, the design can be such as to also allow a certain amount of sliding motion at the third and fourth ends of the scissors-like linkage. Such pivoting and sliding motion can be provided through the use of studs projecting from the first, second, third, and fourth ends, along with slots into which the studs protrude.

The structure of the keytop levelling mechanism is such that the lever arms collapse in scissor-like fashion when the keytop is pressed toward the circuit board. This arrangement serves to maintain the keytop, and particularly the cantilevered portion thereof, level throughout its movement toward and away from the circuit board.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top plan view of an L-shaped keytop mounted on a keyswitch with the levelling mechanism of the present invention mounted under the ascender portion of the L-shaped keytop;

FIG. 2 is a cross-sectional view taken substantially along the line 2—2 shown in FIG. 1;

FIG. 3 is a cross-sectional view taken substantially along the line 3—3 shown in FIG. 1 with the keytop in its extended, non-actuated position;

FIG. 4 is a cross-sectional view taken substantially along the line 3—3 of FIG. 1 with the keytop in its depressed, actuated position;

FIG. 5 is a plan view of one lever arm used in the levelling mechanism of the present invention;

FIG. 6 is a side view in partial cross-section of the lever arm shown in FIG. 5;

FIG. 7 is a plan view of another lever arm used in the levelling mechanism of the present invention;

FIG. 8 is a side view in partial cross-section of the lever arm shown in FIG. 7;

FIG. 9 is a side view of the keytop block used in the levelling mechanism of the present invention;

FIG. 10 is a top view in partial cross-section of the keytop block shown in FIG. 9;

EX. __A__ PG. __8__

3

FIG. 11 is a side view of the frame block used in the levelling mechanism of the present invention; and

FIG. 12 is a top view of the frame block shown in FIG. 11.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to the drawings, wherein like numbers indicate like elements throughout the several views, there is shown in FIG. 1 a keyswitch assembly 10 which includes a keytop 12 having a main portion 14 and a stem portion 16 cantilevered from main portion 14. Main portion 14 is mounted to a plunger 20 of a keyswitch 18 which is mounted on a circuit board 70. A spring 22 maintains the plunger 20 and hence keytop 12 in an extended position, away from circuit board 70, when the keytop is not being pressed down by a keyboard user.

Referring now to FIGS. 2 through 6 of the drawings, the keytop levelling mechanism of the present invention is shown in detail. For comparison purposes, FIG. 3 is a cross sectional view of the levelling assembly when the keytop is in its extended, non-actuated position, and FIG. 4 is essentially the same cross section but with the keytop in its depressed, actuated position. A pair of lever arms 24 and 26 are joined approximately at the centers thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends 72, 74, 76, and 78 respectively. Lever arm 24 is shown in greater detail in FIGS. 7 and 8. Lever arm 26 is shown in greater detail in FIGS. 5 and 6.

The pivot at which lever arms 24 and 26 are joined comprises a shaft 28 extending from lever arm 24 which projects into a collar 30 on lever arm 26. Flange 40 (see FIG. 7) at the end of shaft 28 (produced, e.g., by ultrasonic forming) provides a locking arrangement which holds lever arms 24 and 26 together after shaft 28 has been fully inserted into collar 30.

Keytop 12 is essentially hollow, and the hollow portion of cantilevered portion 16 thereof provides a cavity into which the scissors-like linkage formed from lever arms 24 and 26 extends. A keytop block 60 is mounted in cantilevered portion 16 of keytop 12 to provide a means for pivotally mounting first end 72 of lever arm 24 and second end 74 of lever arm 26. Keytop block 60 is shown in greater detail in FIGS. 9 and 10, and may be mounted in cantilevered portion 16 by conventional heat-staking techniques.

A stud 34 projects from first end 72 of lever arm 24 and protrudes into slot 52 in keytop block 60. Similarly, a stud 36 projects from second end 74 of lever arm 26 and protrudes into slot 54 of keytop block 60. The combination of studs 34 and 36 with slots 52 and 54 provides an articulating joint which allows both pivoting and sliding motion.

In the keyswitch structure shown, a metal frame 68 is situated above circuit board 70. Frame 68 serves to hold keyswitch 18 in place over circuit board 70. The actual electrical connections to keyswitch 18 are made on circuit board 70. Frame 68 also serves to hold a frame block 62 which provides articulating joints for third and fourth ends 76 and 78 of the scissors-like linkage formed from lever arms 24 and 26. As more clearly shown in FIGS. 11 and 12, frame block 62 includes openings, or slots 56 and 58. A stud 38 projecting from third end 76 of lever arm 26 protrudes into opening 56 of frame block 62. Similarly, a stud 32 projecting from fourth end 78 of lever arm 24 protrudes into opening 58 of frame

4

block 62. Openings 56 and 58 provide for pivotal motion and a certain amount of slidable motion of third and fourth ends 76 and 78 respectively.

Ears 64 and 66 are provided on frame block 62 to lock frame block 62 into frame 68. U-shaped openings 56 and 58 are formed by projections 50 and 46 respectively which extend from frame block 62.

As clearly shown in the Figures, the levelling mechanism of the present invention utilizes a scissors-like linkage which extends for substantially the full length of stem portion 16 of keytop 12. In an L-shaped keytop of the type illustrated, the stem portion 16 is often referred to as the "ascender" portion. By placing the levelling mechanism across the full length of the ascender, rather than the width thereof, a vastly improved operation is achieved which insures a smooth operation of the keyswitch and maintains the keytop level throughout its downward travel toward circuit board 70 and its upward travel away from circuit board 70. Pressing on any side of the keytop will cause one side of the scissors-like linkage formed from lever arms 24 and 26 to close. Closing one side will naturally close the other, pulling the keytop down parallel to circuit board 70. This operation is clearly shown in FIGS. 3 and 4.

In comparing FIGS. 3 and 4, it can be seen that when keytop 12 travels from its upward (non-actuated, extended) position to its downward (actuated, depressed) position, stud 34 of lever arm 24 moves outwardly within slot 52 and stud 36 of lever arm 26 moves outwardly in slot 54. Studs 34 and 36 will also rotate, or pivot, to a certain extent within slots 52 and 54 respectively as the keytop is pressed down. Similarly, stud 38 of lever arm 26 and stud 32 of lever arm 24 will rotate, or pivot, and slide outwardly in U-shaped openings 56 and 58 respectively. Since stem portion 16 is substantially hollow, it provides an area into which the scissors-like linkage becomes combined as arms 24 and 26 collapse upon the downward travel of keytop 12.

Those skilled in the art will appreciate that modifications can be made to the shape of lever arms 24 and 26. Similarly, modifications can be made in the mounting mechanisms provided by keytop block 60 and frame block 62. For example, two pivoting joints can be provided along with two sliding joints. It is not mandatory that the sliding joints be provided in the keytop; they can alternatively be provided adjacent the circuit board 70. Alternatively, keytop 12, and specifically stem portion 16 thereof could include one pivoting joint with a corresponding pivoting joint mounted therebelow adjacent circuit board 70, and one sliding joint with a corresponding sliding joint mounted therebelow adjacent circuit board 70. Thus, while only a single preferred embodiment of the present invention has been disclosed for purposes herein, it is to be understood that many variations and modifications could be made thereto. It is intended to cover all of these variations and modifications which fall within the scope of the present invention as defined by the claims appended hereto.

I claim:

1. A keytop levelling mechanism for use in conjunction with:

a keytop having a main portion and a stem portion cantilevered from said main portion; and

a keyswitch, mounted on a circuit board, which is adapted to be actuated when said keytop is pressed; said levelling mechanism comprising:

5

a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends;

means for pivotally mounting said first and second ends to longitudinally opposed ends of said cantilevered portion;

means for pivotally mounting said third and fourth ends to separate joints adjacent said circuit board under said cantilevered portion; and

means for enabling at least two of said first, second, third, and fourth ends to slide in addition to pivot.

2. The mechanism of claim 1 wherein said first and second ends are enabled to slide in addition to pivot.

3. The mechanism of claim 2 wherein said means for pivotally mounting said first and second ends and said enabling means comprises a keytop block mounted within said cantilevered portion, said keytop block including first and second slots into which studs, projecting from said first and second ends respectively, protrude to provide a mounting allowing both pivoting and sliding motion.

4. The mechanism of claim 3 wherein said means for pivotally mounting said third and fourth ends comprises a frame block mounted adjacent and in fixed relation to said circuit board, said frame block including third and fourth openings into which studs, projecting from said third and fourth ends respectively, protrude to provide a mounting allowing pivoting motion.

5. The mechanism of claim 4 wherein said third and fourth openings are slots which allow sliding motion in addition to pivoting motion.

6

6. The mechanism of claim 1 wherein said keytop is L-shaped.

7. A keytop levelling mechanism for use in conjunction with a substantially hollow L-shaped keytop, said mechanism comprising:

a scissors-like linkage having first, second, third, and fourth ends adapted to fit between the ascender portion of said L-shaped keytop and a base situated under said keytop;

first means for mounting said first and second ends within the hollow portion of said ascender portion at longitudinally opposed ends thereof; and

second means for mounting said third and fourth ends to said base;

said first and second mounting means adapted to provide articulating joints enabling said linkage to collapse in scissors-like fashion when said keytop is moved toward said base,

whereby said scissors-like linkage maintains said keytop level throughout its movement toward and away from said base.

8. The mechanism of claim 7 wherein said first mounting means comprises studs projecting from said first and second ends which protrude into slots provided at longitudinally opposed ends of said ascender portion, and said second mounting means comprises studs projecting from said third and fourth ends which protrude into slots provided at said base.

9. The mechanism of claim 7 wherein said base comprises a frame situated above a circuit board to which a keyswitch actuated by said keytop is mounted.

* * * * *

35

40

45

50

55

60

65

EX. __A__ PG. __10__

Exhibit E



FILED

02 AUG 19 PM 1:57

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MINEBEA CO., LTD.,

                              Plaintiff,

        vs.

THINK OUTSIDE, INC. AND
PERIPHERAL TECHNOLOGY, INC.,

                              Defendant.

CASE NO. 01CV771 BTM (POR)

ORDER RE: CLAIM
CONSTRUCTION

## I. BACKGROUND

Dean Cowles invented a keytop leveling mechanism in 1982 for use with computer keyboards or electric typewriters. Generally, when a user pushes down on a keytop at a point not directly over the keyswitch, the keytop tends to tilt which can cause the keyswitch to bind. The objective of the invention is to prevent the keyswitch from binding when pressing the keytop at a point not directly over the keyswitch. Patent 4,433,225 teaches a scissor-like structure to stabilize the portions of a keytop not supported by the keyswitch. Minebea is the owner of Patent '225.

Plaintiff Minebea and defendant ThinkOutside have filed cross-motions for claim construction of Patent '225. Plaintiff Minebea submitted the testimony of expert witnesses Bryan Broussard and William Voit in support of its motion for claim construction. Pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996),

01CV771

1 the court must construe the patents at issue in the above-entitled case as a matter of law.

2 On January 14, 2002, the court held a Markman hearing. The court heard arguments

3 regarding the construction of the disputed claims of the '225 patent and concerning a

4 motion to strike expert testimony. Having considered the evidence presented in the

5 parties' briefs, supporting declarations, and argument at the hearing, the court issues the

6 following ruling construing the disputed claim language as a matter of law.

7

8 II. DISCUSSION

9

10 **Legal Standard for Claim Construction**

11 To ascertain the meaning of the claims, the court initially looks to three sources of

12 intrinsic evidence: the claims, the specification, and the prosecution history. Vitronics

13 Corp. v. Conceptronic Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("It is well-settled that, in

14 interpreting an asserted claim, the court should look first to the intrinsic evidence of

15 record, i.e., the patent itself, including the claims, the specification and, if in evidence, the

16 prosecution history.") These sources form the public record of the patentee's claim. Id.

17 In construing the claims, the court first looks at the language of the claims.

18 Markman, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc) aff'd 517 U.S. 370 (1996). There

19 is a "heavy presumption" in favor of the ordinary and accustomed meaning of claim

20 language as understood by one of ordinary skill in the art. Johnson Worldwide Assocs.,

21 Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999); see also Toro Co. v. White

22 Consol. Indus., Inc., 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("[W]ords in patent claims are

23 given their ordinary meaning in the usage of the field of the invention, unless the text of

24 the patent makes clear that a word was used with a special meaning."). Accordingly, a

25 technical term used in a patent is interpreted as having the meaning a person of ordinary

26 skill in the field of the invention would understand it to mean.

27 In its initial examination of the intrinsic evidence, the court is also instructed to

28 //

2

1 examine the prosecution history to determine whether the patentee has relinquished a
2 potential claim construction in an amendment to the claim or in an argument to overcome
3 or distinguish a reference. Bell Atlantic, 262 F.3d at 1268 (citing Southwall Techs., Inc. v.
4 Cardinal IG, Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) (stating that "[t]he prosecution
5 history limits the interpretation of claim terms so as to exclude any interpretation that was
6 disclaimed during prosecution"). The prosecution history, or "file wrapper," contains the
7 complete record of all the proceedings before the Patent and Trademark Office ("PTO"),
8 including any express representations made by the applicant regarding the scope of the
9 claims. Id. (citing Vitronics, 90 F.3d at 1582). In examining the prosecution history,
10 however, the Court cannot "enlarge, diminish, or vary" the limitations of the claims.
11 Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880).
12      If the meaning of the claim limitation is apparent from the intrinsic evidence alone,
13 the Court may not rely on extrinsic evidence other than that used to ascertain the
14 ordinary meaning of the claim limitation. Bell Atlantic, 262 F.3d at 1268-69. However, in
15 the "rare circumstance" that the meaning of the asserted claims cannot be ascertained
16 after examining the intrinsic evidence, the Court may look to extrinsic evidence to help
17 resolve any lack of clarity. Id. Extrinsic evidence consists of all evidence external to the
18 patent and prosecution history and includes such evidence as expert testimony, articles,
19 and inventor testimony. Markman, 52 F.3d at 980. It may be used only to assist the
20 Court in determining the proper understanding of the disputed limitation, rather than "to
21 vary, contradict, expand, or limit the claim language from how it is defined, even by
22 implication, in the specification or file history." Bell Atlantic, 262 F.3d at 1269 (citing
23 Southwall Techs., Inc. v. Cardinal IG, Co., 54 F.3d at 1584-85). While dictionaries fall
24 within the category of extrinsic evidence, the Court is free to consult them at any time "so
25 long as the dictionary definition does not contradict any definition found in or ascertained
26 by a reading of the patent documents." Vitronics, 90 F.3d at 1584 n.6. Dictionaries are
27 preferred over opinion testimony because they are objective and available to the public.
28 Id. at 1585. This limited use of extrinsic evidence comports with the principle that

3



1  "[a]llowing the public record to be altered or changed by extrinsic evidence . . . would

2  make th[e] right [to design around the claimed invention] meaningless." Id. at 1583.

3  Otherwise, "[a]ny other rule would be unfair to competitors who must be able to rely on

4  the patent documents themselves, without consideration of expert opinion that then does

5  not even exist, in ascertaining the scope of a patentee's right to exclude." Southwall, 54

6  F.3d at 1578.

7

8  II.     Construction of the Disputed Terms of the '225 Patent

9       The Court addresses the following eight disputed terms of Claim 1 of the 225

10  patent:

11

12     A keytop leveling mechanism for use in conjunction with:

13     **[1] a keytop having a main portion and a stem portion cantilevered from said**

14     **main portion; and a keyswitch, [2] mounted on a [3] circuit board,** which is

15     adapted to be actuated when said keytop is pressed; said leveling mechanism

16     comprising:

17

18     **[3] a pair of lever arms** joined at intermediate portions thereof by a **[4] pivot** to

19     form a scissors-like linkage having first, second, third and fourth ends;

20     **[5] means for pivotally mounting said first and second ends to longitudinally**

21     **opposed ends of said cantilevered portion;**

22     **[6] means for pivotally mounting said third and fourth ends to separate joints**

23     **adjacent said circuit board under said cantilevered portion; and**

24     **[7] means for enabling at least two of said first, second, third, and fourth**

25     **ends to slide in addition to pivot.**

26  //

27  //

28  //

01CV771

1    Disputed language numbers 1-3 appear in the preamble of Claim 1.  Descriptions

2    that are recited in a claim's preamble are generally not limitations of the claimed

3    apparatus but instead function to identify its context.  Williams, Mfg. Co. v. United Shoe

4    Machine Corp. 316 U.S. 364, 368 (1942).  However, terms appearing in a preamble may

5    be deemed limitations of a claim when they give meaning to the claim and properly

6    define the invention.  In re Paulsen, 30 F.3d 1475, 1479 (Fed. Cir. 1994).  Where claim

7    language uses a term that can be understood only by looking to the preamble, the

8    preamble must be considered in interpreting the claim.  Pitney Bowes Inc. v. Hewlett-

9    Packard Co., 182 F.3d 1298, 1306 (Fed. Cir. 1999).  A term appearing in the preamble is

10   limiting when it is required to confer meaning on the claim.  Phillips Petroleum Co. v.

11   Huntsman Polymers Corp., 157 F.3d 866, 872 (Fed. Cir. 1998).

12        Claim 1 twice contains the phrase "said cantilevered portion" ('225 patent, col. 5,

13   lines 4-9) referring to the preamble which describes  "a keytop having a main portion and

14   a stem portion cantilevered from said main portion."   This phrase is otherwise undefined.

15   Claim 1 also includes the phrase "said circuit board" which refers to the preambular

16   language "mounted on a circuit board, which is adapted to be actuated when said keytop

17   is pressed" and is also otherwise undefined.  The court therefore finds that the preamble

18   is "intimately meshed with the ensuing language in the claim" and therefore must be

19   construed in interpreting the claim. Pitney Bowes Inc., 182 F.3d at 1306.

20

21   A. A keytop having a main portion and a stem portion cantilevered from said main

22   portion.

23        Think Outside contends that this language should be construed to mean "keytops

24   bearing a shape in which an unsupported segment extends outward at an angle from the

25   supported main part of the keytop."  The effect of such a construction would be to limit

26   the patent  to keys that are "L" or "T" shaped,  excluding long rectangular keys.  Minebea

27   proposes that the main portion should be defined as "the part of the keytop that is in

28   alignment with and in contact with the resilient support.  The stem cantilevered portion is

1 the "part of the keytop that extends laterally from the main portion that is not sufficiently

2 supported by the resilient support to prevent tilting when pressed." This construction of

3 the claim would include long rectangular keys which have a cantilevered portion

4 unsupported by the keyswitch.

5      Having considered the arguments on both sides, the court agrees with Minebea's

6 construction. The court finds that nothing in the plain language of the claim requires that

7 the stem portion extend outward at an angle from the main portion. The court rejects

8 ThinkOutside's contention that implicit in the definition of "stem" is that it juts out at an

9 angle from the main portion.[1] The definition of cantilever is a projecting beam supported

10 only at one end. *Webster's Third New International Dictionary (unabridged)* at 329

11 (1986). The court therefore finds that the stem portion of the keytop is simply the

12 unsupported portion of the cantilever. Bell Atlantic Network Servs., Inc. v. Covad Comms.

13 Group, Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) citing Vitronics, 90 F.3d at 1584 n.6

14 (In determining the ordinary and accustomed meaning of a term to one skilled in the art,

15 "[d]ictionaries and technical treatises, which are extrinsic evidence, hold a 'special place'

16 and may sometimes be considered along with the intrinsic evidence when determining

17 the ordinary meaning of claim terms.")

18      ThinkOutside argues that the '225 patent specification supports their interpretation

19 of stem and main portion. The specification includes diagrams of an L-shaped key which

20 label the stem portion as the part which juts outward from stem 14 at an angle. Also, the

21 patent specification describes the invention in terms of an "oddly shaped keytop, such as

22 an L-shaped keytop." ThinkOutside argues that the specification language

23 distinguishes square or rectangular keytops from oddly-shaped keys:

24     Most keytops used in conventional keyboards are square or
    rectangular in shape. However for some machine functions, keytops

25     of different shapes are used. One shape which is often used for

26 _____

27    [1] ThinkOutside submits dictionary definitions of stem which defines the word in terms of wine glasses, pipes, and musical notes. They argue that in all of the above examples,

28 the stem juts out at an angle from the main portion. The court finds this unpersuasive. The above examples would equally support a definition of stem through contrast to a main portion.

1   certain keyboard functions is an L-shaped keytop.

2 ThinkOutside argues that the patent is limited to oddly-shaped keytops and a rectangular

3 key is not an oddly-shaped keytop.

4     The court finds that although the specifications clearly envision an L-shaped key

5 as an example of an oddly-shaped key, nothing in the specifications and language of the

6 claim excludes a rectangular key. In fact, the prosecution history confirms the fact that

7 the inventor clearly envisioned that rectangular keys are one of the types of "oddly-

8 shaped keytop " for which his invention would provide full-top surface utilization.

9 Responding to the initial rejection by the patent Examiner, the applicant for the '225

10 patent distinguished prior art references by stating that :

11     Both the Abernethy and Fleming disclosures recognize the problem of
    preventing binding when pressing an oddly-shaped keytop at a point

12     which is not directly over the keyswitch . . .
    Prior to applicant . . . there was no use, disclosure, or suggestion of a

13     scissors-type linkage for enabling full-top surface utilization of
    **oddly-shaped keytops.**

14

15 The Abernethy invention related to a rectangular keytop and Fleming involved a large

16 area button. The applicant for the present patent clearly refers to the keytops in these

17 inventions as "oddly-shaped keytops" thus indicating there was no limitation to actual

18 shapes as suggested by ThinkOutside.

19     Nothing in the claim language itself requires a limitation to keytops that have an L-

20 shape (a stem portion that juts out at an angle). When there is ambiguity in the ordinary

21 meaning of a disputed claim term, the meaning of the disputed term may be clarified by

22 referring to the intrinsic evidence of the record, which includes the specification and the

23 prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir.

24 1996). However, "while claims are to be interpreted in light of the specification and with

25 a view to ascertaining the invention, it does not follow that the limitations from the

26 specification may be read in to the claim." Comark Communications Inc. v. Harris Corp.,

27 156 F.3d 1182, 1186 (Fed. Cir. 1998). Even if the specification identifies the invention as

28 dealing with L-shaped keys, the court would not read the specification's description of

1  oddly-shaped keys as limitations of Claim 1 which simply describes a stem portion
2  cantilevered from a main portion. The court construes "main portion" as *the part of the*
3  *keytop that is supported by the keyswitch* and "stem portion cantilevered from said main*
4  portion" as *the part of the keytop that extends laterally from the main portion.*

5

6  **B. Mounted**

7      ThinkOutside contends that "mounted on a circuit board" should be construed to
8  mean "directly attaching the keyswitch to a rigid board having conductive pathways so
9  that the keyswitch derives structural support from the rigid board." Minebea proposes
10  that mounted should be defined as "positioned in place over the circuit board."

11      A patent's claims should not be construed so as to exclude from their scope a
12  preferred embodiment which is disclosed and described in the specification. Hoechst
13  Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1581 (Fed Cir, 1996) ("it is unlikely that
14  an inventor would define the invention in a way that excluded the preferred embodiment,
15  or that persons of skill in this field would read the specification in such a way.");
16  Vitronics, 90 F.3d at 1578 ("Such an interpretation is rarely if ever correct.") An
17  examination of the preferred embodiment reveals that to construe "mount" as directly
18  attaching to the circuit board would result in an construction that excludes the preferred
19  embodiment. The preferred embodiment describes: "Metal frame 68 is situated above
20  circuit board 70. Frame 68 serves to hold keyswitch in place over circuit board 70. The
21  actual electrical connections to keyswitch 18 are made on circuit board 70." This
22  makes it clear that in the preferred embodiment, the keyswitch is supported over the
23  circuit board 70 by frame 68, not directly affixed to the circuit board as Think Outside
24  Suggests. The metal frame 68, not circuit board 70 provides, structural support for the
25  keyswitch. The court therefore does not construe mounted on a circuit to mean directly
26  attached to the circuit board so that it derives structural support from the board.

27      Minebea contends that "mounted" should be construed to mean "positioned." The
28  court finds that nothing in the ordinary meaning of "mounted" or the intrinsic evidence

8

1 warrants such a broad construction. The ordinary meaning of mounted is to attach to a

2 support. *Webster's Third New International Dictionary (unabridged)* at 1477 (1986).

3 There is no basis to believe that the definition of "mounted" in the relevant art is anything

4 other than its ordinary meaning. The court therefore construes "mounted" to mean

5 *secured either directly to the circuit board or onto a base that is attached directly to the*

6 *circuit board.* This definition does not exclude the preferred embodiment.

7

8 **C. Circuitboard**

9     ThinkOutside contends that circuit board should be construed as "a rigid board

10 having conductive pathways" while Minebea argues that the claim should be construed

11 as an "insulating sheet having conductive pathways." For the reasons below, the court

12 accepts Minebea's proposed construction.

13     A claim term is to be construed objectively as one of ordinary skill in the art at the

14 time of invention would have understood the term to mean. Markman, 52 F.3d at 986.

15 "[T]he court must determine how a person of experience in the field of this invention

16 would upon reading the patent documents, understand the words used to define the

17 invention." Toro Co. v. White Consolidated Industries, Inc., 199 F.3d 1295, 1299 (Fed.

18 Cir. 1999). The court may rely on extrinsic evidence *as to the meaning of a claim* only

19 in the rare circumstance when there is ambiguity in the intrinsic evidence. Vitronics v.

20 Conceptronics, 90 F.3d 1576 (Fed. Cir. 1996). However, the court can always receive

21 extrinsic evidence such as dictionary definitions, treatises, articles and expert testimony

22 *to aid and educate the court in understanding the state of the art at the time of invention.*

23 Tanabe Seiyaku Co. Ltd. v. United States Int'l Trade Comm., 109 F.3d 726, 732 (Fed.

24 Cir. 1997); Mantech Envtl. Corp. v. Hudson Envtl. Servs. Inc., 152 F.3d 1368, 1373 (Fed.

25 Cir. 1998).

26     ThinkOutside parses the term circuit board into its constituent words "circuit" and

27 "board" and concludes that since a board is a flat rigid object, a circuit board is a flat,

28 rigid object containing circuits or conductive pathways. The court rejects this construction

1    as an over-literal and improper reliance on dictionary definitions. Liebscher v. Boothroyd,

2    258 F.2d 948, 950 (C.C.P.A. 1958) (indiscriminate reliance on definitions found in

3    dictionaries can often produce absurd results.). Instead, the court finds that "circuit

4    board" is a term of art to be construed as a person skilled in the art of keyboards at the

5    time of the patent.

6         Minebea submits testimony of the experts Broussard and Voit which state that a

7    person skilled in the art in 1983 would have understood the term to include flexible circuit

8    boards and any other non-conductive sheets having conductive pathways. The court

9    accepts this expert testimony as extrinsic evidence to educate the court about the state

10    of the art at the time of the patent.[2] Markman, 52 F.3d at 980. Minebea has also

11    provided the court with examples of contemporaneous patents that included flexible

12    circuit boards. (Sicklinger Decl., Exh. A, B, C ) Based on this evidence, the court finds

13    that "circuit board" should be construed as *insulating sheet having conductive pathways.*

14

15   **D. A Pair of Lever Arms**

16         Think Outside proposes that "a pair of lever arms" be construed as "two structures

17    approximating the shape of a human arm." Minebea contends that lever arm means "a

18    rigid member that turns about a pivot."

19         ThinkOutside argues that dictionary definitions provide that "arm" refers to

20    structures that are slender and approximate the shape of a human arm. It derives its

21    construction by parsing out "arm" from "lever arm" and looking up "arm" in the dictionary.

22    The court rejects this as another over-literal reliance on dictionary definitions. The term

23    "arm" should be construed in the context of the claim language and the specifications.

24    Anderson v. Int'l Eng'g & Mfg., Inc., 160 F.3d 1345, 1348-49 (Fed. Cir. 1998). The court

25    finds that the inventor used the term " arm" as part of the phrase "lever arm" to denote

26    //

27    _____

28       [2] The court will discuss the remainder of the issues raised by ThinkOutside's Motion
to Strike Minebea's Expert Testimony below.

1 | simply the part of the lever that turns around a pivot or fulcrum.[3]   The patent

2 | specification describes "a pair of lever arms 24 and 26 are joined approximately at the

3 | centers thereof by a pivot to form a scissors like linkage." (Col. 3, ll.26-29) Nothing in the

4 | written specifications indicates that the term lever arms is used in any other way than to

5 | indicate the turning component of a lever.

6 |     Although the specifications draw thin long lever arms, "particular embodiments

7 | appearing in the specification will not be read into the claims when the claim language is

8 | broader that such embodiments." Electro. Med. Sys. v. Cooper Life Services, 34 F.3d

9 | 1048, 1054 (Fed. Cir. 1994). "[I]t is well established that broad claims supported by the

10 | written description should not be limited in their interpretation to a preferred embodiment."

11 | Gart v. Logitech, Inc., 254 F.3d 1334, 1343 (Fed. Cir. 2001).   The court therefore will not

12 | limit the phrase "lever arms" in Claim 1 to mean slender structures shown in the

13 | specification diagrams.  Moreover, the specification itself states "[t]hose skilled in the art

14 | will appreciate that modifications can be made to the shape of lever arms 24 and 26."

15 | (Col. 4, lines 40-41). Instead, it construes the term "lever arms" as *a rigid structure of any*

16 | *dimensions which functions as the part of a lever that turns about a fulcrum or pivot.*

17 |

18 | E. Joined at Intermediate Portions thereof by a  Pivot to form a Scissors-like

19 | Linkage [4]

20 |     Think Outside proposes that the court construe "pivot" as "a fixed point at which

21 | these lever arms rotate and do not slide." Minebea contends that "pivot" means "a

---

[3]The court notes that a definition of "lever arm" is the perpendicular distance from the fulcrum of a lever and the line of action of the weight. *Webster's Third New International Dictionary (unabridged)* at 1301 (1986). The inventor clearly did not intend this definition of the phrase "lever arm."

[4]Although Minebea claims the term "joined at intermediate portions thereof" is disputed, no alternative construction of these terms is offered by ThinkOutside. The court will therefore assume that this term is undisputed.  A reading of Think Outside's papers supports the conclusion that they dispute the construction of the terms "lever arms" and "pivot," not "joined at intermediate portions thereof."
The phrase, "to form a scissors-like linkage having first, second, third and fourth ends" also appears undisputed. Minebea's papers offer no alternate construction of this phrase. Again the dispute seems to surround the word "pivot."

1 structure about which something normally turns but also slides." For the reasons

2 discussed below, the court finds that pivot as it appears in Claim 1 does not include

3 sliding motion.

4       Standard and scientific dictionaries confirm that a pivot is a fixed point about which

5 something turns. *Merriam Webster's Collegiate Dictionary* at 887 (10th ed. 1993);

6 *Webster's Third New International Dictionary (unabridged)* at 1477 (1986); *Academic*

7 *Press Dictionary of Science and Technology* at 1659 (1992). Although there are special

8 pivots that allow sliding as well as turning motion such as in a pair of pliers, the ordinary

9 meaning of "pivot" includes only turning motion.

10       An examination of the specifications supports this construction. Where both

11 pivoting and sliding motion are envisioned, the claim and the specifications clearly and

12 explicitly provide for it. Claim 1 provides for "an articulating joint which allows both

13 pivoting and sliding motion." (See Column 3, lines 53-55.) This articulating joint,

14 however, is not the pivot in question here. There is no mention of sliding motion at the

15 pivot which connects the two lever arms. An examination of the diagrams in the

16 specification show that the joints that allow for sliding and pivoting are designed to allow

17 for such movement where as the pivot connecting the two lever arms are not. (Figs. 3,

18 9,11).

19       The court notes that it is not importing a limitation from the specifications where

20 the language of the claim is broader than the material in the specifications. The court

21 finds that the term pivot in Claim 1 means a point about which something turns. The

22 specifications and the diagrams contained therein support the construction that only

23 turning motion was envisioned by the inventor at the pivot which connects the two lever

24 arms as compared to other joints where pivoting and sliding may occur. The court

25 therefore construes "pivot" as *a fixed point about which something turns.*

26

27 **F. Means for pivotally mounting said first and second ends to longitudinally**

28 **opposed ends of said cantilevered portion.**

12

01CV771

1       Think Outside contends that "ends" should be construed as 'the extremity of an

2 object with length." Minebea on the other hand defines ends as "near the boundary."

3 The court rejects both constructions of "ends."

4       Figure 3 of the specifications shows that ends 72 and 74 are near the boundary of

5 the cantilevered portion, but that they are not at the extremity of the cantilevered portion.

6 To interpret "ends" to mean the very outer extremity would be to construe the claim in a

7 way to exclude the preferred embodiment as drawn up in the diagrams. A construction

8 which excludes the preferred embodiment is rarely if ever correct." <u>Vitronics</u>, 90 F.3d at

9 1582. The court therefore finds that the meaning of the terms "ends" in Claim 1 is not

10 limited to the extremity of an object. The court instead construes "ends" as *at or near*

11 *the extremity of an object.*

12

13 **G. Means for pivotally mounting said third and fourth ends to separate joints**

14 **"adjacent" said circuit board under said cantilevered portion.**

15       Think Outside contends that "adjacent" should be construed to mean "next to the

16 circuit board." Minebea proposes that adjacent in Claim 1 means "nearby."

17 The court notes that the dictionary definition of adjacent is lying near, close or

18 contiguous. *Webster's Third New International Dictionary (unabridged)* at 26 (1986).

19 The specifications show that the joints in the preferred embodiment are located near and

20 above the circuit board but not directly contiguous to the circuit board.

21       In the keyswitch structure shown, a metal frame 68 is situated above circuit board
      70 . . . Frame 68 also serves to hold a frame block 62 which provides articulating

22       joints for third and fourth ends 76 and 78 . . .

23 (Col. 3, lines 55-65). To limit claim language "adjacent" to mean next to would exclude

24 the preferred embodiment. The court therefore construes adjacent to mean *contiguous*

25 *or nearby.*

26

27 **H. Means Plus Function Claim Elements**

28       A patent application may describe an element of the invention by identifying it as

1  the "means" for achieving a function rather than by identifying the physical item or

2  element to be used. 35 U.S.C. §112. The court determines the meaning of the means

3  plus function element by looking to the specifications to identify the structure, materials

4  or acts corresponding to the claimed function. Sage Prods. Inc. v. Devon Indus. Inc., 126

5  F.3d 1420, 1428 (Fed. Cir. 1998). The scope of a claim having a means plus function

6  limitation is confined to the structures expressly disclosed in the specifications and

7  equivalents. Symbol Techs. Inc. v. Opticon, 935 F.2d 1569, 1575 (Fed. Cir. 1991). A

8  means- plus- function element will generally be held indefinite if the specification does

9  not contain an adequate disclosure of structure corresponding to the function of the

10  claims. In re Dossel, 115 F.3d 942, 946 (Fed. Cir. 1997)

11

12

13  1. The Means Plus Function Claim Elements Do Not Fail For Indefiniteness

14      Think Outside contends the following means plus function claim elements fail for

15  indefiniteness:

16      [1] means for pivotally mounting said first and second ends to longitudinally

17      opposed ends of said cantilevered portion;

18      [2] means for pivotally mounting said third and fourth ends to separate joints

19      adjacent said circuit board under said cantilevered portion;

20  ThinkOutside asserts that the specification does not contain an adequate disclosure of

21  structures corresponding to the function of these claims. It points out that while the

22  function claimed is "pivotally mounting," the specifications only disclose a structure that

23  mounts the lever arm ends at joints that allow both sliding and pivoting. Because the

24  specifications do not identify joints that allow only pivoting movement, ThinkOutside

25  argues the two above means plus function claims fail for indefiniteness. The court notes

26  however that the third means plus function element does claim pivoting and sliding

27  motion at the joint that mount the lever arms. The third element claims a:

28      [3] means for enabling at least two of said first, second, third, and fourth

14

1  ends to slide in addition to pivot.

2  When read in conjunction with the third element, the means plus function elements of

3  Claim 1 provides a means for mounting the four ends of the lever arms at pivots that

4  provide for both sliding and pivoting motion.   As ThinkOutside concedes, the

5  specifications disclose a structure that accomplishes this function.  Col. 3, lines 49-55

6  and Col. 3, line 60- Col.4, line 3.  The court therefore finds that the means plus function

7  claims of Claim 1 do not fail for indefiniteness.

8

9  2. Structures Corresponding to "means for pivotally mounting said first and second ends

10  to longitudinally opposed ends of said cantilevered portion"

11  Minebea contends that the corresponding structure for the "means for pivotally

12  mounting said first and second ends to longitudinally opposed ends of said cantilevered

13  portion" are stud 34 protruding into slot 52, which is in keytop block 60, and stud 36

14  protruding into slot 54, which is in keytop block 60.  (See Column 3, Lines 39-45)

15  Minebea takes the position that although the slots are in keytop block 60, the keytop

16  block 60 itself is not necessary to perform the required function.  Think Outside contends

17  that keytop block 60 is necessarily a part of the structure that pivotally mounts the first

18  and second ends to the cantilevered portion of the keytop.  The court agrees with

19  ThinkOutside.

20  The function claimed includes mounting the first and second ends of the lever

21  arms to the cantilevered portion of the keytop.  Keytop block 60 which includes the slots

22  52 and 54 is the component that is attached to the keytop:

23  A keytop block 60 is mounted in cantilevered portion of keytop 12 to provide a
    means for pivotally mounting first end of 72 of lever arm 24 and second end 74 of
24  lever arm 26. . . A stud 34 projects from first end of lever arm 24 and protrudes
    into slot 52 in keytop block 60.  Similarly a stud 36 projects from second end 74 of
25  lever arm 26 and protrudes into slot 54 of keytop block 60.

26  Without keytop block 60, the lever arm ends would not  be mounted to the cantilevered

27  portion of the keytop.   Keytop block 60 is therefore a necessary component of  the

28  means for pivotally mounting the  first and second ends to the keytop.  The court

15

1. concludes that the structures which correspond to the first means plus function element
2. are: *keytop block 60, a stud 34 protruding into slot 52 and stud 36 and protruding into slot*
3. *54.*

5. 3. Structures Corresponding to " a means for pivotally mounting said third and fourth
6. ends to separate joints adjacent said circuit board under said cantilevered portion."

7.     Minebea identifies the structure to perform the function "pivotally mounting said
8. third and fourth ends to separate joints adjacent said  circuit board under said
9. cantilevered portion" as "stud 38 protruding into opening 56 and stud 32 protruding into
10. opening 58." ThinkOutside argues that the structure that corresponds to the means
11. must include frame block 62.   Again, the court agrees with ThinkOutside.

12.     The function claimed is mounting the third and fourth ends to joints adjacent the
13. circuit board.  The means for performing that function must include the joints to which the
14. ends are mounted. The specifications states that:

15.     Frame 68 also serves hold a frameblock 62 which provides articulating joints for
    third and fourth  ends 76 and 78 . . . As more clearly shown in Fig. 11 and 12,
16.     frame block 62 includes openings, or slots 56 and 58.  A stud 38
    projecting  from third end 76 of lever arm 26 protrudes into opening 56 of frame
17.     block 62.  Similarly, a stud 32 projecting from fourth end 78 of lever arm    24
protrudes into opening 58 of frame block 62.

19. (Col. 3, line 60 - Col. 4, line 1).

Since frameblock 62 provides the joints to which the third and fourth ends are mounted, it
20. is a necessary part of the means.   The court concludes that the structures which
21. correspond to the first means plus function element are: *frameblock 62, a stud 38*
22. *protruding into opening 56 and stud 32 and protruding into opening 58.*

25. 4. Structures corresponding to a "means for enabling at least two of said first, second,
26. third and fourth ends to slide in addition to pivot."

27.     Minebea contends that the structure that enables the ends to slide instead of pivot
28. is comprised of elongated profiles in at least two of slots 52, slot 54, opening 56 and

16

1 opening 58. ThinkOutside argues that keytop block 60 and frame block 62 (which

2 contain the openings/ slots 52,54, 56,58) is the means for enabling the sliding, in

3 addition to pivoting.

4 Unlike the means plus function elements above which provided a structure for

5 *mounting* the ends, this means plus function claim only needs to provide for a means for

6 allowing sliding and pivoting motion. Sliding and pivoting motion is accomplished by the

7 shape of the opening to which the ends are attached and is not dependent on the

8 structure that provides the openings. The court accepts Minebea's construction which

9 identifies the means structure as the elongated profiles in *slot 52, slot 54, opening 56,*

10 *and opening 58.* Although the specification never expressly says "elongated slots," the

11 slots are numbered and clearly refer to the diagrams which depict elongated slots to

12 allow for the pivoting and sliding motion.

13

14 **III. MOTION TO STRIKE**

15 In support of their motion for claim construction, Minebea submitted expert

16 declarations from William Voit and Bryan Broussard. Broussard and Voit testified that

17 the term circuit board, as used by those skilled in the art in 1983, included both flexible

18 and rigid sheets of materials containing electronic pathways.

19 Voit also testified to the following:

20 1) A lever is a simple machine consisting of a lever arm and a fulcrum. A lever arm need

21 not resemble a human arm.

22 2) Nothing in the claim or specifications limits "a main portion and a stem portion

23 cantilevered from said main portion" to any particular key shape.

24 3) "Mounted" is understood by one skilled in the keyboard art to mean "positioned."

25 4) "Pivot" as understood by one skilled in the art of mechanical engineering art does not

26 exclude a sliding motion.

27 ThinkOutside moves to strike these declarations submitted by William Voit and

28 Bryan Broussard arguing that Minebea has not identified any basis for allowing the court

17

1   to consider extrinsic evidence. For the reasons discussed above, the court accepts the

2   testimony of Broussard and Voit concerning circuit boards as evidence which aids the

3   court in understanding the state of the art at the time of the invention. The court finds

4   that the remaining expert testimony is impermissible extrinsic evidence.

5        In order for the court to consider extrinsic evidence, the court must first conclude

6   that the meaning of a patent claim is ambiguous based on its language and on its

7   intrinsic evidence. Bell & Howell v. Altek Systems, 132 F.3d 701,706 (Fed. Cir. 1997).

8   Minebea argues that because claims must be construed from the perspective of one

9   skilled in the art, with consideration of the state of the art at the time of invention, a court

10  is encouraged to receive aids to assist the court in understanding the state of the art at

11  the time of the invention. Cybor Corp. v. FAS Tech, 138 F.3d 1448, 1462 (Fed. Cir.

12  1998).

13       The court grants the motion to strike expert evidence as to the meanings of

14  "mounted;" "pivot;" "a lever arm;" and a "main portion and a stem portion cantilevered

15  from said main portion." The court notes that these terms are common descriptive terms

16  detailing the patent, not terms of art. The expert testimony as to these matters does not

17  help the court understand the technology behind the patent or provide a background.

18  Vitronics, 90 F.3d at 1585 (holding district court can consider extrinsic evidence to

19  understand the underlying technology but not on the ultimate issue of a disputed claim

20  unless there is an ambiguity.) The expert's conclusions as to these meanings are

21  conclusory statements that go to the ultimate claim construction question. Since the

22  court notes no ambiguity as to the meanings of these terms in the claim and

23  specifications, expert evidence is not appropriate. The court GRANTS the motion to strike

24  with respect to those portions of expert testimony submitted by Minebea.

25       Think Outside also objected to Minebea's expert testimony based on Federal Rule

26  of Evidence 702. Since the court granted the motion to strike with respect to all other

27  expert testimony, it will deal with objections based on Rule 702 only with respect to the

28  accepted testimony regarding circuit boards. Rule 702 states:

1 If scientific, technical or other specialized knowledge will assist the trier of fact to
2 understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education, may testify thereto in
the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
3 facts or data, (2) the testimony is the product of reliable principles.

4 The court finds that both Broussard and Voit are qualified as experts. They have

5 worked in the field of mechanical engineering and in the field of circuit board design and

6 IBM high speed products respectively for many years. Mr. Voit has an advanced degree

7 in mechanical engineering and Mr. Broussard has a degree in electronics technology.

8 They both testify on the basis of their expertise and knowledge of the industry.

9 Think Outside does not dispute their qualifications but contends that they have

10 offered no basis or support for their conclusions. ThinkOutside points out that Broussard

11 and Voit submit no facts or data or other proof that their testimony is based on reliable

12 principles. The court notes that although the reliability inquiry in many cases may

13 involve facts, data and scientific methodologies, in other cases the reliability concerns

14 may focus on the personal knowledge or experience of the experts. Kumho Tire Co. v.

15 Carmichael, 526 U.S. 137,139 (1999) (the Daubert factors are a non-exclusive list of

16 factors and may be inapplicable to certain circumstances). The court finds that

17 Broussard's and Voit's experience in the fields of circuit board design and product

18 development form a reliable basis for their testimony concerning how one skilled in the

19 art of circuit boards would have understood the term "circuit board" at the time of the

20 patent. The court finds Broussard and Voit's testimony concerning circuit boards

21 admissible and denies the motion to strike regarding this testimony.

22

23 **IV. CONCLUSION**

24 For the above reasons, the court GRANTS IN PART and DENIES in part

25 ThinkOutside's motion to strike [67-1] expert evidence. Plaintiff's motion for claim

26 construction is GRANTED IN PART and DENIED IN PART [59-1] and defendant' motion

27 for claim construction [56-1, 72-1] is GRANTED IN PART and DENIED IN PART.

28 The court has given substantial time and study to the issues involved. Generally

19

1  motions for reconsideration are disfavored.  However, if a party believes such a motion to

2  be appropriate, it must file it on or before August 29, 2002.  The motion is limited to 10

3  pages.  Any opposition shall  be filed by September 6, 2002 and shall also be limited to

4  10 pages.  No replies will be accepted.  The limit on the timing and length of any such

5  motion should not be considered encouragement to file one.

6

7  **IT IS SO ORDERED.**

8  Dated: _August 17, 2002_

9  HONORABLE BARRY TED MOSKOWITZ
   United States District Judge

10

11  cc: All parties and counsel of record

12  Magistrate Judge Porter

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20                                                    01CV771

Exhibit F

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINEBEA CO., LTD., a Japanese corporation, | CASE NO. 01CV771 BTM (POR) |
| Plaintiff, | |
| v. | ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION OF COURT'S *MARKMAN* RULING AND |
| THINK OUTSIDE, INC., a California corporation; and PERIPHERAL TECHNOLOGY, INC., a Taiwan corporation, | GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR RECONSIDERATION |
| Defendants. | |

On August 29, 2002 Defendants Think Outside, Inc. and Peripheral Technology, Inc. filed a motion for partial reconsideration of this Court's August 17, 2002, Order interpreting particular elements of Claim 1 of U.S. Patent No. 4,443,225. On September 3, 2002, Plaintiff Minebea Co., Ltd., filed a motion for reconsideration of this Court's construction of the claim term "pivot."

<u>Defendants' Motion (scissors-like linkage)</u>

Defendants ask the Court to interpret the claim limitation "scissors-like linkage" as being "a mechanism that locks the lever arms to each other from the outer sides of the lever arms." Defendants' Joint Memorandum in Support of Partial Reconsideration of Court's Markman Ruling ("Def. Mot.") at 1-2. Defendants argue that the term "scissors-like linkage" "necessarily contemplates that the constituent lever arms will be fastened to one another." Id. Like a pair of common household scissors, they claim that a scissors-like linkage is "universally

01cv771

1  understood to denote a linkage mechanism that joins the two blades from the outer sides of

2  the blades." Id. at 3. What is being contested, however, is not the definition of household

3  scissors but what if any limitations apply to the term "scissors-like linkage" in the patent.

4  Claim language must always be construed in light of the specification. Vitronics Corp.

5  v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("It is well settled that, in interpreting

6  an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent

7  itself, including the claims, the specification and if in evidence, the prosecution history.");

8  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) ("Claims must be

9  read in view of the specification, of which they are a part."). Nothing in the claim language or

10 specifications suggests that the arms in question must be joined from the outer sides. While

11 the defendants are unable to conceive of a type of "scissors" that is not fastened together

12 externally, the Court is not so limited. Because the Court can imagine other types of "scissors-

13 like linkages" that do not require that the blades be attached to one another from the outer

14 sides, it concludes that such a limitation is not intrinsic or implicit in its meaning. Since the

15 language of the claim, the specifications and common knowledge do not limit a scissor type

16 linkage to a pivot fixed from the external side of the scissor arms, the Court does not read such

17 a limitation into the patent.

18 Therefore, the Defendants' motion for reconsideration is DENIED.

19 Plaintiff's motion (Pivot)

20 In their motion for reconsideration, Plaintiff's request that the Court change its

21 construction of the term "pivot" from "a fixed point about which something turns" to "a structure

22 about which something turns or rotates." Memorandum in Support of Minebea Co. Ltd.'s

23 Motion for Reconsideration of the Construction of the Claim Term "Pivot" ("Pl. Mot.") at 1.

24 Plaintiff offers two basic challenges to the court's construction of this term. First, it contends

25 that use of the word "fixed" implies that the pivot is a "fixed point that supports something," i.e.

26 that is it a fixed point in space. The reasoning continues that because the embodied shaft

27 "moves up and down with the keytop" the Court's use of the term "fixed" must certainly be

28 incorrect. Pl. Mot. at 4.

1      While the Court does not agree that its definition of "pivot" implied that it was a "fixed

2 point in space," the Court does not want there to be any misunderstanding as to its meaning.

3 Therefore, the Court amends its construction of "pivot" to mean *a structure about which*

4 *something turns or rotates that is fixed relative to the two arms.*

5      The second challenge is basically a reworking of the Plaintiff's argument at the original

6 *Markman* hearing, namely that the term "pivot" includes not only rotational movement but

7 "sliding" motion as well. As the Court stated in its August 17, 2002, Order:

8     Where both pivoting and sliding motion are envisioned, the claim and the
    specifications clearly and explicitly provide for it. Claim 1 provides for 'an

9     articulating joint which allows both pivoting and sliding motion.' (See Column 3,
    lines 53-55.) This articulating joint, however, is not the pivot in question here.

10     There is no mention of sliding motion at the pivot which connects the two lever
    arms. An examination of the diagrams in the specification shows that the joints

11     that allow for sliding and pivoting are designed to allow for such movement
    whereas the pivot connecting the two lever arms [is] not. (Figs. 3, 9, 11).

12
Order at 12.

13      Because the Plaintiff has not proffered sufficient new evidence or reasoning to convince

14 the Court that it was incorrect in its earlier ruling on this point, this second challenge fails. The

15 Court therefore construes the term "pivot" to mean *a structure about which something turns or*

16 *rotates that is fixed relative to the two arms.*

17 <u>Conclusion</u>

18      For the reasons stated above, the Court DENIES the Defendants' motion for

19 reconsideration and GRANTS the Plaintiff's motion in part and DENIES the Plaintiff's motion

20 in part.

21

22 **IT IS SO ORDERED.**

23 Dated: _10-21-02_

24                            HONORABLE BARRY TED MOSKOWITZ

25                              United States District Judge

26 Copies to:
   All Parties and Counsel of Record

27

28

Exhibit G

1   MICHAEL A. JACOBS (BAR NO. 111664)
    PAUL A. FRIEDMAN (BAR NO. 208920)
2   MORRISON & FOERSTER LLP
    425 Market Street
3   San Francisco, California 94105-2482
    Telephone: (415) 268-7000
4   Facsimile: (415) 268-7522

5   Attorneys for Applicant
    CHICONY AMERICA, INC.
6

7

8

9                   UNITED STATES DISTRICT COURT

10                  SOUTHERN DISTRICT OF CALIFORNIA

11

12  | MINEBEA CO., LTD., a Japanese corporation, | No.   01cv0771-BTM(POR) |
    |---|---|
13  | Plaintiff, | **APPLICANT CHICONY AMERICA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE** |
14  | v. | |
15  | THINK OUTSIDE, INC., a California corporation; and PERIPHERAL TECHNOLOGY, INC., a Taiwan corporation, | Date:   June 6, 2003, 11:30 a.m. Judge:  Hon. Barry Ted Moskowitz |
16  | | |
17  | Defendants. | NO ORAL ARGUMENT UNLESS REQUESTED BY COURT |

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Plaintiff Minebea Co., Ltd. recently asserted that the complaint in this action alleges that the new Stowaway XT Keyboard infringes United States Patent No. 4,433,225. Applicant Chicony America manufactures the Stowaway XT Keyboard for Defendant Think Outside, Inc. With Minebea's clarification that this lawsuit alleges that the Stowaway XT Keyboard infringes its patent, Chicony has an interest in this litigation because:

- Minebea has instituted separate litigation against Chicony in the Western District of Washington involving the same patent and some of the same keyboards, and the outcome in the San Diego litigation will likely be influential in the Seattle litigation;

- Chicony has a palpable business interest in protecting its customers from claims that the products Chicony sells them infringe;

- Chicony's parent corporation is subject to a claim that it has indemnified Think Outside from claims of patent infringement relating to the Stowaway XT Keyboard;

- The Defendants to this action lack the information and resources necessary to defend adequately against the claim that Chicony's keyboards infringe the '225 patent; and

- Chicony has an interest in preventing the disclosure of Chicony's trade secrets, of which Minebea is now seeking the production in this litigation.

Accordingly, Chicony seeks to intervene pursuant to Rules 24(a) and 24(b) of the Federal Rules of Civil Procedure.

# FACTS

District courts must accept as true non-conclusory allegations made in support of a motion to intervene. *Southwest Ctr. for Biological Diversity v. Berg,* 268 F.3d 810, 819 (9th Cir. 2001).

## A. Products Manufactured and Indemnified by Chicony Are at Issue in This Case

Late last year, Chicony America and its parent began manufacturing the Stowaway XT Keyboard for Defendant Think Outside. The Stowaway XT Keyboard is the second-generation

keyboard from Think Outside, Inc., and a follow-up to Think Outside's Stowaway Portable Keyboard. Chicony's parent, Chicony Electronics, is subject to a claim that it has indemnified Think Outside from certain claims of patent infringement related to the Stowaway XT Keyboard. (Friedman Decl. Ex. 1 at ¶ 8.1.)

Minebea has consistently maintained that this litigation encompasses the Stowaway XT Keyboard. For example, referring to the Stowaway XT Keyboard as "the new product," Minebea's lawyers stated in December 2002 that Minebea's complaint

> is broad enough to encompass any infringing product sold by the defendants, and it is also our position that we are entitled to full discovery with respect to the new product, including supplemental interrogatory responses.

(Friedman Decl. Ex. 2 at 9:6-10.) Similarly, after counsel for Think Outside inquired whether the Southern District of California complaint was limited to the first-generation Stowaway Portable Keyboard, Minebea's counsel responded "that the Complaint is not so limited, and that Minebea is clearly entitled to seek discovery relating to additional infringing products and manufacturers." (Friedman Decl. Ex. 3 at 1.)

Recently, Minebea asserted that the Stowaway XT keyboard infringes the '225 patent. In January 2003, Minebea analyzed the Stowaway XT Keyboard in an interrogatory response seeking the basis for Minebea's infringement positions. (Friedman Decl. Ex. 5 at 3:20 – 5:1.) Similarly, in February 2003, Minebea referred to the Stowaway XT Keyboard (by its trade name, the Ultra-Thin Keyboard) as an accused device. (Friedman Decl. Ex. 4 at 2:23.)

**B. Minebea Is Seeking to Compel the Production of Chicony's Trade Secrets**

Minebea recently filed a motion to compel the production of certain documents from Think Outside.[1] Minebea asked in these motions that Magistrate Judge Porter order Think

---

[1] Magistrate Judge Porter denied that motion, finding that Minebea had failed to meet and confer in accordance with Local Civil Rule 26.1 before filing the motion. However, Magistrate Judge Porter directed the parties to meet and confer, and submit to her any remaining disputes. This meet and confer occurred on March 26, 2003, during which Think Outside did not agree to produce Chicony's technical documents – because Think Outside does not have them. (Friedman Decl. ¶¶ 12-14.) Accordingly, it appears likely that this issue will again be submitted to Magistrate Judge Porter shortly, with Minebea presumably again contending that Think Outside is obligated to (somehow) force Chicony to provide materials in its possession to Minebea. It is

*(Footnote continues on following page.)*

Outside to force Chicony to produce documents in Chicony's possession. For example, in its motion, Minebea stated that:

> Think Outside has a legal right to obtain from its suppliers including . . . Chicony Electronics Co., Ltd. the critical technical documents that Minebea seeks. . . . Think Outside should be ordered to produce responsive documents in the possession of Chicony. . . .

(Friedman Decl. Ex. 4 at 7:7-8, 12-13.) Minebea explained in its motion that it is seeking a variety of material, including "detailed engineering analyses" and various other "detailed drawings." (Friedman Decl. Ex. 4 at 8:1-4.) These documents contain proprietary business data that Chicony assiduously shields from disclosure and that were produced at substantial expense and effort to Chicony.

## C. Minebea Has Recently Sued Chicony on the Same Patent and the Same Product in the Western District of Washington

Minebea recently filed a patent infringement action against Chicony America, Inc., and its parent company, Chicony Electronics, in the United States District Court for the Western District of Washington. (Friedman Decl. Ex. 6.)[2] Minebea's complaint does not specify which of Chicony's keyboards it contends infringe the '225 patent, instead referring simply to Chicony's "computer keyboards." (Friedman Decl. Ex. 6 at ¶¶ 12-14.) However, in pre-suit correspondence between the parties' counsel, Minebea's counsel clarified its position that the Stowaway XT Keyboard infringes the '225 patent. (Friedman Decl. Ex. 7 at 2.) The Western District of Washington litigation thus involves some of the same products, and the same patent, that are at issue in this litigation.

---

*(Footnote continued from previous page)*

noted that *none* of the materials in Chicony's possession would relate to the summary judgment motion now pending before this Court.

[2] The defendants in the Western District of Washington litigation have filed a motion to transfer that litigation to this Court pursuant to 28 U.S.C. § 1404(a) or, in the alternative, to dismiss the Western District of Washington litigation for lack of personal jurisdiction or want of venue.

3

The Federal Rules of Civil Procedure provide for two types of intervention: intervention as a matter of right and permissive intervention. Fed. R. Civ. P. 24. Chicony relies on both varieties in this application.

## I. CHICONY CAN INTERVENE AS A MATTER OF RIGHT

Federal Rule of Civil Procedure 24(a)(2) provides for intervention as a matter of right if:

(1) [the applicant] has a significant protectable interest relating to the property or transaction that is the subject of the action;

(2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest;

(3) the application is timely; and

(4) the existing parties may not adequately represent the applicant's interest.

*United States v. City of Los Angeles,* 288 F.3d 391, 397 (9th Cir. 2002). Rule 24(a) is liberally construed in favor of intervention. *Southwest Ctr.,* 268 F.3d at 818.

### A. Chicony Has Numerous Significant Interests In This Litigation

Whether an applicant for intervention demonstrates sufficient interest in an action "is a practical, threshold inquiry." *Id.* "[T]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *See Forest Conservation Council v. United States Forest Serv.,* 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (citation omitted). Chicony has four separate interests in this litigation.

First, there is litigation pending against Chicony in the Western District of Washington raising many of the same issues as those in this litigation. (Friedman Decl. Ex. 6.) Rulings from this Court on issues such as the validity or enforceability of the '225 patent, the range of equivalents afforded the '225 patent, and whether the Stowaway XT Keyboard infringes the '225 patent will likely be afforded substantial deference in the Western District of Washington litigation.

Second, as the manufacturer of the Stowaway XT Keyboard, Chicony has a business interest in ensuring that its customers are not subject to claims of patent infringement. A manufacturer's right to intervene in patent litigation filed against his customer is "well supported

4

by case law." *HBB Ltd. P'ship v. Ford Motor Co.*, No. 92-C-3287, 1992 U.S. Dist. LEXIS 17543, at *4-*5 (N.D. Ill. Oct. 2, 1992). Chicony must, as a business matter, protect its customers against claims that the products it sells infringe a patent. As one Court of Appeals explained:

> it is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling against its products.

*Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 737-38 (1st Cir. 1977).

Third, Minebea is seeking to invoke this Court's power to force Think Outside to make documents within Chicony's control available to Minebea. In a recent motion to compel, Minebea argued that "Think Outside should be ordered to produce responsive documents in the possession of Chicony . . . ." (Friedman Decl. Ex. 4 at 7:12-13.) The documents that Minebea seeks are the property of Chicony, and their disclosure could cause irreparable harm to Chicony. The potential that Magistrate Judge Porter will grant this relief poses a threat to Chicony's legitimate interests in its trade secrets, justifying intervention at least for the purpose of protecting these materials. *See Formulabs, Inc. v. Hartley Pen Co.*, 318 F.2d 485 (9th Cir. 1963) (court should permit intervention by third party to protect the possible disclosure of its trade secrets).

Fourth, the agreement between Chicony Electronics and Think Outside is capable of the interpretation that Chicony Electronics has indemnified Think Outside against claims of infringement related to the keylift mechanism used in the Stowaway XT Keyboard. (Friedman Decl. Ex. 1 at ¶ 8.1.) In the event that Think Outside is unsuccessful in this litigation, there is a possibility that Think Outside will assert a claim for indemnification against Chicony. *HBB Ltd. P'ship,* 1992 U.S. Dist. LEXIS 17543, at *4-*5 (allowing intervention in patent infringement case by manufacturer that indemnified accused devices against claims of infringement).

## B. The Disposition of This Litigation May Affect Chicony's Ability to Protect Its Interests

Rule 24(a) directs the Court to focus on the impairment of interests in the practical sense, rather than in any rigid legal sense. *Natural Res. Def. Council, Inc. v. United States Nuclear Regulatory Comm'n,* 578 F.2d 1341, 1345 (10th Cir. 1978) (Rule 24 "refers to impairment 'as a

5

practical matter.' Thus, the court is not limited to consequences of a strictly legal nature.").
Accordingly, if the absentee would "be substantially affected in a practical sense by a determination made in an action," he should be permitted to intervene. *Southwest Ctr.*, 268 F.3d at 822 (quoting Fed. R. Civ. P. 24 advisory committee's note).

First, the federal court in Seattle is likely to look to this Court's rulings for guidance. While a declaration of this Court against Think Outside would normally not be binding against Chicony, "its practical effect as *stare decisis* might be as decisive." *Bros. Inc. v. W.E. Grace Mfg. Co.*, 261 F.2d 428, 430 (5th Cir. 1958). As the Ninth Circuit has explained, the potential practical effect of this Court's findings is sufficient to justify intervention:

> Such determinations when upheld by an appellate ruling will have a persuasive *stare decisis* effect in any parallel or subsequent litigation. We have said that such a *stare decisis* effect is an important consideration in determining the extent to which an applicant's interest may be impaired.

*United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) (citation omitted).

Second, the terms of the agreement between Chicony and Think Outside require Chicony to indemnify Think Outside for claims of patent infringement related to components provided by Chicony (e.g., keylift mechanisms). In the event of an adverse finding, Chicony's ability to mount a collateral challenge to a finding of infringement is doubtful.

## C. Chicony's Application Is Timely

Minebea has only recently taken the position that the Stowaway XT Keyboard infringes the '225 patent. (Friedman Decl. Ex. 4 (February 28, 2003); Friedman Decl. Ex. 5 (January 6, 2003).) Moreover, Minebea instituted suit against Chicony in the Western District of Washington less than two months ago. (Friedman Decl. Ex. 6.) Because this Court has yet to set a trial date, no new trial date would have to be set.

## D. Chicony's Interests May Not Be Adequately Protected by the Defendants

The burden of showing inadequacy of representation is minimal. *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). It is enough to show that representation of the applicant's interests by the existing parties "may be" inadequate. *Southwest Center*, 268 F.3d at 824.

6

1    First, Chicony has information relevant to this litigation that the Defendants lack.

2    Minebea recently sought to compel Think Outside to take positions regarding the structure of the

3    keylift mechanisms designed and manufactured by Chicony. (Friedman Decl. Ex. 4 at 5:6-10.)

4    Think Outside has indicated its lack of knowledge as to the structure of the keylift mechanisms

5    provided by Chicony. For example, when questioned at a deposition regarding the structure of

6    the keylift mechanisms provided by Chicony, Think Outside's Vice President of Engineering

7    testified to his lack of knowledge regarding these structures, explaining, "I don't have intimate

8    details of the Chicony keyswitch design . . . ." (Friedman Decl. Ex. 2 at 91:1-2.) Allowing

9    intervention would permit Chicony to bring its substantial knowledge of its keyswitches to this

10   litigation. *See LG Elecs. Inc. v. Q-Lity Computer Inc.*, 211 F.R.D. 360, 365-66 (N.D. Cal. 2002)

11   (allowing intervention in patent infringement action where defendant lacked information about

12   accused devices that applicant possessed).

13       Second, both Defendants' ability to defend this action is limited by dwindling resources.

14   For example, in response to a recent motion to compel, one Defendant noted that the Defendants

15   in this case are "small companies with limited resources for litigating this suit through trial."

16   (Friedman Decl. Ex. 8 at 9:14-15.) Chicony thus has a legitimate belief that committing the

17   defense of this matter to the current Defendants may result in this matter being litigated without

18   the full measure of resources that a multinational company like Chicony can commit to this

19   matter. *See Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 F. Supp. 1366 (D. Idaho 1988)

20   (intervention permitted where there was a risk that defendants to action, due to a shortage of

21   resources, could not expend the resources needed to defend case adequately).

22   **II.   ALTERNATIVELY, CHICONY SHOULD BE ALLOWED PERMISSION TO**
23        **INTERVENE**

24       Federal Rule of Civil Procedure 24(b)(2) permits intervention, at the Court's discretion, if

25   the "applicant's claim or defense and the main action have a question of law or fact in common."

26   Rule 24(b) directs the Court to consider whether there will be an undue delay of the rights of the

27   original parties. Like Rule 24(a), Rule 24(b) is construed liberally in favor of intervention. *See,*

28   *e.g., German v. Fed. Home Mortgage Loan Corp.*, 896 F. Supp. 1385, 1391 (S.D.N.Y. 1995).

## A. There Are Common Questions of Both Law and Fact

Rule 24(b)(2) does not require a showing by the applicant that he has a protectable interest in the outcome of the litigation. 7C Wright, Miller & Kane, *Federal Practice & Procedure*, § 1911, at 356-57 (2d ed. 1986). Nor is identity of facts needed. Instead, "[t]he rule requires only that [the applicant's] claim or defense and the main action have a question of law *or fact in common.*" *Id.*, § 1911, at 358 (emphasis added). The existence of a common question, like the application of Rule 24(b) generally, is liberally construed in favor of intervention. *See Bureerong v. Uvawas*, 167 F.R.D. 83, 85 (C.D. Cal. 1996).

Chicony is filing herewith a proposed Complaint in Intervention. This Complaint demonstrates that there is much overlap between the issues already pending in this litigation and the questions in which Chicony has an interest, including:

- whether keyboards sold by Chicony to Think Outside literally infringe the '225 patent;
- whether keyboards sold by Chicony to Think Outside infringe the '225 patent under the doctrine of equivalents;
- the range of equivalents afforded the '225 patent;
- whether the Stowaway XT keyboard infringes the '225 patent; and
- whether the '225 patent is invalid for obviousness or anticipation.

## B. Intervention Will Expedite, Not Delay, This Litigation

Intervention typically delays litigation where the intervenor seeks to introduce issues into the litigation that are not already at issue. By contrast, Chicony seeks to introduce no issues into this litigation that are not already pending. *LG Elecs.*, 211 F.R.D. at 366 (finding that intervention would not delay litigation where intervention would introduce no issues not already pending before the court). Indeed, Minebea has taken the position that Think Outside is obligated to seek to force Chicony to produce documents within Chicony's control. Permitting intervention would expedite the production of these documents. *HBB Ltd. P'Ship*, 1992 U.S. Dist. LEXIS 17543, at *6 (allowing intervention because it would expedite the litigation, given that intervenors possessed documents at issue in litigation).

# CONCLUSION

In *Forest Conservation Council*, the Ninth Circuit explained that a permissive approach to intervention allows the efficient resolution of issues by simplifying, and possibly preventing, future litigation involving related issues. Here, the overlap between this litigation and the litigation pending in the Western District of Washington is manifest, as is Chicony's interest in the outcome of this litigation. For these reasons, and because Chicony has satisfied the standards of both Rule 24(a) and Rule 24(b), Chicony should be permitted to intervene in this action.

Dated: April 4, 2003

MORRISON & FOERSTER LLP

By: _____
Michael A. Jacobs

Attorneys for Applicant
CHICONY AMERICA, INC.

Exhibit H

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MINEBEA CO. LTD., a Japanese )
corporation, )
                         )
         Plaintiff, )
                         )
     vs. )  No. 01-CV 0771BTM (POR)
                         )
THINK OUTSIDE, INC., a )
California corporation; and )
PERIPHERAL TECHNOLOGY, INC., )
a Taiwan corporation. )
                         )
         Defendants. )
_____ )

**CERTIFIED COPY**

## DEPOSITION OF JOHN TANG

Palo Alto, California

Wednesday, December 11, 2002

Reported by:
LYNNE M. LEDANOIS
CSR No. 6811
Job No. 39248



San Francisco
www.esquiredeposition.com
Phone: (415) 288 - 4280

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3

MINEBEA CO. LTD., a Japanese )
4   corporation,                )
                                )
5              Plaintiff,        )
                                )
6        vs.                    ) No. 01-CV 0771BTM (POR)
                                )
7   THINK OUTSIDE, INC., a       )
    California corporation; and  )
8   PERIPHERAL TECHNOLOGY, INC., )
    a Taiwan corporation.        )
9                                )
               Defendants.       )
10  _____ )

11

12

13

14

15              Deposition of JOHN TANG,

16         taken on behalf of Plaintiff at 755 Page

17         Mill Road, Palo Alto, California, beginning at

18         9:37 a.m. and ending at 4:42 p.m., Wednesday,

19         December 11, on 2002, before LYNNE M.

20         LEDANOIS, Certified Shorthand Reporter No.

21         6811

22

23

24

25

                                                  2

1    APPEARANCES:

2

3    For Plaintiff:

4         SCHULTE ROTH & ZABEL LLP
          BY:   JOEL E. LUTZKER
5         BY:   TODD SICKLINGER
          Attorneys at Law
6         919 Third Avenue
          New York, NY  10022
7         212.756.2000

8    For Defendants:

9         MORRISON & FOERSTER LLP
          BY:   PAUL A. FRIEDMAN
10        Attorney at Law
          425 Market Street
11        San Francisco, California  94105-2482
          415.268.6220

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3

1      Palo Alto, California, Wednesday, December 11, 2002

2                    9:37 a.m. - 4:42 p.m.

3

4          (Deposition Exhibit 1 was marked for

5           identification by the Court Reporter.)

6                        JOHN TANG,

7      having been first duly sworn, was examined and

8      testified as follows:

9

10                       EXAMINATION

11     BY MR. LUTZKER:

12         Q    Can you please state your full name.

13         A    John G. Tang.

14         Q    And what is your residence address, sir?

15         A    3358 Melendy Drive, San Carlos, California.

16         Q    Before we get into the substance of the

17     deposition, I did want to note for the record that we

18     had a videographer here and had planned to proceed with

19     this deposition on videotape.

20             Mr. Friedman has objected to that; we have a

21     call in to Magistrate Judge Porter so that can be

22     resolved.  And in the interim, pending resolution,

23     based upon Mr. Friedman's objection, we are proceeding

24     without a videographer.

25             I would also like to indicate to Mr. Friedman

                                                        6



1      MR. FRIEDMAN:  I don't think we've determined

2  that yet.  But it's our position that the complaint

3  needs to be amended to encompass that product.

4      MR. LUTZKER:  All right.  Well, it is our

5  position that there is no need to amend the complaint,

6  that the complaint is broad enough to encompass any

7  infringing product sold by the defendants, and it is

8  also our position that we are entitled to full

9  discovery with respect to the new product, including

10  supplemental interrogatory responses.

11      And, further, to the extent that you are

12  planning on filing a summary judgement motion which is

13  directed to the new product, we certainly expect that

14  we'll be given adequate discovery to deal with that

15  motion.  And to the extent that we are not, we

16  certainly plan on availing ourselves of the procedures

17  under Rule 56(f) under the Rules of Civil Procedure.

18      MR. FRIEDMAN:  I'm sure you are.  I would

19  assume for the -- let's do it this way.  Assume that

20  the new product, meaning the Palm portable keyboard,

21  will figure in our summary judgement motion.

22      Also assume that there is no argument with

23  respect to the Palm portable keyboard that's not

24  highlighted in our interrogatory response to you dated

25  November 4th, nor Michael Jacob's letter to you dated

I, the undersigned, a Certified Shorthand
Reporter of the State of California, do hereby
certify:

That the foregoing proceedings were taken
before me at the time and place herein set forth; that
any witnesses in the foregoing proceedings, prior to
testifying, were placed under oath; that a verbatim
record of the proceedings was made by me using machine
shorthand which was thereafter transcribed under my
direction; further, that the foregoing is an accurate
transcription thereof.

I further certify that I am neither
financially interested in the action nor a relative or
employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date
subscribed my name.


Dated: _____December 12, 2002_____



_____
LYNNE MARIE LEDANOIS
CSR# 6811

163

Exhibit I

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

David H. Kagan
Special Counsel
(212) 756-2591

E-mail
david.kagan@srz.com

October 14, 2002

Paul A. Friedman, Esq.
Morrison & Foerster
425 Market Street
San Francisco, California 94105-2482

Pamela J. Wong, Esq.
Baker & McKenzie
101 West Broadway, Twelfth Floor
San Diego, California 92101

Re: Minebea Co. Ltd. v. Think Outside Inc.
And Peripheral Technology, Inc.
No. 01CV0771 –BTM (POR)

Dear Paul and Pamela:

In its Scheduling Order Regulating Discovery And Other Pretrial Proceedings, the Court has established a deadline of December 9, 2002 for any motion to join other parties, to amend the pleadings, or to file additional pleadings. In order to comply with this deadline, it is imperative that Minebea obtain in a timely manner information responsive to its discovery requests that seek the identification of all products manufactured or sold by defendant Peripheral Technology that were destined for U.S. markets and include a crossed strut keytop leveling mechanism. We further require the names of the customers to whom these sales were made. With respect to Think Outside, it is imperative that we obtain the identification of all manufacturers other than Peripheral Technology who have sold or offered to sell products to Think Outside that include a crossed strut keytop leveling mechanism.

In our meet and confer teleconference that took place on October 9, 2002, prior to the conference with the Court, you indicated that the defendants would not provide this information to Minebea on the grounds that Minebea's infringement claims contained in its Complaint are limited to the Stowaway Portable Keyboard. We explained to you that the Complaint is not so limited, and that Minebea is clearly entitled to seek discovery relating to additional infringing products and manufacturers.

Accordingly, please let us know by October 18, 2002, whether defendants intend to drop their relevance objections and comply in full with Minebea's requests that seek

information regarding additional products sold by Peripheral Technology as well as additional suppliers to Think Outside. If we do not hear favorably from you by October 18, we will immediately proceed with a motion to compel.

Very truly yours,

David H. Kagan

Exhibit J

1   ARNOLD & PORTER
    RONALD L. JOHNSTON (State Bar No. 57418)
2   JAMES S. BLACKBURN (State Bar No. 169134)
    1900 Avenue of the Stars, 17th Floor
3   Los Angeles, California 90067-4408
    Telephone: (310) 552-2500
4   Facsimile: (310) 552-1191

5   SCHULTE ROTH & ZABEL LLP
    JOEL E. LUTZKER
6   DAVID H. KAGAN
    TODD SICKLINGER
7   919 Third Avenue
    New York, New York 10022
8   Telephone: (212) 756-2000
    Facsimile: (212) 593-5955

9
    Attorneys for Plaintiff Minebea Co., Ltd.
10

11              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF CALIFORNIA
12

13  - - - - - - - - - - - - - - - - - - - - - X
    MINEBEA CO., LTD., a Japanese corporation,    :   No. 01 CV 0771BTM (POR)
14
              Plaintiff,                          :   PLAINTIFF MINEBEA CO., LTD.'s
15                                                    SUPPLEMENTAL RESPONSES
                                                 :   AND OBJECTIONS TO
16            v.                                      DEFENDANT THINK OUTSIDE,
                                                 :   INC.'s INTERROGATORY NOS. 6,
17                                                   7, 10, and 13
    THINK OUTSIDE, INC., a California            :
18  corporation; and PERIPHERAL
    TECHNOLOGY, INC., a Taiwan corporation.      :
19
              Defendants.                         :
20  - - - - - - - - - - - - - - - - - - - - - X

21          Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Minebea Co.,

22  Ltd. ("Minebea"), by and through its attorneys, makes the following supplemental responses and

23  objections to Defendant Think Outside, Inc.'s ("Think Outside") First and Second Sets of

24  Interrogatories ("Interrogatories"):

25

26

27
    935863.1
28

# General Objections

1. Minebea incorporates herein by reference its General Objections in Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s Second Set of Interrogatory Requests.

2. Minebea objects to these interrogatories as premature, since Think Outside, Inc. has yet to produce discovery relevant to the Stowaway XT Ultra-Thin Keyboard ("the Ultra-Thin Keyboard"). Accordingly, the responses contained herein are preliminary and Minebea reserves its right to modify or amend them.

## INTERROGATORY NO. 6:

Please identify each Think Outside device that you contend infringes the '225 patent.

## OBJECTIONS TO INTERROGATORY NO. 6:

Minebea incorporates by reference its General Objections and Minebea incorporates by reference its specific objections to Interrogatory 6 contained in Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s First Set of Interrogatory Requests. Additionally, Minebea specifically objects to this interrogatory as premature since Think Outside has yet to provide discovery on the Ultra-Thin Keyboard. Minebea reserves its right to modify or amend its response to this interrogatory.

## RESPONSE TO INTERROGATORY NO. 6

Minebea incorporates by reference its response to Interrogatory 6 contained in Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s First Set of Interrogatory Requests.

S358631.1

PLAINTIFF MINEBEA CO., LTD.'s SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC.'s
INTERROGATORY NOS. 6, 7, 10, and 13

2

Additionally, Minebea identifies the Ultra-Thin Keyboard.

## INTERROGATORY NO. 7:

For each device identified in response to Interrogatory No. 7 and each asserted claim identified in response to Interrogatory No. 1, please specify specifically where in such device each element of each asserted claim is found, stating whether such element is found literally or under the Doctrine of Equivalents. The answer to this interrogatory may be provided in the form of a "claim chart" so long as the requisite specificity is present.

## OBJECTIONS TO INTERROGATORY NO. 7:

Minebea incorporates by reference its General Objections. Additionally, Minebea specifically objects to this interrogatory as premature since Think Outside has yet to provide discovery on the Ultra-Thin Keyboard. Ultra-Thin Keyboard. Minebea reserves its right to modify or amend its response to this interrogatory.

## RESPONSE TO INTERROGATORY NO. 7:

Minebea incorporates by reference its response to Interrogatory 7 contained in Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s First Set of Interrogatory Requests.

Additionally, Minebea provides the following information regarding the Ultra-Thin Keyboard.

| Claim Limitation contained in Claim 1 of '225 Patent | Location of claim element in the Ultra-Thin Keyboard. |
|---|---|
| 1. A keytop levelling mechanism for use in conjunction with: | Yes. |

5328051.1

PLAINTIFF MINEBEA CO., LTD.'s SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC.'s
INTERROGATORY NOS. 6, 7, 10, and 13

3

| | | |
|---|---|---|
| 1<br>2<br>3<br>4 | a keytop having a main portion and a stem portion cantilevered from said main portion; and | <u>Yes</u>. The Ultra-Thin Keyboard contains keys having keytops. Each keytop has a main portion, which is directly supported by a keyswitch (a rubber dome), and a stem portion, which extends horizontally from the main portion. |
| 5<br>6<br>7<br>8<br>9<br>10<br>11 | a keyswitch, mounted on a circuit board, which is adapted to be actuated when said keytop is pressed;<br><br>said levelling mechanism comprising: | <u>Yes</u>. The Ultra-Thin Keyboard has a keyswitch that is mounted on a circuit board and that is adapted to be actuated when the keytop is pressed.<br><br>The keyswitch is comprised of a rubber dome, which is secured directly to a rubber base that is attached to the circuit board. The keyswitch causes an electrical signal to be generated in the circuit board when the keytop is pressed. |
| 12<br>13<br>14<br>15<br>16 | a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends | <u>Yes</u>. The Ultra-Thin Keyboard has a pair of lever arms (an inner lever arm and an outer lever arm) joined at intermediate portions thereof by at least one pivot (the inner lever arm has two pins that fit into two holes in the outer lever arm) to form a scissors-like linkage having first, second, third, and fourth ends. |
| 17<br>18 | means for pivotally mounting said first and second ends to longitudinally opposed ends of said cantilevered portion; | <u>Yes</u>. The Ultra-Thin Keyboard has structures that mount the first and second ends of the scissors like linkage to longitudinally opposed ends of said cantilevered portion. |
| 19<br>20<br>21<br>22 | means for pivotally mounting said third and fourth ends to separate joints adjacent said circuit board under said cantilevered portion; | <u>Yes</u>. The Ultra-Thin Keyboard has structures that mount the third and fourth ends of the scissors like linkage to separate joints adjacent said circuit board under said cantilevered portion. |
| 23<br>24<br>25 | means for enabling at least two of said first, second, third, and fourth ends to slide in addition to pivot. | <u>Yes</u>. The Ultra-Thin Keyboard has structures that enable at least said first end, and said third and said fourth ends to slide in addition to pivot. |

26

27  2258631.1

28

PLAINTIFF MINEDEA CO., LTD.'s SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC 's
INTERROGATORY NOS. 6, 7, 10, and 13

4

Each Claim element is found literally in the Think Outside device.

## REQUEST NO. 10:

Describe in detail the factual basis for Minebea's contention that Think Outside alleged infringement of U.S. Patent No. 4,433,225 (the "'225 patent") has been willful, including the identity of each and every document and/or other sources of information upon which Minebea bases this contention.

## OBJECTIONS TO INTERROGATORY NO. 10:

Minebea incorporates by reference its General Objections and Minebea incorporates by reference its specific objections to Interrogatory 10 contained in Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s Second Set of Interrogatory Requests.

## RESPONSE NO. 10:

Minebea incorporates by reference its response to Interrogatory 10 contained in Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s Second Set of Interrogatory Requests.

Additionally, Think Outside has not obtained an opinion of counsel with respect to the key lift mechanism contained in the Ultra-Thin Keyboard.

## REQUEST NO. 13:

State each and every fact upon which you base your contention that the Stowaway Portable Keyboard meets each limitation of the first and seventh claims of the '225 patent.

9358631.1

PLAINTIFF MINEBEA CO., LTD.'s SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC.'s
INTERROGATORY NOS. 6, 7, 10, and 13

5

1   including the identity of each and every document and/or other sources of information upon which

2   you base your contention

3

4   **OBJECTIONS TO INTERROGATORY NO. 13:**

5            Minebea incorporates by reference its General Objections and Minebea incorporates

6   by reference its specific objections to Interrogatory 13 contained in Plaintiff Minebea Co., Ltd.'s

7   Responses and Objections to Defendant Think Outside, Inc.'s Second Set of Interrogatory Requests.

8   Additionally, Minebea specifically objects to this interrogatory as premature since Think Outside

9   has yet to provide discovery on the Ultra-Thin Keyboard. Minebea reserves its right to modify or

10   amend its response to this interrogatory.

11

12   **RESPONSE NO. 13:**

13

14

15            Minebea incorporates by reference its response to Interrogatory 13 contained in

16   Plaintiff Minebea Co., Ltd.'s Responses and Objections to Defendant Think Outside, Inc.'s First Set

17   of Interrogatory Requests.

18            Additionally, Minebea bases its contentions on the facts shown in the below

19   provided claim chart. The facts are supported by a sample of the Ultra-Thin Keyboard and by John

20   Tang's 30(b)(6) deposition testimony.

21

| Claim Limitation contained in Claim 1 of '225 Patent | Location of claim element in the Ultra-Thin Keyboard. |
|---|---|
| 1. A keytop levelling mechanism for use in conjunction with: | Yes. |

935863.1

PLAINTIFF MINEBEA CO., LTD.'s SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC.'s
INTERROGATORY NOS. 6, 7, 10, and 13

6

| | | |
|---|---|---|
| 1<br>2<br>3<br>4 | a keytop having a main portion and a stem portion cantilevered from said main portion; and | **Yes.** The Ultra-Thin Keyboard contains keys having keytops. Each keytop has a main portion, which is directly supported by a keyswitch (a rubber dome), and a stem portion, which extends horizontally from the main portion. |
| 5<br>6<br>7<br>8<br>9<br>10<br>11 | a keyswitch, mounted on a circuit board, which is adapted to be actuated when said keytop is pressed;<br><br>said levelling mechanism comprising: | **Yes.** The Ultra-Thin Keyboard has a keyswitch that is mounted on a circuit board and that is adapted to be actuated when the keytop is pressed.<br><br>The keyswitch is comprised of a rubber dome, which is secured directly to a rubber base that is attached to the circuit board. The keyswitch causes an electrical signal to be generated in the circuit board when the keytop is pressed. |
| 12<br>13<br>14<br>15<br>16 | a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends | **Yes.** The Ultra-Thin Keyboard has a pair of lever arms (an inner lever arm and an outer lever arm) joined at intermediate portions thereof by at least one pivot (the inner lever arm has two pins that fit into two holes in the outer lever arm) to form a scissors-like linkage having first, second, third, and fourth ends. |
| 17<br>18<br>19 | means for pivotally mounting said first and second ends to longitudinally opposed ends of said cantilevered portion; | **Yes.** The Ultra-Thin Keyboard has structures that mount the first and second ends of the scissors like linkage to longitudinally opposed ends of said cantilevered portion. |
| 20<br>21<br>22 | means for pivotally mounting said third and fourth ends to separate joints adjacent said circuit board under said cantilevered portion; | **Yes.** The Ultra-Thin Keyboard has structures that mount the third and fourth ends of the scissors like linkage to separate joints adjacent said circuit board under said cantilevered portion. |
| 23<br>24<br>25 | means for enabling at least two of said first, second, third, and fourth ends to slide in addition to pivot. | **Yes.** The Ultra-Thin Keyboard has structures that enable at least said first end, and said third and said fourth ends to slide in addition to pivot. |

26

27  9338631.1

28

PLAINTIFF MINEBEA CO., LTD's SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC.'s
INTERROGATORY NOS. 6, 7, 10, and 13

7

DATED this 6th day of January, 2003

ARNOLD & PORTER
RONALD L. JOHNSTON
JAMES S. BLACKBURN


SCHULTE ROTH & ZABEL LLP
JOEL E. LUTZKER
DAVID H. KAGAN
LISA M. KNIGHT
TODD SICKLINGER

By: _____
      Todd Sicklinger

Attorneys for Plaintiff Minebea Co., Ltd.

9038631.1

PLAINTIFF MINEBEA CO., LTD.'s SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANT THINK OUTSIDE, INC.'s
INTERROGATORY NOS. 6, 7, 10, and 13

8

Exhibit K

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MINEBEA COMPANY, LTD., | ) | CIV. NO. 01cv0771-BTM(POR) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | PLAINTIFF MINEBEA'S |
| | ) | RULE 26(a)(1) |
| THINK OUTSIDE, INC. and | ) | INITIAL DISCLOSURES |
| PERIPHERAL TECHNOLOGY, INC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff Minebea Company, Ltd. ("Minebea") hereby makes its initial disclosures to Defendant Think Outside, Inc. ("Think Outside").

**A.     The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

The individuals listed below are likely to have discoverable information that Plaintiff Minebea may use to support its claims or defenses. Except as otherwise indicated, all listed individuals may be reached by contacting Joel Lutzker at the following address:

> Joel Lutzker, Esq.
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York  10022
> Phone:  (212) 756-2000
> Fax:     (212) 593-5955

| Subject Matter | Name | Address & Telephone No. |
|---|---|---|
| **The Patent-In-Suit** | Dean Cowles | Dean Cowles<br>c/o Joel E. Lutzker |
| | Barry R. Lipsitz, Esq. | Barry R. Lipsitz, Esq.<br>c/o Joel E. Lutzker |
| | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| | Reina MacDonald | NMB Technologies<br>Corporation<br>c/o Joel E. Lutzker |
| | | |
| **Defendants' Infringement of the Patent-In-Suit** | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| | Richard Acosta | NMB Technologies<br>Corporation<br>c/o Joel E. Lutzker |
| | Satoru Fujii | NMB Technologies<br>Corporation<br>c/o Joel E. Lutzker |
| | George Kao | 2F. No. 5, Lane 50, Sec. 3,<br>Nan-Kang Rd., Taipei City,<br>Taiwan |
| | Robert A. Olodort | Think Outside, Inc.<br>5790 Fleet Street, Suite 130,<br>Carlsbad, California 92008<br>Phone 760-431-9090 |
| | | |
| **The Willfulness of Defendants' Infringement** | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| | Richard Acosta | NMB Technologies<br>Corporation<br>c/o Joel E. Lutzker |
| | Satoru Fujii | NMB Technologies<br>Corporation<br>c/o Joel E. Lutzker |
| | George Kao | 2F. No. 5, Lane 50, Sec. 3,<br>Nan-Kang Rd., Taipei City,<br>Taiwan |

| Subject Matter | Name | Address & Telephone No. |
|---|---|---|
| | Robert A. Olodort | Think Outside, Inc.<br>5790 Fleet Street, Suite 130,<br>Carlsbad, California 92008<br>Phone 760-431-9090 |
| | | |
| Minebea's Damages | Nobuyuki Takahashi | Minebea<br>c/o Joel E. Lutzker |
| | Yokio Okuyama | Minebea<br>c/o Joel E. Lutzker |
| | Richard Acosta | NMB Technologies<br>Corporation<br>c/o Joel E. Lutzker |
| | George Kao | 2F. No. 5, Lane 50, Sec. 3,<br>Nan-Kang Rd., Taipei City,<br>Taiwan |
| | Robert A. Olodort | Think Outside, Inc.<br>5790 Fleet Street, Suite 130,<br>Carlsbad, California 92008<br>Phone 760-431-9090 |

**B.** **A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Any production of documents by Plaintiff Minebea in the course of making these Initial Disclosures shall not be construed as a waiver of attorney-client privilege, work product exception, and/or any other privilege or exception afforded to Plaintiff Minebea under the law.

The following are the categories of documents in the possession, custody, or control of Plaintiff Minebea that Plaintiff Minebea reasonably anticipates that they may use to support their claims or defenses, unless solely for impeachment. These documents are located at the offices of Plaintiff Minebea, at the offices of NMB Technologies Corporation or at the offices of Minebea's

counsel of record. These documents fall within the following categories and/or relate to the following subject matters:

1. United States Patent No. 4,433,225 and its prosecution history;

2. Extrinsic evidence relevant to claim construction;

3. Defendants' infringement of United States Patent No. 4,433,225;

4. The willfulness of Defendants' infringement;

5. Minebea's damages;

6. Commercial success;

7. Long felt need;

8. Failure of others; and

9. Notice of infringement.

**C.**   **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

Minebea is entitled to damages adequate to compensate Minebea for Defendants' infringement. Minebea's damages include lost profits on the keyboards it would have sold but for the Defendants' infringement. The Patent Statute requires that these damages be no less than a reasonable royalty for the use made of the invention by the Defendants together with interest and costs. Minebea is also entitled to damages necessary to place Minebea in the financial position it would have been but for the Defendants' infringement. These damages include the costs incurred by Minebea in preparing to manufacture the keyboards that are the subject of the supply agreement between Minebea and Think Outside, which has been repudiated by Think

9084931.1

4

Outside. In order to accurately calculate its damages, Minebea requires information that is in the possession of the Defendants. Accordingly, Minebea does not currently have sufficient information to calculate the amounts of its lost profits or a reasonable royalty rate.

**D.** **For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

To the best of Defendant Minebea's knowledge, no applicable insurance agreement exists.

DATED this 3rd day of August, 2001.

By _____
Joel Lutzker
David Kagan
Todd Sicklinger
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Phone: (212) 756-2000


Ronald L. Johnston
James Blackburn
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017

Attorneys for Plaintiff
Minebea Company, Ltd.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINEBEA COMPANY, LTD., | ) CIV. NO. 01cv0771-BTM(POR) |
| Plaintiff, | ) |
| v. | ) |
| THINK OUTSIDE, INC. and PERIPHERAL TECHNOLOGY, INC, | ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that **DEFENDANT MINEBEA'S 26(A)(1) INITIAL**

**DISCLOSURES** was served on August 3, 2001, by U.S. Mail, to:

Paul A. Friedman, Esq.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

_____
Todd Sicklinger

Exhibit L

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

---

| | |
|---|---|
| MINEBEA CO., LTD., a Japanese corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 01CV771BTM(POR) |
| THINK OUTSIDE, INC., a California corporation, and PERIPHERAL TECHNOLOGY, INC., a Taiwan corporation, | ) ) ) ) ) COPY |
| Defendants. | ) ) |

---

Deposition Upon Oral Examination

of

DEAN STUART COWLES

---

Taken at 1215 Fourth Avenue

Seattle, Washington

DATE:  Thursday, December 12, 2002

REPORTED BY:  Mindy L. Suurs, RPR
              CSR No. SUURSML 454Q9

## A P P E A R A N C E S

For the Plaintiff:      JOEL E. LUTZKER and TODD SICKLINGER
Schulte Roth & Zabel
919 Third Avenue
New York, New York 10022

For Think Outside:      PAUL A. FRIEDMAN
Morrison & Foerster
425 Market Street
San Francisco, California 94105-2482

For Peripheral
Technology, Inc.:      PAMELA J. WONG
Baker & McKenzie
101 West Broadway
12th Floor
San Diego, California 92101-3890

--o0o--

## I N D E X

EXAMINATION BY:                                              Page

Mr. Friedman.........................................4

Ms. Wong...........................................133

Mr. Lutzker........................................150

Mr. Friedman.......................................152

Mr. Lutzker........................................155

Mr. Friedman.......................................155

\* \* \*

EXHIBITS FOR IDENTIFICATION

Number                                                      Page

  D-1   United States Patent........................13

  P-1   Disassembled Palm..........................61

  D-2   Subpoena...................................24

  D-3   Drawing of invention.......................67

  D-4   United States Patent......................104

  D-5   Patent Application forms..................124

  D-6   United States Patent Office Application for
       Voting Machine...........................131

\* \* \* \*

1      Q.   Let me do it this way.  Can you recall what trade

2    publications you received when you were working an GIC?

3                    MR. LUTZKER:  Objection, lacks foundation.

4                    THE WITNESS:  No.

5    BY MR. FRIEDMAN:

6      Q.   Did you receive trade publications when you were

7    at GIC?

8      A.   I don't recall.

9      Q.   Were you at the time a member of any industry

10   groups?

11     A.   No.

12     Q.   Did you attend any trade shows when you were

13   working at GIC?

14     A.   Yes.

15     Q.   Do you recall some of the names of the trade

16   shows that you would have attended?

17     A.   Northcon.

18     Q.   Could you try to spell that for me?

19     A.   N-o-r-t-h-c-o-n.

20     Q.   One word?

21     A.   I believe it is.

22     Q.   Now, when you attended these trade shows, were

23   you there just as an attendee, or did you ever give any

24   kind of presentations or speeches?

25     A.   Only as an attendee.

 1        Q.   Do you know how long you've received "Design

 2   News" for?

 3        A.   No.

 4        Q.   Do you recall whether you received "Design News"

 5   when you were at GIC?

 6        A.   No, I do not.

 7        Q.   You don't recall?  Would you say that "Design

 8   News" is a generally well-regarded publication in the

 9   field?

10        A.   Yes.

11        Q.   So besides Northcon, were there any other trade

12   shows that you attended when you were at GIC?

13        A.   Not that I can recall.

14        Q.   What about when you were at Automix?  Were there

15   any trade shows that you attended other than Northcon?

16        A.   No.

17        Q.   Now, I asked you before if you could recall if

18   you had received "Design News" or I think any other

19   magazine when you were at GIC, and you said you could not

20   remember.  Can you remember what you received when you were

21   at Automix?

22             MR. LUTZKER:  Objection, lacks foundation.

23             THE WITNESS:  No.

24   BY MR. FRIEDMAN:

25        Q.   So you can't recall?

1      A.    I can't recall.

2                            (Defendant's Exhibit 2 marked

3                            for identification.)

4    BY MR. FRIEDMAN:

5      Q.    I'll ask you to take a look at this document.

6    Have you seen this document before?

7      A.    Yes.

8      Q.    And this is the subpoena that we sent to you;

9    correct?

10     A.    Yes.

11     Q.    I want you to take a look at the page that's

12   marked 2 at the bottom.  Do you see that?

13     A.    Yes.

14     Q.    Now, before coming here today, did you search any

15   of your files for any of the documents that are listed in

16   this document that I just handed to you?

17     A.    Yes.

18     Q.    And where did you search?

19     A.    I searched my home.

20     Q.    And did you find anything?

21     A.    No.

22     Q.    So you don't even have a copy, say, of the 225

23   patent?

24     A.    Yes.

25     Q.    You had a copy of the 225 patent?

1   were working on, was it generally the procedure that you

2   would record your work in like a lab notebook?

3         A.   Yes.

4         Q.   Do you recall how many lab notebooks you had?

5         A.   No.

6         Q.   And I assume you do not know where those lab

7   notebooks would be now?

8         A.   I do not know.

9         Q.   When you were there, would you have to submit

10  these lab notebooks to a supervisor or anyone else to

11  review your work?

12        A.   Yes.

13        Q.   And do you recall who you submitted those reports

14  to?

15        A.   No.

16        Q.   Maybe to Joe, you had mentioned before?

17        A.   Perhaps.

18        Q.   Anyone else who would review these materials?

19        A.   A colleague.

20        Q.   Do you know which colleague?

21        A.   Not specifically.

22        Q.   But maybe Mr. Serdahl or possibly Mr. Bush?

23              MR. LUTZKER:  Objection, calls for

24  speculation.

25              THE WITNESS:  I don't recall exactly who I

1  disclosed or showed the initial disclosure to.

2  BY MR. FRIEDMAN:

3      Q.   Did you ever record your ideas at home when you

4  were working at GIC?

5      A.   No.

6      Q.   So everything that you would record you would do

7  it at work?

8      A.   Yes.

9      Q.   Okay.  I want to ask you a few questions about

10  your 225 patent.  I assume you've had a chance to look at

11  this recently; right?

12      A.   Yes.

13      Q.   I want you to think back to when you were working

14  on this invention, and can you just tell me why it was that

15  you started trying to figure out what you figured out with

16  this patent?

17      A.   Can you be specific, please.

18      Q.   Sure.  What was the problem that you were trying

19  to solve?  Did someone, 'for example, come to you and say,

20  "Dean, we're having this problem.  Can you see if you can

21  figure something out about how to solve it?"

22          MR. LUTZKER:  Objection, compound question.

23  Which question do you want the witness to answer?

24          THE WITNESS:  Yes, be specific, please.

25  BY MR. FRIEDMAN:

1        A.    Not at that time.

2        Q.    When did you look at them?

3        A.    After the patent had been disclosed and during

4    the patent process.

5        Q.    Okay.  So you looked at some patents -- and I'm

6    sorry, what do you mean by "patent process"?

7        A.    After the -- the initial disclosure of the

8    patent.

9        Q.    After the application to the patent office or

10   after the patent had been issued to you?

11       A.    I don't understand what you're --

12       Q.    I'm sorry.  You said you looked at patents,

13   looked for patents after the patent process.  Is that a

14   correct characterization of your testimony?

15       A.    Say that again.

16       Q.    Let's start over.  When did you -- you said that

17   you looked at some patents in connection with this

18   invention.  When did you look at those patents?

19       A.    After I had disclosed the idea.

20       Q.    Disclosed the idea to whom?

21       A.    I don't recall who.

22       Q.    The people at GIC or the people at the patent

23   office?

24       A.    People at GIC.

25       Q.    So do you recall any of the patents that you

1  looked at?

2       A.    No.

3       Q.    Do you recall finding any patents that you

4  thought helped you solve this problem?

5       A.    No.

6       Q.    So in looking at these patents you found nothing

7  that you thought was helpful to your understanding of how

8  to solve this problem?

9       A.    I looked at the patents after I had solved the

10  problem.

11       Q.    And what did you find as a result of looking at

12  the patents?

13       A.    I had solved the problem with my device.

14       Q.    And how did looking at the patents help you

15  determine that?

16       A.    I don't understand what you're --

17       Q.    Well, you said that looking at the patents helped

18  you determine that you had solved the problem.

19       A.    Yeah.

20       Q.    And I need you to tell me what you mean by that.

21       A.    They had solved the problem also but in a

22  different way.

23       Q.    And "they" meaning the other patents you looked

24  at?

25       A.    "They" meaning the other patents.

1      Q.    So you solved the patent a different way.  Would

2  you say it was a better way based upon what you looked at?

3      A.    Yes.

4      Q.    And just tell me why you think it was better.

5      A.    It met my space limitations.

6      Q.    Other than think about this, disassemble some

7  keyboards, and look at some patents, what else, if

8  anything, did you do to figure out the solution to this

9  problem?

10                 MR. LUTZKER:  Objection, mischaracterizes

11  Mr. Cowles' testimony.

12  BY MR. FRIEDMAN:

13     Q.    You can answer.

14     A.    I solved the problem before I looked at the other

15  patents.

16     Q.    Okay.  What did you do with these patents that

17  you looked at?

18     A.    I don't know.

19     Q.    Did you give them to anyone?

20     A.    I don't know.

21     Q.    Did you analyze them at all?  Did you write down

22  anything that you thought about these patents?

23     A.    I don't recall.

24     Q.    What would help you recall if you had done that?

25                 MR. LUTZKER:  Objection, calls for

1    speculation.

2              THE WITNESS:  I have no idea.

3    BY MR. FRIEDMAN:

4        Q.   Okay.  Do you recall if you sent these patents to

5    your lawyer?

6        A.   I don't recall.

7        Q.   Do you recall if you sent these patents along

8    with your invention disclosure form?

9        A.   I did not have the patents before I -- at the

10   time of the disclosure.

11       Q.   So give me an approximation of the amount of time

12   after you sent this disclosure form that you looked at

13   these patents.

14       A.   I don't know -- I don't know.

15       Q.   Do you recall if these patents were from the

16   keyboard art or from some other field?

17       A.   They were from keyboards and other fields.

18       Q.   So some of them were from the keyboard field?

19       A.   Yes.

20       Q.   And some were not?

21       A.   Yes.

22       Q.   At the time how did you do patent searches back

23   in the early '80s?

24              MR. LUTZKER:  Objection, lacks foundation.

25              THE WITNESS:  I didn't.

1      A.    Again.

2      Q.    Did some of the patents that Mr. Lipsitz sent you

3   have to do with things other than keyboards?

4                  MR. LUTZKER:   Objection, asked and answered.

5   BY MR. FRIEDMAN:

6      Q.    You can answer the question.

7      A.    Yes.

8      Q.    Did some of these patents solve the problem you

9   had identified?

10     A.    Yes.

11     Q.    Did you speak to anyone in coming up with your

12  invention?  Let me limit the time.  Did you speak to anyone

13  in coming up with your invention before you filled out your

14  invention disclosure form?

15     A.    Yes.

16     Q.    Who did you speak to?

17     A.    Some colleagues.

18     Q.    Do you recall which colleagues?

19     A.    Not all of them.

20     Q.    Tell me which ones you do remember speaking to.

21     A.    I do remember Cliff Serdahl.

22     Q.    Do you remember anyone else that you spoke to?

23     A.    I don't recall.

24     Q.    Did you speak to Mr. Bush, by any chance?

25     A.    I don't recall.

1      Q.   So before you completed the disclosure statement

2    that you sent to your colleagues at GIC?

3      A.   Yes.

4      Q.   Do you recall was there just one model or were

5    there more than one models?

6      A.   I don't recall.

7      Q.   So what was the purpose of building the model?

8      A.   To verify.

9      Q.   To verify what?

10     A.   The design.

11     Q.   To verify that the design worked?

12     A.   Yes.

13     Q.   Did you have a question about whether or not your

14   design would work?

15     A.   No.

16     Q.   So the model was just to verify your belief that

17   it would work?

18     A.   Yes.

19     Q.   Now, did you have to make any changes to this

20   model to get it to work?

21     A.   I don't recall.

22     Q.   What would help you recall that?

23              MR. LUTZKER:  Objection, calls for

24   speculation.

25              THE WITNESS:  I can't answer that.

1      Q.   Would there be anyone who would be able to

2   confirm that you were the one that came up with this idea,

3   not someone else at the company?

4                 MR. LUTZKER:  Objection, calls for

5   speculation.

6   BY MR. FRIEDMAN:

7      Q.   You can answer the question.

8      A.   State the question again, please.

9      Q.   To the best of your knowledge, is there anyone at

10  the company who would be able to confirm that you were the

11  one who came up with this invention?

12     A.   I have no idea.

13     Q.   Who did you first speak to about applying for a

14  patent?

15     A.   I didn't.

16     Q.   You never spoke to anyone about applying for a

17  patent?

18     A.   No.

19     Q.   You never spoke to Mr. Lipsitz about applying for

20  a patent?

21     A.   No.

22     Q.   Did you think it was worth applying for a patent

23  on this?

24     A.   I hadn't even thought of it.

25     Q.   So did someone suggest to you that a patent

1    should be applied for?

2        A.    Yes.

3        Q.    Do you recall who?

4        A.    No, I do not.

5        Q.    Did they tell you anything other than that a

6    patent should be applied for on this invention?

7        A.    I don't recall.

8        Q.    Do you know who made the decision to file a

9    patent application on this invention?

10       A.    I have no idea.

11       Q.    Were you involved in that decision in any way?

12       A.    No.

13       Q.    Did anyone ever tell you that this keyboard had

14   the potential for some commercial application?

15       A.    I don't understand your question.

16       Q.    Did anyone ever tell you that this invention

17   could be used in a keyboard that could be sold?

18       A.    That's what we were in business for.

19       Q.    So did someone actually say to you that this

20   invention could be used in a keyboard that GIC was selling?

21       A.    I can't really answer that.

22       Q.    Why can't you answer it?

23       A.    I don't know if somebody specifically told me

24   that or not.

25       Q.    You can't recall?

1       A.    I cannot recall.

2       Q.    Do you know if GIC ever used your invention in a

3    keyboard?

4       A.    I don't recall.

5       Q.    You don't recall if you know or you just don't

6    know?

7       A.    I don't recall if it was ever used.

8       Q.    Did you ever receive any kind of royalties from

9    this invention?

10       A.    No.

11       Q.    Did GIC have a policy, to the best of your

12    knowledge, that allowed inventors to share in the earnings

13    from an invention that they had come up with?

14       A.    Yes.

15       Q.    And did you ever receive any of those royalties

16    for any invention that you came up with from GIC?

17              MR. LUTZKER:  Excuse me.  Could you read

18    back the prior question and response.

19                        (Record read.)

20              MR. FRIEDMAN:  Could you read back my most

21    recent question, please.

22                        (Record read.)

23              MR. LUTZKER:  I object to the use of the

24    word "royalties."  I don't think it's a correct

25    characterization of the testimony.

1    BY MR. FRIEDMAN:

2         Q.   So can you answer the question?

3         A.   No.

4         Q.   Now, when this application was being filed by

5    Mr. Lipsitz, can you tell me about your involvement with

6    that process?

7         A.   Yes.

8         Q.   Could you please tell me about that?

9              MR. LUTZKER:  Well, I'm going to instruct

10   the witness not to respond to that broad question because I

11   think it inherently is seeking attorney-client privileged

12   information.  If you would be much more specific and narrow

13   your question in this area.

14             MR. FRIEDMAN:  Why don't you just state your

15   objection.  I think that's what the federal rules --

16             MR. LUTZKER:  Objection.  Calls for

17   privileged information.  Direct the witness not to answer.

18             MR. FRIEDMAN:  Thank you.

19        Q.   How many times did you speak with Mr. Lipsitz?

20        A.   I don't recall.

21        Q.   Was it more than one?

22        A.   Yes.

23        Q.   Was it more than five?

24        A.   I don't recall.

25        Q.   Was it more than two?

1       A.   Yes.

2       Q.   And over what period of time did you have

3  conversations with Mr. Lipsitz?

4       A.   I don't recall.

5       Q.   Did you review a draft of the patent application

6  before it was filed?

7       A.   Yes.

8       Q.   Do you recall if you made any changes to that

9  application?

10       A.   I do not recall.

11       Q.   Is there something I could show you that would

12  help you remember that?

13       A.   Yes.

14       Q.   Give me an example of what I could show you that

15  would help you remember that.

16       A.   A revision.

17       Q.   And you don't have any copies of the draft

18  application, do you?

19       A.   No.

20       Q.   Did you review any subsequent revisions of the

21  patent application?

22       A.   I don't recall.

23       Q.   Do you know of any products that use your

24  invention?

25       A.   Yes.

1              THE WITNESS:  Yes.

2         Q.   Now, referring again to the unnumbered exhibit on

3    the first page of Exhibit 1 --

4              MR. LUTZKER:  Unnumbered figure on the first

5    page of Exhibit 1.

6              MR. FRIEDMAN:  Yeah.  What did I say?

7              MR. LUTZKER:  Unnumbered exhibit.

8    BY MR. FRIEDMAN:

9         Q.   Referring again to the unnumbered figure on the

10   first page of Exhibit 1 is the component labeled as

11   sixty -- is that a separate piece from the keytop?

12        A.   Referring to Figure 1 or the unmarked figure on

13   the first page of Exhibit 1, it is a separate piece.

14        Q.   So what keeps this structure labeled as

15   Exhibit 60 connected to the keytop?

16        A.   I don't recall.  I'd have to see how we did it.

17        Q.   Let me just direct you -- it's a little bit

18   quicker -- to where the patent explains that, although

19   again, I'm not asking you about the patent; I'm just asking

20   you about what you invented.

21             Take a look at Column 3, Line 45, beginning with

22   the word "keytop."  Why don't you read that out loud,

23   please.

24        A.   "Keytop block sixty shown in greater detail in

25   figures 9 and 10 --" verify that "-- and may be mounted

1   the examination of the application?

2        A.   Can you be specific on that, please?

3        Q.   Well, did you have an understanding of what that

4   language meant?

5        A.   I can't recall whether -- I can't recall whether

6   I had a firm understanding.

7        Q.   I assume that you took your duty seriously.

8             MR. LUTZKER:  Is that a question or a

9   statement of your belief?

10            MR. FRIEDMAN:  What's the objection?

11            MR. LUTZKER:  There's no question.

12            MR. FRIEDMAN:  No question, okay.

13       Q.   Did you understand the statement I just said to

14  you as a question or a statement?

15       A.   I thought it was a statement.

16       Q.   Did you take the duty stated in this document

17  seriously?

18       A.   Yes.

19       Q.   And why do you say that?

20       A.   I can't -- I can only assume as much.  This has

21  been a lot of years ago.

22       Q.   So you don't actually know if you took it

23  seriously; you're just assuming you took it seriously?

24       A.   I don't understand what you're saying there.

25       Q.   Okay.  Why don't you look down a little further.




1      Q.   Did you see it before approximately a week ago?

2      A.   Not that I recall.

3      Q.   So you didn't see this document before you filed

4   a patent application?

5      A.   No, I did not.

6      Q.   Let me ask you a few questions on a different

7   topic.  Do you intend to testify at the trial in this case?

8      A.   I don't understand.  You need to be more specific

9   there.

10     Q.   What is not clear about my question?

11     A.   I don't know about a trial.

12     Q.   So is it fair for me to say that you do not

13  intend to testify at the trial in this case at the present

14  moment?

15     A.   Can't answer that.  I don't understand it.

16     Q.   And again, what don't you understand?

17     A.   The -- I don't understand your question.

18     Q.   Okay.  Are you being paid by Minebea currently?

19     A.   No.

20     Q.   Are you being paid by Minebea's lawyers?

21     A.   No.

22     Q.   Do you have any pecuniary interest in the outcome

23  of this litigation?

24     A.   I don't understand your question.

25     Q.   What don't you understand about it?

1     Q.   Were you allowed to take anything with you?

2     A.   I can't recall.

3     Q.   That probably wasn't very specific either.   Were

4  you allowed to take any work with you, your notes?

5     A.   I don't know if I was allowed to or not.

6     Q.   I suppose the question would be did you?

7               MR. LUTZKER:  Objection, asked and answered.

8               THE WITNESS:  No.

9  BY MS. WONG:

10    Q.   You were saying that you didn't remember whether

11 or not you had ordered any engineering magazines or trade

12 publications at around the time that you were inventing

13 this invention.  At that time how did you keep up with the

14 technology, the keyboard technology?

15              MR. LUTZKER:  Objection, lacks foundation.

16              THE WITNESS:  I have difficult

17 understanding -- I was part of the technology.

18 BY MS. WONG:

19    Q.   So how did you keep track of what other people

20 who were part of the technology -- how did you keep track

21 of what they were doing, too?

22              MR. LUTZKER:  Objection, lacks foundation.

23              THE WITNESS:  I don't recall.

24 BY MS. WONG:

25    Q.   Did you know what other people were doing in your

1      Q.   How about I break it down.

2      A.   Please.

3      Q.   At the time you were working at General

4    Instrument Corporation, did you ever go to meetings about

5    keyboard technology outside General Instrument Corp.?

6      A.   I don't recall.

7      Q.   Did you ever read articles about keyboard

8    technology?

9      A.   I don't recall reading specific articles about

10   keyboard technology.

11     Q.   Did you ever go listen to other people speak

12   about keyboard technology?

13     A.   No.

14     Q.   Was the invention that's described in this

15   patent -- was that the first key lift mechanism that you'd

16   ever designed?

17     A.   I didn't understand your question.

18     Q.   The Exhibit 1 that we've been talking about -- is

19   that the first key lift mechanism that you've ever

20   designed?

21     A.   The first what mechanism?

22     Q.   Key lift mechanism, keytop leveling mechanism.

23     A.   Oh.  I believe it is.

24     Q.   And the one that's shown on this front page, the

25   unmarked figure -- is that the first version that you

1    maker made the model?

2         A.   I can't really answer that.  I have no idea.

3         Q.   Were those drawings part of your invention

4    disclosure statement that you were talking about earlier?

5         A.   I don't know.  I don't know.  I can't answer

6    that.

7         Q.   Okay.  Let's talk about -- I know we had talked

8    earlier about the invention review policy at General

9    Instrument.  When there was an invention to be reviewed, do

10   you normally do that in writing?

11        A.   Can you be more specific?  I don't understand

12   your question.

13        Q.   I guess sometimes when you want to tell somebody

14   about the invention during a process like this, you can

15   either give somebody a call and say "I've got this great

16   idea" or there might be a form that you need to fill out

17   that says, "This is the invention that I have and this is

18   why it's so great."

19                   MR. LUTZKER:  Wait for a question.

20   BY MS. WONG:

21        Q.   And so I guess my question is were either of

22   those ways used to let somebody know that there was an

23   invention that was this great idea?

24        A.   I frankly don't recall the exact way.

25        Q.   Do you remember writing something down about your



1    A.   Be more specific, please.  Still struggling with

2    the time frame here.

3    Q.   I'm talking about after you've designed your

4    invention.

5    A.   Yes.

6    Q.   And you were speaking with the patent attorney

7    about getting a patent application.

8         MR. LUTZKER:  So this is before the

9    application was filed?  Is that --

10        MS. WONG:  Before the application was filed.

11   Q.   At that time before the application was filed,

12   did the patent attorney have you look at other patents?

13   A.   I don't believe so.

14   Q.   Did the patent attorney, at the same period of

15   time, ask you to look at any articles about keyboard

16   technology?

17   A.   I don't believe so.  Can't recall.

18   Q.   Who sent you to this patent attorney?

19   A.   I don't know.

20   Q.   You had said that you had reviewed a draft of the

21   application.  Did anyone else review a draft of this

22   application?

23   A.   I don't know.

24   Q.   Let's go back to Exhibit 1, and we're going to go

25   to the unmarked structure again.

# A F F I D A V I T

STATE OF WASHINGTON )
                   ) ss.
COUNTY OF KING     )

        I have read my within deposition, taken on December 12, 2002, and the same is true and correct, save and except for changes and/or corrections, if any, as indicated by me on the "CORRECTIONS" flyleaf page hereof.

_____

DEAN STUART COWLES

        SUBSCRIBED AND SWORN to before me this

_____ day of _____, 2002.

_____

NOTARY PUBLIC in and for the
State of Washington, residing
at _____.

# C E R T I F I C A T E

STATE OF WASHINGTON  )
                           ) ss.
COUNTY OF KING         )


    I, the undersigned officer of the Court, under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter transcribed under my direction;

    That the witness before the examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination;

    That I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.


    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 18th day of December , 2002.


*Mindy L. Suurs*
NOTARY PUBLIC in and for
the State of Washington,
residing at Bellevue.  My
commission expires 10-3-06.

Exhibit M

    

**MAPS.**   **DRIVING DIRECTIONS.**   **ROAD TRIP PLANNER.**   **YELLOW PAGES.**

# driving directions

HELP ?

- **North America**
- **Europe**
- **Saved Routes**

**What's Nearby**

Search 2 [v] miles for:



○ **BORDERS°**

○ 

○ **krispy kreme**

Search

**Orbitz Travel Deals**

♯ **Flights:**
Find low fares to the San Diego area!

♯ **Rental Cars:**
Find special offers on rental prices in the Los Angeles area!

♯ **Lodging:**
Save up to 75% on Orbitz Savers nationwide. Search San Diego, CA!

**ORBITZ**

**City Guide**

- San Diego Dining
- San Diego News
- San Diego Movies
- San Diego Entertainment

**Yellow Pages**
Search **San Diego** for:
Auto repair [v]

Search

**FROM:**

9730 Independence Ave
Chatsworth, CA
91311-4323 US

**Total Distance:** 157.12 miles

**TO:**

940 Front St
San Diego, CA
92101-8994 US

**Total Estimated Time:**
2 hours, 36 minutes

 **PRINT ROUTE**  **SAVE ROUTE** ▓▓ **E-MAIL ROUTE** ▓▓
▓▓ **REVERSE DIRECTIONS** ▓▓ ▓▓ **DOWNLOAD ROUTE TO PDA** ▓▓

| DIRECTIONS | DISTANCE |
|---|---|
| **1:** Start out going North on INDEPENDENCE AVE toward LASSEN ST. | 0.21 miles |
| **2:** Turn RIGHT onto LASSEN ST. | 0.12 miles |
| **3:** Turn LEFT onto DE SOTO AVE. | 1.62 miles |
| **4:** Merge onto CA-118 E. | 6.66 miles |
| **5:** Merge onto I-405 S toward SANTA MONICA. | 71.09 miles |
| **6:** I-405 S becomes I-5 S. | 76.55 miles |
| **7:** Take the FRONT ST exit toward CIVIC CENTER. | 0.27 miles |
| **8:** Turn SLIGHT RIGHT onto FRONT ST. | 0.60 miles |

**Total Estimated Time:**       **Total Distance:** 157.12 miles
2 hours, 36 minutes

**Need a hotel, car, or flight?**

Search Now!

 **NEW CAR DEALS** ▓▓▓

Get instant pricing on 2003 models at CarsDirect.com.

Acura [v]   Search

**ROUTE OVERVIEW:**

▲ **NORTH** ▲

**ZOOM IN**
⊕



[PETsMART]

Find a
**PETsMART**
store
near you.



CLICK HERE ▶



**CLICKING ON MAP WILL:**  ○ Zoom In  ● Re-center

All rights reserved. Use Subject to License/Copyright

Map Legend  **NAVTECH ON BOARD**

**DESTINATION:**

**940 Front St
San Diego, CA
92101-8994 US**



©2003 MapQuest.com, Inc.; ©2003 Navigation Technologies

**Re-display Directions with:**

● Overview Map with Text    ○ Text Only    ○ Turn-by-Turn Maps with Text

**RE-DISPLAY ROUTE**

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

Site Index | About MapQuest | Partners | MapStore | Help Center

International Web Sites | Mobile MapQuest | Advertise With Us | Business Solutions

Privacy Policy & Legal Notices
© 2003 MapQuest.com, Inc. All rights reserved.

Exhibit N

    

**MAPS**  **DRIVING DIRECTIONS**  **ROAD TRIP PLANNER**  **YELLOW PAGES**

## driving directions

HELP ?

- **North America**
- **Europe**
- **Saved Routes**

**What's Nearby**

Search 2 miles for:

○ **BORDERS**



○ 

○ 

[ Search ]

**Orbitz Travel Deals**

¤ **Flights:**
Find low fares to the Seattle/Tacoma area!

¤ **Rental Cars:**
Find special offers on rental prices in the Los Angeles area!

¤ **Lodging:**
Save up to 75% on Orbitz Savers nationwide. Search Seattle, WA!

*ORBITZ*

**City Guide**

- Seattle Dining
- Seattle News
- Seattle Movies
- Seattle Entertainment

**Yellow Pages**
Search **Seattle** for:

Auto repair

[ Search ]

---

**FROM:**

**9730 Independence Ave**
**Chatsworth, CA**
**91311-4323 US**

**Total Distance:** 1133.67 miles

**TO:**

**1010 5th Ave**
**Seattle, WA**
**98104-1195 US**

**Total Estimated Time:**
18 hours, 21 minutes

[ PRINT ROUTE ]  [ SAVE ROUTE ]  [ E-MAIL ROUTE ]
[ REVERSE DIRECTIONS ]  [ DOWNLOAD ROUTE TO PDA ]

| DIRECTIONS | DISTANCE |
|---|---|
| **1:** Start out going North on INDEPENDENCE AVE toward LASSEN ST. | 0.21 miles |
| **2:** Turn RIGHT onto LASSEN ST. | 0.12 miles |
| **3:** Turn LEFT onto DE SOTO AVE. | 1.62 miles |
| **4:** Merge onto CA-118 E. | 6.66 miles |
| **5:** Merge onto I-405 N toward SACRAMENTO. | 2.85 miles |
| **6:** I-405 N becomes I-5 N. | 927.11 miles |
| **7:** Merge onto I-205 N via exit number 288 toward I-84/THE DALLES/SEATTLE. | 36.57 miles |
| **8:** Merge onto I-5 N. | 158.12 miles |
| **9:** Take the SENECA ST. exit- exit number 165- on the left. | 0.24 miles |
| **10:** Turn SLIGHT LEFT onto SENECA ST. | 0.06 miles |
| **11:** Turn LEFT onto 5TH AVE. | 0.10 miles |

**Total Estimated Time:**
18 hours, 21 minutes

**Total Distance:** 1133.67 miles

**Need a hotel, car, or flight?**
Search Now!

---



**SAVE MONEY. SAVE GAS.**

**Most Fuel Efficient Cars**

Honda Insight
 61 city / 68 hwy

Toyota Prius
 45 city / 52 hwy

Honda Civic Hybrid
 46 city / 51 hwy

Volkswagen Jetta GLS TDI
 42 city / 49 hwy

Volkswagen Golf GLS TDI
 42 city / 49 hwy

Toyota Corolla
 32 city / 40 hwy

❍ See More



CarsDirect

NEW CAR DEALS

Get instant pricing on 2003 models at CarsDirect.com.

Acura   [ Search ]



**ROUTE OVERVIEW:**

▲ NORTH ▲



**CLICKING ON MAP WILL:**  ○ Zoom In  ● Re-center

All rights reserved. Use Subject to
License/Copyright

Map Legend  **NAVTECH ON BOARD**

**DESTINATION:**

**1010 5th Ave
Seattle, WA
98104-1195 US**



**Re-display Directions with:**

● Overview Map with Text       ○ Text Only       ○ Turn-by-Turn Maps with Text

**RE-DISPLAY ROUTE**

These directions are informational only. No representation is made or warranty given as to
their content, road conditions or route usability or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from
such use.

Site Index | About MapQuest | Partners | MapStore | Help Center


International Web Sites | Mobile MapQuest | Advertise With Us | Business Solutions

Privacy Policy & Legal Notices
© 2003 MapQuest.com, Inc. All rights reserved.

Exhibit O



   

Home    Help                              MAPS        DRIVING        ROAD TRIP       YELLOW
                                                      DIRECTIONS     PLANNER         PAGES

# driving directions

HELP ?

- **North America**
- **Europe**
- **Saved Routes**

**What's Nearby**

Search 2 ▼ miles for:

○ BORDERS'



○

○



**Search**

**Orbitz Travel Deals**

◻ **Flights:**
Find low fares to the San Diego area!

◻ **Rental Cars:**
Find special offers on rental prices in Orange County!

◻ **Lodging:**
Save up to 75% on Orbitz Savers nationwide. Search San Diego, CA!



**City Guide**

- San Diego Dining
- San Diego News
- San Diego Movies
- San Diego Entertainment

**Yellow Pages**

Search **San Diego** for:

Auto repair ▼

**Search**

| FROM: | TO: |
|---|---|
| **53 Parker** | **940 Front St** |
| **Irvine, CA** | **San Diego, CA** |
| **92618-1605 US** | **92101-8994 US** |

**Total Distance:** 79.49 miles

**Total Estimated Time:**
1 hour, 21 minutes

**PRINT ROUTE**    **SAVE ROUTE**    **E-MAIL ROUTE**

**REVERSE DIRECTIONS**    **DOWNLOAD ROUTE TO PDA**

| DIRECTIONS | DISTANCE |
|---|---|
| **1:** Start out going Northeast on PARKER toward IRVINE BLVD. | 0.10 miles |
| **2:** Turn RIGHT onto IRVINE BLVD. | 0.17 miles |
| **3:** Turn RIGHT onto BAKE PKWY. | 1.62 miles |
| **4:** Turn LEFT onto ROCKFIELD BLVD. | 0.71 miles |
| **5:** Turn RIGHT onto LAKE FOREST DR. | 0.31 miles |
| **6:** Merge onto I-5 S toward SAN DIEGO. | 75.71 miles |
| **7:** Take the FRONT ST exit toward CIVIC CENTER. | 0.27 miles |
| **8:** Turn SLIGHT RIGHT onto FRONT ST. | 0.60 miles |

| **Total Estimated Time:** | **Total Distance:** 79.49 miles |
|---|---|
| 1 hour, 21 minutes | |

**Need a hotel, car, or flight?**

Search Now!



**NEW CAR DEALS**
Get instant pricing on 2003 models at CarsDirect.com.

Acura ▼    Search



**ROUTE OVERVIEW:**

▲ **NORTH** ▲

ZOOM
IN



©2003 MapQuest.com, Inc.

**CLICKING ON MAP WILL:**  ○ Zoom In  ● Re-center

All rights reserved. Use Subject to
License/Copyright

Map Legend  NAVTECH ON BOARD

**DESTINATION:**

**940 Front St**
**San Diego, CA**
**92101-8994 US**



©2003 MapQuest.com, Inc.; ©2003 Navigation
Technologies

**Re-display Directions with:**

● Overview Map with Text    ○ Text Only    ○ Turn-by-Turn Maps with Text

RE-DISPLAY ROUTE

These directions are informational only. No representation is made or warranty given as to
their content, road conditions or route usability or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from
such use.

Site Index | About MapQuest | Partners | MapStore | Help Center



International Web Sites | Mobile MapQuest | Advertise With Us | Business Solutions

Privacy Policy & Legal Notices
© 2003 MapQuest.com, Inc. All rights reserved.

Exhibit P




**MAPS**


**DRIVING DIRECTIONS**


**ROAD TRIP PLANNER**

**YELLOW PAGES**

# driving directions

HELP ?

- **North America**
- **Europe**
- **Saved Routes**

**What's Nearby**

Search `2 ▾` miles for:

○ BORDERS°



○



○

Search

**Orbitz Travel Deals**

⊐ **Flights:**
Find low fares to the
Seattle/Tacoma area!

⊐ **Rental Cars:**
Find special offers on
rental prices in Orange
County!

⊐ **Lodging:**
Save up to 75% on
Orbitz Savers
nationwide. Search
Seattle, WA!

*ORBITZ*

**City Guide**

- Seattle Dining
- Seattle News
- Seattle Movies
- Seattle Entertainment

**Yellow Pages**

Search **Seattle** for:

`Auto repair ▾`

Search

**FROM:**

**53 Parker**
**Irvine, CA**
**92618-1605 US**

**Total Distance:** 1194.44 miles

**TO:**

**1010 5th Ave**
**Seattle, WA**
**98104-1195 US**

**Total Estimated Time:**
19 hours, 18 minutes

| | PRINT ROUTE | | SAVE ROUTE | | E-MAIL ROUTE |
| REVERSE DIRECTIONS | | DOWNLOAD ROUTE TO PDA |

| DIRECTIONS | DISTANCE |
| --- | --- |
| **1:** Start out going Southwest on PARKER toward CROMWELL. | 0.32 miles |
| **2:** Turn RIGHT onto TOLEDO WAY. | 0.22 miles |
| **3:** Turn LEFT onto ALTON PKWY. | 2.01 miles |
| **4:** Merge onto I-5 N toward LOS ANGELES. | 44.51 miles |
| **5:** Merge onto CA-2 N toward GLENDALE. | 7.97 miles |
| **6:** Merge onto I-210 W via the exit- on the left- toward SAN FERNANDO. | 18.60 miles |
| **7:** Take the I-5 N/GOLDEN STATE FWY exit on the left toward SACRAMENTO. | 0.65 miles |
| **8:** Take the AUTOS exit on the left. | 0.18 miles |
| **9:** Merge onto I-5 N. | 924.88 miles |
| **10:** Merge onto I-205 N via exit number 288 toward I-84/THE DALLES/SEATTLE. | 36.57 miles |
| **11:** Merge onto I-5 N. | 158.12 miles |
| **12:** Take the SENECA ST. exit- exit number 165- on the left. | 0.24 miles |
| **13:** Turn SLIGHT LEFT onto SENECA ST. | 0.06 miles |
| **14:** Turn LEFT onto 5TH AVE. | 0.10 miles |

**Total Estimated Time:** **Total Distance:** 1194.44 miles
19 hours, 18 minutes

**Need a hotel, car, or flight?**
Search Now!

**Search for homes in your local MLS.**

**City**
`Seattle ▾`

**Bed/Bath**
`3 Bd 2 Ba ▾`

**Sq. Ft.**
`1200 ▾` Go!

**zipRealty**



**ROUTE OVERVIEW:**



**CLICKING ON MAP WILL:** ○ Zoom In  ● Re-center

All rights reserved. Use Subject to
License/Copyright

Map Legend  **NAVTECH ON BOARD**

**DESTINATION:**

**1010 5th Ave
Seattle, WA
98104-1195 US**

©2003 MapQuest.com, Inc.; ©2003 Navigation...
Technologies

**Re-display Directions with:**


⊙ Overview Map with Text      ○ Text Only      ○ Turn-by-Turn Maps with Text

[ RE-DISPLAY ROUTE ]

These directions are informational only. No representation is made or warranty given as to
their content, road conditions or route usability or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from
such use.

Site Index | About MapQuest | Partners | MapStore | Help Center
International Web Sites | Mobile MapQuest | Advertise With Us | Business Solutions

Privacy Policy & Legal Notices
© 2003 MapQuest.com, Inc. All rights reserved.

Exhibit Q

# PREAMBLE TO LOCAL RULES

The Local Rules of Practice for the United States District Court for the Southern District of California are contained herein. These rules are divided into two parts: civil and criminal. Civil rules may be cited as " CivLR ___" ; criminal rules may be cited as "CrimLR ___."

Rules covering admiralty and habeas corpus proceedings may be found at the end of the civil rules, cited as A.1-E.1; and HC.1, HC.2, et seq.

# CIVIL LOCAL RULES

## Civil Rule 1.1 Scope and Availability of Local Rules

a.  **Title and Citation.** These are the Local Civil Rules of Practice for the United States District Court for the Southern District of California. They may be cited as "CivLR ___."

b.  **Effective Date.** These Rules become effective on January 1, 2000.

c.  **Scope of the Rules; Construction, Definitions.** These rules supplement the Federal Rules of Civil Procedure, and they shall be construed so as to be consistent with those rules and to promote the just, efficient and economical determination of every action and proceeding. The provisions of the General and Civil Rules shall apply to all actions and proceedings, including criminal, bankruptcy and admiralty, and actions and proceedings before magistrate judges, except where they may be inconsistent with rules or provisions of law specifically applicable thereto.

d.  In any case for the convenience of the parties in interest, or in the interest of justice, a judge may waive the applicability of these rules.

e.  **Definitions**

    1.  "Attorney" or "counsel" includes an attorney, proctor, advocate, solicitor, counsel, or counselor;

    2.  "Brief" includes briefs, memoranda, points and authorities and other written argument or compilation of authorities;

    3.  "Civil action" includes any action, case, proceeding or matter of a civil nature;

    4.  "Clerk" means the Clerk of the United States District Court for the Southern District of California and deputy clerks, unless the context otherwise requires;

    5.  "Court" includes the district judge or magistrate judge to whom a civil or criminal action, proceeding, case or matter has been assigned;

    6.  "Court clerk" means a deputy clerk assigned to the courtroom of a judge or magistrate judge of this Court;

    7.  "Declaration" includes any declaration under penalty of perjury executed in conformance with 28 U.S.C. §1746, and any properly executed affidavit;

    8.  "Defendant" means any party against whom a claim for relief is made or against whom an indictment or information is pending in a criminal case;

    9.  "FRAPPE" means the Federal Rules of Appellate Procedure;

    10.  "F.R.Civ.P." means the Federal Rules of Civil Procedure;

    11.  "F.R.Crim.P." means the Federal Rules of Criminal Procedure;

# Civil Rule 33.1 Interrogatories

a. **Limitation on Number of Interrogatories.** No party shall serve on any other party interrogatories which, including subparagraphs, number more than twenty-five interrogatories without leave of court. Subparagraphs of any interrogatory shall relate directly to the subject matter of the interrogatory. Any party desiring to serve additional interrogatories shall submit to the court a written memorandum setting forth the proposed additional interrogatories and the reasons establishing good cause for their use.

b. **Answers and Objections to Interrogatories.** Answers and objections to interrogatories, objections to answers to interrogatories or motions for more definite answers pursuant to Rule 37(a), F.R.Civ.P. shall identify and quote each interrogatory in full immediately preceding the statement of any answer or objection thereto.

c. **Filing.** Unless filing is ordered by the court on motion of a party or upon its own motion, interrogatories, requests for production and the answers thereto need not be filed unless and until they are used in the proceedings.

# Civil Rule 36.1 Requests for Admission

a. **Limitation on Number of Requests for Admission.** No party shall serve on any other party requests for admission which, including subparagraphs, number more than twenty-five requests for admission without leave of court. Any party desiring to serve additional requests for admission shall submit to the court a written memorandum setting forth the proposed additional requests for admission and the reasons establishing good cause for their use.

b. **Answers and Objections to Requests for Admission.** Responses and objections to requests for admission or answers thereto pursuant to Rule 36, F.R.Civ.P. shall identify and quote each request for admission in full immediately preceding the statement of any answer or objection thereto.

c. **Filing.** Unless filing is ordered by the court on motion of a party or upon its own motion, requests for admission, and requests for production and the answers thereto need not be filed unless and until they are used in the proceedings.

# Civil Rule 38.1 Jury Demand

Where demand is made for a jury trial, it shall appear immediately following the title of the complaint, petition or answer containing the demand, or on such other pleading as may be permitted under Rule 38(b), F.R.Civ.P.

Any other notation on the civil cover sheet, such as those described in Civil Local Rule 3.1, shall not constitute a demand for jury trial under these rules.

# Civil Rule 40.1 Assignment of Civil Cases

a. **Assignment of Civil Cases.** All actions and proceedings of a civil nature shall be numbered consecutively upon the filing of the first document in each such action or proceeding, and the judges shall, from time to time, determine, and indicate by formal order to the clerk, the method by which each action or proceeding shall be assigned to a particular judge, to the end that over a period of time each judge shall be assigned substantially equal amounts of work. Neither the clerk nor any deputy shall have any discretion in determining the judge to whom any matter is assigned, the action of the clerk being ministerial only. The method of assignment chosen by the judges shall be such that the judge to whom any particular matter is to be assigned, in accordance with this rule, shall not be known by or disclosed to the clerk, or any member of the staff, or to any other person, until after such action or proceeding has been filed and numbered.

The judge to whom a case is assigned may transfer such a case at any time to a consenting judge in the interest of efficient administration of the judicial business of the district.

b. **Assignments to New Judges.** Upon the induction of a new judge, the clerk shall ascertain the number of cases which comprises an equal share of all cases then pending, and the number of cases assigned to each active judge. The clerk shall then indicate to each active judge the number of cases to be transferred to the new judge.

It is within the discretion of each active judge to determine which cases shall be transferred to the new judge. The new judge may refuse to accept any such transfer where there are grounds for recusal, in which instance the transferor judge shall transfer a different case to the new judge.

The clerk shall then add the name of the new judge to the random selection system that governs the assignment of new cases to active judges.

c. **Temporary designation.** If a judge is unavailable to handle matters pertaining to his/her cases, he/she may designate another judge who will handle them until the designating judge is available. In the event a judges does not so designate, or the designated judge is unavailable, the chief judge may handle the unavailable judge's matters or designate another judge to handle them until the unavailable judge or his/her designee is available.

d. **Low Number Rule, Criteria.** The clerk shall promptly examine the original complaint or petition in each civil action and proceeding hereafter filed and ascertain whether any one or more civil actions or proceedings pending or any one or more currently filed appear (1) to arise from the same or substantially identical transactions, happenings, or events; or (2) involve the same or substantially the same parties or property, or (3) involve the same patent or the same trademark, except where in one or both of the actions concerned, the same patent or trademark is joined with other patents or trademarks which do not cover the same or substantially identical things or devices; or (4) call for determination of the same or substantially identical questions of law; or (5) for other reasons would entail substantial duplication of labor if heard by different judges.

e. **Notice of Related Case, Duties of Counsel.** Whenever counsel has reason to believe that a pending action or proceeding on file or about to be filed is related to another pending action or proceeding on file in this or any other federal or state court (whether pending, dismissed, or otherwise terminated), counsel shall promptly file and serve on all known parties to each related action or proceeding a notice of related case, stating the title, number and filing date of each action or proceeding believed to be related, together with a brief statement of their relationship and the reasons why assignment to a single district judge is or is not likely to effect a saving of judicial effort and other economies. The clerk will promptly notify the court of such filing. This is a continuing duty that applies not only when counsel files a case with knowledge of a related action or proceeding but also applies after the date of filing whenever counsel learns of a related action or proceeding.

f. **Definition of Related Action.** An action or proceeding is related to another action or proceeding where both of them:

   1. Involve some of the same parties and are based on the same or similar claims, or

   2. Involve the same property, transaction, or event, or

   3. Involve substantially the same facts and the same questions of law.

g. **Duties of Clerk.** Whenever it shall appear to the clerk that any one or more of the above circumstances set forth in Civil Local Rule 40.1(d) exist, it shall be the duty of the clerk to report the cases in question to the judges concerned at the earliest date practicable.

The clerk's report shall set forth, as to each action or proceeding listed therein: (1) the case number, (2) the fullest practicable statement of the names of all parties, (3) a brief statement of the nature of the case and the relief sought, (4) the name of the attorney for plaintiff or petitioning party, and (5) such other information as shall, in the opinion of the clerk, assist in determining whether a case should be transferred under this "low-number" rule. The clerk's report shall be accompanied by an appropriate order for the signature of the judges concerned with the proposed transfer.

h. **Assignments and Transfers.** In order to avoid unnecessary duplication of judicial effort, all pending civil actions and proceedings, which are determined to be related to any other pending civil action or proceeding pursuant to the criteria set forth in Civil Local Rule 40.1(d) shall be assigned to the district judge to whom the case was originally assigned, or the



magistrate judge if the magistrate judge is handling the case by consent, pursuant to Civil Local Rule 40.1, the case first filed of any given series of cases (i.e., the case bearing the lowest case file number in the series). Orders for transfers of cases subject to this "low-number" rule shall be made and entered at the earliest practicable date following commencement of the action or proceeding.

The decision by the magistrate judges as to whether or not to transfer the case to the magistrate judge assigned to the lowest numbered case is independent of the district court judge's decision to transfer. Such decision by the magistrate judges having the high and low numbered cases will be based on the exercise of their sound discretion considering issues of effective case management and settlement.

i.  **Transfer Limitation.** No single series of cases comprising more than ten in number may be transferred to a single judge pursuant to this order without the consent of the transferee judge.

## Civil Rule 40.2 Notice of Party with Financial Interest

Any nongovernmental corporate party to an action in this court shall file a statement identifying all its parent corporations and listing any publicly held company that owns 10% or more of the party's stock. A party shall file a separate statement entitled "Notice of Party with Financial Interest" with its initial pleading filed in the court and shall supplement the statement within a reasonable time of any change in the information.

## Civil Rule 41.1
## Dismissal for Want of Prosecution and for
## Failure to Comply with Local Rules

a.  Actions or proceedings which have been pending in this court for more than six months, without any proceeding or discovery having been taken therein during such period, may, after notice, be dismissed by the court for want of prosecution, at the calling of a calendar prepared for that purpose by the clerk. Such a dismissal shall be without prejudice, unless otherwise ordered.

b.  Failure to comply with the provisions of the local rules of this court may also be grounds for dismissal under this rule.

## JURIES

## Civil Rule 47.1 Examination of Jurors

Unless otherwise ordered, the examination of trial jurors shall be conducted by the judge. Counsel shall submit any questions which they desire to be propounded to the jurors in accordance with Civil Local Rule 16.1(f.10.b)

## Civil Rule 51.1 Filing, Service and Form of Proposed Instructions

a.  **Filing.** Jury instructions shall be filed in accordance with Rule 51, F.R.Civ.P. The judge may in the judge's discretion, receive additional requests for instructions at any time prior to the commencement of argument to the jury.

b.  **Style.** Each proposed instruction shall be concise, cover only one subject which shall be indicated in the caption, set forth the identity of the party submitting it, be written in full on a separate page, be consecutively numbered, and set forth citations to the authorities supporting it.

c.  **Objections.** Objections to proposed instructions may be made in writing or orally, as time permits. Such objections should normally be accompanied by citations of supporting authority. Prior to argument of counsel to the jury, the court shall inform counsel of the instructions which will be given.

d.  **Instructions.** If an instruction is submitted from a recognized book of instructions, it shall be from the latest edition thereof (so noted at the bottom of the instruction); and if modified in any way, deleted material shall be shown in parentheses and additions shall be underscored.

**HONORABLE BARBARA J. ROTHSTEIN**

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

**APR 04 2003** PM

SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

CV 03-00295 #00000014

9        UNITED STATES DISTRICT COURT

10       WESTERN DISTRICT OF WASHINGTON

11       SEATTLE DIVISION

| | |
|---|---|
| MINEBEA CO., LTD., | No.  CV 03 0295 R |
| Plaintiff, | **DEFENDANTS' JOINT MOTION TO TRANSFER OR DISMISS; MEMORANDUM OF LAW IN SUPPORT** |
| v. | |
| CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC., | NOTE ON MOTION CALENDAR: May 2, 2003 |
| Defendants. | [Fed. R. Civ. P. 12(b)(2) & 12(b)(3); 28 U.S.C. §§ 1400(b) & 1404(a)] |

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R)

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................iii

NOTICE OF MOTION ...................................................................................................1

INTRODUCTION.............................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

    A.    The Parties.....................................................................................................2

    B.    The '225 Patent............................................................................................2

    C.    The Accused Devices ...................................................................................2

    D.    The Southern District Of California Litigation .........................................3

ARGUMENT .....................................................................................................................4

I.    THIS COURT SHOULD TRANSFER THIS ACTION TO
    THE SOUTHERN DISTRICT OF CALIFORNIA .............................................4

    A.    This Action Could Have Been Brought in the Southern
        District of California ....................................................................................5

    B.    The Southern District of California Is More Convenient
        for the Substantial Majority of the Witnesses............................................5

    C.    The Southern District of California Is More Convenient
        for All Parties — Including Minebea.........................................................7

    D.    Transferring this Action Will Serve the Interests of
        Justice by Avoiding Duplicative Litigation ..............................................8

    E.    Washington Has No Interest in This Litigation ......................................10

    F.    The Locus of Operative Facts Is in California, Not
        Washington ................................................................................................10

    G.    Minebea's Choice of Forum Is Entitled to Minimal
        Weight .......................................................................................................11

II.    MINEBEA CANNOT CARRY ITS BURDEN OF
    ESTABLISHING PERSONAL JURISDICTION OVER THE
    DEFENDANTS...................................................................................................12

    A.    This District Lacks General Jurisdiction over the
        Defendants..................................................................................................12

    B.    This District Lacks Specific Jurisdiction over the
        Defendants..................................................................................................13

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1.       Chicony Did Not Purposefully Direct the
Accused Keyboards at Washington Residents ........................................... 14

2.       Relatedness ................................................................................. 15

3.       Exercising Personal Jurisdiction Would Be
Unreasonable .............................................................................. 15

C.     Rule 4(k)(2) Does Not Permit the Aggregation of
Chicony Electronics or Chicony America's Contacts ........................................... 17

III.     VENUE DOES NOT LIE IN THIS DISTRICT .............................................................. 18

CONCLUSION .................................................................................................... 19

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

# TABLE OF AUTHORITIES

## CASES

*3D Sys., Inc. v. Aarotech Labs., Inc.*
160 F.3d 1373 (Fed. Cir. 1998)..................................................................................... 12

*A.J. Indus., Inc. v. C.D. Cal.*
503 F.2d 384 (9th Cir. 1974)......................................................................................... 9

*Akro Corp. v. Luker*
45 F.3d 1541 (Fed. Cir. 1995)....................................................................................... 14

*Asahi Metal Indus. Co. v. Super. Ct.*
480 U.S. 102 (1987)........................................................................................... 10, 15, 16

*Asymetrix Corp. v. Lex Computer & Mgmt. Corp.*
No. C94-588Z, 1995 U.S. Dist. LEXIS 20388 (W.D. Wash. Jan. 20, 1995) ............................. 7

*Auto Wax Co. v. Kasei Kogyo Co.*
65 U.S.P.Q.2d 1315 (W.D. Tex. 2001) ........................................................................ 16, 17

*Ballard v. Savage*
65 F.3d 1495 (9th Cir. 1995).......................................................................................... 16

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*
223 F.3d 1082 (9th Cir. 2000)........................................................................................ 13

*Base Metal Trading, Ltd. v. Ojsc "Novokuznetsky Aluminum Factory"*
283 F.3d 208 (4th Cir. 2002).......................................................................................... 17

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*
21 F.3d 1558 (Fed. Cir. 1994)......................................................................................... 5

*Brown Mfg. Corp. v. Alpha Lawn & Garden Equip., Inc.*
219 F. Supp. 2d 705 (E.D. Va. 2002)............................................................................... 11

*Burger King Corp. v. Rudzewicz*
471 U.S. 462 (1985)................................................................................................ 12, 14

*Cont'l Grain Co. v. Barge FBL-585*
364 U.S. 19 (1960)........................................................................................................ 10

*Creative Tech., Ltd. v. Aztech Sys. Pte, Ltd.*
61 F.3d 696 (9th Cir. 1995)............................................................................................ 4

*Fed. Ins. Co. v. Lake Shore, Inc.*
886 F.2d 654 (4th Cir. 1989).......................................................................................... 10

*Ferens v. John Deere Co.*
494 U.S. 516 (1990)....................................................................................................... 8

*Fields v. Sedgwick Associated Risks, Ltd.*
796 F.2d 299 (9th Cir. 1986).......................................................................................... 13

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

*GTE Wireless, Inc. v. Qualcomm, Inc.*
71 F. Supp. 2d 517 (E.D. Va. 1999)......................................................................... 11

*Helicopteros Nacionales de Colombia, S.A. v. Hall*
466 U.S. 408 (1984)................................................................................................ 12, 13

*HollyAnne Corp. v. TFT, Inc.*
199 F.3d 1304 (Fed. Cir. 1999)............................................................................... 19

*Hoover Group, Inc. v. Custom Metalcraft, Inc.*
84 F.3d 1408 (Fed. Cir. 1996)................................................................................. 18

*Hunter Eng'g Co. v. ACCU Indus., Inc.*
No. 3:02cv333, 2002 U.S. Dist. LEXIS 20873 (E.D. Va. Oct. 10, 2002) ............. 9, 10

*Inamed Corp. v. Kuzmak*
249 F.3d 1356 (Fed. Cir. 2001)............................................................................... 15

*Invivo Research, Inc. v. Magnetic Resonance Equip. Corp.*
119 F. Supp. 2d 433 (S.D.N.Y. 2000)...................................................................... 11

*LG Elecs., Inc. v. Advance Creative Computer Corp.*
131 F. Supp. 2d 804 (E.D. Va. 2001)....................................................................... 9

*LG Elecs., Inc. v. First Int'l Computer, Inc.*
138 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................... 8

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
89 F.R.D. 497 (C.D. Cal. 1981)............................................................................... 4

*Lou v. Belzberg*
834 F.2d 730 (9th Cir. 1987)................................................................................... 11

*Maynard v. Phila. Cervical Collar Co.*
No. 00-1555, 2001 U.S. App. LEXIS 18834 (Fed. Cir. Aug. 15, 2001) ................. 14

*Miracle Blade, LLC v. EBrands Commerce Group, LLC*
207 F. Supp. 2d 1136 (D. Nev. 2002) ..................................................................... 12

*N. Am. Phillips Corp. v. Am. Vending Sales, Inc.*
35 F.3d 1576 (Fed. Cir. 1994).................................................................................. 13

*Pac. Car & Foundry Co. v. Pence*
403 F.2d 949 (9th Cir. 1968).................................................................................. 11, 12

*Phillips v. Baker*
121 F.2d 752 (9th Cir. 1941)................................................................................... 18, 19

*Quokka Sports, Inc. v. Cup Int'l Internet Ventures*
99 F. Supp. 2d 1105 (N.D. Cal. 1999) ..................................................................... 18

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*
148 F.3d 1355 (Fed. Cir. 1998)............................................................................... 17

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R)- iv

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

*Ricoh Co. v. Honeywell, Inc.*
   817 F. Supp. 473 (D.N.J. 1993) ........................................................... 10

*S.C. Johnson & Sons, Inc. v. Gillette Co.*
   571 F. Supp. 1185 (N.D. Ill. 1983) ....................................................... 10

*Saint-Gobain Calmar, Inc. v. Nat'l Prods. Corp.*
   230 F. Supp. 2d 655 (E.D. Pa. 2002) .................................................... 11

*Seattle Audubon Soc'y v. Lyons*
   871 F. Supp. 1286 (W.D. Wash. 1994) .................................................... 8

*Smith v. S&S Dundalk Eng'g Works, Ltd.*
   139 F. Supp. 2d 610 (D.N.J. 2001) ....................................................... 17

*Stairmaster Sports/Med. Prods., Inc. v. Pac. Fitness Group*
   916 F. Supp. 1049 (W.D. Wash. 1994) ................................................... 12

*VE Holding Corp. v. Johnson Gas Appliance Co.*
   917 F.2d 1574 (Fed. Cir. 1990) ........................................................... 18

*Van Dusen v. Barrack*
   376 U.S. 612 (1964) ......................................................................... 4

*Viam Corp. v. Iowa Exp.-Import Trading Co., & Spal s.r.l.*
   84 F.3d 424 (Fed. Cir. 1996) ............................................................... 5

*Winner Int'l Royalty Corp. v. Ching-Rong Wang*
   202 F.3d 1340 (Fed. Cir. 2002) ............................................................ 4

## STATUTES & COURT RULES

28 U.S.C.
   § 1391(c) ................................................................................... 18
   § 1400(b) ............................................................................... 1, 18
   § 1404(a) ............................................................................ *passim*

Fed. R. Civ. P.
   12(b)(2) ..................................................................................... 1
   12(b)(3) ..................................................................................... 1
   42(a) ........................................................................................ 9

S.D. Cal. Civ. Rule 40.1(f)(1) ............................................................ 8, 9

## TREATISES

Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and
   Procedure*, (2d ed. 1986)
   § 1068.1 ................................................................................... 17
   § 3851 ...................................................................................... 5
   § 3854 ................................................................................... 5, 8

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R)- v

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

## NOTICE OF MOTION

Pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure, Defendants Chicony America, Inc. and Chicony Electronics Corp. hereby move to transfer this action to the United States District Court for the Southern District of California under 28 U.S.C. § 1404(a), to dismiss this action for lack of personal jurisdiction under the Due Process Clause of the Fifth Amendment to the United States Constitution, or to dismiss this action for want of proper venue under 28 U.S.C. § 1400(b). In support of this Motion, Chicony America and Chicony Electronics rely on this Memorandum of Law, and the accompanying Affidavits of Bruce Chang and Paul Friedman.

## INTRODUCTION

What is this case doing in Washington? None of the parties to this litigation are located in Washington. None of the parties have offices here. None of the accused products were manufactured or designed in Washington. The Defendants did not sell the accused devices in Washington. Of the possible trial witnesses, just one is located in Washington, and his recollection of the pertinent events has faded substantially in the twenty years since they occurred. Neither Defendant is even subject to personal jurisdiction in Washington.

The Southern District of California, by contrast, is the natural forum to adjudicate this dispute. The Plaintiff in this action has filed litigation asserting the same patent and some of the same devices there. Practically all of the witnesses are located in Southern California. Southern California is more convenient for all parties – including the Plaintiff, which has substantial operations there. Additionally, all parties are subject to personal jurisdiction there.

Defendants submit that the most sensible course of action is for the Court to exercise its discretion under 28 U.S.C. § 1404(a) to transfer this action to the Southern District of California. The Court can also dismiss this action for want of personal jurisdiction or proper venue.

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 1

# STATEMENT OF FACTS

## A.    The Parties

Plaintiff Minebea Co., Ltd. is a corporation organized under the laws of Japan with its principal place of business in Tokyo. (Complaint filed February 11, 2003 (hereinafter "Compl.") ¶ 4.) Minebea has locations throughout the United States – including in California – but none in Washington. (Declaration of Paul A. Friedman in Support of Defts.' Joint Mot. to Transfer or Dismiss (hereinafter "Friedman Decl.") Ex. A.) Minebea's domestic keyboard subsidiary, NMB Technologies, is located in Chatsworth, California, which is a suburb of Los Angeles. (Friedman Decl. Ex. A.)

Defendant Chicony Electronics is a Taiwanese corporation with its principal place of business in Taipei. (Compl. ¶ 5.) Chicony Electronics has a wholly-owned domestic subsidiary, Chicony America, Inc., that is also a Defendant to this action. Chicony America is incorporated under the laws of California, with its principal place of business in Irvine, California. (Compl. ¶ 6.)

## B.    The '225 Patent

Minebea purports to own United States Patent No. 4,433,225. (Compl. ¶¶ 8, 12.) The '225 patent, now expired, teaches a mechanism for maintaining keytops in a keyboard level as the user depresses them. Specifically, the patent discloses using two lever arms joined at their middle sections by a pivot to form a mechanism with a "scissors-like" linkage that is placed underneath a keytop for support. This is distinguished from the traditional method of supporting keytops in a keyboard, which employs a rod that fits into a shaft.

## C.    The Accused Devices

The Complaint does not specify which of Chicony's keyboards Minebea contends infringe the '225 patent, instead referring generically to Chicony's "computer keyboards." (Compl. ¶¶ 12-14.) However, in pre-suit correspondence between the parties' counsel, Minebea's counsel identified two keyboards that Minebea contends infringe the '225 patent: (1)

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 2

1  keyboards sold to laptop manufacturers and (2) the Stowaway XT Keyboard, which Chicony

2  sells to a California company, Think Outside, Inc. (Friedman Decl. Ex. B at 1, Ex. C at 2.)

3      Chicony does not sell any of the keyboards identified by Minebea in pre-suit

4  correspondence to customers in Washington. (Declaration of Bruce Chang in Support of Defts.'

5  Joint Mot. to Transfer or Dismiss (hereinafter "Chang Decl.") ¶¶ 25-27.) Nor does Chicony sell

6  any other keyboards incorporating a "scissors-like" keylift mechanism to customers in

7  Washington. (Chang Decl. ¶¶ 25-27.) Chicony does not ship any of these products to

8  Washington. (Chang Decl. ¶ 23.)

9  **D.  The Southern District of California Litigation**

10     In May 2001, Minebea instituted litigation against Think Outside, Inc. and Peripheral

11 Technology, Inc. in the Southern District of California. (Friedman Decl. Ex. D.) This litigation

12 has been assigned to Judge Barry Ted Moskowitz and Magistrate Judge Louisa S. Porter. Judge

13 Moskowitz heard oral argument on the parties' claim construction briefs in January 2002, and

14 issued claim construction rulings in August and October 2002. (Friedman Decl. Exs. E & F.)

15     Chicony America has recently filed a motion to intervene in the Southern District of

16 California litigation. (Friedman Decl. Ex. G.)

17     Like the litigation filed in this Court, the Southern District of California Litigation asserts

18 only the '225 patent. (Compl. ¶ 8; Friedman Decl. Ex. D at ¶¶ 7-9.) Minebea has repeatedly

19 stated that the Southern District of California litigation encompasses the Stowaway XT

20 Keyboard, which is one of the keyboards that is the subject of the lawsuit filed in this District.

21 For example, referring to the Stowaway XT Keyboard as "the new product," Minebea's attorney

22 stated that Minebea's Southern District of California complaint

23          is broad enough to encompass any infringing product sold by the
           defendants, and it is also our position that we are entitled to full
24         discovery with respect to the new product, including supplemental
           interrogatory responses.
25

26 (Friedman Decl. Ex. H at 9:6-10.) Similarly, after counsel for Think Outside inquired whether

27 the Southern District of California complaint was limited to the Stowaway Portable Keyboard,

28

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 3

1 Minebea's counsel responded "that the Complaint is not so limited, and that Minebea is clearly

2 entitled to seek discovery relating to additional infringing products." (Friedman Decl. Ex. I at 1.)

3 Minebea recently analyzed the Stowaway XT Keyboard in an interrogatory response provided in

4 the Southern District of California action. (Friedman Decl. Ex. J at 3:20 – 5:1.)

## ARGUMENT

6     The Court has a panoply of options for seeing to it that this litigation proceeds in the

7 proper District. It can exercise its discretion under 28 U.S.C. § 1404(a) to transfer this action to

8 the Southern District of California. (*See infra* Part I.) The Court can also dismiss this action for

9 want of personal jurisdiction over the Defendants. (*See infra* Part II.) Additionally, the Court

10 can dismiss the action for lack of proper venue under 28 U.S.C. § 1400(b). (*See infra* Part III.)

11 **I.    THIS COURT SHOULD TRANSFER THIS ACTION TO THE SOUTHERN**
**DISTRICT OF CALIFORNIA**

12

13     This Court has the discretion to transfer litigation to another federal district:

14         For the convenience of the parties and witnesses, in the interest of
justice, a district court may transfer any civil action to any other

15         district court or division where it might have been brought.

16 28 U.S.C. § 1404(a). Section 1404(a) manifests Congress's "increased desire to have federal

17 civil suits tried in the federal system at the place called for in the particular case by

18 considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). A

19 § 1404(a) motion to transfer a patent infringement suit is governed by the law of the regional

20 circuit in which the district court sits, rather than the law of the Federal Circuit. *Winner Int'l*

21 *Royalty Corp. v. Ching-Rong Wang*, 202 F.3d 1340, 1352 (Fed. Cir. 2002).

22     The most important factors are those expressly enumerated in § 1404(a): party

23 convenience, witness convenience, and the interest of justice. *See Los Angeles Mem'l Coliseum*

24 *Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 499 (C.D. Cal. 1981). Also of guidance are

25 the numerous forum non conveniens factors, which include, *inter alia*, the forum state's interest

26 in the outcome of the litigation, the plaintiff's choice of forum and the forum's nexus to the

27 dispute. *Creative Tech., Ltd. v. Aztech Sys. Pte, Ltd.*, 61 F.3d 696, 703 (9th Cir. 1995).

28
DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 4

## A. This Action Could Have Been Brought in the Southern District of California

All parties to this action are subject to personal jurisdiction in the Southern District of California. Minebea, *inter alia*, operates a subsidiary in California and has instituted litigation on the same patent in the Southern District of California. *See Viam Corp. v. Iowa Exp.-Import Trading Co., & Spal s.r.l.*, 84 F.3d 424, 430 (Fed. Cir. 1996) (litigant that instituted suit in forum on same patent against different defendant would not be heard to complain that another suit asserting same patent could not be transferred there).

Similarly, both Defendants have a presence in California sufficient to justify the exercise of personal jurisdiction in this case. Chicony America is incorporated under the laws of California with its principal place of business there. (Compl. ¶ 6.) Chicony Electronics, *inter alia*, regularly ships the Stowaway XT Keyboard, one of the accused devices, into California. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994) (shipping substantial number of accused devices into forum is sufficient to exercise personal jurisdiction there).

The patent venue statute, 28 U.S.C. § 1400(b), is coextensive with personal jurisdiction. (*See* Part III, *infra*.) Venue is thus appropriate in the Southern District of California because the court there enjoys personal jurisdiction over all Defendants.

## B. The Southern District of California Is More Convenient for the Substantial Majority of the Witnesses

Witness convenience is "[p]robably the most important factor" in deciding a § 1404(a) motion. 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3851 at 415 (2d ed. 1986). Chicony has identified four probable trial witnesses located in Southern California:

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

| Identity | Location | Knowledge | Relevance |
|----------|----------|-----------|-----------|
| Bruce Chang | Irvine, California | Structure of the keylift mechanisms used in accused keyboards; negotiations and agreements with customers; supply chain of accused devices. (Chang Decl. ¶¶ 3-8; Friedman Decl. ¶ 6.) | Non-infringement; damages; willfulness; defense that bulk of accused products are not sold in the United States and thus not subject to U.S. patent laws. |
| Elain Maio | Irvine, California | Unit and dollar amount of sales of certain infringing products. (Friedman Decl. ¶ 7.) | Damages; authentication of business records. |
| Hank Fu | Irvine, California | Technical knowledge regarding accused keyboards marketed and sold by Chicony; sales by Chicony Electronics of accused devices; sales data; unit and dollar amount of sales of other infringing products. (Friedman Decl. ¶ 8.) | Identification of allegedly infringing products; non-infringement; damages; defense that bulk of accused products are not sold in the United States and thus not subject to operation of United States patent laws; authentication of business records. |
| Susie Ho | Irvine, California | Accounting systems used to collect pertinent data; financial status of Chicony Electronics; sales figures. (Friedman Decl. ¶ 9.) | Damages, reasonable royalty calculation; authentication of business records. |

Although Minebea has yet to disclose the identity of individuals with discoverable knowledge, it has done so in the Southern District of California litigation. (Friedman Decl. Ex. K.) Minebea's disclosure identified four individuals residing in California and just one in this District. (Friedman Decl. Ex. K at 1-3.)

Minebea's Complaint indicates that the sole basis for jurisdiction in this District is the residence here of the '225 patent's inventor. (Compl. ¶ 9.) This is an insufficient basis on which to premise jurisdiction. First, it is improbable that Mr. Cowles's testimony will figure prominently in this litigation. Mr. Cowles was recently deposed in connection with the Southern

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 6

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1  District of California litigation. As illustrated in Appendix A, his memory of events has faded

2  substantially in the twenty years since these events occurred. (*See also* Friedman Decl. Ex. L.)

3  Second, there is little reason to believe that Mr. Cowles will even be a witness at trial,

4  much less a significant one. He was unable to state that he intended to testify at trial, explaining

5  during his recent deposition that "I don't know about a trial." (Friedman Decl. Ex. L at 132:11.)

6  Third, even if Mr. Cowles's memory had not faded dramatically, this Court recognized

7  (in an unpublished decision) that the location of the inventor is much less significant than that of

8  witnesses and sources of proof relating to the accused products. *Asymetrix Corp. v. Lex*

9  *Computer & Mgmt. Corp.*, No. C94-588Z, 1995 U.S. Dist. LEXIS 20388 (W.D. Wash. Jan. 20,

10  1995). The defendant in *Asymetrix*, a patent infringement lawsuit, sought to transfer the action to

11  New Hampshire, where numerous inventors of the patent-at-suit were located. Judge Zilly

12  concluded that on the record before him the location of documents and witnesses pertaining to

13  the accused device was more significant than the inventors' location. *Id.* at *11-*12. Here,

14  rather than there being numerous inventors located in this District, there is only one, and his role

15  at trial will be, at best, marginal.

**C.  The Southern District of California Is More Convenient for All Parties — Including Minebea**

18  There can be little doubt that San Diego is more convenient for both Minebea and

19  Chicony. Minebea's domestic keyboard subsidiary, NMB Technologies, is located in

20  Chatsworth, California, which is 157 miles from the federal courthouse in San Diego, and over

21  1,100 miles from the federal courthouse in Seattle. (Friedman Decl. Exs. M & N.) Chicony

22  America's principal place of business is in Irvine, California, which is almost 1,200 miles from

23  the federal courthouse in Seattle, but just 79 miles from the federal courthouse in San Diego.

24  (Compl. ¶ 6; Friedman Decl. Exs. O & P.)

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

**D.  Transferring this Action Will Serve the Interests of Justice by Avoiding Duplicative Litigation**

Section 1404(a) also identifies "interests of justice" as relevant.  Avoidance of duplicative litigation is among the most important considerations entering into this factor. 15 Wright & Miller, *supra*, § 3854 ("great weight" should be afforded avoiding duplicative litigation).  As the Supreme Court observed,

> [t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to wastefulness of time, energy and money that § 1404(a) was designed to prevent.

*Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990) (citation omitted); *see also Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1286, 1289 (W.D. Wash. 1994) (section 1404(a) seeks to avoid duplicative litigation).

Litigation addressing the '225 patent is already pending in the Southern District of California.  (Friedman Decl. Ex. D.)  Like this litigation, the Southern District of California litigation involves the Stowaway XT Keyboard. (*See supra* pp. 3-4.)  Chicony America has recently filed a motion to intervene in the Southern District of California litigation. (Friedman Decl. Ex. G.)

"The interests of justice strongly favor transfer of a case to another jurisdiction where a related matter is pending." *LG Elecs., Inc. v. First Int'l Computer, Inc.*, 138 F. Supp. 2d 574, 592 (D.N.J. 2001).  Under the Southern District's Local Civil Rules, a case is related if it involves "some of the same parties" and asserts "similar claims" to already pending litigation. (Friedman Decl. Ex. Q (S.D. Cal. Civ. Rule 40.1(f)(1)).  Regardless of whether Judge Moskowitz permits intervention, the complaint before this Court nevertheless involves some of the same parties (Minebea) and some of the same claims (*e.g.,* that the Stowaway XT Keyboard infringes the '225 patent, that the '225 patent is invalid or unenforceable) that the Southern District of California litigation raises.  Because any related case would automatically be assigned to Judge Moskowitz, it is probable that this action will be related to the litigation already pending in the

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 8

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1   Southern District of California, and thus assigned to Judge Moskowitz. (*See* Friedman Decl. Ex.

2   Q (S.D. Cal. Civ. Rule 40.1(h)).)

3       Pending approval by Judge Moskowitz of Chicony America's intervention motion, two of

4   the three parties to this action would be parties to the Southern District of California litigation.

5   In that case, the complaint before this Court would involve not just "*some* of the same parties,"

6   as Local Rule 40.1(f)(1) requires, but *a majority* of the same parties.

7       "Where a party has previously litigated claims involving certain issues in one forum . . . a

8   court in that district will likely be familiar with the facts of the case. As a matter of judicial

9   economy, such familiarity is highly desirable." *LG Elecs., Inc. v. Advance Creative Computer*

10   *Corp.*, 131 F. Supp. 2d 804, 815 (E.D. Va. 2001) (internal quotation omitted). Transferring this

11   litigation will avoid the need to repeat tasks already completed in the Southern District litigation.

12   For example, transfer would avoid the need to engage in costly and time consuming claim

13   construction briefing and argument. *Id.* at 814 (transferring litigation to District that "is familiar

14   with some of the issues present in this suit because it previously rendered a claim construction"

15   on the same patent).

16       Another consideration is whether consolidation is feasible. *See A.J. Indus., Inc. v. D.*

17   *C.D. Cal.*, 503 F.2d 384, 389 (9th Cir. 1974). There exists ample basis for Judge Moskowitz to

18   consolidate this action with the litigation already pending before him. Consolidation is

19   appropriate as to two actions "involving a common question of law or fact." Fed. R. Civ. P.

20   42(a). These actions raise common questions of both law (*e.g.*, the meaning of the '225 patent's

21   claims) and fact (*e.g.*, whether the '225 patent fails for obviousness, whether the Stowaway XT

22   Keyboard infringes the '225 patent, and the range of equivalents afforded the '225 patent).

23       Finally, retaining the litigation in this District raises the specter of inconsistent outcomes.

24   Some of the same devices at issue in this litigation are also at issue in the Southern District of

25   California litigation. Moreover, this Court will have to engage in claim construction anew. *See*

26   *Hunter Eng'g Co. v. ACCU Indus., Inc.*, No. 3:02cv333, 2002 U.S. Dist. LEXIS 20873, at *42

27

28

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 9

1 (E.D. Va. Oct. 10, 2002) ("Transfer will also avoid the risk of inconsistent claim construction of

2 the same or related patent terms . . . .").

3      In sum, transferring this litigation to the Southern District of California will allow two

4 separate pieces of litigation to be resolved in a single proceeding. Transfer will avoid the need to

5 engage in tasks already completed in the Southern District of California litigation, conserve the

6 parties' resources, and avoid the possibility of inconsistent outcomes. This case thus provides a

7 prime instance in which § 1404(a), the purpose of which is "to protect litigants, witnesses and the

8 public against unnecessary inconvenience and expense," is properly applied. *Cont'l Grain Co. v.*

9 *Barge FBL-585*, 364 U.S. 19, 27 (1960).

### E.    Washington Has No Interest in This Litigation

11      Minebea is a Japanese corporation, and no resident of Washington has been injured by the

12 allegations in the Complaint. *Cf. Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 114 (1987)

13 ("Because the plaintiff is not a [Washington] resident, [Washington]'s legitimate interests in the

14 dispute have considerably diminished."). Similarly, just one of the witnesses and none of the

15 evidence is located in this District. *See Fed. Ins. Co. v. Lake Shore, Inc.,* 886 F.2d 654 (4th Cir.

16 1989) (forum's interests diminished where witness, evidence, and parties are outside forum state).

17 Accordingly, Washington's interest is minimal.

### F.    The Locus of Operative Facts Is in California, Not Washington

19      In a patent infringement action, "the preferred forum is that which is the center of the

20 accused activity." *S.C. Johnson & Sons, Inc. v. Gillette Co.*, 571 F. Supp. 1185, 1187-88 (N.D.

21 Ill. 1983) (transferring a case from a district that had "only some very limited sales activity" to

22 the defendant's "hub of activity"); *see also Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 482-

23 83 (D.N.J. 1993). Appropriate considerations in identifying the "hub of activity" include "the

24 location of a product's development, testing, research and production. Also relevant is where

25 marketing and sales decisions were made, rather than where limited sales activity has occurred."

26 *Id.*

27

28 DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 10

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1    Following the seminal decisions in *S.C. Johnson* and *Ricoh*, the district courts have often

2    transferred patent litigation to the forum in which the defendant's allegedly infringing activities

3    were centered. *E.g., Saint-Gobain Calmar, Inc. v. Nat'l Prods. Corp.*, 230 F. Supp. 2d 655 (E.D.

4    Pa. 2002) (patent infringement litigation transferred to location of defendant's decisions about

5    accused device); *Brown Mfg. Corp. v. Alpha Lawn & Garden Equip., Inc.*, 219 F. Supp. 2d 705

6    (E.D. Va. 2002) (patent infringement litigation transferred where defendant designed and

7    manufactured accused device); *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F. Supp. 2d 517 (E.D.

8    Va. 1999) (patent infringement litigation transferred where defendant designed and

9    manufactured accused device).

10    There is no question that almost all of Chicony's activities were focused in Southern

11    California and, conversely, that none occurred in this District.   It is in California that Chicony,

12    *inter alia*, makes marketing decisions regarding the accused devices and manages relationships

13    with customers that purchase the accused devices.  (Chang Decl. ¶¶ 29-30.)

14    Finally, it is settled that mere sales within a forum by a third-party distributor fall short of

15    the showing needed to establish a nexus with a forum sufficient to overcome other factors

16    militating in favor of transfer.  "Where a party's products are sold in many states, sales alone are

17    insufficient to establish a material connection to the forum and to override other factors favoring

18    transfer." *Invivo Research, Inc. v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d 433

19    (S.D.N.Y. 2000) (citation omitted) (patent infringement lawsuit); *see also Saint-Gobain Calmar,*

20    230 F. Supp. 2d at 660 (fact that product was being sold in forum by third-party distributors was

21    not sufficient to overcome transfer).

22    **G.    Minebea's Choice of Forum Is Entitled to Minimal Weight**

23    Although deference is generally accorded a plaintiff's choice of forum, that is not so

24    when the plaintiff chooses a forum that has little connection to either the plaintiff or the

25    defendant. *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968).  Similarly, the

26    plaintiff's choice is afforded minimal weight when the chosen forum is not the location of the

27    alleged conduct. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987).

28    DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 11

1  None of the operative facts occurred within the Western District. The accused devices

2  were designed and manufactured entirely outside Washington. (Chang Decl. ¶¶ 28-32.)

3  Chicony does not sell any of the accused keyboards to its single Washington customer. (Chang

4  Decl. ¶¶ 25-27.) In such circumstances, Minebea's forum choice is afforded minimal weight.

5  "If the operative facts have not occurred within the forum of original selection and that forum

6  has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only

7  to minimal consideration." *Pac. Car & Foundry Co.*, 403 F.2d at 954.

8  Furthermore, none of the parties reside here. Minebea is a Japanese corporation with its

9  primary place of business in Tokyo. (Compl. ¶ 4.) Likewise, both defendants are located outside

10  Washington. (Compl. ¶¶ 5,6.) A plaintiff's choice of forum is afforded deference when filing in

11  its home forum, not when it selects a forum other than its residence. *E.g., Miracle Blade, LLC v.*

12  *EBrands Commerce Group, LLC,* 207 F. Supp. 2d 1136, 1155 (D. Nev. 2002) ("A plaintiff's

13  choice of forum is normally only given substantial deference if the plaintiff is a resident of the

14  district in which the action is brought. Otherwise, this bears little significance . . . .").

15  **II.  MINEBEA CANNOT CARRY ITS BURDEN OF ESTABLISHING**
16  **PERSONAL JURISDICTION OVER THE DEFENDANTS**

17  A court has personal jurisdiction over an out-of-state defendant only if the forum state's

18  long-arm statute permits service of process and the assertion of personal jurisdiction does not

19  violate due process. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-76 (1985).

20  Because Washington's long-arm statute extends to the limits of due process, the Court can

21  sidestep the statutory inquiry and proceed directly to the constitutional analysis. *See Stairmaster*

22  *Sports/Med. Prods., Inc. v. Pac. Fitness Group,* 916 F. Supp. 1049, 1052 (W.D. Wash. 1994).

23  Federal Circuit law governs the exercise of personal jurisdiction in a patent infringement case.

24  *E.g., 3D Sys., Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1377 (Fed. Cir. 1998).

25  **A.  This District Lacks General Jurisdiction over the Defendants**

26  This Court can exercise general jurisdiction over the Defendants only if each of them

27  maintains "continuous and systematic" contacts with Washington. *See Helicopteros Nacionales*

28  DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 12

1  *de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-16 (1984). General jurisdiction typically requires a

2  "physical presence" in the forum state. *See N. Am. Phillips Corp. v. Am. Vending Sales, Inc.,* 35

3  F.3d 1576, 1578 (Fed. Cir. 1994). The test for determining general jurisdiction is "a fairly high

4  standard in practice." *Fields v. Sedgwick Associated. Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir.

5  1986).

6  Minebea cannot demonstrate any of these factors with respect to Chicony America or

7  Chicony Electronics, which:

- are not incorporated under the laws of Washington (Chang Decl. ¶¶ 9, 13);

- do not have their principal places of business in Washington (Chang Decl. ¶¶ 10, 14);

- do not have offices in Washington (Chang Decl. ¶¶ 11, 15);

- do not have an agent for service of process in Washington (Chang Decl. ¶ 16);

- do not have employees in Washington (Chang Decl. ¶ 17);

- do not have a bank account in Washington (Chang Decl. ¶ 18);

- do not have a telephone number listed in Washington (Chang Decl. ¶ 19);

- do not own property in Washington (Chang Decl. ¶ 20); and

- are not licensed to do business in Washington (Chang Decl. ¶ 21).

18  The only connection that Defendants have with Washington is that they have a single

19  customer (Microsoft Corporation) here. (Chang Decl. ¶ 25.) This is an insufficient basis on

20  which to exercise general jurisdiction over Chicony because agreements with a forum resident

21  are an insufficient basis on which to premise general jurisdiction: "engaging in commerce with

22  residents of the forum state is not in and of itself the kind of activity that approximates physical

23  presence within the state's borders." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d

24  1082, 1086 (9th Cir. 2000) (citation omitted).

25  **B.      This District Lacks Specific Jurisdiction over the Defendants**

26  The Federal Circuit applies a three-part test to claims of specific jurisdiction: (1) whether

27  the defendant purposefully directed its activities at residents of the forum, (2) whether the claim

28
DEFENDANTS' MOTION TO TRANSFER OR

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 13

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

arises out of or relates to those activities, and (3) whether assertion of personal jurisdiction is reasonable and fair. *Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995).

### 1. Chicony Did Not Purposefully Direct the Accused Keyboards at Washington Residents

The first prong of the *Akro* test requires consideration of whether Chicony purposefully directed its activities at Washington. *Id.* at 1545. The purposeful availment requirement is met when the defendant's contacts with the forum state proximately result from actions that create a "substantial connection" with the forum state. *Burger King*, 471 U.S. at 475.

Chicony does not sell products incorporating a scissors-like keylift mechanism to customers in Washington. The delivery points for these keyboards are outside Washington. (Chang Decl. ¶ 23.)

Products incorporating Chicony keyboards undoubtedly end up in Washington – just as they do in Vermont, Hawaii, Kansas, and all of the other states. But the fact that Chicony's customers (and their customers' customers) engage in conduct that places Chicony products in Washington does not amount to purposeful availment by Chicony. *See Burger King,* 471 U.S. at 475 (because purposeful availment cannot be based on the "unilateral activity of another party or a third person," plaintiff must demonstrate "actions by the defendant *himself* that create a 'substantial connection' with the forum state").

Stated otherwise, the mere fact that Chicony drops its products into the stream of commerce, as a result of which these products find their way to Washington, is not an act of purposeful availment. "Introducing a product into a stream of commerce is insufficient to establish personal jurisdiction – there must be an additional act to satisfy constitutional due process requirements." *Maynard v. Phila. Cervical Collar Co.,* No. 00-1555, 2001 U.S. App. LEXIS 18834, at *5 (Fed. Cir. Aug. 15, 2001). Minebea has not alleged in its Complaint any "additional act," nor can it, as Chicony:

- does not advertise the accused device in Washington (Chang Decl. ¶ 24);

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 14

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

- does not provide input into its customers' marketing activities in Washington (Chang Decl. ¶ 34);

- does not play a role in devising the channels of distribution its customers use for products containing the accused keyboards (Chang Decl. ¶ 33); and

- does not provide advice or support to users of allegedly infringing products in Washington. (Chang Decl. ¶ 35).

### 2. The Relatedness Prong Precludes Relying on the Sale of Products Not At Issue in This Litigation

Chicony agrees that activities related to its sales of those products incorporating what is arguably a scissors-like mechanism are related to this inquiry. The important point to bear in mind is that Chicony America's relationship with Washington-based Microsoft is irrelevant to this *specific jurisdiction* inquiry because the keyboards that Chicony sells to Microsoft use a shaft-and-rod keylift mechanism, rather than the scissors-like mechanism at issue in this lawsuit. (Chang Decl. ¶¶ 26-27.) Thus, Minebea cannot rely on Chicony's sale to Microsoft of products not at issue in this litigation.

### 3. Exercising Personal Jurisdiction Would Be Unreasonable

The reasonableness inquiry consists of five factors:

> (1) the burden on the defendant, (2) the interests of the forum State, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1363 (Fed. Cir. 2001).

First, Chicony America's locus of operations is in California. (Chang Decl. ¶¶ 13-14.) It is there that the witnesses that bear on this dispute are located. (Chang Decl. ¶¶ 2-8; Friedman Decl. ¶¶ 2-9.) The burden on Chicony Electronics, a Taiwanese corporation, is especially acute. "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114. Additionally, Minebea would be no

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 15

more burdened by litigating in California than in Washington. Minebea is already litigating a closely related disputed in California and its North American keyboard operations are headquartered there. (Friedman Decl. Ex. A & D.)

Second, Washington has little interest in the outcome of this case. The Plaintiff is a Japanese corporation, and no resident of Washington has been injured by the conduct alleged in the Complaint. *Asahi*, 480 U.S. at 114 ("Because the plaintiff is not a [Washington] resident, [Washington]'s legitimate interests in the dispute have considerably diminished.")

Third, Minebea has no greater interest in obtaining relief in this District than it does in the Southern District of California. The Southern District of California can grant the same relief as this Court. Indeed, if transferred, it is probable that this case will proceed to resolution more rapidly than it would if the case stayed here, where the Court would have to complete time-consuming tasks (*e.g.*, claim construction briefing, hearings, and decisions) that have already been settled in the Southern District of California.

Fourth, the Southern District of California has been processing a closely related dispute for almost two years now. It is familiar with the patent, having already issued its claim construction ruling. Additionally, it has addressed numerous discovery issues that are likely to arise in the context of this litigation. Accordingly, "the most efficient resolution of this dispute would be in the Southern District, since the court there already is familiar with the facts and procedural history of the litigation." *Ballard v. Savage*, 65 F.3d 1495, 1502 (9th Cir. 1995).

Recently, a district court rejected as unreasonable the exercise of jurisdiction in a patent infringement case with parallels to this litigation. *Auto Wax Co. v. Kasei Kogyo Co.*, 65 U.S.P.Q.2d 1315 (W.D. Tex. 2001). Kasei Kogyo sold car wax to a California-based distributor, Mark V. *Id.* at 1315-16. Mark V then resold the wax to customers located throughout the United States, including Texas. *Id.* The district court refused to exercise jurisdiction in Texas:

> [W]ere the Court to find sufficient contacts to establish jurisdiction over it, *any* court in the United States where Mark V sold the clay products, where Mark V's buyers then re-sold the products, and so on, would have jurisdiction, until the stream of commerce became one interconnected ocean watering the Due Process Clause down to

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1  nothing. This Court, resisting the current, will not assert personal
2  jurisdiction in this case.

3  *Id.* at 1318. As in *Auto Wax*, the only basis on which to exercise jurisdiction over Chicony in

4  this District is that Chicony's products ultimately wend their way to Washington.

5      Allowing the doctrine to be stretched to encompass every terminus point of a product

6  simply because a defendant's customers (and its customers' customers) chose to sell them there

7  would eviscerate the protections afforded litigants by the Due Process Clause. *Cf. Red Wing*

8  *Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998) (rejecting similar

9  argument because it would lead to defendant's being subject to service nationwide as a result of

10 the unilateral activities of others). As in *Auto Wax* and *Red Wing Shoe*, it would be unreasonable

11 to exercise jurisdiction over the Defendants simply because their products ultimately find their

12 way to Washington residents.

13  **C.    Rule 4(k)(2) Does Not Permit the Aggregation of Chicony Electronics**
           **or Chicony America's Contacts**
14

15      Rule 4(k)(2) of the Federal Rules of Civil Procedure permits aggregation of a foreign

16 entity's contacts only where the entity is not subject to jurisdiction in any single state. *Base*

17 *Metal Trading, Ltd. v. Ojsc "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 215 (4th Cir.

18 2002), *cert. denied*, 123 S. Ct. 101 (2002) ("for jurisdiction over [the defendant] to be proper

19 under Rule 4(k)(2), [the plaintiff] must demonstrate that [the defendant] is not subject to personal

20 jurisdiction in any state . . ."); *Smith v. S&S Dundalk Eng'g Works, Ltd.*, 139 F. Supp. 2d 610,

21 622 (D.N.J. 2001) ("The rule first requires a court to determine . . . whether the foreign

22 defendant lacks sufficient contacts with any single state to subject it to personal jurisdiction

23 there."). The burden rests with Minebea to demonstrate that Chicony is not subject to the

24 jurisdiction of any individual state. 4 Wright & Miller, *supra*, § 1068.1, at 618.

25      Chicony America, incorporated under the laws of California and with an office and

26 employees there, obviously is subject to personal jurisdiction in California. Similarly, Chicony

27 Electronics is also subject to specific jurisdiction in California because, *inter alia*, it regularly

28
DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 17

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

1  ships allegedly infringing products into California. Chicony Electronics is thus amenable to

2  personal jurisdiction in California, and Rule 4(k)(2) does not apply.

3        Even were Rule 4(k)(2) to apply, it would not allow Minebea to simply pick any state in

4  which to sue Chicony Electronics. On the contrary, it is necessary to determine which state has

5  the most contacts with the foreign defendant. *See Quokka Sports, Inc. v. Cup Int'l Internet*

6  *Ventures,* 99 F. Supp. 2d 1105, 1110 (N.D. Cal. 1999) (exercising jurisdiction in California over

7  litigant to which Rule 4(k)(2) applied because California "has more ties to defendants than any

8  other single state, and is the most logical place for jurisdiction to rest.") It is manifest that

9  Chicony Electronics has more ties with California than with Washington. Accordingly, even if

10  contacts could be aggregated under Rule 4(k)(2), jurisdiction still would not rest in this District.

## III.  VENUE DOES NOT LIE IN THIS DISTRICT

12        In this patent infringement action, venue properly rests

13  
> in the judicial district where the defendant resides, or where the
> defendant has committed acts of infringement and has a regular and
> established place of business.

15  28 U.S.C. § 1400(b). For purposes of § 1400(b), a corporation resides in any district in which it

16  is subject to personal jurisdiction. 28 U.S.C. § 1391(c); *see also VE Holding Corp. v. Johnson*

17  *Gas Appliance Co.,* 917 F.2d 1574, 1580 (Fed. Cir. 1990) (§ 1391(c)'s definition of a

18  corporation's residence applies to patent venue statute). As demonstrated in Part II, *supra,*

19  personal jurisdiction does not exist over Chicony America or Chicony Electronics in this District,

20  and thus the Defendants do not reside in this District for purposes of 28 U.S.C. § 1400(b).

21        Moreover, Minebea does not allege in its Complaint that either Defendant has a "regular

22  and established place of business" in this District. *See Hoover Group, Inc. v. Custom Metalcraft,*

23  *Inc.,* 84 F.3d 1408, 1410 (Fed. Cir. 1996) ("Venue is based on the facts alleged in the well-

24  pleaded complaint."). Nor could Minebea make the requisite showing because neither Defendant

25  carries on a substantial part of its ordinary business within this District, nor has offices here. *See*

26  *Phillips v. Baker,* 121 F.2d 752 (9th Cir. 1941). Accordingly, the Court should dismiss this case

27  for lack of venue. *HollyAnne Corp. v. TFT, Inc.,* 199 F.3d 1304, 1307 (Fed. Cir. 1999).

28  

YARMUTH WILSDON CALFO PLLC
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

# CONCLUSION

The most sensible approach to this case is to transfer it to the Southern District of California. Transfer puts this litigation in a District that is more convenient for all parties – including the Plaintiff – as for practically all of the witnesses in this litigation. Transfer also prevents duplicative litigation, and avoids the waste that would result from having two District Courts resolve the same issues at the same time.

Dated: April 4, 2003

YARMUTH WILSDON CALFO PLLC

By: _____

Scott Wilsdon

Attorneys for Defendants
CHICONY ELECTRONICS CORP. and
CHICONY AMERICA, INC.

Additional Counsel of Record:

Michael A. Jacobs (Pro Hac Vice)
Paul A. Friedman (Pro Hac Vice)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

S. J. Christine Yang (Pro Hac Vice)
LAW OFFICES OF S. J. CHRISTINE YANG
Plaza Del Lago
17220 Newhope Street
Suites 101 & 102
Fountain Valley, California 92708
Telephone: (714) 641-4022
Facsimile: (714) 641-2082

DEFENDANTS' MOTION TO TRANSFER OR
DISMISS (CV 03 0295 R) – PAGE 19

**Appendix A**

Selected Excerpts from the Deposition of Dean S. Cowles

## A. The Prior Art

Q. So do you recall any of the patents that you looked at?

A. No.

(Friedman Decl. Ex. L at 43:25-44:2.)

* * *

Q. Okay. What did you do with these patents that you looked at?

A. I don't know.

Q. Did you give them to anyone?

A. I don't know.

Q. Did you analyze them at all? Did you write down anything that you thought about these patents?

A. I don't recall.

(Friedman Decl. Ex. L at 45:16-23.)

* * *

Q. Okay. Do you recall if you sent these patents to your lawyer?

A. I don't recall.

(Friedman Decl. Ex. L at 46:4-6.)

* * *

Q. So give me an approximation of the amount of time after you sent this disclosure form that you looked at these patents.

A. I don't know -- I don't know.

(Friedman Decl. Ex. L at 46:11-14.)

***

Q. So how did you keep track of what other people who were part of the technology -- how did you keep track of what they were doing too?

A. I don't recall.

(Friedman Decl. Ex. L at 135:19-23) (objection omitted).

***

Q. Let me do it this way. Can you recall what trade publications you received when you were working at GIC?

A. No.

Q. Did you receive trade publications when you were at GIC?

A. I don't recall.

(Friedman Decl. Ex. L at 21:1-8) (objection omitted).

***

Q. Do you recall whether you received "Design News" when you were at GIC?

A. No, I do not.

(Friedman Decl. Ex. L at 23:4-6.)

***

Q. Now, I asked you before if you could recall if you had received "Design News" or I think any other magazine when you were at GIC, and you said you could not remember. Can you remember what you received when you were at Automix?

A. No.

Q. So you can't recall?

A. I can't recall.

(Friedman Decl. Ex. L at 23:17-24:1) (objection omitted).

2

**B. Inventorship**

Q. Do you recall how many lab notebooks you had?

A. No.

(Friedman Decl. Ex. L at 32:4-5.)

\* \* \*

Q. And do you recall who you submitted those reports to?

A. No.

(Friedman Decl. Ex. L at 32:13-15.)

\* \* \*

Q. Do you know which colleague?

A. Not specifically.

Q. But maybe Mr. Serdahl or possibly Mr. Bush?

A. I don't recall exactly who I disclosed or showed the initial disclosure to.

(Friedman Decl. Ex. L at 32:20-33:1) (objection omitted).

\* \* \*

Q. Do you remember anyone else that you spoke to?

A. I don't recall.

Q. Did you speak to Mr. Bush, by any chance?

A. I don't recall.

(Friedman Decl. Ex. L at 48:22-25.)

\* \* \*

Q. Do you recall was there just one model or were there more than one models?

A. I don't recall.

(Friedman Decl. Ex. L at 52:4-6.)

* * *

Q. Now, did you have to make any changes to this model to get it to work?

A. I don't recall.

(Friedman Decl. Ex. L at 52:19-21.)

* * *

Q. Were you allowed to take anything with you?

A. I can't recall.

(Friedman Decl. Ex. L at 135:1-2.)

## C. Commercial Viability of the Invention

Q. So did someone suggest to you that a patent should be applied for?

A. Yes.

Q. Do you recall who?

A. No, I do not.

Q. Did they tell you anything other than that a patent should be applied for on this invention?

A. I don't recall.

(Friedman Decl. Ex. L at 54:25-55:7.)

* * *

Q. So did someone actually say to you that this invention could be used in a keyboard that GIC was selling?

A. I can't really answer that.

Q. Why can't you answer it?

A. I don't know if somebody specifically told me that or not.

Q. You can't recall?

A. I cannot recall.

Q. Do you know if GIC ever used your invention in a keyboard?

A. I don't recall.

(Friedman Decl. Ex. L at 55:19-56:4.)

* * *

Q. At the time you were working at General Instrument Corporation, did you ever go to meetings about keyboard technology outside General Instrument Corp.?

A. I don't recall.

(Friedman Decl. Ex. L at 137:3-6.)

* * *

Q. And so I guess my question is were either of those ways used to let somebody know that there was an invention that was this great idea?

A. I frankly don't recall the exact way.

(Friedman Decl. Ex. L at 141:21-24.)

## D. Nondisclosure of Prior Art to the PTO

Q. How many times did you speak with Mr. Lipsitz?

A. I don't recall.

(Friedman Decl. Ex. L at 57:19-20.)

* * *

Q. And over what period of time did you have conversations with Mr. Lipsitz?

A. I don't recall.

(Friedman Decl. Ex. L at 58:2-4.)

* * *

Q. Do you recall if you made any changes to that application?

A. I do not recall.

(Friedman Decl. Ex. L at 58:8-10.)

\* \* \*

Q. Did you review any subsequent revisions of the patent application?

A. I don't recall.

(Friedman Decl. Ex. L at 58:20-22.)

\* \* \*

Q. Did the patent attorney, at the same period of time, ask you to look at any articles about keyboard technology?

A. I don't believe so. Can't recall.

(Friedman Decl. Ex. L at 145:14-17.)

\* \* \*

Q. Well, did you have an understanding of what that language meant?

A. I can't recall whether -- I can't recall whether I had a firm understanding.

(Friedman Decl. Ex. L at 127:3-6.)

**E. Structure of the Claimed Invention**

Q. So what keeps this structure labeled as Exhibit 60 connected to the keytop?

A. I don't recall. I'd have to see how we did it.

(Friedman Decl. Ex. L at 99:14-16.)

FILED    ENTERED
LODGED    RECEIVED

APR 0 1 2003   KN

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY           DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

# APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

> MINEBEA CO., LTD.,
>
>            Plaintiff,
>
>    v.                            Case No. CV 03 0295 R
>
> CHICONY ELECTRONICS CO., LTD.
> and CHICONY AMERICA, INC.,
>
>            Defendants.

Pursuant to Local General Rule 2(d) of the United States District Court for the Western District of Washington, S. J. Christine Yang hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of Defendants Chicony Electronics Co., Ltd. and Chicony America, Inc. This application is based upon the following:

The particular need for my appearance and participation is to assist Defendants in all aspects of representation in this matter.

I, S.J. Christine Yang, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 25, 2003          Signature of applicant: _____

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the Court): 603435

## PLEASE COMPLETE REVERSE OF THIS FORM

CV 03-00295 #00000013

ORIGINAL



APPLICANT'S NAME: S.J. Christine Yang
APPLICANT'S FIRM: Law Offices of Christine Yang
APPLICANT'S ADDRESS: Plaza Del Lago, 17220 Newhope Street, Suites 101 & 102
CITY / STATE / ZIP: Fountain Valley, California 92708
PHONE NUMBER (INCLUDE AREA CODE): (714) 641-4022

## STATEMENT OF LOCAL COUNSEL

I am authorized, and will be prepared, to handle this matter, including trial, in the event the applicant S.J. Christine Yang is unable to be present upon any date assigned by the court.

DATED this _1st_ day of ~~March~~ April, 2003.

_____
Signature of local counsel

LOCAL COUNSEL NAME AND BAR NUMBER: Scott Wilsdon, Bar No. 20608
LAW FIRM: Yarmuth Wilsdon & Calfo PLLC
LOCAL COUNSEL'S ADDRESS: 3080 Washington Mutual Tower, 1201 Third Avenue
CITY / STATE / ZIP: Seattle, Washington 98101-3000
PHONE NUMBER (INCLUDE AREA CODE): (206) 516-3871

## ORDER

IT IS ORDERED that the application of S.J. Christine Yang to appear and participate in this action is hereby approved.

DATED this ___1st___ day of ____April____, 2003.

**BRUCE RIFKIN, CLERK**
**UNITED STATES DISTRICT COURT**

BY: _____
**Deputy Clerk**

United States District Court
for the
Western District of Washington
April 2, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re: 2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:


Peter Scott Ehrlichman, Esq.
DORSEY & WHITNEY LLP
STE 3400
1420 5TH AVE
SEATTLE, WA  98101
FAX 903-8820

Benjamin Levi, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Joel E Lutzker, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Lisa Knight, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Todd Sicklinger, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

David Kagan, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022

FAX 1-212-593-595█

Angelo J Calfo, E█.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

Christine Yang, Esq.
STE 101 & 102
17220 NEWHOPE ST
FOUNTAIN VALLEY, CA  92708
FAX 1-714-641-2082



**APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE**

FILED
LODGED
MAR 2 6 2003
AT SEATTLE
CLERK U.S. DISTRICT
WESTERN DISTRICT OF WASHINGTON

CV 03-00295 #00000012

| | |
|---|---|
| CASE TITLE | FILED ___ ENT ___ |
| | LODGED ___ REI ___ |
| Minebea Co. Ltd. | MAR 2 7 2003 |
| | AT SEATTLE |
| Plaintiff | CLERK U.S. DISTRICT COURT |
| | WESTERN DISTRICT OF WASHINGTON |
| | BY |
| Vs. | CASE NUMBER CV 03 0295R |
| Chicony Electronics Co., Ltd. and Chicony America, Inc. | |
| Defendants. | |

Pursuant to Local General Rule 2(d) of the United states District Court for the Western District of Washington, DAVID KAGAN hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of the PLAINTIFF, Minebea Co., Ltd.

This application is based upon the following:

The particular need for my appearance and participation is: I am litigation counsel for Minebea Co., Ltd.

I, David Kagan, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date March 25, 2003   Signature of applicant _____

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the court): _____

| **PLEASE COMPLETE REVERSE OF THIS FORM** | STATEMENT OF LOCAL COUNSEL |
|---|---|

APPLICANT'S NAME: David Kagan
APPLICANT'S FIRM: Schulte Roth & Zabel LLP   **ORIGINAL**

9405895.1

APPLICANT'S ADDRESS
Street Address                       919 Third Avenue
                                     New York, New York 10022
Phone number (include area code)     212-756-2000

I am authorized, and will be prepared, to handle this matter, including trial, in the event the applicant David Kagan is unable to be present upon any date assigned by the court.

DATED this __26th__ day of __March__, 20 03

LOCAL COUNSEL NAME AND BAR NUMBER:

Peter S. Ehrlichman, WSBA #6591
DORSEY & WHITNEY LLP
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

Signature of local counsel

## ORDER

IT IS ORDERED that the application of DAVID KAGAN to appear and participate in this action is hereby approved.

DATED this __27__ day of __March__, 20 03.

BRUCE RIFKIN, CLERK
UNITED STATES DISTRICT COURT

BY:

Deputy Clerk

United States District Court
for the
Western District of Washington
March 28, 2003


\* \* MAILING CERTIFICATE OF CLERK \* \*


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:

        Peter Scott Ehrlichman, Esq.
        DORSEY & WHITNEY LLP
        STE 3400
        1420 5TH AVE
        SEATTLE, WA  98101
        FAX 903-8820

        Benjamin Levi, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Joel E Lutzker, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Lisa Knight, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Todd Sicklinger, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        David Kagan, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022

FAX 1-212-593-595

Angelo J Calfo, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

FILED
LODGED
ENTER
MAR 2 6 2003
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

# APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

**CASE TITLE**

FILED
LODGED
MAR 27 2003
CLERK U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEPUTY

CV 03-00295 #00000011

Minebea Co. Ltd.

Plaintiff

Vs.                                **CASE NUMBER CV 03 0295R**

Chicony Electronics Co., Ltd. and Chicony America, Inc.

Defendants.

Pursuant to Local General Rule 2(d) of the United states District Court for the Western District of Washington, **TODD SICKLINGER** hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of the **PLAINTIFF, Minebea Co., Ltd.**

This application is based upon the following:

The particular need for my appearance and participation is: **I am litigation counsel for Minebea Co., Ltd.**

I, Todd Sicklinger, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date _March 25, 2003_      Signature of applicant _____

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the court): _____

| **PLEASE COMPLETE REVERSE OF THIS FORM** | STATEMENT OF LOCAL COUNSEL |
| --- | --- |

APPLICANT'S NAME: Todd Sicklinger
APPLICANT'S FIRM: Schulte Roth & Zabel LLP      **ORIGINAL**

0405889.1

APPLICANT'S ADDRESS
Street Address                    919 Third Avenue
                                  New York, New York 10022
Phone number (include area code)  212-756-2000



I am authorized, and will be prepared, to handle this matter, including trial, in the event the applicant Todd Sicklinger is unable to be present upon any date assigned by the court.

DATED this __26__ day of __March__, 20__03__

_(signature)_

---

LOCAL COUNSEL NAME AND BAR NUMBER:

Peter S. Ehrlichman, WSBA #6591
DORSEY & WHITNEY LLP
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

---

Signature of local counsel

**ORDER**

IT IS ORDERED that the application of TODD SICKLINGER to appear and participate in this action is hereby approved.

DATED this __27__ day of __March__, 20__03__.

BRUCE RIFKIN, CLERK
UNITED STATES DISTRICT COURT

BY: _(signature)_

Deputy Clerk

United States District Court
for the
Western District of Washington
March 28, 2003


\* \* MAILING CERTIFICATE OF CLERK \* \*


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:


        Peter Scott Ehrlichman, Esq.
        DORSEY & WHITNEY LLP
        STE 3400
        1420 5TH AVE
        SEATTLE, WA  98101
        FAX 903-8820

        Benjamin Levi, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Joel E Lutzker, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Lisa Knight, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Todd Sicklinger, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Angelo J Calfo, Esq.
        YARMUTH WILSDON CALFO PLLC
        STE 3080
        1201 THIRD AVE
        SEATTLE, WA  98101-3000

FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

## APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

CV 03-00295 #00000010

| CASE TITLE | |
|---|---|
| Minebea Co. Ltd. Plaintiff | |
| Vs. | CASE NUMBER  CV 03 0295R |
| Chicony Electronics Co., Ltd. and Chicony America, Inc. Defendants. | |

Pursuant to Local General Rule 2(d) of the United states District Court for the Western District of Washington, LISA M. KNIGHT hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of the PLAINTIFF, Minebea Co., Ltd.

This application is based upon the following:

The particular need for my appearance and participation is: I am litigation counsel for Minebea Co., Ltd.

I, Lisa M. Knight, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date ___3/25/03___   Signature of applicant _____

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the court): _____

| PLEASE COMPLETE REVERSE OF THIS FORM | STATEMENT OF LOCAL COUNSEL |
|---|---|

APPLICANT'S NAME: Lisa Knight
APPLICANT'S FIRM:  Schulte Roth & Zabel LLP

9405931.1                                                          **ORIGINAL**

APPLICANT'S ADDRESS
Street Address                          919 Third Avenue
                                        New York, New York 10022
Phone number (include area code)        212-756-2000



I am authorized, and will be prepared, to handle this matter, including trial, in the event the applicant Lisa M. Knight is unable to be present upon any date assigned by the court.

DATED this __26__ day of __March__, 20 __03__.

_____

---

LOCAL COUNSEL NAME AND BAR NUMBER:

Peter S. Ehrlichman, WSBA #6591
DORSEY & WHITNEY LLP
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

---

Signature of local counsel

**ORDER**

IT IS ORDERED that the application of LISA M. KNIGHT to appear and participate in this action is hereby approved.

DATED this __27__ day of __March__, 20 __03__.

BRUCE RIFKIN, CLERK
UNITED STATES DISTRICT COURT

BY: _____

Deputy Clerk

United States District Court
for the
Western District of Washington
March 28, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:


        Peter Scott Ehrlichman, Esq.
        DORSEY & WHITNEY LLP
        STE 3400
        1420 5TH AVE
        SEATTLE, WA  98101
        FAX 903-8820

        Benjamin Levi, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Joel E Lutzker, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Lisa Knight, Esq.
        SCHULTE ROTH & ZABEL
        STE 1929
        919 3RD AVE
        NEW YORK, NY  10022
        FAX 1-212-593-5955

        Angelo J Calfo, Esq.
        YARMUTH WILSDON CALFO PLLC
        STE 3080
        1201 THIRD AVE
        SEATTLE, WA  98101-3000
        FAX 516-3888

        Paul A Friedman, Esq.
        MORRISON & FOERSTER
        425 MARKET ST
        SAN FRANCISCO, CA  94105-2482
        FAX 1-415-276-7377

·Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA   94105-2482
FAX 1-415-276-7455



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

# APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

| | |
|---|---|
| CASE TITLE | |

FILED
LODGED
ENTERED
RECEIVED
MAR 26 2003
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

LODGED
ENTERED
RECEIVE
MAR 27 2003
CLERK U.S. SEATTLE
WESTERN DISTRICT OF COURT
DISTRICT OF WASHINGTON
DEPUTY

CV 03-00295 #00000009

Minebea Co. Ltd.

Plaintiff

Vs.                                  CASE NUMBER  CV 03 0295R

Chicony Electronics Co., Ltd. and Chicony America, Inc.

Defendants.

Pursuant to Local General Rule 2(d) of the United states District Court for the Western District of Washington, JOEL LUTZKER hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of the PLAINTIFF, Minebea Co., Ltd.

This application is based upon the following:

The particular need for my appearance and participation is: I am litigation counsel for Minebea Co., Ltd.

I, Joel Lutzker, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date   3/25/03       Signature of applicant _____

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the court): _____

| PLEASE COMPLETE REVERSE OF THIS FORM | STATEMENT OF LOCAL COUNSEL |
|---|---|

APPLICANT'S NAME: Joel Lutzker
APPLICANT'S FIRM:  Schulte Roth & Zabel LLP

9405833.1                                    **ORIGINAL**

APPLICANT'S ADDRESS
Street Address                        919 Third Avenue
                                      New York, New York 10022

Phone number (include area code)      212-756-2000

I am authorized, and will be prepared, to handle this matter, including trial, in the event the applicant Joel Lutzker is unable to be present upon any date assigned by the court.

DATED this 26th day of March, 20 03

LOCAL COUNSEL NAME AND BAR NUMBER:

Peter S. Ehrlichman, WSBA #6591
DORSEY & WHITNEY LLP
1420 Fifth Avenue, #3400
Seattle, WA  98101
206-903-8800

Signature of local counsel

ORDER

IT IS ORDERED that the application of JOEL LUTZKER to appear and participate in this action is hereby approved.

DATED this 27 day of March, 2003

BRUCE RIFKIN, CLERK
UNITED STATES DISTRICT COURT

BY:

Deputy Clerk

United States District Court
for the
Western District of Washington
March 28, 2003


\* \* MAILING CERTIFICATE OF CLERK \* \*


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:


    Peter Scott Ehrlichman, Esq.
    DORSEY & WHITNEY LLP
    STE 3400
    1420 5TH AVE
    SEATTLE, WA   98101
    FAX 903-8820

    Benjamin Levi, Esq.
    SCHULTE ROTH & ZABEL
    STE 1929
    919 3RD AVE
    NEW YORK, NY   10022
    FAX 1-212-593-5955

    Joel E Lutzker, Esq.
    SCHULTE ROTH & ZABEL
    STE 1929
    919 3RD AVE
    NEW YORK, NY   10022
    FAX 1-212-593-5955

    Angelo J Calfo, Esq.
    YARMUTH WILSDON CALFO PLLC
    STE 3080
    1201 THIRD AVE
    SEATTLE, WA   98101-3000
    FAX 516-3888

    Paul A Friedman, Esq.
    MORRISON & FOERSTER
    425 MARKET ST
    SAN FRANCISCO, CA   94105-2482
    FAX 1-415-276-7377

    Michael A Jacobs, Esq.
    MORRISON & FOERSTERS
    425 MARKET ST
    SAN FRANCISCO, CA   94105-2482
    FAX 1-415-276-7455



FILED —— LODGED —— ENTERED —— RECEIVED

MAR 27 2003
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

FILED LODGED ENTERED RECEIVED
MAR 26 2003

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

## APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

| CASE TITLE | |
|---|---|
| Minebea Co. Ltd. | ‖‖‖‖‖‖‖‖‖‖‖‖‖ CV 03-00295 #00000008 |
| Plaintiff | |
| Vs. | CASE NUMBER CV 03 0295R |
| Chicony Electronics Co., Ltd. and Chicony America, Inc. | |
| Defendants. | |

Pursuant to Local General Rule 2(d) of the United states District Court for the Western District of Washington, BENJAMIN LEVI hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of the PLAINTIFF, Minebea Co., Ltd.

This application is based upon the following:

The particular need for my appearance and participation is: I am litigation counsel for Minebea Co., Ltd.

I, Benjamin Levi, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date _March 25, 2003_ Signature of applicant _Benj Li_

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the court):

---

**PLEASE COMPLETE REVERSE OF THIS FORM**     **STATEMENT OF LOCAL COUNSEL**

APPLICANT'S NAME: Benjamin Levi
APPLICANT'S FIRM: Schulte Roth & Zabel LLP      **ORIGINAL**

9405892.1

APPLICANT'S ADDRESS
Street Address                    919 Third Avenue
                                  New York, New York 10022

Phone number (include area code)  212-756-2000

I am authorized, and will be prepared, to handle this matter, including trial, in the event the applicant Benjamin Levi is unable to be present upon any date assigned by the court.

DATED this __26__ day of __March__, 20_03_

LOCAL COUNSEL NAME AND BAR NUMBER:

Peter S. Ehrlichman, WSBA #6591
DORSEY & WHITNEY LLP
1420 Fifth Avenue, #3400
Seattle, WA 98101
206-903-8800

Signature of local counsel

**ORDER**

IT IS ORDERED that the application of BENJAMIN LEVI to appear and participate in this action is hereby approved.

DATED this __27__ day of __March__, 20_03_.

BRUCE RIFKIN, CLERK
UNITED STATES DISTRICT COURT

BY: _____
Deputy Clerk

United States District Court
for the
Western District of Washington
March 28, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:


Peter Scott Ehrlichman, Esq.
DORSEY & WHITNEY LLP
STE 3400
1420 5TH AVE
SEATTLE, WA  98101
FAX 903-8820

Benjamin Levi, Esq.
SCHULTE ROTH & ZABEL
STE 1929
919 3RD AVE
NEW YORK, NY  10022
FAX 1-212-593-5955

Angelo J Calfo, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

## APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

FILED LODGED ENTERED RECEIVED
MAR 2 4 2003 MR
BY CLERK AT SEATTLE
WESTERN DISTRICT COURT
DISTRICT OF WASHINGTON
DEPUTY

MINEBEA CO., LTD.,

        Plaintiff,

    v.

CHICONY ELECTRONICS CO., LTD.
and CHICONY AMERICA, INC.,

        Defendants.

FILED ENTERED
LODGED RECEIVED
MAR 2 5 2003
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

Case No. CV 03 0295

Pursuant to Local General Rule 2(d) of the United States District Court for the Western District of Washington, Michael A. Jacobs hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of Defendants Chicony Electronics Co., Ltd. and Chicony America, Inc. This application is based upon the following:

The particular need for my appearance and participation is to assist Defendants in all aspects of representation in this matter.

I, Michael A. Jacobs, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 19, 2003        Signature of applicant: _____

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the Court): _____

**ERSE OF THIS FORM**

CV 03-00295 #00000007

United States District Court
for the
Western District of Washington
March 25, 2003


* * MAILING CERTIFICATE OF CLERK * *


e:  2:03-cv-00295


'rue and correct copies of the attached were mailed by the clerk to the
:ollowing:


Peter Scott Ehrlichman, Esq.
DORSEY & WHITNEY LLP
STE 3400
1420 5TH AVE
SEATTLE, WA  98101
FAX 903-8820

Angelo J Calfo, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

## APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

FILED LODGED ENTERED RECEIVED
MAR 24 2003 MR
BY WESTERN CLERK AT SEATTLE
DISTRICT OF WASHINGTON

FILED LODGED RECEIVED
MAR 25 2003
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON DEPUTY
BY

---

MINEBEA CO., LTD.,

        Plaintiff,

    v.

CHICONY ELECTRONICS CO., LTD.
and CHICONY AMERICA, INC.,

        Defendants.

Case No. CV 03 0295

---

Pursuant to Local General Rule 2(d) of the United States District Court for the Western District of Washington, Paul A. Friedman hereby applies for permission to appear and participate as counsel in the above entitled action on behalf of Defendants Chicony Electronics Co., Ltd. and Chicony America, Inc. This application is based upon the following:

The particular need for my appearance and participation is to assist Defendants in all aspects of representation in this matter.

I, Paul A. Friedman, understand that I am charged with knowing and complying with all applicable local rules;

I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no pending disciplinary proceedings against me.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 18, 2003          Signature of applicant: _Paul A. Friedman_

I have enclosed the required filing fee of $50.00

Receipt number (to be completed by the Court): _____

**PLEASE COMPLETE REVERSE OF THIS FORM**



CV 03-00295 #00000006

ORIGINAL



United States District Court
for the
Western District of Washington
March 25, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:


Peter Scott Ehrlichman, Esq.
DORSEY & WHITNEY LLP
STE 3400
1420 5TH AVE
SEATTLE, WA  98101
FAX 903-8820

Angelo J Calfo, Esq.
YARMUTH WILSDON CALFO PLLC
STE 3080
1201 THIRD AVE
SEATTLE, WA  98101-3000
FAX 516-3888

Paul A Friedman, Esq.
MORRISON & FOERSTER
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7455

Michael A Jacobs, Esq.
MORRISON & FOERSTERS
425 MARKET ST
SAN FRANCISCO, CA  94105-2482
FAX 1-415-276-7377



CV 03-00295 #00000005



FILED
LODGED
ENTERED
RECEIVED

MAR 1 8 2003

CLERK AT SEATTLE
U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

MINEBEA COMPANY, LTD.,

      Plaintiff,

  v.

CHICONY ELECTRONICS COMPANY, et al.,

      Defendants.

Cause Number C03-295R

ORDER REGARDING INITIAL DISCLOSURES, JOINT STATUS REPORT, AND EARLY SETTLEMENT

## I. INITIAL SCHEDULING DATES

Pursuant to the December 1, 2000 revisions to the Federal Rules of Civil Procedure, the Court sets the following dates for initial disclosure and submission of the Joint Status Report and Discovery Plan:

| | |
|---|---|
| Deadline for FRCP 26(f) Conference: | **7 April 2003** |
| Combined Joint Status Report and Discovery Plan as Required by FRCP 26(f) and Local Rule CR 16: | **21 April 2003** |
| Initial Disclosures Pursuant to FRCP 26(a): | **5 May 2003** |

ORDER REGARDING INITIAL DISCLOSURES, JOINT STATUS REPORT, AND EARLY SETTLEMENT - 1

## II. JOINT STATUS REPORT & DISCOVERY PLAN

All counsel and any pro se parties are directed to confer and provide the Court with a combined Joint Status Report and Discovery Plan (the "Report") by **21 April 2003.** The conference shall be by direct and personal communication, whether that be a face-to-face meeting or a telephonic conference. The Report will be used in setting a schedule for the prompt completion of the case. It must contain the following information by corresponding paragraph numbers:

1.    A statement of the nature and complexity of the case.

2.    A statement of which ADR method (mediation, arbitration, or other) should be used. The alternatives are described in Local Rule CR 39.1 and in the ADR Reference Guide which is available from the clerk's office. If the parties believe there should be no ADR, the reasons for that belief should be stated.

3.    Unless all parties agree that there should be no ADR, a statement of when mediation or another ADR proceeding under Local Rule CR 39.1 should take place. In most cases, the ADR proceeding should be held within four months after the Report is filed. It may be resumed, if necessary, after the first session.

4.    A proposed deadline for joining additional parties.

5.    A proposed discovery plan that indicates:

    A.    The date on which the FRCP 26(f) conference and FRCP 26(a) initial disclosures took place;

    B.    The subjects on which discovery may be needed and whether discovery should be conducted in phases or be limited to or focused upon particular issues;

    C.    What changes should be made in the limitations on discovery imposed under the Federal and Local Civil Rules, and what other limitations should be imposed;

    D.    A statement of how discovery will be managed so as to minimize expense (e.g., by foregoing or limiting depositions, exchanging documents informally, etc.); and

ORDER REGARDING INITIAL DISCLOSURES, JOINT STATUS REPORT,
AND EARLY SETTLEMENT - 2

1        E.      Any other orders that should be entered by the Court under FRCP 26(c) or under

2                 Local Rule CR 16(b) and (c).

3      6.     The date by which the remainder of discovery can be completed.

4      7.     Whether the parties agree that a full-time Magistrate Judge may conduct all proceedings,

5 including trial and the entry of judgment, under 28 U.S.C. § 636(c) and Local Rule MJR 13. Agreement

6 in the Report will constitute the parties' consent to referral of the case to a full-time Magistrate Judge.

7      8.     Whether the case should be bifurcated by trying the liability issues before the damages

8 issues, or bifurcated in any other way.

9      9.     Whether the pretrial statements and pretrial order called for by Local Rules CR 16(e), (h),

10 (i), and (l), and 16.1 should be dispensed with in whole or in part for the sake of economy.

11     10.    Any other suggestions for shortening or simplifying the case.

12     11.    The date the case will be ready for trial.

13     12.    Whether the trial will be jury or non-jury.

14     13.    The number of trial days required.

15     14.    The names, addresses, and telephone numbers of all trial counsel.

16     15.    If, on the due date of the Report, <u>all</u> defendant(s) or respondent(s) have not been served,

17 counsel for the plaintiff shall advise the Court when service will be effected, why it was not made earlier,

18 and shall provide a proposed schedule for the required FRCP 26(f) conference and FRCP 26(a) initial

19 disclosures.

20     16.    Whether any party wishes a scheduling conference prior to a scheduling order being

21                 entered in the case.

22     If the parties are unable to agree on any part of the Report, they may answer in separate

23 paragraphs. No separate reports are to be filed.

24     The time for filing the Report may be extended only by court order. **Any request for extension**

25 **should be made by telephone to Elizabeth Tyree at (206) 553-2996.**

26

ORDER REGARDING INITIAL DISCLOSURES, JOINT STATUS REPORT,
AND EARLY SETTLEMENT - 3

1    If the parties wish to have a status conference with the Court at any time during the pendency of

2 this action, **they should notify Elizabeth Tyree at (206)553-2996.**

3               ## III. PLAINTIFF'S RESPONSIBILITY

4    This Order is issued at the outset of the case, and a copy is delivered by the clerk to counsel for

5 plaintiff (or plaintiff, if pro se) and any defendants who have appeared.  Plaintiff's counsel (or plaintiff,

6 if pro se) is directed to serve copies of this Order on all parties who appear after this Order is filed within

7 ten (10) days of receipt of service of each appearance.  Plaintiff's counsel (or plaintiff, if pro se) will be

8 responsible for starting the communications needed to comply with this Order.

9               ## IV. EARLY SETTLEMENT CONSIDERATION

10    When civil cases are settled <u>early</u> -- before they become costly and time-consuming -- all parties

11 and the court benefit.  The Federal Bar Association Alternative Dispute Resolution Task Force Report

12 for this district stated:

13       [T]he major ADR related problem is not the percentage of civil cases that ultimately settle,
         since statistics demonstrate that approximately 95% of all cases are resolved without trial.
14       However, the <u>timing</u> of settlement is a major concern.  Frequently, under our existing
         ADR system, case resolution occurs far too late, after the parties have completed discovery
15       and incurred substantial expenditure of fees and costs.

16    The judges of this district have adopted a resolution "approving the Task Force's recommendation

17 that court-connected ADR services be provided as early, effectively, and economically as possible in

18 every suitable case."

19    The steps required by this Order are meant to help achieve that goal while preserving the rights

20 of all parties.

21    **If settlement is achieved, counsel shall notify Elizabeth Tyree at (206)553-2996.**

22

23

24

25

26

ORDER REGARDING INITIAL DISCLOSURES, JOINT STATUS REPORT,
AND EARLY SETTLEMENT - 4

## V. SANCTIONS

A failure by any party to comply fully with this Order may result in the imposition of sanctions.

IT IS SO ORDERED this 18th day of March 2003.

_Barbara J. Rothstein_

BARBARA JACOBS ROTHSTEIN
U.S. DISTRICT JUDGE

United States District Court
for the
Western District of Washington
March 20, 2003


* * MAILING CERTIFICATE OF CLERK * *


:e:  2:03-cv-00295


'rue and correct copies of the attached were mailed by the clerk to the
:ollowing:


     Peter Scott Ehrlichman, Esq.
     FOSTER PEPPER & SHEFELMAN
     STE 3400
     1111 3RD AVE
     SEATTLE, WA  98101-3299
     FAX 749-1933

     Angelo J Calfo, Esq.
     YARMUTH WILSDON CALFO PLLC
     STE 3080
     1201 THIRD AVE
     SEATTLE, WA  98101-3000
     FAX 516-3888

HONORABLE BARBARA J. ROTHSTEIN

FILED                CC: TO JUDGE—MR
LODGED         ENTERED
                        RECEIVED
MAR 1 4 2003 MR
BY ___ CLERK AT SEATTLE
WESTERN U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
                              DEPUTY

CV 03-0295 #00000004

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MINEBEA CO., LTD. | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| CHICONY ELECTRONICS CO., LTD. and CHICONY AMERICA, INC. | ) ) ) |
| Defendants. | ) ) ) |

CIVIL ACTION No. CV 03 0295R

**NOTICE OF SUBSTITUTION AND WITHDRAWAL**

**TO:** **Clerk of the Court;**

AND TO:    Foster Pepper & Shefelman PLLC and Ramsey Ramerman;

AND TO:    Yarmuth Wilsdon Calfo PLLC and Angelo Calfo

    PLEASE TAKE NOTICE that the law firm of Foster Pepper & Shefelman PLLC, 1111

Third Avenue, Suite 3400, Seattle, Washington 98101, withdraws as counsel for Plaintiff

Minebea Co., Ltd. and Peter S. Ehrlichman of Dorsey & Whitney LLP, 1420 Fifth Avenue, Suite

3400, Seattle, Washington 98101 substitutes as counsel for Minebea, Plaintiff in this action.

NOTICE OF SUBSTITUTION AND WITHDRAWAL -1-
CV 03 0295R

ORIGINAL



**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

All future pleadings, notices, documents or other papers, exclusive of process, should be served upon said substituted attorneys at the address shown below.

DATED this ___14th___ day of March, 2003.     FOSTER PEPPER & SHEFELMAN

RAMSEY RAMERMAN WSBA #30423
1111 Third Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 447-4400
Facsimile: (206) 447-9700

Attorneys for Plaintiff
MINEBEA CO., LTD.

DORSEY & WHITNEY LLP

PETER EHRLICHMAN WSBA #6591
U.S. Bank Centre
1420 Fifth Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 903-8800
Facsimile: (206) 903-8820

Attorneys for Plaintiff
MINEBEA CO., LTD.

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

HONORABLE BARBARA J. ROTHSTEIN

FILED
LODGED ENTERED
RECEIVED

MAR 14 2003 MR

BY CLERK AT SEATTLE
U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

CC: TO JUDGE MR

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |  |
|---|---|---|
| MINEBEA CO., LTD. | ) | CIVIL ACTION No. CV 03 0295R |
|  | ) |  |
| Plaintiff, | ) | **CERTIFICATE OF SERVICE** |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| CHICONY ELECTRONICS CO., LTD. and | ) |  |
| CHICONY AMERICA, INC. | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

I certify that on March 14, 2003, I caused to be served a true copy of the following documents as indicated after each to the individuals identified below:

1.   Notice of Substitution and Withdrawal; and

2.   Certificate of Service.

CERTIFICATE OF SERVICE - 1

ⵔRIGINAL

**DORSEY & WHITNEY LLP**
A Limited Liability Partnership
U.S. Bank Bldg. Centre
1420 Fifth Ave., Suite 3400
Seattle, Washington 98101
(206) 903-8800

Angelo J. Calfo
Yarmuth Wilsdon Calfo PLLC
Attorneys for Chicony Electronics CO., Ltd.
and Chicony America, Inc.
3080 Washington Mutual Tower
1201 Third Avenue
Seattle, WA 98101-3000

☐ By Messenger

☐ By US Mail

☐ By Personal Service

☐ Other:

DATED this _14_ day of March, 2003.

_Lynne M. Overlie_
Lynne Overlie

**DORSEY & WHITNEY** LLP
A Limited Liability Partnership
U.S. Bank Bldg. Centre
1420 Fifth Ave., Suite 3400
Seattle, Washington 98101
(206) 903-8800




FILED ___ ENTERED
___ LODGED ___ RECEIVED

**MAR 10 2003**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

The Honorable Barbara Jacobs Rothstein

FILED
LODGED ___ ENTERED
___ RECEIVED
MAR 04 2003  MR
BY___ AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

MINEBEA CO., LTD.,

    Plaintiff,

    v.

CHICONY ELECTRONICS CO., LTD. and
CHICONY AMERICA, INC.,

    Defendants.

No. CV 03 0295R

**STIPULATION AND ORDER
EXTENDING TIME FOR
DEFENDANTS CHICONY
ELECTRONICS, CO., LTD. AND
CHICONY AMERICA, INC. TO
RESPOND TO COMPLAINT**

    On February 11, 2003, plaintiff Minebea Co., Ltd. filed this lawsuit against defendants Chicony Electronics Co., Ltd. and Chicony America, Inc. Defendant Chicony Electronics Co., Ltd. was served on February 13, 2003, and defendant Chicony America, Inc. was served on February 21, 2003. All parties hereby stipulate and agree that defendants Chicony Electronics Co., Ltd. and Chicony America, Inc. shall have an



**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

**ORIGINAL**

1 extension of time to answer or otherwise respond to the complaint to and including

2 April 4, 2003.

3     IT IS SO STIPULATED:

4 DATED: March 4 , 2003.      YARMUTH WILSDON CALFO PLLC

5

6

7                Angelo J. Calfo, (Bar No. 27079)
1201 Third Avenue, Suite 3080
Seattle, WA 98101

8                206-516-3800

9                Attorneys for Defendants

10 DATED: March 4th , 2003.      DORSEY & WHITNEY LLP

11

12

13                Peter Ehrlichman (Bar No. 6591)
1420 – 5th Avenue, #3400

14                Seattle, WA 98101
206-903-8800

15                Attorneys for Plaintiff

16

17     **IT IS SO ORDERED.**

18

19 Dated: March 8, 2003

20                BARBARA JACOBS ROTHSTEIN

21                UNITED STATES DISTRICT JUDGE

22

23

24

25

26

STIPULATION EXTENDING TIME FOR CHICONY
ELECTRONICS CO., LTD. AND CHICONY AMERICA,
INC. TO RESPOND TO COMPLAINT - 2
**CV 03 0295R**

**YARMUTH WILSDON CALFO PLLC**
3080 WASHINGTON MUTUAL TOWER
1201 THIRD AVENUE
SEATTLE WASHINGTON 98101-3000
T 206 516 3800  F 206 516 3888

United States District Court
for the
Western District of Washington
March 11, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:03-cv-00295


True and correct copies of the attached were mailed by the clerk to the
following:

        Peter Scott Ehrlichman, Esq.
        FOSTER PEPPER & SHEFELMAN
        STE 3400
        1111 3RD AVE
        SEATTLE, WA  98101-3299
        FAX 749-1933

        Ramsey Ramerman, Esq.
        FOSTER PEPPER & SHEFELMAN
        STE 3400
        1111 3RD AVE
        SEATTLE, WA  98101-3299
        FAX 447-9700

        Angelo J Calfo, Esq.
        YARMUTH WILSDON CALFO PLLC
        STE 3080
        1201 THIRD AVE
        SEATTLE, WA  98101-3000
        FAX 516-3888

porIres

_____ FILED _____ENTERED
_____LODGED_____RECEIVED

FEB 27 2003   DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY
                                    DEPUTY

## IN THE
## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASH. AT SEATTLE

| | |
|---|---|
| **MINEBEA CO., LTD.,** | Hearing Date: |
| Plaintiff/Petitioner | CAUSE NO. **CV03-0295R** |
| | DECLARATION OF SERVICE OF: |
| vs. | **SUMMONS IN A CIVIL CASE; COMPLAINT FOR PATENT INFRINGEMENT** |
| **CHICONY ELECTRONICS CO., LTD., AND CHICONY AMERICA, INC.,** | |
| Defendant/Respondent | |

The undersigned hereby declares: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **13th day of February, 2003, at 11:52 AM**, at the address of **53 PARKER , IRVINE, Orange** County, **CA** ; this declarant served the above described documents upon **CHICONY AMERICA, INC.,,** by then and there personally delivering **1** true and correct copy(ies) thereof, by then presenting to and leaving the same with **Susie Ho (A F 5'3 45 120 Blk Hair), Head of Accounting/Person in Charge.**

No Information was provided or discovered that indicates that the subjects served are members of the U.S. military.

Declarant hereby states under penalty of perjury under the laws of the State of **Washington** that the statement above is true and correct.

DATED this **14th day of February, 2003**.

**Sheri Lynn Gonzalez, Reg. # 2236, Los Angeles**

**Service Fees Total** _____
   *Agent/Server Do NOT Price*

ABC's Client Name
**Foster, Pepper - Seattle**
**9997-800 MINEBEA V.**
**CHICONY AM**

ORIGINAL PROOF
SERVICE

CV 03-00295 #00000002

# UNITED STATES DISTRICT COURT

WESTERN _____ District of ___ WASHINGTON _____

MINEBEA CO., LTD.,

**SUMMONS IN A CIVIL CASE**

V.     PLAINTIFF,

CHICONY ELECTRONICS CO., LTD., AND CHICONY
AMERICA, INC.

CASE NUMBER:

# CV03  0295 ℟

TO: (Name and address of Defendant)

Chicony America, Inc.
Bruce Chang
53 Parker
Irvine, CA  92618

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Peter S. Ehrlichman
Sarah Johnson
Foster Pepper & Shefelman PLLC
1111 Third Ave., #3400
Seattle, WA  98101

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable
period of time after service.

BRUCE RIFKIN

FEB 1 1 2003

CLERK _____

(By) DEPUTY CLERK

DATE

# ORIGINAL

CV 03-0295 #1

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

FEB 11 2003 DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON AT SEATTLE

MINEBEA CO., LTD.,

                Plaintiff,

v.

CHICONY ELECTRONICS CO., LTD., AND CHICONY AMERICA, INC.,

                Defendants.

No. **CV03 0295R**

COMPLAINT FOR PATENT INFRINGEMENT

## I. COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Minebea Co., Ltd. ("Minebea" or "Plaintiff"), by its attorneys, for its Complaint against defendants Chicony Electronics Co., Ltd. ("Chicony Electronics") and Chicony America, Inc. ("Chicony America") (collectively, "Chicony" or "Defendants"), alleges as follows:

## II. JURISDICTION AND VENUE

1.    This Court possesses, pursuant to 28 U.S.C. §§ 1331 and 1338, subject matter jurisdiction over the cause of action alleged herein because this matter arises under the patent laws of the United States, 35 U.S.C. § 1 et seq.

2.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400, because Defendants reside in this District pursuant to 28 U.S.C. § 1391(c).

COMPLAINT FOR PATENT INFRINGEMENT - 1
Case No.

**ORIGINAL**

FOSTER PEPPER & SHEFELMAN PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299 ♦ 206-447-4400

50367637.01

3.     This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.185 because, among other things, they transact business in the State of Washington. This Court also has personal jurisdiction over Chicony Electronics pursuant to Federal Rule of Civil Procedure 4(k)(2).

### III. THE PARTIES

4.     Plaintiff Minebea is a corporation organized under the laws of Japan with its principal place of business at ARCO Tower, 19th Floor, No. 1-8-1, Shimo-Meguro 1-chrome, Meguro-ku, Tokyo 153, Japan. Minebea is a manufacturer of electronic devices including computer keyboards.

5.     Upon information and belief, Chicony Electronics is a corporation of Taiwan, with a principal place of business at No. 25, Wu-Gong 6th Road, Wu-Ku Industrial Park, Taipei Hsien 248, Taiwan. Chicony Electronics is a manufacturer, seller and exporter of computer equipment and computer keyboards. Chicony Electronics manufactures, sells, imports, and sells for importation into the United States computer equipment and computer keyboards.

6.     Upon information and belief, Chicony America is a corporation organized under the laws of California, with a principal place of business at 53 Parker, Irvine, California 92618. Upon information and belief, Chicony America is a wholly-owned subsidiary of Chicony Electronics. Chicony America is a manufacturer, seller and importer of computer equipment and computer keyboards. Chicony America manufactures, sells, and imports into the United States computer equipment and computer keyboards.

### IV. CLAIM I

### (Patent Infringement)

7.     Plaintiff Minebea repeats and realleges Paragraphs 1 through 6, inclusive, as though fully set forth herein and incorporates them by reference.

8.     United States Patent No. 4,433,225 ("the '225 Patent"), a copy of which is attached hereto as Exhibit A, was duly and legally issued by the United States Patent and

COMPLAINT FOR PATENT INFRINGEMENT - 2
Case No.

FOSTER PEPPER & SHEFELMAN PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299 ♦ 206-447-4400

50367637.01

Trademark Office on February 21, 1984. The '225 Patent, which is entitled "Keytop Levelling Mechanism", relates to a keytop leveling mechanism useful in computer keyboards.

9. The inventor of the invention described and claimed in the '225 Patent is Mr. Dean S. Cowles, who, upon information and belief, now resides at 13710 42nd Ave SE, Snohomish, Washington 98296.

10. Minebea is the assignee of all rights, title, and interest in and to the '225 Patent.

11. Defendants are and have been aware of the '225 Patent.

12. Defendants have infringed and are continuing to infringe at least one claim of the '225 Patent in violation of 35 U.S.C. § 271 by the manufacture, sale, offer for sale, and importation of their computer keyboards.

13. Further, Defendants, by reason of their manufacture, sale, offer for sale, and importation of their computer keyboards have induced the infringement and are continuing to induce the infringement of at least one claim of the '225 Patent in violation of 35 U.S.C. § 271(b).

14. Further, Defendants, by reason of their manufacture, sale, offer for sale, and importation of their computer keyboards have contributorily infringed and are continuing to contributorily infringe at least one claim of the '225 Patent in violation of 35 U.S.C. § 271(c).

15. By reason of Defendants' infringement of the '225 Patent, Minebea has suffered and is continuing to suffer damages for which Minebea is entitled to compensation as allowed to the full extent of the law, pursuant to 35 U.S.C. §§ 281, 284.

16. Because Defendants' infringement of the '225 Patent is willful, Minebea is entitled to treble damages pursuant to 35 U.S.C. § 284.

17. By reason of Defendants' ongoing and continuous infringement of the '225 Patent, Minebea is entitled to entry of an injunction against Chicony preventing further infringement of Minebea's patent rights, pursuant to 35 U.S.C. §§ 281, 283.

COMPLAINT FOR PATENT INFRINGEMENT - 3
Case No.

FOSTER PEPPER & SHEFELMAN PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299 ♦ 206-447-4400

18. This case should be deemed as exceptional, and Minebea is entitled to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## DEMAND FOR JUDGMENT

WHEREFORE, Minebea prays for judgment as follows:

A. This Court enter judgment that Defendants are liable for infringement, inducement to infringe, and contributory infringement of the '225 Patent in violation of 35 U.S.C. § 271;

B. This Court award Minebea compensatory damages to the fullest extent permitted by 35 U.S.C. § 284;

C. This Court enter judgment that Defendants' infringement is willful, and award Minebea treble damages pursuant to 35 U.S.C. § 284;

D. This Court award issue an order permanently enjoining Defendants from infringing Minebea's patent rights pursuant to 35 U.S.C. § 283;

E. A determination and ruling that this case is exceptional, and an award to Minebea of its attorneys' fees pursuant to 35 U.S.C. § 285; and

F. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY

Minebea requests that all issues triable by a jury be so tried in this case.

COMPLAINT FOR PATENT INFRINGEMENT - 4
Case No.

FOSTER PEPPER & SHEFELMAN PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299 ♦ 206-447-4400

50367637.01

DATED this 11th day of February, 2003.

FOSTER PEPPER & SHEFELMAN PLLC

Peter S. Ehrlichman, WSBA No. 6591
Sarah K. Johnson, WSBA No. 30915
Ramsey Ramerman, WSBA No. 30423
Attorneys for Plaintiff
Minebea Co., Ltd.

Joel E. Lutzker
David Kagan
Benjamin Levi
Todd Sicklinger
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Phone: (212) 756-2000
Attorneys for Minebea Co., Ltd.

COMPLAINT FOR PATENT INFRINGEMENT - 5
Case No.

50367637.01

# United States Patent [19]

**Cowles**

[11] **4,433,225**

[45] **Feb. 21, 1984**

[54] **KEYTOP LEVELLING MECHANISM**

[75] Inventor: **Dean S. Cowles**, Spokane, Wash.

[73] Assignee: **General Instrument Corporation,** New York, N.Y.

[21] Appl. No.: **468,127**

[22] Filed: **Feb. 22, 1983**

[51] Int. Cl.³ ............................................. H01H 3/12
[52] U.S. Cl. .................................................. 200/340
[58] Field of Search ............. 200/5 A, 159 R, 159 A, 200/159 B, 340; 248/584, 585

[56] **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,144,270 | 8/1964 | Bilancia | 248/584 |
| 3,741,512 | 6/1973 | Olsson | 248/585 |
| 3,916,150 | 10/1975 | Abernethy et al. | 200/340 |
| 3,940,578 | 2/1976 | Pointon | 200/340 |
| 4,392,037 | 7/1983 | Fleming | 200/340 |

## FOREIGN PATENT DOCUMENTS

2309367 11/1976 France ................................ 248/584

*Primary Examiner*—John W. Shepperd
*Attorney, Agent, or Firm*—Barry R. Lipsitz

[57] **ABSTRACT**

A keytop levelling mechanism for use in conjunction with a keytop having a main portion and a stem portion cantilevered from the main portion, e.g., an L-shaped keytop. When pressed, the keytop actuates a keyswitch mounted on a circuit board. The levelling mechanism comprises a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage. The scissors-like linkage is mounted between the stem portion of the keytop and the circuit board in a manner such that it collapses in scissor-like fashion when the keytop is pressed toward the circuit board. In this manner, the scissor-like linkage maintains the keytop level throughout its movement toward and away from the circuit board.

**9 Claims, 12 Drawing Figures**





EXHIBIT A
PAGE 1 OF 7 PAGES

# FIG. 1.



# FIG. 2.



EXHIBIT A
PAGE 2 OF 7 PAGES



FIG. 3.

FIG. 4.

FIG. 5.

FIG. 6.

EXHIBIT _A_
PAGE _3_ OF _7_ PAGES



FIG. 7.



FIG. 8.



FIG. 9.



FIG. 10.



FIG. 11.



FIG. 12.

EXHIBIT A
PAGE 4 OF 7 PAGES

1

## KEYTOP LEVELLING MECHANISM

### BACKGROUND OF THE INVENTION

The present invention relates to keyboards for use in computer terminals, typewriters, and the like, and more particularly to a mechanism for maintaining an oddly-shaped keytop level during its downward and upward travel when used on a keyboard.

Various types of keyboards are used on typewriters, computer terminals and the like for typing or entering data into a computer. Such keyboards are typically manufactured from a plurality of separate keyswitches which are lined up on a circuit board. Each individual keyswitch has a keytop thereon which is generally stamped or otherwise marked with the number or letter which that keyswitch represents. Thus, a keyboard for a conventional typewriter will have something on the order of 50 separate keyswitches, 26 of them representing the letters of the alphabet, 10 representing the digits 0-9, with additional switches for various punctuation and machine functions.

Most keytops in conventional keyboards are square or rectangular in shape. However, for some machine functions, keytops of different shapes are used. One shape which is often used for certain keyboard functions is an L-shaped keytop. Such keytops provide a convenient way of increasing the useable keytop area by providing an extension into an adjacent row of the keyboard without upsetting the esthetics of the keyboard. Typically, one portion of the L-shaped keytop is used while typing on the main or "alpha" portion of the keyboard while the other portion of the keytop (usually the "ascender" portion of an L-shaped keytop) is used while making entries on an auxiliary group of keyswitches located beside the main keyboard array. It is therefore important that an oddly-shaped keytop, such as an L-shaped keytop, be capable of use by pressing any part thereof. This feature is known as "full top surface utilization".

Full top surface utilization of oddly-shaped keytops is often difficult to provide, e.g., when used in conjunction with low profile keyswitches, when the keyswitch itself does not provide sufficient support for the entire keytop.

In the past, attempts to provide full top surface utilization of L-shaped keytops have not been entirely adequate. The objective of any solution is to prevent the keyswitch from binding when pressing the keytop at a point which is not directly over the keyswitch. One prior solution has been to limit the useable area of the keytop so that the forces created by a keyboard user pressing upon the keytop are directed to an area compatible with the action of the keyswitch. A disadvantage of this solution, however, is that the limited area defeats the purpose of the specially shaped keytop, i.e., the provision of additional keytop area. Another solution has been to incorporate a lever stabilizer mechanism similar to those used for multi-wide keytops such as space bars. However, due to the limited widths that can be obtained in oddly shaped keytops, for example in the narrow ascender portion of an L-shaped keytop, such lever stabilizer mechanisms are not adequate.

It would be advantageous to provide full top surface utilization of an oddly shaped keytop, such as an L-shaped keytop, along with smooth, level keyswitch actuation. Such features should be available even when only a narrow keytop section, such as a narrow as-

2

cender portion of an L-shaped keytop, is to be maintained level. Such a levelling mechanism should be economical, easy to manufacture, and capable of being fabricated from a minimal number of parts. This invention relates to such a keytop levelling mechanism.

### SUMMARY OF THE INVENTION

In accordance with the present invention, a keytop levelling mechanism is provided. The levelling mechanism is adapted for use in conjunction with a keytop which has a main portion along with a stem portion cantilevered from the main portion. The keytop is used to actuate a keyswitch, which is mounted on a circuit board. The levelling mechanism comprises a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends. Means is provided for pivotally mounting the first and second ends to longitudinally opposed ends of the cantilevered portion of the keytop. Means is also provided for pivotally mounting the third and fourth ends to separate joints adjacent the circuit board under the cantilevered portion. Finally, means is provided for enabling at least one end of each lever arm to slide in addition to pivot.

In a preferred embodiment, the first and second ends of the scissors-like linkage are designed to pivot and slide within the cantilevered portion of the keytop. In this preferred embodiment, the design can be such as to also allow a certain amount of sliding motion at the third and fourth ends of the scissors-like linkage. Such pivoting and sliding motion can be provided through the use of studs projecting from the first, second, third, and fourth ends, along with slots into which the studs protrude.

The structure of the keytop levelling mechanism is such that the lever arms collapse in scissor-like fashion when the keytop is pressed toward the circuit board. This arrangement serves to maintain the keytop, and particularly the cantilevered portion thereof, level throughout its movement toward and away from the circuit board.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top plan view of an L-shaped keytop mounted on a keyswitch with the levelling mechanism of the present invention mounted under the ascender portion of the L-shaped keytop;

FIG. 2 is a cross-sectional view taken substantially along the line 2—2 shown in FIG. 1;

FIG. 3 is a cross-sectional view taken substantially along the line 3—3 shown in FIG. 1 with the keytop in its extended, non-actuated position;

FIG. 4 is a cross-sectional view taken substantially along the line 3—3 of FIG. 1 with the keytop in its depressed, actuated position;

FIG. 5 is a plan view of one lever arm used in the levelling mechanism of the present invention;

FIG. 6 is a side view in partial cross-section of the lever arm shown in FIG. 5;

FIG. 7 is a plan view of another lever arm used in the levelling mechanism of the present invention;

FIG. 8 is a side view in partial cross-section of the lever arm shown in FIG. 7;

FIG. 9 is a side view of the keytop block used in the levelling mechanism of the present invention;

FIG. 10 is a top view in partial cross-section of the keytop block shown in FIG. 9;

3

FIG. 11 is a side view of the frame block used in the levelling mechanism of the present invention; and

FIG. 12 is a top view of the frame block shown in FIG. 11.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to the drawings, wherein like numbers indicate like elements throughout the several views, there is shown in FIG. 1 a keyswitch assembly 10 which includes a keytop 12 having a main portion 14 and a stem portion 16 cantilevered from main portion 14. Main portion 14 is mounted to a plunger 20 of a keyswitch 18 which is mounted on a circuit board 70. A spring 22 maintains the plunger 20 and hence keytop 12 in an extended position, away from circuit board 70, when the keytop is not being pressed down by a keyboard user.

Referring now to FIGS. 2 through 4 of the drawings, the keytop levelling mechanism of the present invention is shown in detail. For comparison purposes, FIG. 3 is a cross sectional view of the levelling assembly when the keytop is in its extended, non-actuated position, and FIG. 4 is essentially the same cross section but with the keytop in its depressed, actuated position. A pair of lever arms 24 and 26 are joined approximately at the centers thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends 72, 74, 76, and 78 respectively. Lever arm 24 is shown in greater detail in FIGS. 7 and 8. Lever arm 26 is shown in greater detail in FIGS. 5 and 6.

The pivot at which lever arms 24 and 26 are joined comprises a shaft 28 extending from lever arm 24 which projects into a collar 30 on lever arm 26. Flange 40 (see FIG. 2) at the end of shaft 28 (produced, e.g., by ultrasonic forming) provides a locking arrangement which holds lever arms 24 and 26 together after shaft 28 has been fully inserted into collar 30.

Keytop 12 is substantially hollow, and the hollow portion of cantilevered portion 16 thereof provides a cavity into which the scissors-like linkage formed from lever arms 24 and 26 extends. A keytop block 60 is mounted in cantilevered portion 16 of keytop 12 to provide a means for pivotally mounting first end 72 of lever arm 24 and second end 74 of lever arm 26. Keytop block 60 is shown in greater detail in FIGS. 9 and 10, and may be mounted in cantilevered portion 16 by conventional heat-staking techniques.

A stud 34 projects from first end 72 of lever arm 24 and protrudes into slot 52 in keytop block 60. Similarly, a stud 36 projects from second end 74 of lever arm 26 and protrudes into slot 54 of keytop block 60. The combination of studs 34 and 36 with slots 52 and 54 provides an articulating joint which allows both pivoting and sliding motion.

In the keyswitch structure shown, a metal frame 68 is situated above circuit board 70. Frame 68 serves to hold keyswitch 18 in place over circuit board 70. The actual electrical connections to keyswitch 18 are made on circuit board 70. Frame 68 also serves to hold a frame block 62 which provides articulating joints for third and fourth ends 76 and 78 of the scissors-like linkage formed from lever arms 24 and 26. As more clearly shown in FIGS. 11 and 12, frame block 62 includes openings, or slots 56 and 58. A stud 38 projecting from third end 76 of lever arm 26 protrudes into opening 56 of frame block 62. Similarly, a stud 32 projecting from fourth end 78 of lever arm 24 protrudes into opening 58 of frame

4

block 62. Openings 56 and 58 provide for pivotal motion and a certain amount of slidable motion of third and fourth ends 76 and 78 respectively.

Ears 64 and 66 are provided on frame block 62 to lock frame block 62 into frame 68. U-shaped openings 56 and 58 are formed by projections 50 and 46 respectively which extend from frame block 62.

As clearly shown in the Figures, the levelling mechanism of the present invention utilizes a scissors-like linkage which extends for substantially the full length of stem portion 16 of keytop 12. In an L-shaped keytop of the type illustrated, the stem portion 16 is often referred to as the "ascender" portion. By placing the levelling mechanism across the full length of the ascender, rather than the width thereof, a vastly improved operation is achieved which insures a smooth operation of the keyswitch and maintains the keytop level throughout its downward travel toward circuit board 70 and its upward travel away from circuit board 70. Pressing on any side of the keytop will cause one side of the scissors-like linkage formed from lever arms 24 and 26 to close. Closing one side will naturally close the other, pulling the keytop down parallel to circuit board 70. This operation is clearly shown in FIGS. 3 and 4.

In comparing FIGS. 3 and 4, it can be seen that when keytop 12 travels from its upward (non-actuated, extended) position to its downward (actuated, depressed) position, stud 34 of lever arm 24 moves outwardly within slot 52 and stud 36 of lever arm 26 moves outwardly in slot 54. Studs 34 and 36 will also rotate, or pivot, to a certain extent within slots 52 and 54 respectively as the keytop is pressed down. Similarly, stud 38 of lever arm 26 and stud 32 of lever arm 24 will rotate, or pivot, and slide outwardly in U-shaped openings 56 and 58 respectively. Since stem portion 16 is substantially hollow, it provides an area into which the scissors-like linkage becomes contained as arms 24 and 26 collapse upon the downward travel of keytop 12.

Those skilled in the art will appreciate that modifications can be made to the shape of lever arms 24 and 26. Similarly, modifications can be made in the mounting mechanisms provided by keytop block 60 and frame block 62. For example, two pivoting joints can be provided along with two sliding joints. It is not mandatory that the sliding joints be provided in the keytop; they can alternatively be provided adjacent the circuit board 70. Alternatively, keytop 12, and specifically stem portion 16 thereof could include one pivoting joint with a corresponding pivoting joint mounted therebelow adjacent circuit board 70, and one sliding joint with a corresponding sliding joint mounted therebelow adjacent circuit board 70. Thus, while only a single preferred embodiment of the present invention has been disclosed for purposes herein, it is to be understood that many variations and modifications could be made thereto. It is intended to cover all of these variations and modifications which fall within the scope of the present invention as defined by the claims appended hereto.

I claim:

1. A keytop levelling mechanism for use in conjunction with:

a keytop having a main portion and a stem portion cantilevered from said main portion; and

a keyswitch, mounted on a circuit board, which is adapted to be actuated when said keytop is pressed;

said levelling mechanism comprising:

EXHIBIT A

PAGE 6 OF 7 PAGES

a pair of lever arms joined at intermediate portions thereof by a pivot to form a scissors-like linkage having first, second, third, and fourth ends;

means for pivotally mounting said first and second ends to longitudinally opposed ends of said cantilevered portion;

means for pivotally mounting said third and fourth ends to separate joints adjacent said circuit board under said cantilevered portion; and

means for enabling at least two of said first, second, third, and fourth ends to slide in addition to pivot.

2. The mechanism of claim 1 wherein said first and second ends are enabled to slide in addition to pivot.

3. The mechanism of claim 2 wherein said means for pivotally mounting said first and second ends and said enabling means comprises a keytop block mounted within said cantilevered portion, said keytop block including first and second slots into which studs, projecting from said first and second ends respectively, protrude to provide a mounting allowing both pivoting and sliding motion.

4. The mechanism of claim 3 wherein said means for pivotally mounting said third and fourth ends comprises a frame block mounted adjacent and in fixed relation to said circuit board, said frame block including third and fourth openings into which studs, projecting from said third and fourth ends respectively, protrude to provide a mounting allowing pivoting motion.

5. The mechanism of claim 4 wherein said third and fourth openings are slots which allow sliding motion in addition to pivoting motion.

6. The mechanism of claim 1 wherein said keytop is L-shaped.

7. A keytop levelling mechanism for use in conjunction with a substantially hollow L-shaped keytop, said mechanism comprising:

a scissors-like linkage having first, second, third, and fourth ends adapted to fit between the ascender portion of said L-shaped keytop and a base situated under said keytop;

first means for mounting said first and second ends within the hollow portion of said ascender portion at longitudinally opposed ends thereof; and

second means for mounting said third and fourth ends to said base;

said first and second mounting means adapted to provide articulating joints enabling said linkage to collapse in scissors-like fashion when said keytop is moved toward said base,

whereby said scissors-like linkage maintains said keytop level throughout its movement toward and away from said base.

8. The mechanism of claim 7 wherein said first mounting means comprises studs projecting from said first and second ends which protrude into slots provided at longitudinally opposed ends of said ascender portion, and said second mounting means comprises studs projecting from said third and fourth ends which protrude into slots provided at said base.

9. The mechanism of claim 7 wherein said base comprises a frame situated above a circuit board to which a keyswitch actuated by said keytop is mounted.

* * * * *

EXHIBIT A

PAGE 7 OF 7 PAGES

JS 44
(Rev. 3/99)

CV03 0295R

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS
MINEBEA CO., LTD.

## DEFENDANTS
CHICONY ELECTRONICS CO., LTD., AND CHICONY AMERICA, INC.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

FILED —— ENTERED
LODGED RECEIVED

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Peter S. Ehrlichman/Sarah Johnson/Ramsey Ramerman
Foster Pepper & Shefelman PLLC
1111 Third Ave., #3400
Seattle, WA 98101

ATTORNEYS (IF KNOWN)

FEB 1 1 2003

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

DJ

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☒ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/ Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
Transferred from
☐ 5 another district (specify)
☐ 6 Multidistrict Litigation
Appeal to District Judge from
☐ Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
35 USC 1

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23 Declaratory relief/injunction

DEMAND $ Damages/ CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE 2/11/03

SIGNATURE OF ATTORNEY OF RECORD

ORIGINAL

# UNITED STATES DISTRICT COURT

Southern District Of California
Office Of The Clerk
880 Front Street, Room 4290
San Diego, California 92101-8900
Phone: (619) 557-5600
Fax: (619) 702-9900

W. Samuel Hamrick, Jr.
Clerk of Court

Matt Dykman
Chief Deputy

August 13, 2003

U.S. District Court Washington
Office of the Clerk
1010 Fifth Avenue Room 215
Seattle, WA 98104-9876

Michael A. Jacobs
Morrison & Foerster
425 Market Street
San Francisco, CA 94105

James S. Blackburn
Arnold & Porter
1900 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067

RE: Minebea Co LTD v. Chicony Electronics Co., LTD

You are hereby notified that the above entitled case was on 08/12/2003 transferred from the USDC Washington to the U.S. District Court, Southern District of California. The case will now contain the case number of the Southern District, and the initial of the assigned Judge. The case has been assigned to the Honorable Thomas J. Whelan, and on all future filings please show the case number as **03cv1614-W(RBB).**

W. Samuel Hamrick, Jr.
Clerk of Court

# M. AGUILAR

By: _____
M. Aguilar    , Deputy Clerk

AO 120 (3/85)

| TO:<br><br>**Commissioner of Patents and Trademarks**<br>**Washington, D.C. 20231** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION REGARDING A PATENT** |
|---|---|

In compliance with the Act of July 19, 1952 (66 Stat. 814; 35 U.S.C. 290) you are hereby advised
that a court action has been filed on the following patent(s) in the U.S. District Court:

| DOCKET NO.<br>03cv1614-W(RBB) | DATE FILED<br>08/12/2003 | U.S. DISTRICT COURT<br>United States District Court, Southern District of California |
|---|---|---|
| PLAINTIFF<br><br>Minebea Co., LTD | | DEFENDANT<br><br>Chicony Electronics Co., LTD and Chicony America Inc. |

| PATENT NO. | DATE OF PATENT | PATENTEE |
|---|---|---|
| 1 4,433,225 | 02/21/1984 | Dean S. Cowles |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment  ☐ Answer  ☐ Cross Bill  ☐ Other Pleading | |
|---|---|---|
| PATENT NO. | DATE OF PATENT | PATENTEE |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following decision has been rendered or judgment issued:

| DECISION/JUDGMENT | | |
|---|---|---|
| | | |
| CLERK | (BY) DEPUTY CLERK | DATE |

Copy 1 - Upon initiation of action, mail this copy to Commissioner   Copy 3 - Upon termination of action, mail this copy to Commissioner
Copy 2 - Upon filing document adding patent(s), mail this copy to Commissioner  Copy 4 - Case file copy

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MINEBEA CO LTD | CHICONY ELECTRONICS CO. LTD *FILED* |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | *03 AUG 12 P 2: 09* COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) *CLERK U.S. DISTRICT COURT SOUTHERN DIST. OF CALIF.* NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED *BY: DEPUTY* |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) BENJAMIN LEVI 919 3RD AVE, STE 1929 NEW YORK, NY 10022 212-756-2000 | ATTORNEYS (IF KNOWN) '03 CV 1614 W    RBB |

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)  FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

## 35:145 PATENT INFRINGEMENT

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (13958) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

*USDC WASHINGTON*

☐ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appelate Court  ☐ 4 Reinstated or Reopened  ☒ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See Instructions):

JUDGE _____  Docket Number _____

DATE 8/12/03